No. 23-5080

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

ROWAN FOWLER; ALLISTER HALL; and CARTER RAY,

*Plaintiffs-Appellants*,

v.

KEVIN STITT, in his official capacity as Governor of the State of Oklahoma;
KEITH REED, in his official capacity as Commissioner of Health for the
Oklahoma State Department of Health; and KELLY BAKER, in her official
capacity as State Registrar of Vital Records,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Oklahoma
No. 4:22-cv-00115-JWB-MTS (Judge John W. Broomes)

---

## PLAINTIFFS-APPELLANTS' SUPPLEMENTAL BRIEF

---

Peter C. Renn
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa St., Ste. 1260
Los Angeles, CA 90017
(213) 382-7600

Shelly L. Skeen
Nicholas J. Hite
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street, NW, Suite 4140
Washington, D.C. 20006
(202) 804-6245

Karen Keith Wilkins
1515 S. Denver Ave.
Tulsa, OK 74119
(918) 599-8118

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................1

BACKGROUND .............................................................................1

STANDARD ..................................................................................4

ARGUMENT .................................................................................5

I.     The Policy Discriminates Against Plaintiffs Based on Transgender Status and Sex.....................................................................................5

    A.    The Policy Discriminates Against Plaintiffs Based on Transgender Status. ................................................................5

    B.    The Policy Discriminates Against Plaintiffs Based on Sex. ................8

II.    The Policy Requires Heightened Scrutiny. ....................................14

III.   The Policy Cannot Be Justified Under Any Level of Scrutiny. ....................17

    A.    *Skrmetti* Does Not Alter This Court's Rational Basis Analysis. ........17

    B.    This Court Correctly Held the Policy Lacks a Rational Basis.............19

CONCLUSION ...............................................................................21

CERTIFICATE OF COMPLIANCE......................................................23

CERTIFICATE OF SERVICE .............................................................24

CERTIFICATE OF DIGITAL SUBMISSION .........................................25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Acosta v. Jani-King of Oklahoma, Inc.*,
  905 F.3d 1156 (10th Cir. 2018)............................................................................4

*Am. Ass'n of Physicians for Human Rights, Inc. v. NIH*,
  No. 8:25-cv-01620-LKG, 2025 WL 2377705 (D. Md. Aug. 14, 2025) .............13

*Bostock v. Clayton Cnty., Ga.*,
  590 U.S. 644 (2020) ........................................................................................15

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ........................................................................................19

*Clinton v. Sec. Benefit Life Ins. Co.*,
  63 F.4th 1264 (10th Cir. 2023)........................................................................14

*de la Fuente Díaz v. González Colón*,
  -- F. Supp. 3d --, 2025 WL 1549377 (D.P.R. 2025) ..................................... 19-20

*Doe v. Horne*,
  115 F.4th 1083 (9th Cir. 2024)..................................................................... 8, 15

*Doe v. Rocky Mtn. Classical Acad.*,
  99 F.4th 1256 (10th Cir. 2024)...................................................................... 4, 14

*Doe v. South Carolina*,
  No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025) .................................13

*Fowler v. Stitt*,
  104 F.4th 770 (10th Cir. 2024).................................. 6, 7, 8, 13, 15, 18, 19, 20, 21

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011)........................................................................16

*Gloucester Cnty. Sch. Bd. v. Grimm*,
  141 S. Ct. 2878 (2021) ....................................................................................11

*Griffith v. El Paso Cnty., Colo.*,
129 F.4th 790 (10th Cir. 2025)...................................................... 7-8, 9, 14, 15, 16

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020)........................................................ 11, 15

*H.R. v. Cunico*,
745 F. Supp. 3d 842 (D. Ariz. 2024)........................................... 20, 21

*Klikno v. United States*,
928 F.3d 539 (7th Cir. 2019)....................................................... 5

*Lopez v. River Oaks Imaging & Diagnostics Grp., Inc.*,
542 F. Supp. 2d 653 (S.D. Tex. 2008) ........................................ 17

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015) ...................................... 21

*Orr v. Trump*,
778 F. Supp. 3d 394 (D. Mass. 2025) .......................................... 10

*Romer v. Evans*,
517 U.S. 620 (1996) ................................................................... 7, 17

*Smith v. City of Salem*,
378 F.3d 566 (6th Cir. 2004)........................................................ 16-17

*Talbott v. United States*,
775 F. Supp. 3d 283 (D.D.C. 2025) ............................................ 10

*Tirrell v. Edelblut*,
748 F. Supp. 3d 19 (D.N.H. 2024) .............................................. 11

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025) .................................... 1, 7, 11, 12, 13, 15, 18, 19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ................................................................... 6, 7

*Vincent v. Bondi*,
127 F.4th 1263 (10th Cir. 2025).................................................... 4, 5, 16

**Statutes**

70 Okla. Stat. § 27-106 .............................................................20

**Other Authorities**

Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96
Notre Dame L. Rev. 171 (2020) .......................................................... 5

**INTRODUCTION**

This Court's opinion was correct before *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), and it remains correct after *Skrmetti*.  While *Skrmetti* had the potential to decide what level of constitutional scrutiny applies to government discrimination against transgender people, it ultimately decided far less.  That is because the Supreme Court concluded that the state law before it did not discriminate on the basis of transgender status or sex at all.  In contrast, Oklahoma's birth certificate policy (the "Policy") before this Court does.  And while *Skrmetti* accordingly had no occasion to decide the proper level of scrutiny for such discrimination, this Court did.  Applying rational basis review, *Skrmetti* held that the factual record before it connected the state law at issue with the government interests asserted.  Meanwhile, the factual allegations here plausibly established the absence of even a rational connection between the Policy and any conceivable government interest, much less the exceedingly persuasive justification required under heightened scrutiny.  Indeed, the stark juxtaposition between this case and *Skrmetti*—analyzing a fundamentally different policy triggering a different level of review and supported by different government justifications—only confirms the correctness of this Court's decision.

**BACKGROUND**

Because this Court is familiar with the background of this case, Plaintiffs

summarize it only briefly here.

Repeated life experiences ingrained in Plaintiffs Rowan Fowler, Allister Hall, and Carter Ray the significance of being able to furnish identity documents consistent with their gender identity.  When Ms. Fowler, for instance, presented identification in the past outing her as a transgender woman, she was openly denied service by a business on one occasion and attacked with a derogatory slur on another, causing her to fear for her safety whenever leaving her home for months afterwards.  A.25-30.[1]  When Mr. Hall and Mr. Ray were unable to present identity documents consistent with their gender identity, they encountered problems in interactions with financial institutions, barriers in updating other forms of identification, and interrogation from strangers questioning their identity.  A.30-37.  Each of these experiences chipped away at Plaintiffs' dignity, privacy, and security—in addition to their basic sense of belonging in the community.

Birth certificates are foundational identity documents used in an array of settings from employment to schools to government programs.  Before the events giving rise to this litigation, Oklahoma had long provided transgender people with copies of birth certificates reflecting sex designations consistent with their gender identity.  A.21 (alleging that this practice lasted for at least 14 years, if not longer).

---

[1] References to "A." are to Plaintiffs' Appendix filed on September 28, 2023.

That practice abruptly ended in 2021 after Governor Stitt learned that the state agency responsible for vital records, the Oklahoma State Department of Health (OSDH), had entered into a settlement enabling a plaintiff, whose gender identity did not match their assigned sex, to obtain an amended birth certificate with a gender-neutral designation.  A.21-22.  He then issued a public statement stating, "I believe that people are created by God to be male or female. Period."  A.22.  He "wholeheartedly condemn[ed]" the agency's settlement and vowed to take "whatever action necessary to protect Oklahoma values."  A.22.

The Governor delivered on that political promise with an Executive Order banning OSDH from providing the birth certificates at issue in this case.  A.22.  Although Plaintiffs had received state court orders to obtain amended birth certificates consistent with their male and female gender identity, A.26-27, 31, 34, OSDH denied those changes on the stated grounds that they were prohibited by the Executive Order, A.27, 31-32, 34-35.

Plaintiffs subsequently filed suit raising, in relevant part, an equal protection claim under the Fourteenth Amendment.  The district court granted Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  This Court reversed the dismissal of Plaintiffs' equal protection claim.  Defendants subsequently petitioned for rehearing en banc, which this Court denied, without a vote or noted dissent.

3

## STANDARD

This Court is familiar with the standard of review for dismissal of a complaint under Rule 12(b)(6).  "Under this standard, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party."  *Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) (quotes omitted); *see also Doe v. Rocky Mtn. Classical Acad.*, 99 F.4th 1256, 1260-61 (10th Cir. 2024) (holding that "all inferences" must be drawn in plaintiff's favor).  "There is a low bar for surviving a motion to dismiss, and a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quotes omitted).

The procedural posture of this appeal—in which the Supreme Court issued a GVR order granting *certiorari*, vacating the judgment, and remanding for further consideration in light of *Skrmetti*—does not alter this standard, nor does it indicate that the Supreme Court believed that this Court misapplied that standard.  "The remand doesn't necessarily signal a disagreement with the panel's reasoning or result."  *Vincent v. Bondi*, 127 F.4th 1263, 1264 n.1 (10th Cir. 2025).  This Court has therefore "freshly considered" the issues after a GVR order and "conclude[d] that [the new Supreme Court authority] doesn't undermine the panel's earlier

4

reasoning or result." *Id.* This Court is not alone. *See, e.g.*, *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019) (reaffirming prior decision and rejecting the premise that a GVR order creates "some kind of presumption that the result should change"). Indeed, "a healthy proportion of GVR'd judgments are, *wholly appropriately*, reinstated on remand." Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96 Notre Dame L. Rev. 171, 220 (2020). "Moreover, a GVR does not even necessarily indicate that the prior analysis has become invalid, for the new decision may turn out to be irrelevant." *Id.* A GVR order is simply "an efficient way for the Supreme Court to obtain the views of the lower courts on the effect of a new decision, whatever those views might be." *Klikno*, 928 F.3d at 544.

## ARGUMENT

This Court invited supplemental briefing on three issues: (1) whether the law at issue here involved classifications based on transgender status; (2) the proper level of scrutiny under the Equal Protection Clause of the Fourteenth Amendment; and (3) whether the allegations in the complaint meet that standard.

## I.     The Policy Discriminates Against Plaintiffs Based on Transgender Status and Sex.

### A.     The Policy Discriminates Against Plaintiffs Based on Transgender Status.

Regardless of how it is analyzed, the Policy inescapably discriminates

against Plaintiffs based on their transgender status.  While there are multiple ways
in which the Policy does so, including because its terms necessarily deprive
transgender people of birth certificates consistent with their gender identity, this
Court recognized that one long-standing avenue for establishing purposeful
discrimination is based on the totality of the relevant facts.  *Fowler v. Stitt*, 104
F.4th 770, 786 (10th Cir. 2024).  Whether an intent to discriminate was a
motivating factor for any government action "demands a sensitive inquiry into []
circumstantial and direct evidence of intent."  *Vill. of Arlington Heights v. Metro.
Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

       This Court correctly performed that "sensitive inquiry" based on the totality
of the facts alleged.  First, even if the Policy were viewed as facially neutral, there
is no question that its harm falls on one group: transgender people.  *Fowler*, 104
F.4th at 786.  Second, the events leading up to the Policy's adoption also support a
finding of discriminatory intent.  *Id.*  That includes the Governor's candid
statements about his motivation and target for his action, the abrupt reversal of a
more than decade-long predecessor policy, the exceptionally unusual defiance of
court orders, and the fiery "wholehearted[] condemn[ation]" of agency action.[2]

_____

[2] These allegations are more than sufficient to support a plausible intent to
discriminate.  And even if more were needed, that would not justify the district
court's dismissal without leave to amend.  *Cf. Fowler*, 104 F.4th at 788 (noting that

*See Vill. of Arlington Heights*, 429 U.S. at 267 (holding that departures from normal processes can indicate "improper purposes are playing a role" including when a practice "suddenly was changed").  Finally, this Court observed that the absence of any legitimate justification for the Policy left the "'inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected.'"  *Fowler*, 104 F.4th at 788 (quoting *Romer v. Evans*, 517 U.S. 620, 634 (1996)).

Nothing in *Skrmetti* affects this Court's intent analysis.  Citing *Arlington Heights*, *Skrmetti* reaffirmed that even where a law neither covertly nor overtly discriminates based on a protected characteristic, it can nonetheless be motivated by a discriminatory purpose, which "subject[s] the law to heightened review." *Skrmetti*, 145 S. Ct. at 1832.  But "[n]o such argument ha[d] been raised" in *Skrmetti*.  *Id.*  That is not the case here.  As this Court recognized, "Plaintiffs have alleged facts from which we can reasonably infer discriminatory purpose." *Fowler*, 104 F.4th at 786.

The Policy's discrimination against transgender people is also "facially apparent," which provides an independent basis for the same conclusion that this Court reached.  *Griffith v. El Paso Cnty., Colo.*, 129 F.4th 790, 811 n.12 (10th Cir.

---

additional factual allegations were needed to establish the specific connection between the Policy and the OSDH Commissioner's departure from the agency).

2025).  A policy can "discriminate on its face" even "without referring to" the characteristic at issue.  *Doe v. Horne*, 115 F.4th 1083, 1104 (9th Cir. 2024) (cleaned up).  To illustrate, "[s]tate laws defining marriage as between a man and a woman, but making no mention of sexual orientation, discriminated on their face based on sexual orientation."  *Id.*  That is because, under the law, only same-sex couples "were barred from marrying *consistent with their sexual orientation*."  *Id.* And the fact that "everyone" was barred from marrying a same-sex partner did not change the law's facially discriminatory nature.  Likewise, under the Policy here, only transgender people are denied birth certificates consistent with their gender identity.[3]  That is intentional discrimination on its face.

Whether through *Arlington Heights* framework, or through the Policy's own terms, the Policy intentionally discriminates against transgender people.

## B.    The Policy Discriminates Against Plaintiffs Based on Sex.

Even if there were no factual allegations showing an intent to discriminate based on transgender status in particular (which necessarily establishes sex

---

[3] While this Court remarked that "the Policy prevents all Oklahomans from amending their sex designations," *Fowler*, 104 F.4th at 785 n.9, the complaint alleges that transgender people, "unlike other people born in Oklahoma," lack the ability to obtain birth certificates consistent with their gender identity.  A.18. Cisgender people receive birth certificates consistent with their gender identity, which itself is sufficient to establish facial discrimination; but even if they did not (e.g., due to error), discovery may additionally confirm that OSDH policy nevertheless provided them with access to corrected certificates.

discrimination, *see infra* § II.A), the Policy would still discriminate against Plaintiffs based on sex on independent grounds. That is because, but for each Plaintiff's sex assigned at birth, each Plaintiff would have access to a birth certificate consistent with his or her gender identity. *Skrmetti* does not change that straightforward reasoning.

This Court's decision in *Griffith*, 129 F.4th at 790, provides another illustration of this same principle. There, a transgender woman alleged that a county jail policy denied her housing and access to clothing and commissary products consistent with her gender identity. Unlike the situation here, there was no factual allegation that the county sheriff had adopted the policy because, for instance, he believed that people are created by God to be male or female, or that he wished to use jail policy to express disapproval of transgender people or impress "Oklahoma values" on them. *Cf.* A.22. But none of that was necessary to this Court's analysis that heightened scrutiny nonetheless applied. Indeed, this Court recognized that the sex discrimination in the jail policy was "facially apparent" because a transgender woman is denied housing and commissary products designated for females, whereas a cisgender woman is not, based on her sex assigned at birth. 129 F.4th at 811 n.12. That is—without more—"necessarily discriminating on the basis of sex." *Id.*

The same is true here: Plaintiffs have alleged that the Policy mandates that a

transgender woman is denied a female-designated birth certificate, whereas a

cisgender woman is not, based on her sex assigned at birth.  A.11.  That, too,

necessarily discriminates based on sex.  And it would do so even if the Governor

had never explained that the basis for his Executive Order was his disapproval of

transgender people.  Defendants do not disagree.  In their own words, "the birth

certificate law at issue here … classif[ies] individuals based on biological or birth

sex."[4]  Dist. Ct. ECF 24 at 20.

Other courts have adopted similar reasoning as this Court, holding that

policies discriminated based on sex because the plaintiffs would have avoided the

discrimination at issue had they been assigned a different sex at birth.  *See, e.g.*,

*Orr v. Trump*, 778 F. Supp. 3d 394, 410 (D. Mass. 2025) ("The differential

treatment—in whether the applicant can obtain a passport with a sex marker that

reflects their gender identity—is entirely dependent on the applicant's sex assigned

at birth."); *Talbott v. United States*, 775 F. Supp. 3d 283, 316 (D.D.C. 2025)

(holding that military ban discriminated against plaintiffs based on sex because a

transgender woman, who is assigned male at birth, is penalized for a female gender

---

[4] Notably, Defendants have also taken this position despite their claim that
Oklahoma statutes forbid OSDH from providing transgender people with birth
certificates consistent with their male or female gender identity.  In other words,
even if the Executive Order did not exist, Defendants' position is that Oklahoma
statutes themselves still classify Plaintiffs based on sex in denying them birth
certificates matching their gender identity.

identity that would be tolerated in a cisgender woman, who is assigned female at birth); *Tirrell v. Edelblut*, 748 F. Supp. 3d 19, 36 (D.N.H. 2024) (explaining that state law discriminated based on sex because whether a student with a female gender identity would be barred from girls' soccer tryouts turned on her sex assigned at birth); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 615 (4th Cir. 2020) (holding that school board discriminated against transgender plaintiff by denying him school records consistent with his gender identity, because "[u]nlike students whose gender matches their sex-assigned-at-birth, Grimm is unable to obtain a transcript indicating that he is male"), *cert. denied*, 141 S. Ct. 2878 (2021).

Nothing in *Skrmetti* undermines this Court's reasoning for how to detect sex discrimination. If anything, *Skrmetti* supports it. *Skrmetti* held that the Tennessee law at issue (SB1), which barred gender-affirming care for minors, did not discriminate on the basis of sex. The reason, according to *Skrmetti*, is because changing only the minor's assigned sex would not be sufficient to change the outcome; rather, it also required changing the medical condition being treated. It compared the example of a transgender boy (whose assigned sex is female) who is barred from taking puberty blockers to treat gender dysphoria with the example of a cisgender boy (whose assigned sex is male) who is able to take puberty blockers under the law. 145 S. Ct. at 1830. But it held that the cisgender boy *also* needed a

qualifying diagnosis, like precocious puberty, to receive puberty blockers under the law.  Thus, merely changing a minor's assigned sex did not change the outcome in *Skrmetti*.

*Skrmetti* illustrated the same point using the example of a transgender boy seeking testosterone for gender dysphoria.  "If you change his biological sex from female to male, SB1 would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone—such as a congenital defect, precocious puberty, disease, or physical injury."  *Id.* at 1834.  Thus, the Court held that his sex was not "the but-for cause of his inability to obtain testosterone."  *Id.* In other words, two variables would have to change—*both* the patient's assigned sex *and* the medical condition for which treatment is sought—to change the outcome under Tennessee law.  *Cf. id.* (explaining that the court must "change one thing at a time and see if the outcome changes" to ascertain if a but-for cause exists) (quotes omitted).

Here, however, changing only Plaintiffs' assigned sex changes whether they receive a birth certificate consistent with their gender identity.  This Court recognized that reasoning in its prior opinion: "Take Ms. Fowler, for example. If her sex were different (i.e., if she had been assigned female at birth), then the Policy would not deny her a birth certificate that accurately reflects her identity. So too for Mr. Hall and Mr. Ray—had they been assigned male at birth, the Policy

would not impact them.  Thus, the Policy intentionally treats Plaintiffs differently because of their sex assigned at birth." *Fowler*, 104 F.4th at 789.  In contrast to *Skrmetti*, there is no second variable that must be changed to change the outcome under the Policy.  Changing Plaintiffs' assigned sex is sufficient.

The Fourth Circuit has confirmed that this reasoning remains in full force after *Skrmetti*.  *See Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *8 & n.11(4th Cir. Aug. 15, 2025) (holding that a school policy that banned transgender boy from boy's restroom based on his sex assigned at birth likely violated equal protection in light of *Grimm*, which "remains the law of this Circuit" and had not been abrogated by the Supreme Court); *id.* at *10 (Diaz, J., concurring) (explaining that *Skrmetti* "has little to say about the issues *Grimm* addressed"); *see also Am. Ass'n of Physicians for Human Rights, Inc. v. NIH*, No. 8:25-cv-01620-LKG, 2025 WL 2377705, at *8 (D. Md. Aug. 14, 2025) (affirming that *Grimm* remains good law after *Skrmetti*).

The Policy also does not merely "reference" sex—it imposes a *burden* on Plaintiffs based on their assigned sex: the deprivation of access to a birth certificate consistent with their gender identity.  To be sure, *Skrmetti* clarified that a law's "mere reference to sex" is not sufficient under existing precedent to constitute sex discrimination warranting heightened scrutiny.  145 S. Ct. at 1829.  But that is not the situation here.  The Policy does not "merely classify" people based on assigned

13

sex in, say, an internal government database. The Policy deprives Plaintiffs of their ability to present copies of their birth certificates consistent with their gender identity while navigating life, which others are afforded.

## II.    The Policy Requires Heightened Scrutiny.

The Policy requires heightened scrutiny because it discriminates against Plaintiffs based on sex. As explained above, it does so by discriminating based on transgender status, *supra* § I.A, which necessarily entails discrimination based on sex,[5] and by discriminating based on assigned sex itself, *supra* § I.B. Sex discrimination demands heightened scrutiny. *Doe*, 99 F.4th at 1259 ("Intermediate scrutiny is not a new standard, and its application is clear in both Supreme Court and Tenth Circuit precedent: courts must evaluate sex-based classifications under intermediate scrutiny."). And there is not—and should not be—an exception to that general rule merely because transgender people are the ones on its receiving end.

First, Plaintiffs have plausibly alleged that Defendants intentionally targeted transgender people for discrimination, and as *Bostock* explained, "it is impossible

---

[5] Discrimination against transgender people also exhibits all the indicia of a suspect or quasi-suspect classification, for reasons that Plaintiffs have previously briefed, and warrants heightened scrutiny on that basis as well. Pls. Br. at 26-31. *Griffith* has also now confirmed that the issue remains open for resolution. 129 F.4th at 813 n.15 (discussing existing circuit precedent).

14

to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 660 (2020).  Nothing in *Skrmetti* changes the correctness of this Court's application of *Bostock* to the Equal Protection Clause.  *Fowler*, 104 F.4th at 788-94; *see also Doe*, 115 F.4th at 1107 (applying *Bostock* to hold that sports ban discriminated against transgender females based on sex); *Grimm*, 972 F.3d at 616-17 (applying *Bostock* to hold that school restroom policy discriminated against transgender plaintiff based on sex under Title IX).  Because the Supreme Court held that there was no discrimination based on transgender status in *Skrmetti* at all, it had no occasion to decide that issue.  145 S. Ct. at 1834 ("We have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context, and we need not do so here.").  At the same time, as explained *supra*, § I.B, *Skrmetti*'s analysis for detecting the existence of sex discrimination nonetheless bears a striking resemblance to *Bostock*'s analysis.  And as this Court explained, *Bostock* provides a "commonsense explanation for how to detect a sex-based classification." *Fowler*, 104 F.4th at 790-91.

Moreover, another panel of this Court agreed with the logic of applying *Bostock* to the Equal Protection Clause in *Griffith*, which itself requires application of heightened scrutiny here.  129 F.4th at 811-12.  *Griffith* remains binding circuit

precedent after *Skrmetti*.[6]  In another case where the Supreme Court issued a GVR

order granting certiorari, vacating this Court's opinion, and remanding in light of a

new Supreme Court decision, this Court held that the new decision did not

"indisputably and pellucidly abrogate[]" Tenth Circuit precedent from another

case, which remained good law.  *Vincent*, 127 F.4th at 1264.  That GVR order was

not enough to do so.  Here, as well, the GVR order does not "indisputably and

pellucidly" abrogate this Court's precedent in *Griffith*.  And, in any event,

*Griffith*'s analysis is persuasive at a minimum to this Court.

Second, even setting *Bostock* to one side, discrimination against any

person—regardless of gender identity—because of their sex assigned at birth (or

what Defendants refer to as biological sex) requires heightened scrutiny, and there

is no principled basis for carving out transgender people from that general rule.

Courts recognized an analogous point in the context of protections against sex

stereotyping, which apply to everyone and cannot be gerrymandered to exclude

transgender people from their scope.  *See Glenn v. Brumby*, 663 F.3d 1312, 1318-

19 (11th Cir. 2011) ("All persons, whether transgender or not, are protected from

discrimination on the basis of gender stereotype. … Because these protections are

afforded to everyone, they cannot be denied to a transgender individual."); *Smith v.*

---

[6] Defendants in *Griffith* have obtained an extension until October 7, 2025 to file a
petition for a writ of certiorari.

*City of Salem*, 378 F.3d 566, 574-75 (6th Cir. 2004) ("*Price Waterhouse* … does not make Title VII protection against sex stereotyping conditional or provide any reason to exclude Title VII coverage for non sex-stereotypical behavior simply because the person is a transsexual"); *Lopez v. River Oaks Imaging & Diagnostics Grp., Inc.*, 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008) ("There is nothing in existing case law setting a point at which a man becomes *too* effeminate, or a woman becomes *too* masculine, to warrant protection").  Indeed, to hold otherwise—and selectively withdraw universal protections from discrimination afforded to everyone else—would be "a denial of the equal protection of the laws in the most literal sense."  *Romer*, 517 U.S. at 633.  In other words, if discrimination based on assigned sex triggers heightened scrutiny for cisgender people, the same must hold true for transgender people as well.

## III.    The Policy Cannot Be Justified Under Any Level of Scrutiny.

Nothing in *Skrmetti* changes this Court's analysis that Plaintiffs had plausibly alleged that the Policy cannot survive any level of constitutional scrutiny. And because the Policy fails even rational basis review, it necessarily cannot survive heightened scrutiny either.

### A.    *Skrmetti* Does Not Alter This Court's Rational Basis Analysis.

As a threshold matter, *Skrmetti* did not break any new ground on the legal standard for rational basis review, and this Court hewed to that well-established

standard when applying it to the facts alleged here.  For instance, *Skrmetti*

confirmed that the question under rational basis review is whether there is any

reasonably conceivable set of facts that can justify the law at issue.  145 S. Ct. at

1835.  This Court did too.  *Fowler*, 104 F.4th at 794 (holding that plaintiffs must

negative every conceivable basis).  *Skrmetti* also confirmed that rational basis

review does not require mathematical nicety in government line-drawing.  145 S.

Ct. at 1836.  This Court recognized the same.  *Fowler*, 104 F.4th at 794

(recognizing that there can be rational solutions to problems that are underinclusive

or overinclusive).  *Skrmetti* further declined to second-guess the lines drawn by the

state.  145 S. Ct. at 1836.  This Court likewise acknowledged its limited role under

rational basis review.  *Fowler*, 104 F.4th at 795 ("the proposed justification 'is not

subject to courtroom fact-finding and may be based on rational speculation'").

The justification that *Skrmetti* found sufficient to satisfy rational basis

review was also limited to the specific context of gender-affirming medical care

for minors.  The Court focused on particular medical treatments—puberty blockers

and hormones—for a particular population and purpose—minors seeking treatment

for gender dysphoria.  145 S. Ct. at 1835-37 (pointing to legislative findings

regarding fertility, disease, and minors' capacity to engage in medical decision-

making).  That justification is far afield from providing a rational basis for the

Policy here about whether "male" or "female" is listed on Plaintiffs' birth

certificates.  And while *Skrmetti* had a fully developed factual record before it, this case remains at the pleading stage.

For purposes here, *Skrmetti* is more instructive for the examples it cited of laws that did *not* survive rational basis review, rather than the Tennessee law that survived such review.  That included *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985), where *Skrmetti* noted that the "record did not reveal any rational basis for [the] city zoning ordinance."  145 S. Ct. at 1836.  And it included *Romer*, where *Skrmetti* noted that the "sheer breadth" of the law was "so discontinuous with the reasons offered for it that the [law] seem[ed] inexplicable by anything but animus toward the class it affect[ed]."  145 S. Ct. at 1836.  This Court similarly applied this precedent in its rational basis analysis here.  *Fowler*, 104 F.4th at 788.

### B.    This Court Correctly Held the Policy Lacks a Rational Basis.

A fatal defect cutting across all potential rationales for the Policy is the absence of a rational *connection* between the Policy and any interest.  That connection is severed, at the very least, by Oklahoma's retention of original certificates.  *Fowler*, 104 F.4th at 795.  Whatever interest exists in those documents, Oklahoma continues to have access to them, just as it did during the many years preceding the Policy, and just as it does for other types of alterations apart from sex that are made to birth certificates.  *Id.*; *see also de la Fuente Díaz v.*

19

*González Colón*, -- F. Supp. 3d --, 2025 WL 1549377, at *8 (D.P.R. 2025)

(agreeing with this Court's rational basis analysis and noting that "the

Commonwealth already has existing processes in place to retain original birth

certificates in cases where a birth certificate has been subsequently amended");

*H.R. v. Cunico*, 745 F. Supp. 3d 842, 852 (D. Ariz. 2024) (rejecting government's

justification for refusing to provide amended birth certificates because amendment

does not destroy the original).  This reality eviscerates any connection between the

Policy and a purported interest in having an accurate record of Plaintiffs' assigned

sex, for instance.  Nothing in *Skrmetti* changes the correctness of this Court's logic

on that front.

Similarly, this Court correctly held that the Policy does not rationally further

an interest in protecting women.  To the extent that Defendants seek to exclude

transgender female students from participating in girls' athletics, Oklahoma relies

on affidavits—not birth certificates—to achieve its goal.  *Fowler*, 104 F.4th at 796

(citing 70 Okla. Stat. § 27-106).  The Policy adds nothing.  On this point, as well,

*Skrmetti* is silent.

Finally, this Court considered other possible interests—including fraud

prevention and resource conservation—but it could not conceive of how the Policy

would rationally further those interests.  *Fowler*, 104 F.4th at 796-97.  Nothing in

*Skrmetti* provides fresh illumination of a rational connection that this Court was

20

unable to discern.

It is particularly revealing that Defendants cannot justify the Policy by arguing that it advances the very purpose for which identity documents exist in the first place: identity verification. That is because the Policy actively undermines that goal. A.20. When a transgender woman like Ms. Fowler attempts to prove that she is the person reflected on her birth certificate, and yet that document indicates the certificate holder is male, that discordance impedes the goal of verifying her identity. In these situations, when transgender people "furnish their [identity document] to third-persons for purposes of identification, the third-person is likely to conclude that the furnisher is not the person described on the [identity document]." *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (quotes omitted); *H.R.*, 745 F. Supp. 3d at 852 (recognizing that identity documents discordant with one's gender identity "would be misleading and likely unhelpful in accurately verifying identity"). What possible reason could cause Oklahoma to adopt an identity document policy that affirmatively undermines the very reason for identity documents? As this Court observed, "the Policy 'seems inexplicable by anything but animus toward' transgender people." *Fowler*, 104 F.4th at 788.

## CONCLUSION

For the foregoing reasons, this Court should reaffirm its prior opinion.

Dated: September 2, 2025

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street, NW, Suite 4140
Washington, D.C. 20002
(202) 804-6245

Shelly L. Skeen
Nicholas J. Hite
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

Respectfully submitted,

/s/ Peter C. Renn
Peter C. Renn
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa St., Ste. 1260
Los Angeles, CA 90017
(213) 382-7600

Karen Keith Wilkins
1515 S. Denver Ave.
Tulsa, OK 74119
(918) 599-8118

**CERTIFICATE OF COMPLIANCE**

This brief complies with the Court's August 6, 2025 Order, because it is no longer than 25 pages.

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and 10th Cir. R. 32 because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on September 2, 2025.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made;

(2) no paper copies of this document are required per the Court's August 6, 2025

Order; and (3) the electronic submission was scanned this document for viruses

using Microsoft Defender and, according to that program, this document is virus

free.

/s/ Peter C. Renn           
Counsel for Plaintiffs-Appellants
