No. 23-5080

ROWAN FOWLER, *et al.*,

*Plaintiffs-Appellants*,

v.

KEVIN STITT, in his official capacity as Governor of the State of Oklahoma, *et al.*,

*Defendants-Appellees.*

On appeal from the United States District Court
for the Northern District of Oklahoma
The Hon. John W. Broomes
No. 4:22-cv-00115-JWB-MTS

## Supplemental Brief for the State of Oklahoma

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................2

ARGUMENT .............................................................................................................6

    I.    PLAINTIFFS OMIT THE STANDARD FOR A GVR AND WRONGLY ACCUSE
        THE STATE OF DISREGARDING STATE LAW. ............................................6

    II.   UNDER THE *SKRMETTI* ANALYSIS, OKLAHOMA'S BIRTH CERTIFICATE
        POLICY DOES NOT DISCRIMINATE BASED ON TRANSGENDER STATUS. ............8

    III.UNDER THE *SKRMETTI* ANALYSIS, OKLAHOMA'S BIRTH CERTIFICATE
        LAW IS SUBJECT ONLY TO RATIONAL BASIS REVIEW. ...........................16

    IV. UNDER THE *SKRMETTI* ANALYSIS, OKLAHOMA'S BIRTH CERTIFICATE
        POLICY CLEARLY SURVIVES RATIONAL BASIS REVIEW. .........................20

CONCLUSION .........................................................................................................25

CERTIFICATE OF COMPLIANCE .................................................................................27

CERTIFICATE OF DIGITAL SUBMISSION .....................................................................27

CERTIFICATE OF SERVICE ........................................................................................27

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)............................................................................... 8, 10

*Bostock v. Clayton County,*
 590 U.S. 644 (2020).......................................................................3, 4, 19, 20

*Cleburne v. Cleburne Living Ctr., Inc.,*
 473 U.S. 432 (1985)...................................................................................18

*Doe v. Horne,*
 115 F.4th 1083 (9th Cir. 2024) ..................................................................16

*FCC v. Beach Commc'ns, Inc.,*
 508 U.S. 307 (1993)........................................................................21, 22, 24

*Fowler v. Stitt,*
 104 F.4th 770 (10th Cir. 2024) .....................3, 8, 9, 10, 11, 12, 13, 14, 15, 18, 21, 23, 24

*Gore v. Lee,*
 107 F.4th 548 (6th Cir. 2024) .........................................4, 5, 12, 16, 23, 24, 26

*Griffith v. El Paso County,*
 129 F.4th 790 (10th Cir. 2025) ..................................................................19

*Grzegorczyk v. United States,*
 142 S. Ct. 2580 (2022) ................................................................................6

*Kan. Jud. Rev. v. Stout,*
 519 F.3d 1107 (10th Cir. 2008) ...................................................................8

*Kennedy v. Bremerton Sch. Dist.,*
 597 U.S. 507 (2022)...................................................................................14

*Lawrence v. Chater,*
 516 U.S. 163 (1996)............................................................................. 1, 6, 7

*Little v. Hecox,*
 145 S. Ct. 2871 (2025) ..............................................................................16

*Pers. Adm'r of Massachusetts v. Feeney,*
 442 U.S. 256 (1979)............................................................................. 12, 21

*Pino v. United States,*
 507 F.3d 1233 (10th Cir. 2007) ...................................................................8

*Poe v. Drummond,*
 No. 23-5110, --- F.4th ----, 2025 WL 2238038 (10th Cir. Aug. 6, 2025) ......15

*R.R. Ret. Bd. v. Fritz,*
 449 U.S. 166 (1980)...................................................................................21

*Stitt v. Fowler,*
 145 S. Ct. 2840 (2025) ...............................................................................1, 5

*United States v. Skrmetti,*
 145 S. Ct. 1816 (2025) ............................................. 1, 2, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15,
               17, 18, 19, 20, 21, 22, 25, 26

*United States v. Virginia*,
    518 U.S. 515 (1996) ..................................................................9
*Vincent v. Bondi*,
    127 F.4th 1263 (10th Cir. 2025) ......................................6, 7
*Wellons v. Hall*,
    558 U.S. 220 (2010) ..................................................................6
*West Virginia v. B.P.J.*,
    No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025) .........16

## Statutes

63 O.S. § 1-311 .............................................................10, 12, 16
63 O.S. § 1-316 ......................................................................21, 22
63 O.S. § 1-321 ..............................................................................22

## Constitutional Provision

OKLA. CONST. art. VI, § 8 ........................................................13

## Other Authorities

Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*,
    96 NOTRE DAME L. REV. 171 (2020) ..................................6

Decl. of Independence (U.S. 1776) ..........................................14

*Matthew* 19:4
    (ESV) .........................................................................................14

**INTRODUCTION**

On June 18, 2025, the U.S. Supreme Court issued its much-anticipated decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). In evaluating the appeal of a preliminary injunction, *Skrmetti* ruled against Lambda Legal and held that "a Tennessee law banning certain medical care for transgender minors" was subject only to rational basis review and did not violate the Equal Protection Clause. *Id.* at 1824, 1829. "[Q]uestions regarding its policy," the Court explained, should be decided by "the people, their elected representatives, and the democratic process." *Id.* at 1837. Soon after, the Supreme Court granted Oklahoma's petition for certiorari here, vacated this Court's judgment, and remanded "for further consideration in light of … *Skrmetti*." *Stitt v. Fowler*, 145 S. Ct. 2840 (2025).

After losing decisively, Lambda Legal now claims there is a "stark juxtaposition between this case and *Skrmetti*," which analyzed "a fundamentally different policy triggering a different level of review and supported by different government justifications." Plaintiffs' Suppl. Brief ("Pls. Supp.") at 1. This strains credulity. A hot-off-the-presses Supreme Court opinion involving Lambda Legal, transgender plaintiffs, and the Equal Protection Clause will obviously affect a pending case involving Lambda Legal, transgender plaintiffs, and the Equal Protection Clause. And the Supreme Court would not have granted certiorari and remanded if *Skrmetti* were "fundamentally" different. Rather, it issues a GVR when there is a "reasonable probability" the outcome may change. *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam).

*Skrmetti* counsels for the State here. The Supreme Court rejected Lambda Legal's argument that Tennessee's law "classifies on the basis of sex because its prohibitions reference sex." 145 S. Ct. at 1829. Indeed, the Supreme Court "has never suggested that mere reference

to sex is sufficient to trigger heightened scrutiny." *Id.* But all Oklahoma's policy does here is identify and reference sex. And if a "Tennessee law banning certain medical care for transgender minors" does not discriminate based on transgender status, *id.* at 1824, then it is highly implausible that merely recording sex at birth and declining to alter it later discriminates on transgender status. This is especially so given that *Skrmetti* used the phrase "biological sex" over a dozen times. If the Supreme Court can recognize biological sex, why can't Oklahoma?

Finally, *Skrmetti* held that when "plausible reasons" support a governmental action, "our inquiry is at an end," and courts must not "second-guess the lines" states draw. *Id.* at 1835–36. This Court should apply that deferential standard here and uphold Oklahoma's constitutional practice of documenting biological sex on birth certificates.

## **BACKGROUND**

In relevant part, the court below held that "the content of a birth certificate constitutes government speech which does not implicate the First Amendment." P.A. 57.[1] The court then held that Oklahoma's declining to change sex to gender identity on birth certificates does not discriminate against a suspect class for equal protection purposes, and it applied rational basis review. Under that review, the court held that Oklahoma's approach to birth certificates furthers at least two legitimate interests: (1) protecting the integrity of vital records, and (2) using those records to protect the interests of women. P.A. 86–90.

In so holding, the court observed that "Plaintiffs do not directly challenge the applicable Oklahoma statute and regulations." P.A. 50 n.4. Plaintiffs chose instead to "contend

---

[1] As with the State's original response, citations to appendices will take this form: P.A. # (Plaintiffs-Appellants' Appendix) or D.A. # (Defendants-Appellees' Appendix).

that Oklahoma law has affirmatively granted transgender people the right to amend their sex designation on a birth certificate since at least 2007." *Id.* The court dismissed this because "the Oklahoma legislature only authorized the Commissioner of Health to amend birth certificates in the situations specifically set forth in the statute and the regulations." *Id.* And, as a legal matter, "[n]either the statute nor the regulations authorize the Commissioner to amend the sex designation." P.A. 51 n.4. "As such, Defendants' enforcement of Oklahoma law would only be unconstitutional if the underlying law is unconstitutional." *Id.*

Represented by Lambda Legal, Plaintiffs appealed to this Court. By discarding their First Amendment claim on appeal, Plaintiffs effectively conceded that "the content of a birth certificate constitutes government speech which does not implicate the First Amendment." P.A. 57. Once again, Plaintiffs framed their case as a challenge against an executive policy of the Governor, rather than an Oklahoma law. In a published opinion, this Court reversed on equal protection grounds. *Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024).

To begin, this Court wrote that "[a]t this stage, we must accept ... that the Policy, not Oklahoma law, prevents Plaintiffs from obtaining amended birth certificates." *Id.* at 776 n.3. On equal protection, this Court analyzed whether Oklahoma's approach discriminates based on transgender status. Recognizing that the policy is facially neutral, this Court inferred discriminatory intent on three grounds: (1) a "disparate impact on transgender people"; (2) "the events leading up to the Policy's adoption"—mostly, an acknowledgement of God as Creator of the sexes by Governor Kevin Stitt; and (3) an "inability to proffer a legitimate justification for the Policy." *Id.* at 786–88. Furthermore, the Court held that, under *Bostock v. Clayton County*, 590 U.S. 644 (2020), because Oklahoma "discriminates based on transgender

status, it necessarily discriminates on the basis of sex as well." *Id.* at 788.[2] Finally, this Court held that Oklahoma's decision not to replace sex on a birth certificate was irrational because, among other things, the State did not maintain the same policy for driver's licenses and Oklahoma maintains a copy of the original certificate. *Id.* at 794–97.

Several weeks later, the Sixth Circuit reached the opposite conclusion in *Gore v. Lee*, 107 F.4th 548 (6th Cir. 2024). There, with Chief Judge Sutton writing, the Sixth Circuit affirmed a dismissal of a Lambda Legal challenge to Tennessee's refusal to alter sex on birth certificates. The Sixth Circuit held that: (1) Tennessee had not discriminated on sex; (2) transgender individuals are not a suspect class and rational basis review applies; and (3) "[a]mple legitimate explanations support Tennessee's amendment policy," including "[t]racking the biological sex of infants" to aid public health, "maintaining a consistent, historical, and biologically based definition of sex," and "protect[ing] the integrity and accuracy of … vital records." *Id.* at 560–61 (citation omitted).

In *Gore*, Lambda Legal invoked this Court's opinion to "insist that Tennessee can maintain this original information but still must issue an amended birth certificate for a citizen's 'own use.'" *Id.* at 561. "With respect," the Sixth Circuit responded, "this approach misunderstands rational basis review. That deferential standard does not require States to show that a classification is the only way, the best way, or even the most defensible way to achieve their interests." *Id.* Rather, rational basis review "requires only that some plausible reason

---

[2] Judge Hartz dissented from this holding because *Bostock* "addressed an employment claim under Title VII, not a challenge to a generally applicable law under the Equal Protection Clause." *Id.* at 801 (Hartz, J., dissenting in part). Given that Oklahoma's approach was facially neutral, he would have held that Plaintiffs did not sufficiently plead a sex-discrimination case.

supports the classification, no matter how imprudent or ineffective." *Id.* (cleaned up). In the end, "Tennessee, like all States, records a fact of birth: the biological sex of the child. A policy requiring an error before changing that record rationally correlates with the State's interest in consistency and historical accuracy." *Id.* Lambda Legal did not appeal *Gore* to the Supreme Court. Thus, Kentucky, Michigan, Ohio, and Tennessee—home to around 33 million people—are free to decline sex amendments to their birth certificates.

Meanwhile, in *Skrmetti*, Lambda Legal was making many of the same arguments as here: it claimed the Tennessee law there, which prohibited certain medical procedures for transgender minors, "is a classic sex classification," "discriminates against minors because they are transgender," "triggers heightened scrutiny," and "cannot survive any standard of review." Brief for Respondents in Support of Petitioner, *United States v. Skrmetti*, No. 23-477, 2024 WL 4003791, at *18, *20, *37. On June 18, 2025, the U.S. Supreme Court rejected those arguments. Tennessee's law does not classify based on sex or transgender status, the Court held, and it "clearly" survives rational basis review. *Skrmetti*, 145 S. Ct. at 1835. Soon after, the Supreme Court granted Oklahoma's petition for certiorari in the present case, vacated this Court's judgment, and remanded "in light of … *Skrmetti*." *Stitt*, 145 S. Ct. at 2840.

On remand, this Court has invited the parties to address: "1) Whether the law at issue here involved classifications based on transgender status; 2) The proper level of scrutiny under the Equal Protection Clause of the Fourteenth Amendment; and 3) Whether the allegations in the complaint meet that standard." Order, Doc. 119 (August 6, 2025). After *Skrmetti*, this Court should find that the law does not classify based on transgender status, rational basis review is appropriate, and Oklahoma's law is rational.

**ARGUMENT**

I. **PLAINTIFFS OMIT THE STANDARD FOR A GVR AND WRONGLY ACCUSE THE STATE OF DISREGARDING STATE LAW.**

Several preliminary matters merit discussion. Perhaps most significantly, Lambda Legal omits the standard underlying the Supreme Court's decision to GVR (Grant, Vacate, and Remand) a case. Although a "remand doesn't necessarily signal a disagreement with the panel's reasoning or result," Pls. Supp. at 4 (quoting *Vincent v. Bondi*, 127 F.4th 1263, 1264 n.1 (10th Cir. 2025)), that is not the end of the story. Rather, the Supreme Court has repeatedly held that a GVR is appropriate only when there is "a **reasonable probability** that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination **may determine the ultimate outcome of the litigation**." *Lawrence*, 516 U.S. at 167 (emphases added); *see also Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001) (same); *Wellons v. Hall*, 558 U.S. 220, 225 (2010) (per curiam) ("the standard . . . remains as it always has been"); *Grzegorczyk v. United States*, 142 S. Ct. 2580, 2587 (2022) (Sotomayor, J., dissenting from the denial of a GVR order) ("All [justices] agree that a GVR order is inappropriate when the outcome plainly would not change on remand."). This standard is even discussed in Plaintiffs' cited sources. *See, e.g.*, Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96 NOTRE DAME L. REV. 171, 220 (2020) ("[T]he Supreme Court's standard . . . is that there is a 'reasonable probability' that the intervening development would influence the lower court and 'may' change the judgment." (quoting *Lawrence*, 516 U.S. at 167)).

Thus, with its GVR here, the Supreme Court believes that there is a "reasonable probability" that this Court will reject a prior premise that is substantial enough to potentially

change "the ultimate outcome of the litigation." *Lawrence*, 516 U.S. at 167. Phrased differently, the GVR is "a direction" to this Court "to reassess the validity" of the earlier opinion. *Vincent*, 127 F.4th at 1264 n.1. That is more significant than Plaintiffs let on. If nothing else, the GVR undermines Lambda Legal's contention that *Skrmetti* is "fundamentally" distinguishable. Pls. Supp. 1. Regardless of how *Skrmetti* differs from this case, the Supreme Court identified a "reasonable probability" that *Fowler*'s equal protection reasoning and outcome could change based on *Skrmetti*. The standard cannot be ignored.

Rather than engaging with the governing standard, Plaintiffs focus on distractions. For instance, Lambda Legal blasts the State's "exceptionally unusual defiance of court orders." Pls. Supp. at 6. This claim is misleading. As Oklahoma has explained—and as the district court recognized—nothing in Oklahoma law authorizes changing sex on a birth certificate to gender identity. *See* P.A. 50–51 n.4; Brief of Appellees at 10–11 (Nov. 13, 2023). The only reason some individuals obtained such orders was by misusing the non-adversarial procedure for name changes. *See* 12 O.S. § 1631 ("Right to Petition for Change of Name"). Despite a lack of State involvement or prior notice, the State Department of Health complied for years. P.A. 47; D.A. 21. But that does not make the orders valid, legally. What is "exceptionally unusual" here is not the State's position, but rather Plaintiffs' effort to persuade federal courts to enforce baseless state court orders. The district court correctly refused, holding that Plaintiffs "must seek enforcement from the court(s) that issued the orders." P.A. 52 n.5.

If Plaintiffs truly believed in the validity of the orders, it would not have been difficult to raise the issue in Oklahoma courts. Instead, they have chosen to wield the orders in federal court as a rhetorical cudgel. Perhaps it is time, then, for Plaintiffs' overwrought language to be

tested. A central dispute has been whether the barrier arises from Oklahoma law itself or the Governor's policy. The district court found that Oklahoma law, as a matter of law, did not allow the changes Plaintiffs seek. P.A. 50–51 n.4. This Court, though, stated it must "accept as true that the Policy, not Oklahoma law, prevents Plaintiffs from obtaining amended birth certificates." *Fowler*, 104 F.4th at 776 n.3. Oklahoma respectfully disagrees. Courts must accept as true only factual allegations, not legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And what "Oklahoma law[] prevents," *Fowler*, 104 F.4th at 776 n.3, is surely a legal conclusion.

Given Plaintiffs' continued emphasis on state court orders, the State suggests that this Court could certify, to the Oklahoma Supreme Court, the question of whether Oklahoma law permits a party to change the sex on birth certificates to gender identity as Plaintiffs seek here. *See Kan. Jud. Rev. v. Stout*, 519 F.3d 1107, 1120 (10th Cir. 2008) ("[A] federal court may certify a state-law issue sua sponte."). The Oklahoma Supreme Court's answer to this question would assist in resolving the dispute, *see Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007) (discussing certification standards under Oklahoma law), especially given that Plaintiffs' arguments in support of discriminatory intent focus on the Governor and not the Legislature. Certification could also resolve thorny questions relating to redressability. (What happens, for example, if Plaintiffs prevail against the Governor but Oklahoma law still stands in the way?) Thus, this Court should consider certifying this question to the Oklahoma Supreme Court.

## II. UNDER THE *SKRMETTI* ANALYSIS, OKLAHOMA'S BIRTH CERTIFICATE POLICY DOES NOT DISCRIMINATE BASED ON TRANSGENDER STATUS.

In *Skrmetti*, the Supreme Court held that Tennessee's law did not discriminate based on transgender status. That holding is important here. If a law that expressly "bann[ed] certain medical care for transgender minors," 145 S. Ct. at 1824, does not discriminate based on

transgender status for purposes of equal protection, then how could a law (or policy) be discriminatory that merely identifies biological sex at birth and maintains it on a government record? Logically, it cannot. There is no way in which Oklahoma's facially neutral birth certificate approach classifies based on transgender status when the law in *Skrmetti* does not.

Supporting this further is the Supreme Court's use of the phrase "biological sex" over a dozen times. For example, *Skrmetti* explained that "transgender" means a person's "gender identity does not align with their biological sex." *Id.* And the dissent acknowledged "that there are 'biological differences between men and women.'" *Id.* at 1879 (Sotomayor, J., dissenting). This Court, on the other hand, took "no position on the correct way to define sex," it quoted Plaintiffs for the proposition that there is a "medical consensus that gender identity is innate" and "has biological underpinnings," and it accepted as true the allegation that Plaintiffs' biological sex marker was "no longer accurate" because it did not match their gender identity. *Fowler*, 104 F.4th at 775–76 & n.2, 787. It is difficult to reconcile these approaches, even accounting for differing postures. The State is unaware of any authority indicating that a court must accept as true allegations that contradict a fundamental reality the Supreme Court has recognized for decades. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women . . . are enduring" and "remain cause for celebration[.]"); *Skrmetti*, 145 S. Ct. at 1856 (Alito, J., concurring in part and in the judgment) ("What those cases have always meant by 'sex' is the status of having the genes of a male or female."). Not every allegation couched as a "fact" must be accepted, as jurists must "draw on [their] judicial experience and common sense" in evaluating plausibility. *Iqbal*, 556 U.S. at 679. Even this Court later acknowledged in the now-vacated opinion, albeit in some tension with its earlier

statements, that "binding Supreme Court precedent recognizes 'biological differences between men and women.'" *Fowler*, 104 F.4th at 793.

Regardless, the more critical point is this: if the Supreme Court can recognize and discuss biological sex, why can't Oklahoma? How is it that the highest court in the land can identify (and celebrate) biological realities, and yet for Oklahoma to do so in a limited fashion—merely maintaining a biological sex marker on a government document—constitutes discrimination in violation of the Equal Protection Clause? It is nigh impossible to harmonize Plaintiffs' demand here with the Supreme Court's approach and language in *Skrmetti*. If it is rational to recognize and celebrate biological differences, as the Supreme Court has held, and it is not discrimination to regulate medical procedures for transgender individuals, then surely it is not discriminatory to document biological sex on a birth certificate.

Under *Skrmetti*, how a law actually classifies matters most, not just whom it might affect. *Contra Fowler*, 104 F.4th at 786. Even though Tennessee's law undeniably (and exclusively) affected transgender individuals by "banning certain medical care for transgender minors," the Supreme Court held that it "include[d] only two classifications"—age and medical procedure—neither of which triggered heightened scrutiny. *Skrmetti*, 145 S. Ct. at 1824, 1833. Here, Oklahoma's birth certificate approach does not contain any relevant classifications at all, much less any classification of transgender individuals. Merely documenting a new child's sex, age, and birth location, D.A. 46, does not "classify" based on those factors under the Equal Protection Clause so much as it just identifies objective realities at birth. *See* 63 O.S. § 1-311(B) ("The physician in attendance shall certify to the facts of birth."); *Skrmetti*, 145 S. Ct. at 1831 (a "sex-based classification[]" is one that "prohibit[s]

conduct for one sex that it permits for the other"). If a "mere reference to sex" is insufficient for heightened scrutiny, 145 S. Ct. at 1829, then how much more inadequate is a total absence of anything concerning transgender status in Oklahoma's policy on birth certificates?

To the extent there is one, the "class" affected by Oklahoma's birth certificate and anti-amendment policy is broader than transgender status—everyone is implicated since everyone has a sex. Conversely, the class also encompasses everyone with a characteristic *not* recorded on birth certificates, whether it be a medical condition, hair color, socioeconomic status, or anything else imaginable. This Court admitted that Oklahoma's "Policy appears facially neutral because it prevents all Oklahomans—regardless of their sex or gender identity—from amending the sex designation on their birth certificates." *Fowler*, 104 F.4th at 785. The inquiry should have ended there, especially since Plaintiffs admit the original recording of sex on birth certificates does not discriminate against transgender persons. *Id.* at 787.

Nevertheless, this Court asserted—and Lambda Legal now reiterates after *Skrmetti*—that one can "infer purposeful discrimination on the basis of transgender status" in Oklahoma's declining to later change the accurate sex designation. *Id.* at 785. The Court offered three bases for this, all of which are undermined in one way or another by *Skrmetti*. *Contra* Pls. Supp. at 7 ("Nothing in *Skrmetti* affects this Court's intent analysis.").

*First*, this Court found that the policy's "disparate impact on transgender people indicates discriminatory intent." *Fowler*, 104 F.4th at 786. To reach that conclusion, though, this Court conflated sex with gender identity. Per this Court, Plaintiffs experience a disparate impact because their gender identity is not represented on a birth certificate while the gender identity of "cisgender" individuals is represented. *Id.* But birth certificates do not record gender

identity at all—only the "facts of birth" like "biological sex." 63 O.S. § 1-311(B) & (G). And per *Skrmetti*, "biological sex" and "gender identity" are not the same thing. *See* 145 S. Ct. at 1824; *see also id.* at 1881 (Sotomayor, J., dissenting) (acknowledging an "incongruence between sex and gender identity"). Even Plaintiffs describe gender identity as a "core internal sense," P.A. 10, whereas sex denotes "a biological and historical fact of birth," *Gore*, 107 F.4th at 559. *See also Gore*, 107 F.4th at 558 (gender identity "is not definitively ascertainable at the moment of birth, and it can change over time" (cleaned up)). Thus, under *Skrmetti*'s logic and language, Oklahoma's choice to record sex, and to decline later alterations, does not disparately impact anyone. Everyone has their biological sex recorded and maintained. All are treated the same.

This Court's disparate impact theory also runs aground on the shore of *Skrmetti*'s holding that the Tennessee law in question did not discriminate based on transgender status even though the group regulated consisted of "only transgender individuals." 145 S. Ct. at 1833. In *Skrmetti*, the Supreme Court effectively found that a disparate impact on transgender people did not indicate discriminatory intent. There, Tennessee was merely regulating a medical procedure. *Id.* Here, Oklahoma is merely keeping accurate state records about "the facts of birth." 63 O.S. § 1-311(B); *see also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 271 (1979) (finding no equal protection claim even though the "impact of the veterans' preference law upon the public employment opportunities of women has thus been severe"). Per *Skrmetti*, it is not enough that the alleged "harm falls on one group." Pls. Supp. at 6.[3]

---

[3] This Court also found a disparate impact from the Governor allegedly removing the ability for transgender people to obtain birth certificates matching their gender identity. *Fowler*, 104 F.4th at 786–88. This fails for the reasons just described. And again, Oklahoma law has never allowed gender identity on birth certificates; it specifies that the "facts of birth" are to be recorded. 63 O.S. § 1-311(B). The Governor's express "policy" was to follow the law. P.A. 22.

*Second*, this Court found surrounding events showed discriminatory intent, focusing repeatedly on Governor Stitt's statement that "I believe that people are created by God to be male or female. Period." *Fowler*, 104 F.4th at 775, 777, 787. This Court opined that "[w]hen read in context," that statement "demonstrates disfavor with people amending their birth certificates to change the sex designation." *Id.* at 787. The specific "people amending their birth certificates to change the sex designation" that Governor Stitt was addressing, however, were seeking a "non-binary" designation, not a change from "male" to "female" (or vice versa). P.A. 47–50. The context, that is, was distinguishable from the present lawsuit. Regardless, it is unclear why a Governor expressing "disfavor with people amending their birth certificates to change the sex designation" is problematic, any more than it would be problematic for the Governor to express disfavor with someone trying to amend the age designation. Oklahoma law does not allow such a change, and it is the Governor's constitutional duty to disapprove of practices contrary to law. OKLA. CONST. art. VI, § 8 ("The Governor shall cause the laws of the State to be faithfully executed ….").

In any event, it is futile after *Skrmetti* to maintain that the Governor's stating his belief that people are "male or female" shows invidious intent or animus. Again, the Supreme Court in *Skrmetti* repeatedly recognized "biological sex," and it discussed the existence of only two sexes—male and female. *See, e.g.*, 145 S. Ct. at 1830 n.2 (acknowledging individuals "whose biological sex is female" and those "whose biological sex is male"); *see also id.* at 1856 (Alito, J., concurring in part and in the judgment) (discussing "the two biological sexes: male and female"); *id.* at 1875 (Sotomayor, J., dissenting) (repeatedly mentioning "both sexes"). If

Governor Stitt's insistence that humans are only male or female is evidence of invidious intent or animus, then every Supreme Court justice holds the same prejudices.

The only remaining possibility is that this Court objected to the Governor's statement that people "are created by God." But how can the expression of a basic and well-known religious belief about how the world works be equated to animus or an intent "to target transgender people"? *Fowler*, 104 F.4th at 787. Such statements appear in sources as varied as the Declaration of Independence and the Gospels. *See Matthew* 19:4 (ESV) (Jesus: "Have you not read that he who created them from the beginning made them male and female ...."); Decl. of Independence pmbl. (U.S. 1776) ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights ...."). And the Supreme Court has recently insisted that "[r]espect for religious expressions is indispensable to life in a free and diverse Republic." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022). To hold that animus can be found in the Governor's acknowledgement of a Creator would violate this fundamental principle.

Tellingly, in arguing that "events" show discriminatory intent, Plaintiffs do not focus on the "Creator" statement. Pls. Supp. at 6–7. Instead, they cite the Governor's "abrupt reversal of a more than decade-long predecessor policy." *Id.* at 6. But an elected official reversing a predecessor's policy cannot possibly be grist for an animus challenge; that's an everyday political occurrence, nationwide. Next, Plaintiffs argue that the State's "exceptionally unusual defiance of court orders" shows ill intent. *Id.* But as explained above, Plaintiffs have conspicuously avoided state court enforcement, choosing instead to kvetch here, where state court orders are irrelevant. Finally, Plaintiffs argue that the Governor's "fiery wholehearted

condemnation of agency action" shows discriminatory intent. *Id.* (cleaned up). The State is aware of no authority indicating that an executive's "fiery" words or mandatory oversight of an agency can count as ill intent or animus, and any such holding would be preposterous and a violation of the separation of powers.

After *Skrmetti*, this Court recently dismissed an intent-based equal protection challenge to an Oklahoma law resembling Tennessee's law. *Poe v. Drummond*, No. 23-5110, --- F.4th ---, 2025 WL 2238038 (10th Cir. Aug. 6, 2025). Going beyond *Skrmetti*, this Court explained why the plaintiffs in *Poe* were wrong to claim, under the Equal Protection Clause, that Oklahoma had acted with an impermissible purpose. *Id.* at *6–7. Among other things, this Court rejected the plaintiffs' reliance on statements from Governor Stitt. *Id.* at *6 n.5. Instead, this Court relied significantly on what the "statute's text demonstrates" to hold that the Legislature did not enact the law with invidious intent or purpose. *Id.* at *7. Like *Skrmetti*, this Court's decision in *Poe* (and the text of Oklahoma law) counsels strongly for the State.

*Third*, this Court found discriminatory intent because Oklahoma's policy was "not rationally related to a legitimate state interest*." Fowler*, 104 F.4th at 788, 795–96. As will be discussed momentarily, this Court's aggressive approach to rational basis review cannot be squared with the more deferential approach in *Skrmetti* (or in the Sixth Circuit's decision in *Gore*, for that matter). In the end, Oklahoma law does not "inescapably discriminate[]" against transgender individuals, facially or implicitly. Pls. Supp. at 5.

For their part, Plaintiffs add that the "terms" of Oklahoma's policy "necessarily deprive transgender people of birth certificates consistent with their gender identity." Pls. Supp. at 6. The State welcomes this admission that the legal "terms" are what matter in this dispute. But

if Plaintiffs' contention were taken seriously (and literally), it would mean that individuals possess a right to have gender identity listed on a government birth certificate even though gender identity is not ascertainable at birth. That is incoherent, in no small part because birth certificates are indisputably government speech and the government can reasonably decide to include, on birth certificates, only "the facts of birth." 63 O.S. § 1-311(B). Oddly, Plaintiffs' phrasing also indicates that they do not fully take issue with their biological sex being listed so much as with their current gender identity *not* being listed. But that is a different issue than trying to replace one designation with the other, as they seek here.

Lambda Legal also cites a Ninth Circuit decision to argue that "[a] policy can 'discriminate on its face' even 'without referring to' the characteristic at issue." Pls. Supp. at 8 (quoting *Doe v. Horne*, 115 F.4th 1083, 1104 (9th Cir. 2024)). But *Doe* held that a "transgender sports ban" is likely unconstitutional under the Equal Protection Clause. 115 F.4th at 1111. The Supreme Court, after *Skrmetti*, has granted certiorari in two cases involving transgender participation in women's sports, thus making reliance on *Doe* fraught, to say the least. *See Little v. Hecox*, 145 S. Ct. 2871 (2025); *West Virginia v. B.P.J.*, No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025). Regardless, this argument is revealing. In essence, Lambda Legal contends that every law regulating sex in some way discriminates against transgender individuals. This is not what *Skrmetti* held, and it is not what the Constitution requires.

### III. UNDER THE *SKRMETTI* ANALYSIS, OKLAHOMA'S BIRTH CERTIFICATE LAW IS SUBJECT ONLY TO RATIONAL BASIS REVIEW.

Oklahoma's approach to birth certificate amendments should be subject to rational basis review. Even if this Court found discrimination based on transgender status, *Skrmetti* gave no support to the argument that this status constitutes a suspect class. Rather, the

concurrences explained at length "why … it does not." *Skrmetti*, 145 S. Ct. at 1849–55 (Barrett, J., with Thomas, J., concurring); *see also id.* at 1859–67 (Alito, J., concurring in part and in the judgment). Justice Barrett, for example, wrote that "plaintiffs face a high bar" in their effort, "as evidenced by the failure of even vulnerable groups to satisfy it," such as "the mentally disabled, the elderly, and the poor." *Id.* at 1850–51. She went on to explain that transgender status is not knowable at birth, it is not immutable, and the transgender population is "large, diverse, and amorphous" rather than "discrete." *Id.* at 1851–52 (citation omitted). And to hold "that transgender people constitute a suspect class would require courts to oversee all manner of policy choices normally committed to legislative discretion"—"ranging from access to restrooms to eligibility for boys' and girls' sports teams." *Id.* at 1852–53.

Justice Alito agreed that transgender status "does not warrant heightened scrutiny." *Id.* at 1855 (Alito, J., concurring in part and in the judgment). He opined that transgender status is not immutable since "persons can and do move into and out of the class." *Id.* at 1861. He also explained that "despite the small size of the transgender population, the members of this group have had notable success in convincing many lawmakers to address their problems." *Id* at 1866. Given that the Supreme Court has "*never* embraced a new suspect class under" its "strict" test, *id.* at 1851 (Barrett, J., concurring), this Court should decline to do so now.

Nor should this Court apply heightened scrutiny because of allegations of sex discrimination. This Court held that all laws concerning "biological differences" are subject to intermediate scrutiny. *Fowler*, 104 F.4th at 793. But *Skrmetti* was clear: the Supreme Court "has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny." 145 S. Ct. at 1829. Rather, the Supreme Court has held that sex "provides no sensible ground for

*differential treatment.*" *Id.* at 1828 (emphasis added) (quoting *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985)). In other words, a "sex-based classification" that triggers heightened scrutiny[4] is one where the law "prohibit[s] conduct for one sex that it permits for the other." *Id.* at 1831. Nothing of that sort is occurring here. This is the quintessential example of a policy that merely references the reality of biological sex without making any distinction or differential treatment between the two sexes whatsoever. Oklahoma is literally just documenting, on a government form, that a person's biological sex *exists*.

That *Skrmetti* applied those principles to the medical context does not render them inapplicable here. To the contrary, the Supreme Court made plain that one reason heightened scrutiny was inappropriate in the medical context was because "biological differences between men and women (differences due to sex chromosome or sex hormones) may contribute to variations seen in the safety and efficacy of drugs, biologics, and medical devices." *Id.* at 1829–30 (quoting FDA, Sex as a Biological Variable (Jan. 30, 2025)). Biological reality, that is, drove the Supreme Court's reasoning in *Skrmetti*, and a State cannot violate the Constitution by recognizing that same reality in something as mundane as a birth certificate. As such, heightened scrutiny should not apply. *See id.* at 1853 (Barrett, J., concurring) ("[L]egislatures have many valid reasons to make policy in these areas, and so long as a statute is a rational means of pursuing a legitimate end, the Equal Protection Clause is satisfied.").

---

[4] Plaintiffs treat it as a "gotcha" that the State once wrote that birth certificate laws "classif[y] individuals based on biological or birth sex." Pls. Supp. at 10 (quoting D.A. 30). But Oklahoma's entire point there was that some sex references are so benign as to merit only rational basis review, D.A. 23–34, which *Skrmetti* confirmed.

Lambda Legal objects that *Skrmetti* "does not change" this Court's "straightforward reasoning" that "but for each Plaintiff's sex assigned at birth, each Plaintiff would have access to a birth certificate consistent with his or her gender identity." Pls. Supp. at 9. But saying that a person would have a different birth certificate if their biological sex were different is practically a tautology. Of course it would: that's the point of documenting male or female sex. That reasoning cannot stand given *Skrmetti*'s emphasis that mere references to sex do not merit heightened scrutiny and that some sort of differential treatment is required. 145 S. Ct. at 1828–29. And the *Griffth v. El Paso County, Colorado* decision Plaintiffs rely on, 129 F.4th 790 (10th Cir. 2025), was issued before *Skrmetti*, meaning *Skrmetti*'s reasoning on this point controls.[5]

*Skrmetti* deployed a *Bostock*-esque analysis at one point, but Lambda Legal omits that, in doing so, the Supreme Court expressly declined to decide "whether *Bostock*'s reasoning reaches beyond the Title VII context" (despite Lambda Legal's "urg[ing]"). *Id.* at 1834. *Skrmetti* showed great caution, that is, which is in line with *Bostock* itself. *See* 590 U.S. at 681 (declining, even under Title VII, "to address bathrooms, locker rooms, or anything else of the kind"). Meanwhile, the concurring justices explained that *Bostock* does not apply to equal protection claims. *See* 145 S. Ct. at 1839 (Thomas, J., concurring) ("[I]n constitutional challenges, courts need not engage *Bostock* at all."); *id.* at 1855 (Alito, J., concurring in part and in the judgment) (similar). Given the Supreme Court's caution, concurrences, and certiorari grants, this Court

---

[5] *Griffith* is also still eligible for appeal to the Supreme Court, Pls. Supp. at 16 n.6; it drew a robust dissent from Judge Tymkovich, 129 F.4th at 836–50; it relied on this Court's now-vacated decision in the present case, *id.* at 810–12 & n.11; and its scenario of a transgender inmate's housing assignment is easily distinguishable from birth certificates.

should be wary of adopting Lambda Legal's view that *Bostock* requires a finding of sex discrimination merely from the State's maintenance of a sex marker on birth certificates.

As a last gasp, Plaintiffs argue that Oklahoma's policy "does not merely 'reference' sex" but rather "imposes a *burden* on Plaintiffs based on their assigned sex: the deprivation of access to a birth certificate consistent with their gender identity." Pls. Supp. at 13–14. Yet again, this conflates sex and gender identity. Merely identifying a baby's sex is not a burden on anyone, as Plaintiffs admit, nor is maintaining that marker on a government document later down the road. Everyone's sex is recorded (and maintained), no one's gender identity is recorded. It is hard to imagine a more apropos example of sex merely being referenced.

## IV. UNDER THE *SKRMETTI* ANALYSIS, OKLAHOMA'S BIRTH CERTIFICATE POLICY CLEARLY SURVIVES RATIONAL BASIS REVIEW.

The State agrees with much of this Court's initial description of rational basis review. Plaintiffs certainly bear the responsibility "to negative every conceivable basis which might support" Oklahoma's approach, "it is entirely irrelevant for constitutional purposes whether the conceived reason" was the actual motivation behind Oklahoma's policy, Oklahoma's policy "may be based on rational speculation unsupported by evidence or empirical data," and Oklahoma may act incrementally and be "under- or overinclusive." *Fowler*, 104 F.4th at 794–95 (citations omitted). *Skrmetti* echoed these sentiments, and it added that "where there exist 'plausible reasons' for the relevant government action, 'our inquiry is at an end.'" 145 S. Ct. at 1835 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–314 (1993)).

In *Skrmetti*, the Supreme Court found—over Lambda Legal's opposition—Tennessee's law to be "clearly" rational. *Id.* at 1835. It accepted Tennessee's findings and justifications at face value and found that the law's "age- and diagnosis-based classifications are plainly

rationally related to these findings and the State's objective of protecting minors' health and welfare." *Id.* at 1835–36. The Supreme Court rejected Lambda Legal's counterpoints in part because "Tennessee concluded that there is an ongoing debate" over the "risks and benefits" of the medical procedures in question, and Tennessee's law "responds directly to that uncertainty." *Id.* at 1836. The Supreme Court, that is, "decline[d] the plaintiffs' invitation to second-guess the lines that" Tennessee drew. *Id.* Even if Lambda Legal's arguments "may be true," Tennessee's view "may also be true." *Id.* And "[t]he fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Id.* (quoting *R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). Contrary to this Court, the Supreme Court again made clear that "[t]he calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *Id.* at 1837 (quoting *Pers. Adm'r of Mass.*, 442 U.S. at 272).

This Court's analysis of Oklahoma's policy did not resemble the deferential approach in *Skrmetti*, nor did it match the standards this Court laid out initially. Most prominently, this Court found that Oklahoma's legitimate interest in the accuracy of vital statistics was not furthered because Oklahoma retains a copy of the original birth certificate. But this violates the fundamental principle that "it is entirely irrelevant" for rational basis review whether the "conceived reason for the challenged" action was the actual motivation. *FCC*, 508 U.S. at 315. One can easily conceive that maintaining an accurate sex designation promotes accuracy in statistics, even if a state may not have been motivated by that interest. Regardless, Oklahoma was motivated by that interest. In finding that Oklahoma retains the original record, this Court relied on Oklahoma law (citing, *e.g.*, 63 O.S. § 1-316(B)(2)), even though Oklahoma law also

has stated since 1963 that Oklahoma birth certificates may be amended only in certain limited circumstances "to protect the integrity and accuracy of vital statistics records." 63 O.S. § 1-321(A). To make its point, that is, this Court simultaneously relied on Oklahoma's Legislature and deemed it irrational. Oklahoma's laws should be read in harmony, if at all possible, rather than pitted against each other.[6]

In accepting "the plaintiffs' invitation to second-guess the lines that" Oklahoma drew, *Skrmetti*, 145 S. Ct. at 1836, this Court also took an overly narrow view of Oklahoma's interest in accuracy. An amended birth certificate for an individual's own use is still government speech, regardless of whether the State retains the original copy, and thus Oklahoma retains a compelling interest in the accuracy and content of that speech. This interest alone should easily sustain Oklahoma's approach to birth certificates, as the Sixth Circuit held. *See Gore*, 107 F.4th at 559 ("Tennessee's policy is simply a nondiscriminatory form of government speech embraced by some States about an undeniable historical fact.").

This Court's argument proves too much, as well, since it would mean that Oklahoma has no rational basis to keep individuals from changing anything on their birth certificates. By this Court's earlier logic, because the State maintains an original copy it could not rationally decline to change the date of birth, for instance. Plaintiffs could claim that a certificate with their true birthdate impedes the goal of verifying their identity (because they look younger or older), exposes intimate information, and causes (age) discrimination. If keeping an original copy removes any rational basis for preventing amendments changing the sex marker, what

---

[6] Moreover, this Court did not address the point that the very same subsection says that after amendment the original certificate shall not "be subject to inspection except upon order of a court of competent jurisdiction or as otherwise specifically provided by law." *Id.* § 1-316(B)(2).

ground would Oklahoma have for opposing such a change to an age designation?

It was in response to the "original information" argument that the Sixth Circuit opined that this Court's "approach misunderstands rational basis review." *Gore,* 107 F.4th at 561. "That deferential standard," Chief Judge Sutton explained, "does not require States to show that a classification is the only way, the best way, or even the most defensible way to achieve their interests." *Id.* That a court finds a policy "imprudent," "ineffective," or "imperfect" does not mean it is utterly irrational. *Id.* Oklahoma, like Tennessee, "records a fact of birth: the biological sex of the child. A policy requiring an error before changing that record rationally correlates with the State's interest in consistency and historical accuracy." *Id.*

This Court also rejected Oklahoma's approach because it "is at odds with the fact that Oklahoma law allows amendments to the sex designation on driver's licenses." *Fowler,* 104 F.4th at 795–96. But driver's licenses are not historically grounded birth certificates, so why would uniformity between the two be logically required? Regardless, this contravened yet another axiom of rational basis review that this Court recognized, which is that a "legislature must be allowed leeway to approach a perceived problem incrementally." *FCC,* 508 U.S. at 316. For rational basis, in this Court's own words, a state policy should stand even if it is "under- or overinclusive." *Fowler,* 104 F.4th at 794–95. That same axiom undermines this Court's assertion that Oklahoma's interest in accuracy of immutable characteristics on birth certificates is irrational because Oklahoma allows changes to paternity for adoption purposes. States are entitled to draw lines and carve out exceptions to otherwise general rules and interests, and they may be under-inclusive in doing so. *See Gore,* 107 F.4th at 561 ("[T]he Constitution does not require Tennessee to allow all changes or none.").

This Court also argued that a legitimate interest in protecting women's sports was "not rationally related to the Policy" because Oklahoma law does not currently use birth certificates to protect women's sports. *Fowler*, 104 F.4th at 796. But it is "entirely irrelevant" that Oklahoma does not require the use of birth certificates in its law protecting women's sports, given that it would be rational for Oklahoma or any other state to do so if it wanted. *FCC*, 508 U.S. at 315. Further, ensuring that every Oklahoma birth certificate accurately reflects biological sex provides school districts and private leagues with a reliable indicator of biological sex in their own efforts to protect women's sports.

Finally, in addressing the rational basis of resource conservation, this Court argued that the amici states had not offered up a "discussion of what resource sex-designation amendments require" or explained "how the Policy would rationally conserve those resources." *Fowler*, 104 F.4th at 796. But surely such depth is not necessary for rational basis review, since it is easily conceivable that it will take at least *some* time, effort, and resources to accommodate a change of sex. And in rejecting the amici states' rational basis of fraud prevention, this Court criticized the states for failing to "offer more information." *Id.* This Court then offered its own speculation in favor of Plaintiffs that Oklahoma's approach "may facilitate, rather than prevent, fraud." *Id.* But as *Skrmetti* demonstrated, if what both sides are saying "may be true," rational basis review does not permit a court to speculate or rule in favor of the challengers. 145 S. Ct. at 1836. *Skrmetti* contradicts this Court's earlier approach.

Nevertheless, Plaintiffs contend that *Skrmetti* is distinguishable because its rational basis review, and the justification it accepted, were "limited to the specific context of gender-affirming medical care for minors." Pls. Supp. at 18. But it is unsurprising and not particularly

meaningful that the Supreme Court addressed the circumstances in front of it.[7] What matters more is that the principles and deferential approach embraced by the Supreme Court do apply more broadly than just the medical context. The Supreme Court certainly did not say that its analysis was so limited, and its GVR of this case tends to indicate its belief otherwise.

Even if accepted, Plaintiffs' claim that *Skrmetti* is limited to the medical context undermines one of their final arguments. Plaintiffs find it to be "particularly revealing that Defendants cannot justify the Policy by arguing that it advances the very purpose for which identity documents exist in the first place: identity verification." Pls. Supp. at 21. But if nothing else, *Skrmetti* made clear that biological differences are important in the medical context. *See* 145 S. Ct. at 1829–30. Extrapolating, then, it is perfectly rational for a State to believe that a birth certificate containing biological sex could in some circumstances advance identity verification in a helpful way. At a bare minimum, it is vital in the medical context, where knowing a patient's sex could change the course of treatment in normal or emergency circumstances. Oklahoma's approach is rational, even under an overly limited view of *Skrmetti*.

In the end, this interest is just one of many "[a]mple legitimate explanations [that] support [Oklahoma's] amendment policy." *Gore*, 107 F.4th at 560.

## CONCLUSION

Based on the Supreme Court's decision in *Skrmetti*, this Court should affirm. Oklahoma has not plausibly violated the Equal Protection Clause of the Constitution by permanently documenting sex on birth certificates.

---

[7] Plaintiffs wrongly claim that "*Skrmetti* had a fully developed factual record before it." Pls. Supp. at 19. *Skrmetti* was an appeal from a *preliminary* injunction. There were factual materials present, to be sure, but the record was not "fully" developed.

*Respectfully submitted,*

s/*Zach West*
_____
GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellees*

**CERTIFICATE OF COMPLIANCE**

This supplemental brief complies with the page limitations set forth in the Court's August 6, 2025 Order, Doc. 119, because—excluding the portions exempted by Fed. R. App. P. 32(f)—it contains not more than 25 pages. This brief complies with the typeface requirements of the Court's August 6, 2025 Order and Fed. R. App. P. 32(a)(5), as well as the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface (13-point Garamond) using Microsoft Word 2016.

s/ *Zach West*
ZACH WEST

**CERTIFICATE OF DIGITAL SUBMISSION**

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with Crowdstrike antivirus using the latest version updated on September 21, 2025.

s/ *Zach West*
ZACH WEST

**CERTIFICATE OF SERVICE**

I certify that on September 22, 2025, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. The seven required paper copies, each of which is an exact replica in form and content, will be dispatched via commercial carrier for receipt within five business days after the court issues a notice that the electronic version is accepted for filing.

s/ *Zach West*
ZACH WEST