No. 23-5080

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

ROWAN FOWLER; ALLISTER HALL; and CARTER RAY,

*Plaintiffs-Appellants*,

v.

KEVIN STITT, in his official capacity as Governor of the State of Oklahoma; KEITH REED, in his official capacity as Commissioner of Health for the Oklahoma State Department of Health; and KELLY BAKER, in her official capacity as State Registrar of Vital Records,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Oklahoma
No. 4:22-cv-00115-JWB-MTS (Judge John W. Broomes)

---

## PLAINTIFFS-APPELLANTS' SUPPLEMENTAL REPLY BRIEF

---

Peter C. Renn
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa St., Ste. 1260
Los Angeles, CA 90017
(213) 382-7600

Shelly L. Skeen
Nicholas J. Hite
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street, NW, Suite 4140
Washington, D.C. 20006
(202) 804-6245

Karen Keith Wilkins
1515 S. Denver Ave.
Tulsa, OK 74119
(918) 599-8118

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 1

I.      The GVR Order Contemplates Further Consideration—Not Reversal .................... 1

II.     The Policy Discriminates Against Plaintiffs Based on Transgender Status and Sex. ......................................................................................... 3

        A.      *Skrmetti* Does Not Change This Court's Analysis that the Policy Discriminates Based on Transgender Status. ................................. 4

        B.      *Skrmetti* Does Not Change This Court's Analysis that the Policy Discriminates Based on Sex. ........................................................ 8

III.    There Is No Basis for Exempting the Policy from Heightened Scrutiny. .............. 10

IV.     The Policy Fails Even Rational Basis Review. ...................................................... 12

CONCLUSION ................................................................................................. 15

CERTIFICATE OF COMPLIANCE ................................................................ 16

CERTIFICATE OF SERVICE ......................................................................... 17

CERTIFICATE OF DIGITAL SUBMISSION ................................................ 18

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Baskin v. Bogan*,
766 F.3d 648 (7th Cir. 2014) .......................................................................... 10

*Bostock v. Clayton Cnty., Ga.*,
590 U.S. 644 (2020) ................................................................................. 3, 9, 10

*Dalton v. Reynolds*,
2 F.4th 1300 (10th Cir. 2021) ........................................................................... 8

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ....................................................................... 10

*Doe v. Rocky Mtn. Classical Acad.*,
99 F.4th 1256 (10th Cir. 2024) ....................................................................... 11

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024) ........................................................... 4, 11, 12, 15

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*,
916 F.3d 792 (10th Cir. 2019) ......................................................................... 11

*Gore v. Lee*,
107 F.4th 548 (6th Cir. 2024) ......................................................................... 13

*Griffith v. El Paso Cnty., Colo.*,
129 F.4th 790 (10th Cir. 2025) ..................................................................... 7, 11

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ....................................................................... 7, 12

*Lawrence v. Chater*,
516 U.S. 163 (1996) .................................................................................... 1, 2

*Lawrence v. Texas*,
539 U.S. 558 (2003) ....................................................................................... 6

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) ....................................................................................... 7

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992) ................................................................. 13

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ............................................................... 6

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................................. 14

*Romer v. Evans*,
   517 U.S. 620 (1996) ............................................................. 14

*United States v. Skrmetti*,
   145 S. Ct. 1816 (2025).......................... 1, 3, 4, 5, 10, 11, 12

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) ............................................................. 14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ........................................................... 5, 6

*Vincent v. Bondi*,
   127 F.4th 1263 (10th Cir. 2025) ........................................ 2, 9

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ............................................. 12

## Statutes

63 Okla. Stat. § 1-323 .............................................................. 14

## Other Authorities

Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96 Notre
   Dame L. Rev. 171 (2020) ...................................................... 2

Stephen M. Shapiro et al., *Supreme Court Practice* ch. 5, § 5.12(b) (11th ed. 2019) ........ 2

**INTRODUCTION**

Defendants cannot overcome the key difference that separates this case from *United States v. Skrmetti*, 145 S. Ct. 1816 (2025): the law there did not discriminate based on transgender status or sex, whereas the Policy here does. That is because merely changing the assigned sex of the plaintiffs in *Skrmetti* did not change the outcome, whereas doing so here unquestionably changes the outcome. The Supreme Court was also not presented with any argument for intentional discrimination based on the totality of the facts, whereas the factual allegations before this Court showing intentional discrimination against transgender people could not be more stark.

These material differences also mean that *Skrmetti* does not present any basis for Defendants to relitigate this entire appeal, raising arguments that are divorced from anything that *Skrmetti* decided. In any event, this Court correctly found those arguments meritless before, and the same remains true now.

**ARGUMENT**

**I.    The GVR Order Contemplates Further Consideration—Not Reversal.**

Defendants wrongly regard the GVR order as effectively communicating a silent direction for this Court to reverse itself. But, by its own terms, the GVR order only requires that this Court engage in "further consideration" in light of *Skrmetti*. As this Court and others have explained, a GVR order does not mean that the Supreme Court believes that the lower court's reasoning or conclusion is wrong. Pls. Br. (Doc. 126) 4-5. This Court has analyzed the GVR standard—including the authority that Defendants cite, *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (finding remand appropriate where there is

1

a reasonable probability that a recent development "may" affect the litigation)—and it has confirmed that a GVR "doesn't necessarily signal a disagreement with the panel's reasoning or result." *Vincent v. Bondi*, 127 F.4th 1263, 1264 n.1 (10th Cir. 2025) (citing *Lawrence* and Stephen M. Shapiro et al., *Supreme Court Practice* ch. 5, § 5.12(b) (11th ed. 2019)).

A GVR order serves the interests of judicial efficiency: the lower court is often best positioned to decide, in the first instance, whether a recent development actually influences the case. *Lawrence*, 516 U.S. at 167. After all, unlike the Supreme Court, the lower court has had the benefit of full briefing and argument on the merits, and it has already once decided the issue. But it is not uncommon for lower courts to conclude, after giving further consideration in light of the development at issue, that their prior analysis and conclusion continue to stand. Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96 Notre Dame L. Rev. 171, 220 (2020).

Defendants ultimately place more weight on the GVR order here than it can bear. The Supreme Court could have issued the GVR order if for no other reason than the relationship of topics noted by Defendants: both this case and *Skrmetti* involve "transgender plaintiffs, and the Equal Protection Clause." Defs. Br. 1. Having just resolved one equal protection claim by transgender litigants, and immediately presented with another, the Supreme Court could have determined that it would be efficient for this Court to analyze whether the former actually impacts the latter. But any similarity between *Skrmetti* and this case ends there, as nothing in *Skrmetti* actually changes this Court's reasoning or conclusion.

## II.     The Policy Discriminates Against Plaintiffs Based on Transgender Status and Sex.

Defendants' primary argument for why the Policy here does not discriminate based on transgender status or sex reduces to this: the law in *Skrmetti* did not do so. Defs. Br. 8-9.  But that skips over the Supreme Court's reasoning for *why* the law in *Skrmetti*—which banned gender-affirming medical care—did not discriminate on those bases.  The Court explained that the Tennessee law did not do so because it employed "a classification based on medical use."  *Skrmetti*, 145 S. Ct. at 1833.  That is illustrated by the fact that merely changing the minors' transgender status or assigned sex—without *also* changing the diagnosis at issue—did not change the outcome there.  Here, however, the Policy does not discriminate based on medical use, and changing Plaintiffs' transgender status or assigned sex *does* change the outcome: they would have access to certificates matching their gender identity.

*Skrmetti*'s use of the phrase "biological sex" does not remotely negate the Policy's discrimination.  Defs. Br. 9-10.  First, Plaintiffs have never argued that birth-assigned sex, or what Defendants refer to as biological sex, does not exist.  But, as *Bostock* illustrates, Defendants' conception of biological sex is not inconsistent with the existence of discrimination against transgender people.  *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) (proceeding on the assumption that sex refers "only to biological distinctions between male and female" because "nothing in our approach to these cases turns on the outcome of [that] debate").  To the contrary, the Policy discriminates against Plaintiffs *because of* their assigned sex.  *Infra* § II.B.  This Court similarly recognized

3

that biological "differences exist," and they may be relevant to whether state action passes judicial scrutiny—"[b]ut those differences 'cannot render' a classification sex or gender-neutral." *Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024).

Second, despite Defendants' suggestion, Defs. Br. 10, Plaintiffs have never argued that the government cannot maintain a record of assigned sex. Indeed, Plaintiffs have pointed to the fact that Oklahoma already does precisely that through original birth certificates—and those remain available whether the Policy exists or not. But the Policy does deny Plaintiffs copies of amended certificates consistent with their gender identity. That deprives them of documents that they can equally use to prove their identity, which all other Oklahomans are afforded.

Finally, if Defendants' argument were taken to its logical conclusion, every instance of discrimination against transgender people could be recast as mere recognition of "biological realities." Defs. Br. 10. For instance, a school that bars a transgender girl from wearing female-typical clothing would be doing nothing more than acknowledging that biological sex is real. That would create a gaping hole in the fabric of equal protection, permitting any discrimination against transgender people to evade judicial review because, in Defendants' view, there has been no discrimination at all.

**A.    *Skrmetti* Does Not Change This Court's Analysis that the Policy Discriminates Based on Transgender Status.**

Because the Supreme Court was not presented in *Skrmetti* with any argument for intentional discrimination against transgender people under *Arlington Heights*, it provides no grounds for Defendants to relitigate this Court's holding on that front. 145 S. Ct. at

1832.  That alone defeats Defendants' attempt.

In any event, each of Defendants' arguments denying the existence of intentional discrimination fails.  First, Defendants continue to deny that the Policy has any impact on transgender people at all.  That blinks reality.  Consigning a transgender woman like Ms. Fowler to using a birth certificate that indicates the certificate holder is male when she attempts to prove her identity does not have the same impact as providing a cisgender woman with a birth certificate reflecting that the certificate holder is female.  The Policy plainly "bears more heavily" on transgender people.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  Defendants' retort—that "[a]ll are treated the same"—relies on the purported facial neutrality of the Policy (which is incorrect for independent reasons, *see* Pls. Br. 7-8).  Defs. Br. 12.  But the entire point of the *Arlington Heights* analysis is to detect intentional discrimination *even where* a policy is neutral.  And Defendants' contention that disparate impact alone is not *sufficient* to show intentional discrimination does not negate its clear relevance to the inquiry.  *Cf. id.* (arguing that Tennessee law also had a disparate impact on transgender people).

Second, *Skrmetti* does not bolster Defendants' attacks on this Court's fact-bound analysis of the events surrounding the Policy, because the Supreme Court had no occasion to engage in any similar factual analysis.  Defendants instead largely recycle the arguments they unsuccessfully pressed before *Skrmetti*.  For instance, they posit that Governor Stitt was only targeting non-binary people—not transgender men and women— but that story is inconsistent with the fact that OSDH denied Plaintiffs amended birth certificates on the grounds that they were barred by his Executive Order.  A.27, 31-32,

34-35.  Likewise, they insist that Governor Stitt's public statements were merely an expression of his religious beliefs, but that ignores that his statements expressing disapproval of people transgressing his belief about God's plan were used *to explain the basis for government policy*.  Defs. Br. 14; *see also id.* 13-14 (insisting that Governor Stitt's sentiment was no different than that of "every Supreme Court justice").  When "sincere, personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the state itself on an exclusion that soon demeans or stigmatizes."  *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015).

Ultimately, Defendants' various attempts to sanitize the facts surrounding the Policy's adoption fall flat.  In Defendants' retelling, there is nothing remarkable—or even relevant—about a government official adopting a policy on the stated grounds of moral disapproval, the circumstances motivating the abrupt reversal of a prior longstanding policy, and openly defying court orders.  The law holds otherwise.  *See Vill. of Arlington Heights*, 429 U.S. at 268 (holding that contemporary statements by decisionmakers can be "highly relevant"); *id.* at 267 (holding that an abrupt change can evidence discriminatory intent, such as when a decisionmaker reverses course upon learning how the policy was utilized by the group at issue); *id.* (holding that departures from ordinary procedures can "evidence that improper purposes are playing a role"); *see also Lawrence v. Texas*, 539 U.S. 558, 577-78 (2003) (holding that moral disapproval is not a sufficient government interest).

Defendants cannot attempt to deflect from these facts by pointing to Oklahoma statutes.  After three and a half years of litigation spanning multiple courts, Defendants

now half-heartedly suggest for the first time in this case that perhaps the Oklahoma Supreme Court should opine on whether state law permits OSDH to provide Plaintiffs with amended birth certificates.  Defs. Br. 8.  That argument is waived many times over and procedurally impermissible.  *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (holding that defendants' attempts to undermine the validity of a separate court order that allowed transgender plaintiff to obtain amended birth certificate was an impermissible collateral attack).

Defendants' state-law arguments are incorrect, for reasons Plaintiffs have previously explained (*see, e.g.*, Doc. 66 at 10; Doc. 110 at 14), but they are also ultimately inconsequential.  First, no amount of statutory interpretation can erase the facts surrounding Governor Stitt's Executive Order and his statements explaining his motivation for its adoption.  Second, while those facts powerfully illustrate one avenue for establishing intentional discrimination, there is also an independent basis for that conclusion.  A policy that deprives transgender people of treatment consistent with their gender identity "facially" discriminates based on transgender status (and sex, *infra* § II.B.).  *Griffith v. El Paso Cnty., Colo.*, 129 F.4th 790, 811 n.12 (10th Cir. 2025); Pls. Br. 7-8.  Third, the barrier imposed by the Governor itself creates an equal protection injury that can be redressed by its removal.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  Finally, and of particular relevance here, whether an Executive Order, or both an Executive Order and a state statute, bars the relief sought by Plaintiffs is ultimately immaterial where state law lacks a rational basis under the U.S. Constitution.

Last, Defendants decry this Court's application of rational basis review as "aggressive," but this Court faithfully applied the standard for such review, which *Skrmetti* did not change, as well as its own precedent, which confirms that such review "is not toothless." *Dalton v. Reynolds*, 2 F.4th 1300, 1309 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 348 (2021). It scoured for a rational basis for the Policy in Defendants' and *amici*'s arguments, but it was left empty-handed. *See infra* § IV.

**B.    *Skrmetti* Does Not Change This Court's Analysis that the Policy Discriminates Based on Sex.**

Defendants have no substantive response to the critical difference between *Skrmetti* and this case: merely changing the assigned sex of the minor plaintiffs in *Skrmetti* did not change the outcome, whereas merely changing the assigned sex of Plaintiffs here does change the outcome, affording them access to certificates consistent with their gender identity. That difference is what gives rise to sex discrimination here. Defendants seem to imply that this straightforward reasoning is too obvious to count as sex discrimination. Defs. Br. 19 (agreeing that "[o]f course" Plaintiffs would have access to the birth certificates sought if they were assigned a different sex but characterizing that fact as a "tautology"). But, by that argument, *Bostock* itself was wrongly decided. Its import is similarly straightforward: if a plaintiff would escape the harm at issue if their gender identity were held constant but only their assigned sex were changed—i.e., if they were simply *not transgender*—then there has been discrimination because of sex.

The Policy here also does not constitute a "mere reference" to sex by the government. Defs. Br. 17. Discrimination requires the presence of both differential

8

treatment and harm, *Bostock*, 590 U.S. at 657, and the Policy here imposes both. Birth certificates do not merely sit around in a file cabinet; the government provides copies to its holders so that they can use them. A.18. Defendants' recharacterization of the Policy challenged here as "literally just documenting" a person's assigned sex is a misdirect. Defs. Br. 18. The original birth certificates maintained by Defendants accomplish that— but Plaintiffs challenge Defendants' refusal to provide copies of amended certificates consistent with their gender identity that they can equally use to prove who they are. Also unavailing is Defendants' belated argument that even amended certificates are government speech. The government cannot shield discriminatory conduct on the grounds that it claims to be advancing a message by engaging in that conduct. That conduct deprives Plaintiffs of the equal ability to prove their identity to others.

Defendants have no persuasive response to the point that, even setting this Court's discriminatory intent analysis under *Arlington Heights* to one side, the Policy discriminates based on sex on independent grounds. As *Griffith* and other authorities explain, denying transgender people treatment consistent with their gender identity is sex discrimination. Defendants cannot handwave *Griffith* away as pre-*Skrmetti* authority, Defs. Br. 19, because nothing in *Skrmetti* is inconsistent with its reasoning, and *Skrmetti* certainly did not "indisputably and pellucidly" overrule *Griffith*. *Vincent*, 127 F.4th at 1264. Nor can *Griffith* be dismissed as a case about housing assignments—a fact that might be relevant at the *justification* stage of the analysis but cannot defeat its relevance here to the threshold question of whether there has been sex discrimination in the first place. Defs. Br. 19 n.5. Defendants' attempts to distinguish other authorities fail for

9

similar reasons.  Defs. Br. 16 (attempting to distinguish *Doe v. Horne*, 115 F.4th 1083 (9th Cir. 2024), as analyzing a sports ban, while ignoring that the general proposition at issue—about when facial discrimination exists—applies outside the context of discrimination against transgender people); *see also Baskin v. Bogan*, 766 F.3d 648, 657 (7th Cir. 2014) (recognizing that marriage bans discriminated against same-sex couples based on sexual orientation).

## III.    There Is No Basis for Exempting the Policy from Heightened Scrutiny.

Because the Policy discriminates based on sex and transgender status, it requires heightened scrutiny.  Pls. Br. 14-17.  As to sex discrimination, none of Defendants' arguments urging this Court to retreat from its holding that *Bostock* applies to the Equal Protection Clause is grounded in anything that *Skrmetti* actually held, because the Supreme Court did not have occasion to reach the issue.  In contrast, the issue was and is squarely presented here.  And the general rule that protects everyone from sex discrimination—which is achieved by requiring the government to prove its burden under intermediate scrutiny—should not be artificially construed to carve out transgender people from its ambit.  Pls. Br. 16-17.  Courts must not "suddenly roll out a new and more rigorous standard" for sex discrimination when it comes to transgender people. *Bostock*, 590 U.S. at 673.  That basic principle applies with as much if not greater force to the constitutional guarantee of equal protection than to a statutory protection.

Because sex discrimination does not *only* exist in situations where the law "'prohibit[s] conduct for one sex that it permits for the other,'" intermediate scrutiny should not be limited to only those situations either.  Defs. Br. 18 (quoting *Skrmetti*, 145

10

S. Ct. at 1831)).  *Skrmetti* did not hold otherwise.  As this Court observed, striking

potential jurors on the basis of sex is also plainly sex discrimination "even if one sex

collectively is not treated worse than another."  *Fowler*, 104 F.4th at 792.  Likewise, a

government policy requiring conformity with expectations associated with one's assigned

sex may not treat one sex better or worse than the other, but it would be sex

discrimination all the same.  *See also Doe v. Rocky Mtn. Classical Acad.*, 99 F.4th 1256,

1260 (10th Cir. 2024) (rejecting that a school dress code could escape "the traditional

intermediate scrutiny framework" even if it imposed "comparable burdens" on males and

females); *Griffith*, 129 F.4th at 810-12 (holding that jail policy discriminated against

plaintiff based on sex, even though it did not treat one assigned sex better than the other).

      To the extent Defendants believe that heightened scrutiny should be bypassed

because sex discrimination that does not treat one group more favorably than another is

more likely to be permissible, Defs. Br. 18 n.4, the government still has an opportunity to

demonstrate as much at the justification stage of the analysis.  But that underlying

assumption—that certain discrimination is permissible—requires testing through the

methodological rigor of heightened scrutiny.  No analytical shortcut can reliably suffice,

especially because when it comes to sex, laws "supposedly based on reasonable

considerations may in fact reflect archaic and overbroad generalizations."  *Free the*

*Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 799 (10th Cir. 2019)

(cleaned up).  And one judge's intuition about what situations are generally "permissible"

to warrant dispensing with heightened scrutiny entirely may not be shared by another,

making the evenhanded approach required by heightened scrutiny all the more critical.

Of course, situations requiring heightened scrutiny are not unlimited. The government is only put to the task of justifying its actions under heightened scrutiny where there is discrimination in the first place, which, as explained above, requires both differential treatment and harm—not a mere reference to sex. *Cf.* Defs. Br. 18 (relying upon medical examples of mere references to sex). And disparate impact alone would not be sufficient to trigger heightened scrutiny under existing law. *Cf. Fowler*, 104 F.4th at 802 (Hartz, J., dissenting in part based on concerns for "unintended consequences").

Discrimination against transgender people additionally bears the indicia of at least a quasi-suspect classification warranting heightened scrutiny. None of the *Skrmetti* concurrences changes the law regarding the relevant indicia. Defendants cannot negate perhaps the most important considerations: a history of discrimination and the fact that a person's transgender status does not relate to their value to society. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Grimm*, 972 F.3d at 612. Gender identity is also resistant to *voluntary* change. A.39; *cf.* Defs. Br. 17. And while religion is also not ascertainable at birth, that fact does not make discrimination more defensible. *Skrmetti*, 145 S. Ct. at 1831 ("religion may trigger heightened scrutiny"). Finally, transgender people remain at least as politically vulnerable as other groups were when the Supreme Court recognized their right to protection. Doc. 18 at 28.

## IV.    The Policy Fails Even Rational Basis Review.

Defendants fail in tethering their rational basis arguments to *Skrmetti* and instead regurgitate the same arguments that failed to persuade this Court and failed to attract en

banc review.  Armed with nothing new, the result should not be different.

*Skrmetti* lacked the key features that make this case unique.  Under Oklahoma's longstanding birth certificate policy, it *both* maintained a record of original certificates—thus serving any conceivable interest in such records—*and also* provided transgender people with copies of amended certificates consistent with their gender identity.  That alone severs any rational connection between the Policy and any conceivable interest.  Nothing in *Skrmetti*—which did not analyze anything comparable—suggests otherwise.

Defendants' responses miss the mark.  They first attack a straw man that an interest in accuracy need not have actually motivated the Policy under rational basis review, but the key defect is the lack of a rational connection to that interest.  Defs. Br. 21-22.  Defendants also claim that anyone could change "anything" on their birth certificates, Defs. Br. 22, but restoring the ability to amend a certificate to match an individual's gender identity is a far cry from amending a certificate to list a random birthdate.  As in their en banc petition, Defendants also rely on *Gore v. Lee*, 107 F.4th 548 (6th Cir. 2024).  But the Sixth Circuit neglects that the government must not only have a "plausible policy reason for the classification"—the classification must also "rationally further[]" that interest.  *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).  When a policy is utterly ineffective, "the relationship [between] the classification [and] its goal is … so attenuated as to render the distinction arbitrary or irrational."  *Id.*; *see also* Doc. 110 at 12-13.

Defendants also raise no new arguments about how the Policy rationally furthers an interest in protecting women's sports, much less explain how *Skrmetti* breathes new

life into them.  The United States likewise repeats similar arguments that were already

litigated here.  *See, e.g.*, U.S. Br. at 1 (discussing sex-separated facilities); *but see* Doc.

18 at 53 (same).  Defendants also raise nothing new as to purported interests in resource

conservation and fraud prevention.  "[A] concern for the preservation of resources

standing alone can hardly justify the classification used in allocating those resources."

*Plyler v. Doe*, 457 U.S. 202, 227 (1982).  And Defendants continue to fail to provide any

explanation of *how* the Policy even conceivably addresses fraud.  Nor can they, as the

Policy adds nothing to Oklahoma law.  *See, e.g.*, 63 Okla. Stat. § 1-323(C)(4) (permitting

electronic verification of birth certificates "for fraud protection"); *id.* § 1-323(C)(1) (same

for "[a] government agency in [the] conduct of its official business"); *see also U.S. Dep't

of Agric. v. Moreno*, 413 U.S. 528, 536-37 (1973) (rejecting fraud prevention as

providing a rational basis for challenged policy).

Defendants do not argue that consigning Ms. Fowler to present a birth certificate

to third parties that says the certificate holder is "male" rationally furthers a goal of

verifying that she is the same person reflected on the certificate.  That would be irrational

on its face—which Oklahoma's own practice for driver's licenses further confirms.  But

because Defendants do not press the argument, their related over- and under-inclusion

arguments largely fall by the wayside, Defs. Br. 23, although a policy that is vastly over-

and under-inclusive also fails rational basis review.  *See Romer v. Evans*, 517 U.S. 620,

632 (1996); *Moreno*, 413 U.S. at 536-37.

Instead, Defendants make a distinct argument—that medical providers should

know a transgender person's biological sex—but their final attempt to identify a rational

14

basis for the Policy only accomplishes the opposite.  Defs. Br. 25.  They again fail at the critical juncture: establishing a rational *connection* between how providing Ms. Fowler an amended birth certificate—which she can present to banks, employers, motor vehicle officials, and the like—would somehow prevent healthcare providers from taking her assigned sex into account.  Every day, transgender people access healthcare across America, and their possession of identity documents matching their identity does not remotely stand in the way.

This Court's prior holding remains as true now as it did before: "There is no rational connection here—the Policy is in search of a purpose."  *Fowler*, 104 F.4th 797.

## CONCLUSION

For the foregoing reasons, this Court should reaffirm its prior opinion.

Dated: October 2, 2025

Respectfully submitted,

/s/ Peter C. Renn

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street, NW, Suite 4140
Washington, D.C. 20002
(202) 804-6245

Peter C. Renn
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa St., Ste. 1260
Los Angeles, CA 90017
(213) 382-7600

Shelly L. Skeen
Nicholas J. Hite
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

Karen Keith Wilkins
1515 S. Denver Ave.
Tulsa, OK 74119
(918) 599-8118

**CERTIFICATE OF COMPLIANCE**

This brief complies with the Court's August 6, 2025 Order, because it is no longer than 15 pages.

This brief also complies with the requirements of the Court's August 6, 2025 Order and Federal Rule of Appellate Procedure 32(a)(5), as well as the type-style requirement of Federal Rule of Appellate Procedure 32(a)(6) and 10th Cir. R. 32, because it was prepared using Microsoft Word 2016 in Times New Roman 13-point font, a proportionally spaced typeface.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

16

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on October 2, 2025.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that (1) all required privacy redactions have been made; (2) no paper copies of this document are required per the Court's August 6, 2025 Order; and (3) the electronic submission was scanned this document for viruses using Microsoft Defender and, according to that program, this document is virus free.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants