No. 23-5080

---

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

ROWAN FOWLER; ALLISTER HALL; and CARTER RAY,

*Plaintiffs-Appellants*,

v.

KEVIN STITT, in his official capacity as Governor of the State of Oklahoma;
KEITH REED, in his official capacity as Commissioner of Health for the
Oklahoma State Department of Health; and KELLY BAKER, in her official
capacity as State Registrar of Vital Records,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Oklahoma
No. 4:22-cv-00115-JWB-MTS (Judge John W. Broomes)

---

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

---

Peter C. Renn
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa St., Ste. 1260
Los Angeles, CA 90017
(213) 382-7600

Shelly L. Skeen
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, D.C. 20006
(202) 804-6245

Karen Keith Wilkins
1515 S. Denver Ave.
Tulsa, OK 74119
(918) 599-8118

**[ORAL ARGUMENT REQUESTED]**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF RELATED CASES ................................................................ 3

STATEMENT OF JURISDICTION .................................................................... 3

STATEMENT OF ISSUES ................................................................................. 3

STATEMENT OF THE CASE ............................................................................ 4

A.    Gender Identity ....................................................................................... 4

B.    Significance of Birth Certificates .......................................................... 5

C.    Plaintiffs' Experiences ........................................................................... 6

D.    Oklahoma's Birth Certificate Policy ...................................................... 8

E.    District Court Proceedings ...................................................................... 11

STANDARD OF REVIEW ................................................................................. 13

SUMMARY OF ARGUMENT ........................................................................... 13

ARGUMENT ...................................................................................................... 16

I.    Plaintiffs Pled Sufficient Facts to State a Plausible Claim that the Birth
      Certificate Policy Deprives Them of Equal Protection. ........................... 16

      A.    The Policy Triggers Heightened Scrutiny Because It Discriminates
            Against Transgender People Based on Sex ...................................... 17

      B.    The Policy Discriminates Against Transgender People, Who
            Constitute a Quasi-Suspect Class at a Minimum. ............................ 26

i

II.     The Alleged Involuntary Disclosure of Plaintiffs' Transgender Status
        Caused by the Policy States a Plausible Claim for a Privacy Violation. ......31

        A.     Transgender Status Is Highly Personal and Intimate Information
               Protected by the Right to Privacy.........................................................31

        B.     The District Court Improperly Dismissed Plaintiffs' Privacy
               Claim By Wrongly Reframing the Privacy Interest at Stake.............36

III.    Plaintiffs Plausibly Alleged Facts to Show that the Government's
        Proffered Justifications for the Policy Fail Any Level of Scrutiny...............42

        A.     The Government's Justification of "Accuracy" Is Rationally
               Disconnected from Any Concrete Interest...........................................43

        B.     The Policy Cannot Be Justified In the Name of "Protecting
               Women."................................................................................................51

CONCLUSION ...........................................................................................................54

STATEMENT REGARDING ORAL ARGUMENT .............................................56

CERTIFICATE OF COMPLIANCE.......................................................................57

CERTIFICATE OF SERVICE ................................................................................58

CERTIFICATE OF DIGITAL SUBMISSION ......................................................59

10TH Cir. R. 28.2(A) ATTACHMENT TO BRIEF
(Attachment 1: District Court Memorandum and Order, Dkt. 52, Filed 6/8/23) ...60

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Acosta v. Jani-King of Oklahoma, Inc.*,
  905 F.3d 1156 (10th Cir. 2018)............................................................13

*Adkins v. City of New York*,
  143 F. Supp. 3d 134 (S.D.N.Y. 2015)........................................... 27, 35

*A.L.A. v. W. Valley City*,
  26 F.3d 989 (10th Cir. 1994)....................................................... 31, 37

*Anderson v. Blake*,
  469 F.3d 910 (10th Cir. 2006)................................................ 32, 33, 37

*Arroyo Gonzalez v. Rosello Nevares*,
  305 F. Supp. 3d 327 (D.P.R. 2018)........................................ 17, 34, 43

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
  208 F. Supp. 3d 850 (S.D. Ohio 2016)........................................ 27, 29

*Bostock v. Clayton Cnty.,Ga.*,
  140 S. Ct. 1731 (2020) ............................................ 12, 17, 20, 21, 22

*Botello v. Morgan Hill Unified Sch. Dist.*,
  No. C09-02121 HRL, 2009 WL 3918930 (N.D. Cal. Nov. 18, 2009) ...............41

*Brown v. Zavaras*,
  63 F.3d 967 (10th Cir. 1995)....................................................... 23, 29

*Clinton v. Sec. Benefit Life Ins. Co.*,
  63 F.4th 1264 (10th Cir. 2023)............................................................13

*Colo. Christian Univ. v. Weaver*,
  534 F.3d 1245 (10th Cir. 2008).........................................................26

*Corbitt v. Taylor*,
513 F. Supp. 3d 1309 (M.D. Ala. 2021) .................................................. 17, 20, 49

*Dalton v. Reynolds*,
2 F.4th 1300 (10th Cir. 2021) .................................................................................42

*Denver Policemen's Protective Ass'n v. Lichtenstein*,
660 F.2d 432 (10th Cir. 1981) ................................................................................31

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001) ..............................................................................42

*Druley v. Patton*,
601 Fed. App'x. 632 (10th Cir. 2015) ....................................................................29

*D.T. v. Christ*,
552 F. Supp. 3d 888 (D. Ariz. 2021) ............................................................. 17, 20

*Eastwood v. Dep't of Corrs.*,
846 F.2d 627 (10th Cir. 1988) ................................................................................31

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018) ..................................................................................25

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017) ....................................................................27

*Fabian v. Hosp. of Cent. Conn.*,
172 F. Supp. 3d 509 (D. Conn. 2016) ....................................................................24

*Flack v. Wis. Dep't of Health Servs.*,
328 F. Supp. 3d 931 (W.D. Wis. 2018) ..................................................................27

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*,
916 F.3d 792 (10th Cir. 2019) .................................... 16, 18, 24, 25, 44, 46, 47, 53

*Frontiero v. Richardson*,
411 U.S. 677 (1973) ........................................................................................ 28, 52

*F.V. v. Barron*,
  286 F. Supp. 3d 1131 (D. Idaho 2018)...................... 17, 19, 23, 27, 28, 30, 43, 44

*F.V. v. Jeppesen*,
  466 F. Supp. 3d 1110 (D. Idaho 2020).............................................................10

*Gore v. Lee*,
  No. 3:19-cv-0328, 2023 WL 4141665 (M.D. Tenn. Jun. 22, 2023), *appeal docketed*, No. 23-5669 (6th Cir. Jul. 26, 2023)........................................... 17, 23

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020)............................................................ 18, 20, 27, 28

*Hecox v. Little*,
  79 F.4th 1009 (9th Cir. 2023)........................................................................ 18, 52

*In Re Childers-Gray*,
  487 P.3d 96 (Utah 2021) ........................................................................................49

*Johnson v. California*,
  543 U.S. 499 (2005) ................................................................................................26

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019).............................................................................27

*Kitchen v. Herbert*,
  755 F.3d 1193 (10th Cir. 2014)..................................................................... 41, 44

*K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*,
  No. 3AN-11-05431-CI, 2012 WL 2685183
  (Alaska Super. Ct. Mar. 12, 2012) ..................................................... 17, 39, 49, 50

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ...............................................................................................40

*Lankford v. City of Hobart*,
  27 F.3d 477 (10th Cir. 1994)........................................................................ 32, 35, 40

*Leiser v. Moore*,
  903 F.3d 1137 (10th Cir. 2018).................................................................... 33, 34

*Love v. Johnson*,
   146 F. Supp. 3d 848 (E.D. Mich. 2015)................... 17, 34, 35, 38, 39, 47, 49, 50

*Lowe v. Raemisch*,
   864 F.3d 1205 (10th Cir. 2017)........................................................30

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
   286 F. Supp. 3d 704 (D. Md. 2018) ...................................................27

*Marquez v. Montana*,
   No. DV-21-873 (Yellowstone Cnty. Dist. Apr. 21, 2022)...................................17

*Matson v. Board of Education*,
   631 F.3d 57 (2d Cir. 2011)...........................................................34

*MH v. First Judicial Dist. Ct. of Laramie Cnty.*,
   465 P.3d 405 (Wyo. 2020) ..........................................................49

*Navajo Nation v. New Mexico*,
   975 F.2d 741 (10th Cir. 1992)........................................................26

*Norseworthy v. Beard*,
   87 F. Supp. 3d 1104 (N.D. Cal. 2015) ...............................................27

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015) ..............................................................30

*Pavan v. Smith*,
   137 S. Ct. 2075 (2017) ..............................................................45

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ................................................................40

*Powell v. Schriver*,
   175 F.3d 107 (2d Cir. 1999).................................................... 33, 35

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) ................................................................25

*Ray v. Himes*,
No. 2:18-cv-272, 2019 WL 11791719 (S.D. Ohio Sept. 12, 2019).. 17, 39, 40, 47

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020)............... 17, 26, 28, 34, 35, 38, 42, 44, 46

*Romer v. Evans*,
517 U.S. 620 (1996) ....................................................................... 42, 52

*S.E.C. v. Shields*,
744 F.3d 633 (10th Cir. 2014).................................................................13

*Schroer v. Billington*,
424 F. Supp. 2d 203 (D.D.C. 2006) ......................................................24

*Schroer v. Billington*,
577 F. Supp. 2d 293 (D.D.C. 2008) ......................................................24

*Schwenk v. Hartford*,
204 F.3d 1187, 1201 (9th Cir. 2000)......................................................29

*Sheets v. Salt Lake Cnty.*,
45 F.3d 1383 (10th Cir. 1995)................................................................32

*Smith v. Avanti*,
249 F. Supp. 3d 1194 (D. Colo. 2017)...................................................25

*Stewart v. City of Oklahoma City*,
47 F.4th 1125 (10th Cir. 2022)......................................................... 32, 33

*Stidham v. Peace Officer Stds. and Training*,
265 F.3d 1144 (10th Cir. 2001)........................................................ 32, 36

*Tudor v. SE Okla. State Univ.*,
13 F.4th 1019 (10th Cir. 2021)...............................................................21

*United States v. Virginia*,
518 U.S. 515 (1996) ....................................................................... 18, 54

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017)..................................................................27

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012)....................................................................42

*Zzyym v. Pompeo*,
  958 F.3d 1014 (10th Cir. 2020)...................................................... 24, 50

## Statutes

28 U.S.C. § 1291 ......................................................................................3

28 U.S.C. § 1331 ......................................................................................3

28 U.S.C. § 1343 ......................................................................................3

42 U.S.C. § 1983 ......................................................................................3

Okla. Admin. Code 310:105-3-3 .............................................................43

Okla. Admin Code 310:105-3-5 ..............................................................45

63 Okla. Stat. § 1-301 ............................................................................46

63 Okla. Stat. § 1-303 ............................................................................46

63 Okla. Stat. § 1-311 ............................................................................43

63 Okla. Stat. § 1-316 ...................................................................... 43, 45

63 Okla. Stat. § 1-321 ..........................................................................9, 43

63 Okla. Stat. § 1-323 ............................................................................39

70 Okla. Stat. § 1-125 ............................................................................53

70 Okla. Stat. § 27-106 ..........................................................................53

## Other Authorities

Am. Med. Ass'n, Resolution 5-I-19, *Removing Sex Designation from the Public Portion of the Birth Certificate* (Jun. 15, 2021).......................................................48

Centers for Disease Control and Prevention, Model State Vital Statistics Act and Regulations (1992).......................................................................................................48

H.R. 5, 117th Cong. (2021).......................................................................................28

Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 MICH. J. GENDER & L. 373 (2013) ..........................................................................................................................48

## INTRODUCTION

For at least 14 years, transgender people born in Oklahoma were able to amend their birth certificates to match their gender identity.  Transgender women were able to obtain birth certificates indicating that they were female, and transgender men were able to obtain birth certificates indicating that they were male.  In 2021, Governor Stitt issued an Executive Order reversing that long-standing practice and categorically banned them from doing so.  He explained why: "I believe that people are created by God to be male or female.  Period."

The Governor's rejection and disapproval of transgender people is not a constitutionally valid reason for stripping them of access to basic tools that they use to prove their identity like everyone else.  Successful navigation of modern life requires proof of identity.  From employment to housing, and health care to financial affairs, there are few facets of life where we are not called upon to prove our identities.  But when transgender people like Plaintiffs are called upon to do so, they cannot use their birth certificates—one of the most foundational documents to verify identity—as others are freely able to do.  Instead, the presentation of their birth certificates involuntarily discloses their transgender status and exposes them to an all-too-real risk of harassment, discrimination, and even violence.

The district court dismissed Plaintiffs' complaint despite the plausible violations of their constitutional rights to equal protection and privacy that other

courts have recognized in identical contexts.  The government's policy discriminates against transgender people because it deprives them of access to birth certificates that match their gender identity, which others are afforded.  It infringes upon their right to privacy because one's transgender status is highly personal and intimate information, as this Court already has recognized.

The district court therefore erred in applying rational basis review rather than heightened scrutiny, but it also failed to provide a convincing answer to a central question under any level of scrutiny: what, exactly, is the harm to others in allowing transgender people to correct their birth certificates?  The complaint alleged that in all the years that Oklahoma permitted transgender people to correct their birth certificates, no harm occurred, just as no harm is caused by permitting similar corrections to their driver's licenses.  And it alleged the same is true elsewhere, as the vast majority of states also permit such corrections.

None of the justifications for the policy answer that question.  The district court imagined that allowing transgender women to access birth certificates matching their gender identity would displace cisgender women from podiums at sporting events.  But this is a case about birth certificates, not sports.  The flimsiness of the government's hypothetical justifications confirms that its policy is a solution in search of a problem.  Taking Plaintiffs' factual allegations as true, the complaint stated valid claims for relief that should have been allowed to proceed.

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs brought claims arising under federal law pursuant to 42 U.S.C. § 1983.  This Court possesses jurisdiction under 28 U.S.C. § 1291.  The district court granted Defendants' motion to dismiss, disposing of all claims, on June 8, 2023. Plaintiffs timely filed a notice of appeal on July 6, 2023.

## STATEMENT OF ISSUES

1.      Whether the district court erred in dismissing Plaintiffs' equal protection claim alleging that Defendants' categorical ban discriminates against transgender people and thus requires heightened scrutiny as discrimination based on either sex or transgender status.

2.      Whether the district court erred in dismissing Plaintiffs' privacy claim on the grounds that there is no infringement of privacy where the government causes the disclosure of one's transgender status through documents the government provides to individuals to prove their identity to others.

3.      Whether the district court erred in holding that there is an adequate justification for Defendants' categorical ban where the complaint alleged that no harms occurred previously or elsewhere in the absence of a ban and the

government retains possession of the original versions of birth certificates.

## STATEMENT OF THE CASE

### A.    Gender Identity

All individuals have multiple sex-related characteristics, including hormones, external and internal reproductive organs, sex chromosomes, and gender identity.  A.14.[1]  For a majority of people, these characteristics are in alignment with one another.  For a minority, they are not.  A person is transgender where their gender identity—a person's core internal sense of their own gender— diverges from their sex assigned at birth.  A person is cisgender where their gender identity is aligned with their sex assigned at birth.  There is a medical consensus that gender identity is innate and has biological underpinnings.  A.15, 39.

Where an individual's assigned sex and gender identity are not in alignment, the critical determinant of a person's sex is their gender identity.  A.14.  Attempts to change a person's gender identity are not only ineffective but dangerous and risk serious psychological and physical harm.  A.15.

Gender dysphoria is the clinically significant distress that can be associated with the discordance between one's assigned sex and gender identity and can result in depression, self-harm, or suicide without appropriate treatment.  A.15-16.

---

[1] References to "A." are to Plaintiffs-Appellants' Appendix.  References to "ECF" are to the documents filed in the district court.

Living in a manner consistent with one's gender identity is a key aspect of that treatment. A.16. Transition is the process by which transgender people come to live in a manner consistent with their gender identity. *Id.* Transition can include multiple components, including social transition as well as medical care to bring one's body into alignment with one's gender identity. *Id.* The ability to access identity documents consistent with one's gender identity is important to social transition. *Id.* To be effective in alleviating gender dysphoria, social transition must be respected across all aspects of a person's life. *Id.*

**B.    Significance of Birth Certificates**

Identity documents in general, and birth certificates in particular, play a critical role in modern life. They answer a fundamental question: who are you? People rely on identity documents to prove to others that they are who they say they are. A birth certificate is an essential government-issued document that serves as proof of one's identity. It is commonly used for a variety of purposes, including proof of identity, age, and citizenship, and by a variety of entities, including employers, government agencies, and educational, financial, and health care institutions. A.10-11, 18. It also serves as the foundation for other important identity documents such as driver's licenses, social security cards, voter registration cards, and passports. A.18.

Denying transgender people identity documents consistent with their gender

identity causes significant harm.  It forcibly discloses their transgender status, which is deeply private and sensitive information, in contexts where they would otherwise keep that information private.  A.19.  Transgender people experience high rates of discrimination, harassment, and violence.  *Id.*  Saddling them with identity documents discordant with their gender identity exposes them to these very harms.  *Id.*  It also undermines the goal of identity verification by causing others to question whether they are the same individuals reflected on their identity documents.  A.20.

## C.    Plaintiffs' Experiences

Plaintiffs are transgender people who were born in Oklahoma and seek access to birth certificates consistent with their gender identity.  Plaintiff Rowan Fowler is a 48-year-old transgender woman who is trained in graphic design.  A.25.  Plaintiff Allister Hall is a 27-year-old transgender man who studied English literature in college and aspired to become a teacher.  A.30.  Plaintiff Carter Ray is a 25-year-old transgender man who is an Emergency Medical Technician who provided care to Oklahomans during the COVID-19 epidemic.  A.33.

Plaintiffs' experiences illustrate the hostility and antipathy that transgender people routinely encounter when their transgender status is revealed because of inaccurate identity documents.  Ms. Fowler experienced that first-hand after she began her transition.  When she attempted to patronize a bar with friends, she

presented her license that still reflected male at the time to the bouncer, who

responded, "We don't serve your kind here.  You can find someplace else to

drink."  A.28-29.  The experience was deeply humiliating and made Ms. Fowler

feel like a burden on her friends, who had already entered and had to find another

place they could all go.  A.29.  On another occasion at a restaurant, she ordered an

alcoholic beverage and presented her license to a waiter, who said "fucking tranny"

as he was walking away, loud enough for others to hear it, and did not return to the

table.  *Id.*  The experience was "soul-crushing" and caused Ms. Fowler to fear for

her safety whenever she left her house for months after the experience.  *Id.*

Mr. Ray had similarly humiliating experiences.  When he patronized a

bowling alley with a friend, he ordered a drink and presented his license upon

request, but the manager did not believe that he was the license holder because it

still indicated female at the time.  A.35.  The manager escalated the situation by

bringing over a second manager, and then a third employee, who accused Mr. Ray

of using a sibling's license.  A.35-36.  Having a routine trip to the bowling alley

turn into a public dispute over his identity was insulting and demoralizing.  A.36.

After repeated instances of having his identity interrogated, Mr. Ray began to self-

isolate, declined invitations from friends and family to go out, and stayed at home

alone.  *Id.*

Plaintiffs have also feared for their safety, simply for being who they are.

Through Ms. Fowler's work with the local community, she knows that other

transgender Oklahomans have been physically attacked because they are

transgender, and she personally feared for her safety one night when a stranger

followed her around in public, causing her to retreat into a store for refuge.  A.28.

Mr. Hall has had similar experience with strangers following him around in public.

A.32.  Mr. Ray has likewise feared for his safety in situations where his

transgender status was at risk of disclosure, including an "unnerving" incident

when he was pulled over by a patrol officer.  A.36.  Based on the hostility he has

faced as a transgender man, Mr. Ray also kept his transgender status private at

work out of fear that he would lose his job if it was disclosed.  *Id.*

## D.    Oklahoma's Birth Certificate Policy

The Oklahoma State Department of Health (OSDH) is responsible for the

state's vital records including the issuance and alteration of birth certificates.

A.13-14.  From at least 2007, if not earlier, until 2021, OSDH allowed transgender

people to correct the gender markers on their birth certificates without any harm to

others.  A.21.  OSDH officials did so believing that it was consistent with their

responsibility to protect the integrity and accuracy of Oklahoma's vital records.  *Id.*

Rather than implement an administrative process to handle such corrections

directly, OSDH corrected birth certificates after individuals obtained orders from

state courts in Oklahoma and elsewhere directing that their birth certificates be

corrected to match their gender identity.  *Id.*

The policy challenged in this litigation ("Birth Certificate Policy" or

"Policy") originates in part from actions taken by Governor Stitt in response to the

resolution of litigation involving OSDH officials.  In 2021, OSDH entered into a

settlement that enabled a plaintiff, whose gender identity did not match their sex

assigned at birth, to obtain an amended birth certificate with a gender-neutral

designation, consistent with their gender identity.  A.21-22.

After learning of the settlement, Governor Stitt issued a statement on

October 21, 2021 stating, "I believe that people are created by God to be male or

female.  Period."  A.22.  He further stated, "There is no such thing as non-binary

sex, and I wholeheartedly condemn the OSDH court settlement."  *Id.*  He vowed to

take "whatever action necessary to protect Oklahoma values."  *Id.*

Shortly thereafter, on November 8, 2021, Governor Stitt issued Executive

Order 2021-24.  The Executive Order asserted that Oklahoma law did not "provide

OSDH or others any legal ability to in any way alter a person's sex or gender on a

birth certificate."  *Id.*  It directed OSDH to immediately cease amending birth

certificates in a manner inconsistent with its terms.[2]  *Id.*  Governor Stitt also

---

[2] The next year, Oklahoma enacted legislation providing that, going forward, the
sex designated on birth certificates "shall be either male or female and shall not be
nonbinary or any symbol representing a nonbinary designation including but not
limited to the letter 'X.'"  A.23 (quoting 63 Okla. Stat. § 1-321).

enforced the Executive Order by specifically instructing OSDH officials that they could not correct the birth certificates of transgender people to reflect their male or female gender identity. *Id.*

Because of the Policy, OSDH denied Plaintiffs' requests for birth certificates consistent with their gender identity, A.27, 31-32, 34-35, even though they had obtained state court orders for such certificates, A.26-27, 31, 34.[3]

Oklahoma's Policy stands in sharp contrast to the approach taken in at least 47 states, which do not categorically ban transgender people from correcting their birth certificates to match their gender identity, as well as the federal government, which allows transgender people to correct their gender on passports and other federal records. A.23-24.[4] The Policy is also contrary to Oklahoma's own practice

---

[3] Contrary to the district court's characterization, Plaintiffs did not ask it "to enforce those orders." A.52. Rather, Plaintiffs challenged Defendants' Policy, which is an independent barrier standing in the way of the relief they seek and which violates their federal constitutional rights *regardless* of any such orders. OSDH refuses to provide transgender people with certificates matching their gender identity; the proper remedy for that constitutional violation is for OSDH to provide them. *See F.V. v. Jeppesen*, 466 F. Supp. 3d 1110, 1117-18 (D. Idaho 2020) (holding that constitutional remedy required agency to process applications).

[4] Tennessee and Kansas also bar transgender people from accessing birth certificates matching their gender identity, and their policies are the subject of legal challenges. *Infra* n.6. In 2019, Kansas entered into a consent decree permitting such access, *Foster v. Andersen*, No. 18-2552, ECF No. 33 (D. Kan. Jun. 21, 2019), but in 2023, it passed a law seeking to once again ban such access, spurring renewed litigation.

as to driver's licenses, which permits such corrections.  A.24.

## E.    District Court Proceedings

Plaintiffs filed this action on March 14, 2022 against the Governor, the OSDH Commissioner, and the OSDH State Registrar of Vital Records seeking injunctive relief against the government's categorical refusal to provide them with access to birth certificates consistent with their gender identity.  Plaintiffs brought claims under the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the First Amendment.[5]  Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  After Plaintiffs served written discovery requests on Defendants to develop the factual record for their claims, Defendants filed a motion to stay discovery, which Plaintiffs opposed.  ECF 42, 47.  The district court granted that motion and stayed all discovery, citing the pending motion to dismiss and an interest in saving taxpayer money from responding to discovery.  ECF 49 at 3.  Several months later, the district court granted Defendants' motion to dismiss.  A.45-90.

With respect to Plaintiffs' equal protection claim, the district court held that government discrimination against transgender people receives only rational basis

---

[5] Plaintiffs appeal only the dismissal of their equal protection and informational privacy claims and any aspect of the decision and proceedings below relevant to the appeal of those claims.

review.  A.83.  It refused to regard such discrimination as a form of sex

discrimination because it viewed doing so as "compressing transgender people into

classifications based on sex."  *Id.*  It did not address *Bostock v. Clayton Cnty., Ga.*,

140 S. Ct. 1731 (2020).  It also believed that earlier circuit cases precluded finding

that transgender people constitute a quasi-suspect class in their own right.  A.83.

The court expressed that "[t]he legislature must have a certain amount of flexibility

and freedom from judicial oversight."  A.85.

   With respect to Plaintiffs' privacy claim, the district court held that no right

to privacy was implicated because there was no allegation that Defendants

personally disclosed Plaintiffs' transgender status to others.  A.73.  The district

court recognized, however, that when Plaintiffs use their birth certificates, it causes

others to realize that Plaintiffs are transgender.  A.54.  It also reasoned that no

privacy right could be violated because birth certificates were not filed when the

Fourteenth Amendment was adopted in 1868.  A.75.

   The district court held that the Policy was justified by a rational basis in

promoting accuracy and protecting women.  It believed that changing the sex listed

on Plaintiffs' birth certificates would undermine accuracy by changing the facts of

birth, even though other post-birth changes to birth certificates are permitted.

A.87.  It imagined that corrected birth certificates might allow transgender women

to participate in women's sports and presumed that their exclusion in that context

12

would be constitutional, and therefore held the Policy was too.  A.89.

## STANDARD OF REVIEW

This Court applies *de novo* review to a dismissal under Federal Rule of Civil Procedure 12(b)(6).  *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).  "Under this standard, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party."  *Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) (quotes omitted).  The complaint need only contain sufficient factual matter to nudge the claims across the line from conceivable to plausible to state a claim for relief, and allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.  *Shields*, 744 F.3d at 640.

"Granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quotes omitted).  "There is a low bar for surviving a motion to dismiss, and a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Id.* (quotes omitted).

## SUMMARY OF ARGUMENT

The district court erred in dismissing the complaint because Plaintiffs stated

facially plausible claims that the Policy violates their constitutional rights to equal protection and privacy, as other courts analyzing similar policies have recognized.

The Policy discriminates against transgender people because it deprives them, and them alone, of access to birth certificates consistent with their gender identity that they can use. It therefore requires heightened scrutiny. As *Bostock* made clear, discrimination against transgender people is necessarily based on sex. And here, the Policy is literally a sex-based classification, which inflicts injury on transgender people like Plaintiffs whose gender identity contravenes the government's classification. Discrimination against transgender people also bears all the indicia of a suspect or quasi-classification in its own right, an issue that this Court's prior authority intentionally left open for future development.

The Policy infringes upon the constitutional right to informational privacy, and thus requires a compelling interest achieved through the least intrusive means, because one's transgender status is a quintessential form of highly private and intimate information warranting protection. The government provides individuals with copies of their own birth certificates so that they can use them to prove their identity, but the district court acknowledged that when Plaintiffs do so, their transgender status is disclosed. The district court rejected Plaintiffs' privacy claim by wrongly focusing on how the privacy infringement occurs, rather than on whether the information at issue is private. It thus reasoned that because birth

14

certificates were not filed when the Fourteenth Amendment was adopted, no privacy right could be implicated. But that conflates the existence of a cognizable privacy interest with the manner in which that interest is infringed.

The Policy fails any level of scrutiny because it lacks even a rational basis. First, the district court held that it would be "inaccurate" to allow transgender people to make post-birth changes to their birth certificates, even though other post-birth changes are permitted for a variety of reasons. Moreover, nothing about providing a corrected version of a birth certificate to a transgender person changes the information on the original version of the birth certificate, which remains in the government's possession, should it be required for any reason.

Second, the district court credited the government's assertion that its policy protects cisgender women, whose interests are purportedly at odds with transgender women. On its own terms, that justification does not explain the policy as it relates to transgender men. As to transgender women, the district court's resort to speculating about hypothetical outcomes in women's sporting events in a case about birth certificates illustrates the lack of any rational tether between the policy and any adequate government interest. And as the complaint plausibly alleged, none of the court's imagined harms came to fruition in Oklahoma for the 14 years that preceded the policy or anywhere else.

## ARGUMENT

### I.    Plaintiffs Pled Sufficient Facts to State a Plausible Claim that the Birth Certificate Policy Deprives Them of Equal Protection.

Defendants' Birth Certificate Policy strips transgender people like Plaintiffs of access to birth certificates that match their gender identity that accurately communicate who they are—and that they can use without compromising their privacy, dignity, and safety—while people who are not transgender continue to have access to such documents.  Because that discriminates based on sex and transgender status, it triggers heightened scrutiny under equal protection on either basis.

Heightened scrutiny imposes a "stringent" standard: the policy at issue is presumed unconstitutional unless the government can satisfy its burden to demonstrate that "an exceedingly persuasive justification" actually motivated its enactment.  *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 799 (10th Cir. 2019) ("*Fort Collins*") (quotes omitted).  The law must serve important government objectives through means substantially related to achieving those objectives.  Laws "supposedly based on 'reasonable considerations' may in fact reflect 'archaic and overbroad generalizations about gender.'"  *Id.*  Thus, "as we inquire into a gender-based classification's objectives, we must beware of stereotypes and their potential to perpetuate inequity."  *Id.* at 802.

Regardless of the precise level of scrutiny employed, the majority of courts

in modern history have arrived at the same conclusion: governmental barriers that deprive transgender people of identity documents matching their gender identity are unconstitutional.  That includes federal and state courts in Ohio, Idaho, Michigan, Alabama, Alaska, Montana, Arizona, and Puerto Rico ruling upon policies barring or restricting transgender people from accessing birth certificates or driver's licenses consistent with their gender identity.[6]  As detailed below, *infra* III, the complaint plausibly alleges that the Policy cannot withstand even rational basis review.

### A.    The Policy Triggers Heightened Scrutiny Because It Discriminates Against Transgender People Based on Sex.

Discrimination requires two elements: differential treatment and harm.  *See, e.g.*, *Bostock*, 140 S. Ct. at 1740.  There is no question that Plaintiffs have alleged that the Policy causes transgender people harm.  Indeed, the district court itself

---

[6] *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925 (S.D. Ohio 2020); *Ray v. Himes*, No. 2:18-cv-272, 2019 WL 11791719 (S.D. Ohio Sept. 12, 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018); *Arroyo Gonzalez v. Rosello Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018); *Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015); *K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012); *see also Marquez v. Montana*, No. DV-21-873 (Yellowstone Cnty. Dist. Apr. 21, 2022); *Corbitt v. Taylor*, 513 F. Supp. 3d 1309 (M.D. Ala. 2021); *D.T. v. Christ*, 552 F. Supp. 3d 888 (D. Ariz. 2021).  The only other modern case upholding a birth certificate policy is *Gore v. Lee*, No. 3:19-cv-0328, 2023 WL 4141665 (M.D. Tenn. Jun. 22, 2023), *appeal docketed*, No. 23-5669 (6th Cir. Jul. 26, 2023), which was wrongly decided as well as factually and procedurally distinguishable.

recognized some of those harms—including, for example, the fact that it causes others "to realize that a Plaintiff is transgender" and it "inhibit[s] the success of their intended goal to be perceived as a man or a woman." A.54. Accordingly, the central question for Plaintiffs' sex discrimination claim is simply whether the Policy engages in differential treatment based on sex. The Policy does so in multiple ways, including because it classifies based on sex and causes Plaintiffs harm based on their gender identity as well as sex stereotypes.

*Sex-Based Classification.* The Policy inescapably engages in sex-based differential treatment if for no other reason than this: it is literally a sex-based classification on its face. As the Supreme Court held long ago, "all gender-based classifications" are subject to equal protection. *United States v. Virginia*, 518 U.S. 515, 555 (1996); *accord Fort Collins*, 916 F.3d at 799. A policy that "cannot be stated without referencing sex" is a paradigmatic example of a sex-based classification. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (holding that a school policy that barred a transgender male from boys' facilities based on his "biological gender" discriminated on the basis of sex); *Hecox v. Little*, 79 F.4th 1009, 1022 (9th Cir. 2023) (holding that athletics law necessarily "ban[ned] transgender women from 'biologically female' teams" and discriminated based on sex).

Here, Defendants' Policy cannot be stated, much less understood, without

18

referencing sex.  First, the Executive Order permanently consigns transgender people to the sex designation they were assigned at birth by forbidding OSDH officials from "'alter[ing] a person's sex or gender on a birth certificate.'"  A.22. Second, the complaint alleged that Governor Stitt and his office have "specifically instruct[ed] OSDH officials that they cannot correct the birth certificates of transgender people to reflect their male or female gender identity."  A.22-23. Third, the Policy was specifically created in response to OSDH changing the birth certificate of an individual whose gender identity did not match their assigned sex and to stop that practice from continuing.  A.21-22.

If there were any doubt that the Policy is based on sex, Defendants' position in this litigation erased it.  In their own words, "the birth certificate law at issue here … classif[ies] individuals based on biological or birth sex."  ECF 23 at 20. And the district court itself then proceeded to analyze Defendants' proffered interest of "classifying individuals based on the two sexes."  A.86.  Thus, far from being facially neutral, classifying transgender people like Plaintiffs based on Defendants' view of "sex" is the Policy's central and defining feature.

Courts have recognized that where the government deprives transgender people of identity documents reflecting their gender identity, it has engaged in discrimination based on sex.  *F.V.*, 286 F. Supp. 3d at 1145 (holding that state's birth certificate policy "violate[d] the Equal Protection Clause by failing to provide

19

an avenue for transgender people to amend the sex listed on their birth certificates"); *cf. Corbitt v. Taylor*, 513 F. Supp. 3d 1309, 1315 (M.D. Ala. 2021) (holding that "the State sets the criteria by which it channels people into its sex classifications" when it deprived transgender plaintiffs of driver's licenses consistent with their gender identity absent surgery); *D.T.*, 552 F. Supp. 3d at 895-96 (holding that state's birth certificate policy requiring surgery discriminated against transgender people based on sex).

At most, Defendants argued below that they treat *everyone* differently based on sex because anyone assigned female at birth receives a birth certificate with a female designation and anyone assigned male at birth receives a birth certificate with a male designation. But, even if it were somehow possible to disregard Plaintiffs' factual allegations that the Policy specifically targeted transgender people to prevent them from correcting their birth certificates on a motion to dismiss, A.22-23, that does not make the Policy any more "neutral" with respect to sex than an employer who fires both transgender men and transgender women. *See Bostock*, 140 S. Ct. at 1742-43; *see also Grimm*, 972 F.3d at 609. To be sure, cisgender males and females are not *harmed* here by the Policy's classification based on sex and therefore have suffered no discrimination as a result—but that is different from the basic question of whether people receive different birth certificates depending on "sex," which they plainly do, regardless of how that term

20

is understood.  And, of course, transgender people *are* harmed by that sex-based classification.  A.17-20.

The district court failed to seriously grapple with Plaintiffs' sex discrimination claim.  Instead, it asserted that "there is no indication that the Supreme Court is willing to extend heightened scrutiny … by compressing transgender people into classifications based on sex."  A.83.  But its decision refused to acknowledge the elephant in the room—*Bostock*—even though it was central to the parties' briefing below.  Echoing the exact same language as the district court here, the *Bostock* dissent believed that the majority had wrongly "squeezed" transgender people into protections against sex discrimination.  140 S. Ct. at 1772 (Alito, J., dissenting).  But a majority of the Supreme Court rejected that view.  Any disagreement with *Bostock* is not grounds to ignore it.  In fact, this Court already recognized that it is "clear" that *Bostock* overruled its prior circuit authority holding that discrimination against transgender people is not necessarily discrimination because of sex—which "is no longer valid precedent."  *Tudor v. SE Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) (holding that transgender professor plaintiff was entitled to tenure and other relief).

*Bostock* held that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex."  140 S. Ct. at 1741.  Notably, that is true regardless of how "sex" is defined.  The

21

Supreme Court expressly assumed—without deciding—that sex referred to nothing more than one's reproductive biology for the sake of argument; but it concluded that discrimination against a transgender person still necessarily turned on that person's birth-assigned sex, at a minimum. *Id.* at 1739 ("because nothing in our approach to these cases turns on the outcome of the parties' debate … we proceed on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female").

Here, too, the Policy necessarily engages in a sex-based classification regardless of how "sex" is defined. Even if sex were narrowly (and wrongly) construed to encompass only an individual's sex assigned at birth—or what Defendants call "biological sex," ignoring that the complaint alleged that gender identity itself has biological underpinnings, A.15—the Policy nonetheless discriminates on that basis. The Policy deprives Ms. Fowler of a birth certificate matching her gender identity because she was assigned male at birth. Had she been assigned female at birth, she would have a certificate matching her identity, which she could use to participate in society like everyone else without experiencing the harms detailed in the complaint. Thus, Defendants' argument that "sex" excludes gender identity—in defiance of all scientific and medical understanding to the contrary, A.14-17—is not only wrong as a matter of fact, and

impermissible at the pleading stage, but it is also futile under *Bostock*.[7]

***Gender Identity and Sex Stereotypes.*** The Policy also discriminates based on sex in other ways including gender identity and sex stereotypes. Although a person possesses multiple sex-related characteristics (including hormones, chromosomes, and reproductive organs), and these characteristics are typically in alignment with one another for most people, the complaint alleged that gender identity is the critical determinant of a person's sex where one's gender identity diverges from their assigned sex, as science and medicine have recognized. A.14. Thus, "to conclude discrimination based on gender identity or transsexual status is not discrimination based on sex is to depart from advanced medical understanding in favor of archaic reasoning." *F.V.*, 286 F. Supp. 3d at 1144. Defendants' meritless factual disagreement with these realities cannot be credited at the pleading stage where Plaintiffs' factual allegations control.

Indeed, this Court itself recognized long ago that the scope of sex discrimination may be informed by research regarding gender identity. *See Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995) (recognizing that "research concluding that sexual identity may be biological" could be relevant to equal

---

[7] The analysis in *Gore* fails for the same reason, among others. In arguing that "sex" on a birth certificate merely refers to external genitalia, 2023 WL 4141665, at *19, the Tennessee court lost sight that this does not relieve the government of justifying the harm that its sex-based classification causes to transgender people.

protection claim but holding that *pro se* prisoner had not met factual burden).  And this Court's jurisprudence has continued to follow the scientific realities of life, including by recognizing that while most people are male or female, "some people are neither," as in the case of an intersex person seeking an accurate passport. *Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020); *accord Schroer v. Billington*, 424 F. Supp. 2d 203, 211 (D.D.C. 2006) (recognizing that sex "is not a cut-and-dried matter of chromosomes").  To be sure, the majority of people possess sex-related characteristics in typical alignment with one another.  But as this Court held, sex-based policies "supposedly based on 'reasonable considerations' may in fact reflect 'archaic and overbroad generalizations about gender.'" *Fort Collins*, 916 F.3d at 801.  That is precisely the case here.

Discrimination based on sex "is not only discrimination because of maleness and discrimination because of femaleness" but, rather, includes "discrimination because of the properties or characteristics by which individuals may be classified as male or female." *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016).  That is why discrimination based on gender transition, for instance, is based on sex, even if males and females are treated equally. *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008).  Likewise, it is blackletter law that discrimination based on "sex" encompasses discrimination based on the failure to conform to sex stereotypes—not merely "biological sex."  Long ago, the

24

Supreme Court recognized that it is discriminatory to insist that individuals match the sex stereotypes expected of them. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (holding that an employer discriminated against a woman deemed insufficiently feminine, even if the employer had no objection to women per se). As this Court has cautioned: "Any law premised on generalizations about 'the way women are'—or the way men are—will fail constitutional scrutiny because it serves no important governmental objective." *Fort Collins*, 916 F.3d at 801 (quotes partially omitted).

These stereotypes are also inherent in discrimination against transgender people. *See, e.g.*, *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc*., 884 F.3d 560, 576 (6th Cir. 2018) (recognizing that "stereotypical notions of how sexual organs and gender identity ought to align" are inherent in discrimination against transgender people); *Smith v. Avanti*, 249 F. Supp. 3d 1194, 1200-01 (D. Colo. 2017) (recognizing that discrimination against transgender people is based on sex stereotyping).

The Policy is anchored in Governor Stitt's personal views regarding how "people are created by God to be male or female" and the "Oklahoma values" that he believed must be protected by "whatever action necessary." A.22. He "wholeheartedly condemn[ed]" OSDH for its actions contrary to these views, and the unexpected "resignation" of the head of OSDH was announced the day after

this condemnation. *Id.* Under these views, God created Ms. Fowler to be male, not female, and God created Mr. Hall and Mr. Ray to be female, not male. Adherence to sex stereotypes was thus an essential element of the *justification* for the Policy, which ultimately dooms its constitutionality and at a minimum triggers heightened scrutiny. *See Navajo Nation v. New Mexico*, 975 F.2d 741, 744 (10th Cir. 1992) (holding that, where present, invidiousness is fatal to constitutionality); *see also Ray*, 507 F. Supp. 3d at 940 (holding that Ohio's reversal in birth certificate policy "resemble[d] the sort of discrimination-based legislation … 'born of animosity toward the class of persons affected'").[8] These factual allegations support a plausible claim for relief.

## B. The Policy Discriminates Against Transgender People, Who Constitute a Quasi-Suspect Class at a Minimum.

The Policy also independently requires heightened scrutiny because government discrimination against transgender people bears all the indicia of a suspect or quasi-suspect classification. Heightened scrutiny is required where the government targets a class that (1) has been historically subjected to

---

[8] To be clear, Plaintiffs need not show animus, nor an intent to cause harm, to establish intentional discrimination, which "is merely the intent to treat differently." *Colo. Christian Univ. v. Weaver,* 534 F.3d 1245, 1260 (10th Cir. 2008). Intentional discrimination is also necessarily established wherever a policy is facially discriminatory, even where it was enacted for benevolent reasons. *See, e.g.*, *Johnson v. California*, 543 U.S. 499, 505 (2005) (race-based prison housing policy sought to reduce racial tensions).

discrimination, (2) has a defining characteristic frequently bearing no relation to one's ability to perform or contribute to society, (3) has obvious, immutable, or distinguishing characteristics, and (4) is a minority or politically vulnerable. *Karnoski v. Trump*, 926 F.3d 1180, 1200 n.17 (9th Cir. 2019) (quotes omitted).

As a litany of federal courts including the Fourth and Ninth Circuits have recognized, all these indicia are present for transgender people.[9]  A.38-39.  First, there has been a long and cruel history of discrimination against transgender people, which remains pervasive to this day.  "There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."  *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Grimm*, 972 F.3d at 612.  Second, this longstanding discrimination is unrelated to transgender people's value to society. *Grimm*, 972 F.3d at 612; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F. Supp. 3d at 139.  Third, transgender people have an obvious, immutable, or distinguishing characteristic that defines them as a discrete group.  *Grimm*, 972

---

[9] *See, e.g.*, *Karnoski*, 926 F.3d at 1200; *Grimm*, 972 F.3d at 610-13; *Ray*, 507 F. Supp. 3d at 937; *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719-22 (D. Md. 2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 952-53 (W.D. Wis. 2018); *F.V.*, 286 F. Supp. 3d at 1144; *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016) ("*Highland*"); *Norsworthy v. Beard,* 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (S.D.N.Y. 2015).

27

F.3d at 612-13; *Ray*, 507 F. Supp. 3d at 937. Finally, "transgender people are unarguably a politically vulnerable minority." *F.V.*, 286 F. Supp. 3d at 1145; *Grimm*, 972 F.3d at 613.

With respect to these indicia, the district court only objected to one: it held that a group must have "*no* effective means of redressing any discrimination through the normal political process." A.85 (emphasis in original). But the relevant standard is not whether a group is able to secure *any* protections for itself. By the time of *Frontiero*, for example, Congress had already passed Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, and the Equal Rights Amendment. *Frontiero v. Richardson*, 411 U.S. 677, 687 (1973). Here, transgender people still lack express protections on the basis of gender identity across a multitude of civil rights laws. *See, e.g.*, H.R. 5, 117th Cong. (2021). And their political power is significantly limited by the reality that transgender people constitute less than one percent of the population and, even then, they are still underrepresented in every branch of government. *Grimm*, 972 F.3d at 586.

The district court also presumed that because transgender people may correct their birth certificates in most states, they have adequate "political power" to fend for themselves. A.85. But identity documents are merely one context of government action targeting transgender people among many, including health care, education, facilities, athletics, and religious discrimination. *Grimm*, 972 F.3d

at 612.  Each is "but one example of the relative political powerlessness of this group."  *Highland*, 208 F. Supp. 3d at 874.  Because heightened scrutiny applies across all forms of government discrimination, as the district court recognized, A.85, it is indefensible to isolate one context as a purported basis for denying heightened scrutiny across-the-board.  Even as to identity documents, this litigation illustrates the growing anti-transgender tide.

The district court also erred in concluding that this Court's decision in *Brown*, 63 F.3d at 971, required application of rational basis review.  First, *Brown* has no relevance with respect to Plaintiffs' sex discrimination claim, where *Bostock* provides the controlling precedent.  Second, by its own terms, *Brown* disclaimed that it was deciding the heightened scrutiny question because the *pro se* prisoner's allegations were "too conclusory to allow proper analysis."  *Id.* at 971. Third, *Brown* made clear that the question remained open in future cases,[10] including because "[r]ecent research concluding that sexual identity may be biological suggests reevaluating *Holloway*," *id.*, referring to a Ninth Circuit decision, which that court subsequently held "has been overruled by the logic and language" of intervening Supreme Court authority.  *Schwenk v. Hartford*, 204 F.3d

---

[10] To the extent it has any relevance, the unpublished decision in *Druley v. Patton*, 601 Fed. App'x. 632 (10th Cir. 2015), which also involved *pro se* prisoner litigation, only confirms that understanding.  It observed that the Court had not held that transgender people constitute a suspect class "[t]o date."  *Id.* at 635.

1187, 1201 (9th Cir. 2000).  "[O]ur medical understanding of biological sex and gender has advanced significantly in the forty-[six] years since *Holloway*."  *F.V.*, 286 F. Supp. 3d at 1143-44.  *Brown* is not precedent for issues that were reserved rather than decided.  *Lowe v. Raemisch*, 864 F.3d 1205, 1209 (10th Cir. 2017).

Finally, the district court believed that it would be "premature" to recognize that discrimination against transgender people warrants heightened scrutiny because legislatures are "struggling with a broad array of legislation … around transgender rights."  A.85.  That reasoning has it backwards.  It is precisely when legislatures are actively curtailing the rights of a vulnerable minority that heightened scrutiny—and courts—are most needed.  *Cf. Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015) ("The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right.").  Heightened scrutiny would be largely superfluous if it were only recognized once legislatures voluntarily ceased fire.  While the district court expressed reluctance to recognize new quasi-suspect classes, courts are required to analyze the various indicia of a suspicious classification because they are already calibrated to strike the appropriate balance between majority rule and minority rights.  The district court's belief that legislatures need "flexibility and freedom from judicial oversight," A.85, cannot be squared with the very premise of heightened scrutiny and the role that courts play in upholding equal protection for

30

all.

## II.     The Alleged Involuntary Disclosure of Plaintiffs' Transgender Status Caused by the Policy States a Plausible Claim for a Privacy Violation.

### A.     Transgender Status Is Highly Personal and Intimate Information Protected by the Right to Privacy.

The Policy infringes upon Plaintiffs' right to privacy by causing the involuntary disclosure of their transgender status, which courts have consistently recognized is precisely the kind of highly personal and intimate information that warrants constitutional protection.  As the district court itself candidly acknowledged, "the birth certificate might cause a person to realize that a Plaintiff is transgender."  A.54 (analyzing speech implications of the Policy).

As a threshold matter, this Court has held across decades of precedent that there is a constitutional right to informational privacy.  The district court spilled considerable ink as if it were being called upon to decide that question in the first instance, A.59-77, and thus "break new ground in this field" of substantive due process, A.72 (quotes omitted), which it viewed as an usurpation of legislative power.  But circuit precedent settled the issue more than forty years ago and has recognized a constitutional right to privacy across a range of contexts.  *See, e.g.,* *Denver Policemen's Protective Ass'n v. Lichtenstein*, 660 F.2d 432, 435 (10th Cir. 1981) (adopting three-prong test for privacy violations); *Eastwood v. Dep't of Corrs.*, 846 F.2d 627, 630 (10th Cir. 1988) (privacy in sexual matters); *A.L.A. v. W.*

*Valley City*, 26 F.3d 989, 990 (10th Cir. 1994) (privacy in HIV test results);

*Lankford v. City of Hobart*, 27 F.3d 477, 479 (10th Cir. 1994) (privacy in medical

records); *Sheets v. Salt Lake Cnty.*, 45 F.3d 1383, 1388 (10th Cir. 1995) (privacy in

diary); *Anderson v. Blake*, 469 F.3d 910, 915 (10th Cir. 2006) (privacy in

videotape of alleged rape). This Court recently confirmed: "[w]e have long held

that the constitutional right to privacy prohibits the government from inquiring into

or disclosing private information." *Stewart v. City of Oklahoma City*, 47 F.4th

1125, 1137 (10th Cir. 2022).

To analyze an informational privacy claim, courts must consider (1) if the

party asserting the right has a legitimate expectation of privacy in that information,

(2) if disclosure of that information serves a compelling state interest, and (3) if the

disclosure has been made in the least intrusive manner. *Stidham v. Peace Officer

Stds. and Training*, 265 F.3d 1144, 1155 (10th Cir. 2001). Plaintiffs' complaint

pled facts that satisfied all of those prongs. Because the Policy fails even rational

basis review, *infra* III, it necessarily fails strict scrutiny, and thus the latter two

prongs are satisfied.

With respect to the first prong, an individual's transgender status is exactly

the type of "highly personal or intimate information" that merits constitutional

protection. *Id.* In *Anderson*, this Court expressly agreed with the Second Circuit

that "[t]he excruciatingly private and intimate nature of transsexualism, for persons

32

who wish to preserve privacy in the matter, is really beyond debate.'"  469 F.3d at

915 (quoting *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999)).  This Court

held that the plaintiff had a privacy right in a video depicting her alleged rape,

despite acknowledging that its prior precedent had not confronted that fact pattern,

because it agreed with the reasoning of sister circuits finding other highly personal

information to be protected by privacy, including specifically the Second Circuit's

decision in *Powell*.  *Id.*  Indeed, simply being transgender "is likely to provoke

both an intense desire to preserve one's medical confidentiality as well as hostility

and intolerance from others."  *Powell*, 175 F.3d at 111; *accord* A.15-16, 19-20

(describing medical need to live in accordance with gender identity).

　　This Court's analysis in *Leiser v. Moore*, 903 F.3d 1137, 1145 (10th Cir.

2018), further supports the conclusion that one's transgender status receives

privacy protection.  That case concerned the disclosure of a plaintiff's cancer

diagnosis by jail officials to elicit support from his friends and family.  While the

narrow issue on appeal was whether there was "clearly established" law to

overcome a qualified-immunity defense to damages (which *Lesier* concluded that

the plaintiff had failed to demonstrate),[11] its reasoning is nonetheless instructive

---

[11] For avoidance of doubt, this Court in *Stewart*, 47 F.4th at 1137 n.8, specifically
rejected any contention that "our informational privacy precedents had been
overruled" by *Leiser*.

here.  This Court contrasted the varying levels of social opprobrium attached to various conditions, some of which fall squarely within the zone of privacy and others that may not.  For instance, "'[w]hat distinguishe[s] fibromyalgia from AIDS and transsexualism [is] that its disclosure would not 'bring about public opprobrium [or] expose a person to discrimination and intolerance.'"  *Id.* (quoting *Matson v. Board of Education*, 631 F.3d 57, 58-60 (2d Cir. 2011)).  Whatever the boundaries of a right to informational privacy, a person's transgender status falls within its core.

Other courts have similarly recognized that a person's transgender status is protected by the constitutional right to privacy and that relegating transgender people to identity documents that disclose their transgender status infringes upon that right.  *See, e.g.*, *Ray*, 507 F. Supp. 3d at 932 (holding that birth certificate policy disclosed transgender status, which is "highly personal" information "protected by the due process clause's informational right to privacy"); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333 ("'there are few areas [with] more closely intimate facts of a personal nature than one's transgender status'"); *Love*, 146 F. Supp. 3d at 853-56 (holding that driver's license policy threatened disclosure of private and intimate information concerning one's transgender status).   While Defendants argued that birth certificates do not literally say "transgender" on them, the district court recognized that when Plaintiffs present them to others, it causes

others "to realize that a Plaintiff is transgender."  A.54.

Transgender people have good reason to safeguard their status: in addition to revealing highly private information, its involuntary disclosure can expose them to discrimination and harassment as well as jeopardize their physical safety and bodily integrity.[12]  *See Ray*, 507 F. Supp. 3d at 934 (emphasizing the "heightened risk of harm transgender people face when forced to disclose"); *Powell*, 175 F.3d at 111. "A mismatch between the gender indicated on the document and the gender of the holder calls down discrimination." *Adkins*, 143 F. Supp. 3d at 139-40; *Ray*, 507 F. Supp. 3d at 934 (describing expert testimony "about how being forced to disclose documents with the wrong sex listed leads some transgender individuals to not pursue jobs, services, or opportunities because they are fearful of pushback and humiliation").  There remains "a great deal of animosity towards the transgender community," as confirmed by a "plethora" of evidence—including disturbing hate crime statistics. *Love*, 146 F. Supp. 3d at 855-56.  Plaintiffs' own life experiences confirm these threats are all too real.  A.28-29, 35; *accord Ray*, 507 F. Supp. 3d at 933 (described how a mismatched birth certificate at a workplace led to "having

---

[12] To be clear, these additional harms are not necessary to support a right to informational privacy under Tenth Circuit precedent—which simply focuses on whether the information at issue is highly personal or intimate, *see, e.g.*, *Lankford*, 27 F.3d at 479-80—but they reinforce the high stakes in the involuntary disclosure of one's transgender status.

feces spread on their desk," "their brake lines cut, and death threats made against them"). Compromising that privacy puts transgender people at great risk of harassment, discrimination, and even violence. And these concerns have only compounded amid the current wave of government action targeting transgender people. *Supra* I.B.

### B. The District Court Improperly Dismissed Plaintiffs' Privacy Claim By Wrongly Reframing the Privacy Interest at Stake.

The district court entirely sidestepped the three-prong privacy test required under settled circuit authority, *Stidham*, 265 F.3d at 1155, and instead dismissed Plaintiffs' privacy claim for independent reasons unmoored from that precedent.

First, the district court concluded that Plaintiffs' focus on whether transgender status constitutes "information that is highly personal and intimate" was improperly "articulated in broad, general terms." A.72. Instead, it re-characterized Plaintiffs' privacy interest as the "right to amend the sex designation on their birth certificate to be consistent with their gender identity." A.74. Reframed as such, it found no historical support for such a right in 1868 when the Fourteenth Amendment was adopted because Oklahoma did not file birth certificates until 1908. A.75. In doing so, however, the district court wrote out Plaintiffs' privacy claim altogether by conflating the court's view of the ultimate relief being sought with the cognizable privacy interest itself.

Whether information is highly personal or intimate and thus meriting

privacy protection is the proper inquiry—not the *manner* in which disclosure

occurs nor the *remedy* for such disclosure.  To illustrate, in *Anderson*, 469 F.3d at

914, this Court did not hold that the plaintiff's right at "the most specific level,"

A.74, was a right not to have a videotape of her alleged rape disclosed by the

government—and then reject that right on the grounds that precedent had not

decided that precise fact pattern (which it acknowledged was the situation) or that

videotapes did not exist in 1868.  Instead, it properly focused on the level of

specificity that circuit precedent had already decided was appropriate: whether the

information at issue, which concerned a bodily violation, was highly personal or

intimate.  Indeed, this Court even held that the right at issue was "clearly

established" to defeat qualified immunity, because "a general constitutional rule

that has already been established can 'apply with obvious clarity to the specific

conduct in question, even though the very action in question has [not] been

previously held unlawful.'"  *Id.* at 917.

    Similarly, in *A.L.A.*, 26 F.3d at 990, this Court did not reject plaintiff's

privacy claim on the grounds that HIV did not exist when the Fourteenth

Amendment was adopted.  Rather, it focused on the correct level of specificity:

whether confidential medical information was entitled to constitutional privacy

protection.  Taking the reasoning of the district court here to its logical conclusion,

there would also be no privacy infringement if the government were to maintain a

website listing all people who had tested positive for HIV on grounds of public health, because a "careful description" of the right as "a right to change a government website disclosing one's HIV status" would find no support in precedent or history and would require affirmative government action to remedy.

Here, the correct level of specificity dictated by precedent is whether a person's transgender status is highly personal or intimate information. Courts striking down similar policies that involuntarily disclosed one's transgender status have analyzed privacy claims at a similar level of specificity, rather than focus on the particular means by which disclosure occurred or is remedied. *See, e.g.*, *Ray*, 507 F. Supp. 3d at 931-32; *Love*, 146 F. Supp. 3d at 853-56.

Second, the district court dismissed the privacy claim on the grounds that there was no allegation that Governor Stitt or the other Defendants directly disclosed the birth certificates of transgender people to third parties. But the government is responsible for the disclosures that it causes—regardless of whether it engages in those disclosures itself or causes disclosure by other means. If the government issued business cards to its transgender employees saying "transgender" on them, it could hardly absolve itself of responsibility for violating their privacy by arguing that it had not directly disclosed their status to others.

As other courts have recognized in analogous contexts, Defendants bear responsibility for the privacy violations of the Policy they have created and

enforced.  The court in *Ray* acknowledged that the Ohio agency responsible for vital records "is not the entity requiring disclosure or the entity actually disclosing the information," but it held that "the threat of disclosure is imposed indirectly by the government through its birth certificates."  *Ray*, 2019 WL 11791719, *10. Given that the government exercised "'absolute control' over the information contained in Plaintiffs' birth certificates," the court was not persuaded at the pleading stage that Defendants played "no part in the forced disclosure of Plaintiffs' transgender status."  *Id.*  Similarly, in *K.L.*, the Alaska court recognized that the government did not directly disclose the party's transgender status but it held that its driver's license policy nonetheless caused the privacy violations.  2012 WL 2685183, at *6; *see also Love*, 146 F. Supp. 3d at 852 (holding that plaintiffs stated a valid privacy claim based on a policy that "indirectly requires them to reveal their transgender status … to all who see [their] licenses").  Notably, the government does not maintain birth certificates simply to file them away in a cabinet; it provides people with copies of their own birth certificates so they can be used.  63 Okla. Stat. § 1-323(A)(1); A.18.

Indeed, the Policy forces transgender people to make a Hobson's choice: they must either (a) forego the use of their birth certificates and the benefit of such use that others freely enjoy or (b) compromise highly personal and intimate information and expose themselves to harm whenever they present their birth

certificates to others.  "Plaintiffs cannot avoid such disclosure unless … [they] forego participating in public life—'determining eligibility for employment, obtaining other identity documents [], establishing school records, proving age, and enrolling in government programs.'"  *Ray*, 2019 WL 11791719, at *10.  And Defendants admit that birth certificates are "'required for identification'" in modern life.  A.75.  But the government cannot force people to choose between a valuable benefit and a constitutionally protected right.  *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *accord Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *Ray*, 2019 WL 11791719, at *10.  In other words, the government may not accomplish indirectly that which it could not accomplish directly.

Notably, the district court's narrow view of constitutional privacy—in which the total universe of privacy violations consists only of situations where the government discloses information to a third party—is incorrect.  Privacy violations also occur even where no third-party disclosure occurs at all.  In *Lankford*, 27 F.3d at 479-80, for instance, this Court held that a police chief violated the privacy of an employee simply by improperly accessing her medical records to confirm her sexual orientation.  To be sure, third-party disclosure may exacerbate the harm of a privacy violation, as it does here, just as safeguards against such disclosure may mitigate its harm; but the principles animating the protection of privacy can be

violated even in the absence of third-party disclosure. Courts have thus also recognized that the violation of privacy "is not limited to the state's disclosure of personal information—it also includes a plaintiff's compelled disclosure of personal information." *Botello v. Morgan Hill Unified Sch. Dist.*, No. C09-02121 HRL, 2009 WL 3918930, at *4 (N.D. Cal. Nov. 18, 2009).

Third, the district court dismissed the privacy claim on the grounds that Plaintiffs sought to "compel" the government to take affirmative action in the form of amending their birth certificates. A.73. As a threshold matter, the district court seemingly grafted a fourth prong onto this Court's three-prong privacy test without any support in this Court's privacy jurisprudence. More fundamentally, halting a privacy violation—or, for that matter, any substantive due process violation— always requires *some* action by the government official responsible for causing that violation, such as the ministerial function here of printing corrected certificates. But that does not constitute an affirmative act of "'do[ing] something *for* someone'" in the sense described by the district court. *Id.* (emphasis in original quotation). When this Court recognized that the substantive due process rights of same-sex couples had been violated by denying them the right to marry, it is equally true that government officials had to take the affirmative act of printing marriage certificates bearing their names. *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014). But that did not alter the prohibitory nature of the relief being sought.

41

*Cf. Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001) (rejecting that injunction was mandatory rather than prohibitory even though return to last uncontested status between the parties required defendant to take action). The same is true here, especially given that Defendants previously corrected the birth certificates of transgender people to reflect their gender identity.

## III. Plaintiffs Plausibly Alleged Facts to Show that the Government's Proffered Justifications for the Policy Fail Any Level of Scrutiny.

While the Policy requires heightened scrutiny, Plaintiffs alleged facts to show that it fails even rational basis review. Even in an ordinary case, rational basis review "is not toothless." *Dalton v. Reynolds*, 2 F.4th 1300, 1309 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 348 (2021). Courts have also applied more searching rational basis review where the government has discriminated against an unpopular group. *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012); *cf.* A.81 (recognizing the consensus that "courts should be skeptical of—and should scrutinize more carefully—classifications involving politically powerless groups that have historically been discriminated against"). In all events, the court must conduct an inquiry into "the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

Several courts have held that birth certificate policies like the one here triggered heightened scrutiny but failed even rational basis review. *See, e.g.*, *Ray*, 507 F. Supp. 3d at 939 ("Defendants' Policy justifications do not even survive

rational basis review because there is no logical connection between the Policy and proffered justifications."); *F.V.*, 286 F. Supp. 3d at 1142 (birth certificate policy lacked rational basis); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333 (birth certificate policy was "not justified by any legitimate government interest").

## A. The Government's Justification of "Accuracy" Is Rationally Disconnected from Any Concrete Interest.

Plaintiffs plausibly alleged that the Policy lacks any rational connection to a government interest in promoting the accuracy of birth certificates.

First, as a threshold matter, the district court misapprehended the purpose and utility of birth certificates, which are not merely to record information that existed at the time of a person's birth. Oklahoma's own laws confirm that birth certificates are not immutable records of circumstances that existed at a fixed point in time. Individuals are able to obtain new birth certificates upon adoption, annulment of adoption, the subsequent marriage of one's parents, judicial determination of paternity, and court orders regarding surrogacy. 63 Okla. Stat. §§ 1-311, 1-316. They are also able to obtain amended birth certificates after name changes, paternity acknowledgments, and paternity adjudications. 63 Okla. Stat. § 1-321; *see also* Okla. Admin. Code 310:105-3-3 (permitting alterations to correct errors or misstatements).

These features of state law negate any contention that birth certificates must remain unaltered to preserve their "historical accuracy." *Cf. Ray*, 507 F. Supp. 3d

at 938 (rejecting proffered interest of "maintaining historically accurate records" on similar grounds); *F.V.*, 286 F. Supp. 3d at 1141 (observing that post-birth amendments to birth certificates are permitted). Rather than exist as mere historical records, birth certificates operate as contemporaneous identity documents that people present to others to fully participate in society, including when applying for employment, enrolling in school, or obtaining a passport, a driver's license, a social security card, or a voter registration card. A.10-11, 18.

Second, any interest in "accuracy" must be grounded in more than the mere assertion that Plaintiffs' birth certificates are accurate because they reflect the sex they were assigned at birth. That simply restates what the Policy does. It does not explain *why* the government has any concrete and articulable interest in refusing to correct their birth certificates to match their gender identity. Equal protection "require[s] more—not less—judicial scrutiny when asserted physical differences are raised to justify gender-based discrimination." *Fort Collins*, 916 F.3d at 805; *id.* at 804 (cautioning of "nebulous" government interests). This Court rejected as "wholly circular" a similar argument advanced by the government that same-sex couples could not be recognized as spouses because they were excluded from the institution of marriage "by definition." *Kitchen*, 755 F.3d at 1216. Here, as well, the government cannot defend its refusal to issue Ms. Fowler, for instance, a birth certificate reflecting that she is female on the circular grounds that she was not

44

assigned female at birth. Stated differently, an asserted government interest in "accuracy" begs the question: to what end?

The district court's attempt to backfill any concrete interest for the Policy fails to supply a rational basis. It relied on Justice Gorsuch's dissent in *Pavan* that a "biology based birth registration regime" ensures that "government officials can identify public health trends" and helps "individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders." A.87 (quoting *Pavan v. Smith*, 137 S. Ct. 2075, 2079 (2017)). Apart from the fact that the dissent's view was not adopted by the Supreme Court, *Pavan* concerned the distinct issue of parentage and same-sex couples. It was in that context that the dissent argued that listing non-biological parents on a birth certificate impacted determinations regarding biological lineage and genetic susceptibility, for instance. None of that is implicated here.

More importantly, the relief sought by Plaintiffs is limited to providing transgender people with corrected versions of their birth certificates; it does not change *Defendants*' ability to retain and use the original versions and their underlying information for any permissible purpose. Even where Defendants issue a new birth certificate for other purposes, they still retain a copy of the original birth certificate. *See, e.g.*, 63 Okla. Stat. § 1-316(B)(2) (retaining original certificate after adoption); Okla. Admin Code 310:105-3-5 (same following

"legitimation").  Thus, for example, nothing about the relief sought by Plaintiffs

changes the government's ability to engage in any "tabulation, analysis and

publication of statistical data derived from such records." 63 Okla. Stat. §§ 1-301,

303 (authorizing such functions as part of the system of vital records).  In other

words, Oklahoma law is already structured such that any conceivable government

interest is fully achieved through the original certificate.  *Cf. Fort Collins*, 916 F.3d

at 804-05.  If information regarding one's assigned sex at birth is supposedly

needed for some reason, Defendants have access to it.  There is no rational basis

for refusing to provide *Plaintiffs* with corrected versions of those certificates.

Third, the district court failed to articulate what specific accuracy-related

harm was caused by the prior policy.  It did not identify any harm that resulted

from Oklahoma previously allowing transgender people to correct their birth

certificates to match their gender identity for more than a decade.  *See Ray*, 507 F.

Supp. 3d at 939 (noting that state's "about-face" in barring transgender people

from correcting their birth certificates after previously allowing such corrections

was not in response to any problems).  It did not provide answers to basic

questions: Who was harmed?  How did that harm occur?  And it disregarded

Plaintiffs' factual allegation that—up until the moment of the Governor's

Executive Order—the government officials directly responsible for vital records

*agreed* that allowing transgender people to correct their birth certificates in fact

46

furthered the "integrity and accuracy of Oklahoma's vital records."  A.21.

Nor did the district court point to any harm from similar longstanding and ongoing practices in the overwhelming majority of states.  *Cf. Fort Collins*, 916 F.3d at 803 ("laws in the neighboring cities of Boulder and Denver, and in many other jurisdictions, allow female toplessness, and the City presented no evidence of any harmful fallout"); *Love*, 146 F. Supp. 3d at 857 (expressing "serious[] doubt[]" that other states permitting gender marker corrections "have any less interest in ensuring an accurate record-keeping system"); *Ray*, 2019 WL 11791719, at *12 ("Forty-eight other states have figured it out.").  As the complaint's factual allegations made clear, and the court was bound to take as true at the pleading stage, there were no such harms in Oklahoma or anywhere else.  A.21.

To the extent the district court believed that research into "public health trends" might have been impaired, Order at 43, it failed to even hypothesize *how* that might have occurred.[13]  That mental exercise would also need to grapple with the reality that transgender people constitute a small minority group.  A.38. Tellingly, even the Model State Vital Statistics Act issued by the Centers for

---

[13] The absence of any factual context for this imagined issue highlights why it should not have been resolved at the pleading stage.  And to the extent greater factual allegations were needed to address this issue—which the district court raised for the first time when simultaneously dismissing the case—Plaintiffs should have been afforded leave to amend to provide them.

Disease Control—which the district court cited—does not impose a categorical bar against the correction of gender markers by transgender people.[14]  Indeed, the purported relevance of including sex on birth certificates is itself a factual matter that cannot be resolved at the pleading stage, much less in Defendants' favor.[15]

Fourth, the Policy thwarts any interest in accuracy.  To begin, it undermines the ability of transgender people to prove that they are the same individuals reflected on their birth certificates.  When a transgender man attempts to prove that he is the person indicated on his certificate, and yet that document indicates that the certificate holder is female, that discordance impedes the goal of verifying his identity.  *Cf., e.g.*, A.29, 35.  Courts have recognized that when transgender people initially "furnish their [identity document] to third-persons for purposes of

---

[14] The district court cited to a June 2021 revision that does not appear to exist. A.46.  The MSVSA was revised in 1977 to address gender marker corrections, providing that a birth certificate be amended where "the sex of an individual born in this State has been changed by surgical procedure."  Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 MICH. J. GENDER & L. 373, 400 (2013).  The last updated version of the MSVSA that was approved, which is the 1992 revision, did not alter this language.  Model State Vital Statistics Act and Regulations § 21(d), *available at* https://www.cdc.gov/nchs/data/misc/mvsact92b.pdf.

[15] The position of the American Medical Association, for instance, is that one's assigned sex should not appear on the public portion of a birth certificate.  Am. Med. Ass'n, Resolution 5-I-19, *Removing Sex Designation from the Public Portion of the Birth Certificate* (Jun. 15, 2021), *available at* https://www.ama-assn.org/system/files/2021-04/j21-bot15.pdf.

identification, the third-person is likely to conclude that the furnisher is not the person described on the [identity document]." *K.L.*, 2012 WL 2685183, at *7. They have thus rejected that "a sex designation that differs from the license-holder's appearance" would somehow promote—rather than undermine—accurate identification. *Corbitt*, 513 F. Supp. 3d at 1323; *see also Love*, 146 F. Supp. 3d at 856 (holding that the government's refusal to correct gender markers on driver's licenses "undermines Defendant's interest in accurately identifying Plaintiffs"); *In Re Childers-Gray*, 487 P.3d 96, 108 n.19 (Utah 2021) (recognizing that barring transgender people from identity documents matching their gender identity creates confusion and "obviate[s] the very purpose of legal identification"); *MH v. First Judicial Dist. Ct. of Laramie Cnty.*, 465 P.3d 405, 410 (Wyo. 2020) (ruling for transgender female petitioner who sought to correct her birth certificate gender marker because "[i]f a person's sex … is incorrect, [the] inability to amend that information would undermine the accuracy of her vital records").

The problems created by the mismatch between one's gender identity and one's birth certificate are illustrated by similar experiences that have played out in Plaintiffs' lives. *See, e.g.*, A.29-30, 35-36. Consigning a transgender woman who lives openly as a woman to an identity document labeling her as male only injects inaccuracy into situations where she presents that document to others. "A chef might label a jar of salt a jar of sugar, but the label does not make the salt any

sweeter." *Zzymm*, 958 F.3d at 1024 (rejecting government justification based on accuracy in denying intersex plaintiff of passport with gender-neutral marker). Rather, it only generates confusion for anyone relying on such a label.

The district court failed to address this accuracy problem and instead only addressed a distinct one: the mismatch between a birth certificate that reflects one sex, and other identity documents or government records such as driver's licenses that reflect another sex. That, too, is an accuracy problem created by the Policy; but it is a separate one. A.24, 30. And as to that separate issue, courts have recognized that a mismatch between identity documents undermines their accuracy. *See K.L.*, 2012 WL 2685183, at *7 ("the absence of any procedure for changing the sex designation on an individual's license can create discrepancies and inaccuracies between Alaska driver's licenses [and] other forms of government issued identification"); *Love*, 146 F. Supp. 3d at 857.

The district court's only response to this inaccuracy is that the Constitution does not demand "logical tidiness" and tolerates the "imperfect." A.88. But there is a world of difference between situations where inconsistency exists due to inadvertence, happenstance, or incremental reform, *id.*, and a situation where the government affirmatively creates arbitrariness where none previously existed through its deliberate choices. There is no rational basis for the latter. Rather, the fact that Oklahoma permits transgender people to obtain driver's licenses

50

consistent with their gender identity—even as it deprives them of the same ability

with respect to their birth certificates—and without causing any of the harms

hypothesized by the district court, A.11, further demonstrates its irrationality.

### B.     The Policy Cannot Be Justified In the Name of "Protecting Women."

The district court also wrongly credited the assertion that the Policy was

justified, in Defendants' words, "to protect the interests of women."  ECF 24 at 23.

The court held that it could "conceive" of hypothetical scenarios where it would

want to know a person's sex assigned at birth—including if "biological men" who

were not "particularly competitive in male sports" chose to "compete as

transgender women and begin to displace women from the podiums."  A.89.  This

imagined *post hoc* justification fails for many of the same reasons detailed above,

including the dearth of any indication that women in Oklahoma were previously

harmed by transgender people correcting their birth certificates or driver's licenses

or that women nationwide have been harmed by transgender people doing so in

other states.  But it also fails for independent reasons.

First, even taken on its own terms, this justification of "protecting women"

fails to explain 50% of the Policy: if the government's concern is that transgender

women should not be able to correct their birth certificates because of purported

harm to cisgender women, that does not explain why transgender men should not

be able to correct their birth certificates.  It is therefore vastly and impermissibly

51

over-inclusive even under rational basis review.  *See Romer*, 517 U.S. at 632.

Indeed, Defendants' contention that the Policy was motivated and justified by a

view that women needed protection—even though the Policy applies to both

transgender men and women—is itself a confession of sex discrimination.  Sex

discrimination is often "rationalized by an attitude of 'romantic paternalism'" such

as the notion that "[m]an is, or should be, women's protector and defender" and

that "[t]he natural and proper timidity and delicacy" of women must be preserved.

*Frontiero*, 411 U.S. at 684 (quotes omitted).

Second, the district court's reliance on hypothetical scenarios in which the

government seeks to discriminate against transgender people is unavailing.  As a

threshold matter, it assumes that the government would be constitutionally

permitted to engage in such discrimination—which is neither an issue presented by

this case (let alone litigated on a factual record) nor an outcome that is reasonable

to presume.  To the contrary, several courts have found such discrimination to be

unlawful.  *See Hecox*, 79 F.4th at 1033 n.16 (collecting cases).  The government

cannot prevail in this litigation on the unproven assumption that it would prevail in

other litigation.  Nor should this Court attempt to decide a hypothetical case in

order to resolve the narrow and concrete dispute actually presented here.

Moreover, even if the government could show that it is constitutional to

exclude transgender people from equally participating in sports, categorically

banning 100% of transgender people born in Oklahoma—the vast majority of whom, it is reasonable to assume, are not seeking to compete on sports teams at public schools—from correcting their birth certificates under any circumstances is not a rational means of achieving that goal. *Cf. Fort Collins*, 916 F.3d at 802 (noting that laws may "'classify unnecessarily and overbroadly by gender when more accurate and impartial laws can be drawn'"). And tellingly, Oklahoma law does in fact exclude transgender students from participating on athletic teams consistent with their gender identity; but it does not even rely on birth certificates to do so. Instead, it enforces that exclusion through "an affidavit acknowledging the biological sex of the student at birth." 70 Okla. Stat. § 27-106.

Third, Oklahoma has the ability to look to an original birth certificate when it wishes to do so for a particular purpose and, in fact, it already does so. For example, Oklahoma enacted a statute providing that, for purposes of access to sex-separated restrooms and facilities in public schools, a person's sex is the one "identified on the individual's original birth certificate." 70 Okla. Stat. § 1-125. Setting aside whether such a practice is constitutional,[16] the indisputable reality that Oklahoma has the ability to look to an individual's original birth certificate—

---

[16] The constitutionality of excluding transgender students from facilities consistent with their gender identity is subject to pending litigation. *Bridge v. Okla. State Dep't of Educ.*, No. 5:22-cv-00787-JD (W.D. Okla.).

*regardless* of whether it is subsequently amended—eviscerates any claim that the Policy is rationally related to any government interest. Indeed, Oklahoma's reliance on original birth certificates also allows it to directly ascertain a person's sex assigned at birth even as to transgender people who were born outside Oklahoma and corrected their birth certificate to match their gender identity. If it can do that for residents born out-of-state, there is no reason it cannot do the same for residents born in-state. Again, the relief sought by Plaintiffs—which merely consists of providing them with corrected certificates—does not prevent the government from looking to their original certificates for any lawful purpose.

## CONCLUSION

"A prime part of the history of our Constitution ... is the story of the extension of constitutional rights and protections to people once ignored or excluded." *Virginia*, 518 U.S. at 557. Faithful application of that principle is sufficient to resolve this appeal, without more. At this juncture in the litigation, Plaintiffs need not demonstrate that Defendants lack an adequate justification for the Policy, nor does this Court need to decide that issue. Rather, their burden is merely to show that they alleged sufficient facts to state valid claims entitled to discovery. Plaintiffs therefore respectfully request that the Court reverse the district court's dismissal of their equal protection and informational privacy claims.

Dated: September 28, 2023

Respectfully submitted,

/s/ Peter C. Renn

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, D.C. 20006
(202) 804-6245

Peter C. Renn
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa St., Ste. 1260
Los Angeles, CA 90017
(213) 382-7600

Shelly L. Skeen
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

Karen Keith Wilkins
1515 S. Denver Ave.
Tulsa, OK 74119
(918) 599-8118

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs' counsel believes that oral argument would aid this Court's disposition of the appeal, which will impact transgender people beyond the parties, both with respect to the issue of identity documents and the larger issues concerning the level of scrutiny applicable to discrimination against transgender people and the involuntary disclosure of one's transgender status.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,953 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and 10th Cir. R. 32 because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on September 29, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made;

(2) any paper copies of this document submitted to the Court are exact copies of

the version filed electronically; and (3) the electronic submission was scanned this

document for viruses using Microsoft Defender and, according to that program,

this document is virus free.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

## 10TH CIR. R. 28.2(A) ATTACHMENT TO BRIEF

- Memorandum and Order, Dkt. 52 (docketed Jun. 8, 2023)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

ROWAN FOWLER, et al.,

        Plaintiffs,

v.                                         Case No.  22-cv-115-JWB-SH

KEVIN STITT, in his official capacity
As Governor of the State of Oklahoma,
et al.,

        Defendants.

**MEMORANDUM AND ORDER**

Plaintiffs are two transgender men and one transgender woman born in Oklahoma who seek to alter their respective Oklahoma birth certificates to reflect their sex to be consistent with their current gender identity.  Plaintiffs allege that the State of Oklahoma's refusal to issue revised birth certificates violates their federal constitutional rights under the Free Speech Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment.  (Doc. 41.)[1]  Defendants move to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 24.)  The motion is fully briefed and ready for review.  (Docs. 33, 38.)  For the reasons explained below, Defendants' motion is GRANTED.

I.      **BACKGROUND**

---

[1] As explained in Section I *infra*, Plaintiffs filed the second amended complaint (Doc. 41) after the motion to dismiss had been fully briefed.  But the parties filed a joint stipulation indicating that this pleading only contains non-substantive changes and the parties asked the court to treat the pending motion to dismiss as applying equally to the second amended complaint.  (Doc. 39.)  The parties' request was granted by the then-assigned district court judge. (Doc. 40.)  Accordingly, the court cites to the second amended complaint herein as it is the operative pleading.

Under Oklahoma law, a certificate of birth must be filed with the Oklahoma State Registrar shortly after birth. *See* 63 O.S. § 1-311(A). The individual preparing the certificate, typically the attending physician, "shall certify to the facts of birth and provide the medical information required by the certificate . . ." *See id*. § 1-311(B). This includes information such as the date and time of birth, the child's name, the names of the parents, and the child's sex (the "sex designation").[2] By signing the certificate worksheet, the parent "attest[s] to the accuracy of the personal data entered thereon . . ." *See id*. § 1-311(E).

Prior to April 2022, 63 O.S. § 1-321 authorized the Oklahoma State Department of Health ("OSDH") Commissioner to amend a birth certificate in the following situations: (1) to reflect a person's new legal name change; (2) to show paternity, if paternity was not shown on the original birth certificate; (3) to change the surname of a child born out of wedlock; and (4) "in accordance with [the] regulations . . . adopted by the State Commissioner of Health." 63 O.S. § 1-321(A), (C), (D), (E). The applicable regulations authorized the following amendments: (1) "Name added to certificate if item blank"; (2) "erroneous entries"; and (3) to "correct[] an error or misstatement of fact as to any non medical information." *See* Okla. Admin. Code § 310:105-3-3(a)-(d). Under § 1-321(A), all other amendments were prohibited: "A certificate or record registered under this article may be amended *only* in accordance with this article *and regulations thereunder adopted by the State Commissioner of Health . . . .*" 63 O.S. § 1-321(A) (emphasis added).

---

[2] In the second amended complaint, Plaintiffs refer to this as the "sex designation on their birth certificates, also known as a gender marker." (Doc. 41 at 2.) However, Plaintiffs allege that their Oklahoma birth certificates "currently indicate[]" that their "sex" is male or female. (*Id*. at 4.) Prior to April 2022, the Oklahoma statute and applicable regulations were silent on the official term, but the Oklahoma legislature has since clarified that the item is a "biological sex designation." *See* 63 O.S. § 1-321(H) (2022). Thus, based on Plaintiffs' allegations that their birth certificates list "sex" as opposed to "gender," the enactment of 63 O.S. § 1-321(H), and the fact that Plaintiffs are seeking prospective relief, the court finds that the proper term is "sex designation." *See also* 63 O.S. § 1-310(a) (providing that Oklahoma birth certificates "shall include as a minimum the items recommended by the federal agency responsible for national vital statistics"); Centers for Disease Control and Prevention, *Model State Vital Statistics Act and Model State Vital Statistics Regulations*, Item 3, Page 1 (June 2021 Rev.) (recommending the "sex of the infant" be included in a birth certificate).

From at least 2007 until late-2021, Oklahoma state district courts and OSDH allowed transgender people to amend the sex designation on their birth certificates to match their gender identity.  (Doc. 41 at 2, 12.)  Between 2018 and 2021, OSDH amended the sex designations on the birth certificates of more than one hundred transgender people to match their gender identity.  (*Id*. at 12.)

In early 2021, each of the Plaintiffs filed Petitions for Change of Name and Gender Marker and eventually obtained "court orders directing that the [Plaintiff's] birth certificate be amended to match their gender identity."  (*See id*. at 14, 17-18, 22-23, 25-26.)  On August 18, 2021, the District Court of Tulsa County granted Plaintiff Rowan Fowler's Petition.  (*Id*. at 17.)  "In addition to changing her name, the August 18, 2021 court order . . .  also ordered, adjudged, and decreed that Ms. Fowler is female; that any designation by Oklahoma agencies of Ms. Fowler being anything other than female is incorrect; and that she shall be designated as female on official documents generated, issued, or maintained in the State of Oklahoma."  (*Id*.)  Plaintiff Allister Hall obtained a similar order on August 24, 2021.  (*Id*. at 22.)  And Plaintiff Carter Ray obtained a similar order on June 24, 2021.[3]  (*Id*. at 25.)  After obtaining their orders, Plaintiffs promptly sought to amend their birth certificates by providing OSDH with a copy of the court order and paying the requisite fee.  (*Id*. at 18, 22, 25.)

Up until that point, the parties agree that it was OSDH's practice to grant such applications and make the necessary amendments.  (*See id*. at 12; Doc. 24 at 11 ("[OSDH] complied with those court orders, believing Oklahoma law required said compliance notwithstanding the need to protect the integrity and accuracy of vital statistics records."))  However, this practice apparently

---

[3] The allegations concerning Ray's court order are slightly different than the others.  The second amended complaint alleges that the court "ordered, adjudged, and decreed that the gender marker on Mr. Ray's birth certificate be changed to male and that OSDH issue a new birth certificate consistent with the changes ordered."  (Doc. 41 at 25.)

ended in October 2021 as the result of litigation commenced by a plaintiff who sought an amended

birth certificate with a gender-neutral designation. Commissioner of Health Lance Frye and other

OSDH officials eventually entered into a settlement which enabled the plaintiff to obtain an

amended birth certificate with a non-binary, gender-neutral designation. (Doc. 41 at 12-13.)

In response to this settlement, Governor Stitt issued a statement on October 21, 2021, in

which he stated that: "I believe that people are created by God to be male or female. Period." (*Id*.

at 13.) He further stated that: "There is no such thing as non-binary sex, and I wholeheartedly

condemn the OSDH court settlement that was entered into by rogue activists who acted without

receiving proper approval or oversight. I will be taking whatever action necessary to protect

Oklahoma values." (*Id*.) The following day, on October 22, Commissioner Frye announced his

resignation, which was effective immediately. (*Id*.)

On November 8, 2021, Governor Stitt issued Executive Order 2021-24 ("Executive

Order"), which ordered the OSDH to "[c]ease amending birth certificates that is in any way

inconsistent with 63 O.S. § 1-321." The Executive Order provides, in full:

> It has come to my attention that the Oklahoma State Department of Health (OSDH)
> has entered into a settlement agreement which was not reviewed or approved by
> my Administration. This settlement requires OSDH to amend birth certificates in a
> manner not permitted under Oklahoma Law. This Order ensures that this
> unauthorized action will be corrected.
>
> 63 O.S. § 1-321 establishes how and when a birth certificate may be amended under
> Oklahoma Law. Neither this statute nor Oklahoma law otherwise provide OSDH
> or others any legal ability to in any way alter a person's sex or gender on a birth
> certificate. Moreover, neither this statute, nor OSDH's administrative rules, give
> the agency authority to enter agreements that circumvent the laws of this state.
>
> Therefore, I, J. Kevin Stitt, Governor of the State of Oklahoma, pursuant to the
> power vested in me by Article VI of the Oklahoma Constitution, hereby order that
> OSDH immediately:
>
> 1. Cease amending birth certificates that is in any way inconsistent
>    with 63 O.S. § 1-321.

4

2. Remove from its website any reference to amending birth certificates that is inconsistent with its authority under 63 O.S. § 1-321.
3. Inform the Governor's office of any pending litigation that is related to amending birth certificates in Oklahoma.
4. Provide the Governor's office with any other information that OSDH feels is responsive to this Executive Order.

I also encourage our lawmakers, upon reconvening for the 2nd Regular Session of the 58th Legislature this coming February to:

1. Immediately pass legislation that will clarify, to the extent necessary, that changes in sex or gender on a birth certificate or a designation of non-binary is contrary to Oklahoma Law.
2. Include in the legislation a provision that requires the Commissioner of Health to promulgate any administrative rules necessary to effectuate the purposes of this statute.

Okla. Admin. Code § 1:2021-24 (Nov. 8, 2021).

Plaintiffs' applications were all denied between January and March 2022 when they received an email from Defendant Baker "which invoked the Governor's Executive Order in the denial." (Doc. 41 at 18, 23, 26.) Plaintiffs allege that Governor Stitt and his office have enforced the Executive Order by specifically instructing OSDH officials that they cannot correct the birth certificates of transgender people to reflect their male or female gender identity. (*Id*. at 14.)

On April 26, 2022, Governor Stitt signed into law Senate Bill 1100 ("SB1100"), which amends 63 O.S. § 1-321 by adding the following provision: "Beginning on the effective date of this act, the biological sex designation on a certificate of birth amended under this section shall be either male or female and shall not be nonbinary or any symbol representing a nonbinary designation including but not limited to the letter 'X'". 63 O.S. § 1-321(H) (2022); *see also* 2022 Okla. Sess. Laws, c. 87, § 4, emerg. eff. April 26, 2022.

Since then, Oklahoma officials have denied the requests of other transgender people to amend the sex designation on their birth certificate to match their gender identity. (Doc. 41 at 13-

14.)  They have denied such requests even where they were accompanied by court orders directing that the transgender person's birth certificate be amended to match their gender identity.  (*Id*. at 14.)  OSDH officials have stated that they believe they cannot grant such requests because of the Executive Order.  (*Id*.)  Oklahoma continues to permit other changes to birth certificates (such as for adoption and legal name).

On March 14, 2022, Plaintiffs filed this lawsuit against Governor Stitt, OSDH Commissioner of Health Keith Reed, and State Registrar of Vital Records Kelly Baker.  (Doc. 1.) According to Plaintiffs:

> Possessing accurate identity documents that are consistent with a person's gender identity—which represents a person's core internal sense of their own gender—is essential to a person's basic social, economic, physical, and mental well-being.  A birth certificate is a critical and ubiquitous identity document used in many settings to verify a person's identity.  Access to employment, education, housing, health care, voting, banking, credit, travel, and many government services all hinge on having appropriate and accurate personal documentation that reflects a person's true identity.  Birth certificates are also often used to obtain other essential identity documents, such as driver's licenses and passports.

> While others born in Oklahoma have access to an accurate birth certificate matching their gender identity, transgender people are barred from obtaining an accurate birth certificate matching their gender identity.  Oklahoma's refusal to issue such birth certificates erects a barrier to the full recognition, participation, and inclusion of transgender people in society.  Indeed, few things are as essential to personhood and regular interaction in the world as being able to accurately present a person's identity to those with whom they come into contact.

(*Id*. at 1-2.)

In this lawsuit, Plaintiffs challenge Defendants' "*policy and practice of refusing* to provide transgender people with birth certificates that match their gender identity" (the "Policy").[4]  (*Id*. at

---

[4] Plaintiffs do not directly challenge the applicable Oklahoma statute and regulations.  Plaintiffs seem to contend that Oklahoma law has affirmatively granted transgender people the right to amend their sex designation on a birth certificate since at least 2007.  However, Plaintiffs offer little more than a conclusory statement in a footnote to support this position.  (*See* Doc. 33 at 10 n.1.)  As explained above, the Oklahoma legislature only authorized the Commissioner of Health to amend birth certificates in the situations specifically set forth in the statute and the regulations.  *Cf. Okla. Alcoholic Bev. Control Bd. v. Central Liquor Co.*, 421 P.2d 244, 249 (Okla. 1966) ("Certainly our Legislature was well aware of this widely employed practice and could easily have inserted language authorizing

11 (emphasis added.))  Plaintiffs allege that Defendants' Policy infringes upon fundamental rights protected by the United States Constitution and discriminates against transgender people which bears indicia of a suspect classification requiring heightened scrutiny by the courts.  Plaintiffs bring three claims under 42 U.S.C. §§ 1983 & 1988 alleging violations of the Free Speech Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment.  Plaintiffs allege that Oklahoma's Policy "lacks any narrowly-tailored, substantial, or even rational relationship to a valid government interest, and it is not the least restrictive means of achieving a valid government interest."  (Doc. 41 at 16.)  Plaintiffs contend that the Policy is "not supported by any compelling, substantial, or even legitimate government interest," and is instead "maintained and motivated by animus toward transgender people."  (*Id*. at 15-16.)

Plaintiffs filed the first amended complaint on July 29, 2022.  (Doc. 21.)  On August 26, 2022, Defendants filed the present motion to dismiss pursuant to Rule 12(b)(6).  (Doc. 24.)  The motion was fully briefed as of October 14, 2022 when Defendants filed their reply.  (Doc. 38.)  In the interim, then-assigned District Court Judge Gregory Frizzell denied Plaintiff Ray's motion to proceed pseudonymously.  (Doc. 4; Doc. 37.)  As a result, Defendants consented to Plaintiffs filing a second amended complaint to comply with the court's order, and the parties filed a joint stipulation to apply the pending motion to dismiss to Plaintiffs' second amended complaint.  (Doc. 39.)  The parties agreed that the second amended complaint would only contain non-substantive

---

discounts based upon quantity had it intended such an exception to Section 536.  It did not do so.").  Neither the statute nor the regulations authorize the Commissioner to amend the sex designation.  As such, Defendants' enforcement of Oklahoma law would only be unconstitutional if the underlying law is unconstitutional.  Nevertheless, it does not appear that Plaintiffs are *required* to challenge the statute, so the court will refer to the challenged state action as the "Policy," as Plaintiffs have framed it in the second amended complaint.  *See Veritext Corp. v. Bonin*, 2022 WL 1719275, at *3 (E.D. La. 2022) ("Many cases that include enforcement related injunctive relief do allege that the underlying state statute is unconstitutional or violates federal law, but this type of allegation does not appear to be a requirement.").

changes such as the full disclosure of Plaintiff Ray's name and updates to the Plaintiffs' ages due to the time that had passed since the case had been filed.  (*Id*. at 1.)  Judge Frizzell granted the parties' request on November 7, 2022.  (Doc. 40.)  Plaintiffs filed the second amended complaint on November 7, 2022.

On January 11, 2023, Defendants filed a Rule 26(c) motion to stay discovery pending resolution of the motion to dismiss.  (Doc. 42.)  Finding good cause shown, Judge Frizzell granted the motion on January 25.  (Doc. 49.)  The case was transferred to the undersigned on February 15, 2023.  (Doc. 50.)

## II.   LEGAL STANDARD

Upon a motion to dismiss, the court must determine whether a complaint states a legally cognizable claim by making allegations that, if true, would show that the plaintiff is entitled to relief.  The pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678 (citing *Twombly*, 550 U.S. at 556).

## III.   ANALYSIS[5]

Defendants contend that Plaintiffs fail to state a cognizable claim under the Free Speech Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, or the Due Process Clause of the Fourteenth Amendment.   The court addresses each claim in turn.

---

[5] In some respects, Plaintiffs, who obtained state court orders directing OSDH to amend their birth certificates, are asking the court to enforce these orders.  To the extent that Plaintiffs' claims are based on Defendants' violations of state court orders, they must seek enforcement from the court(s) that issued the orders, as this court generally does not have jurisdiction to enforce orders made by another court or to compel that court to take any action.  *See Sameer v. Khera*, 2018 WL 4039964, at *1 (E.D. Cal. 2018) (citing cases); *LaBranche v. Becnel*, 2013 WL 12091147, at *2 (E.D. La. 2013) ("[F]ederal courts, as courts of original jurisdiction, do not sit as appellate courts to review, modify, nullify, or enforce the orders of the state courts.").

A.      **Free Speech**

The court begins by addressing Plaintiffs' First Amendment claim.  Plaintiffs claim that Defendants' refusal to amend their birth certificates violates their First Amendment right to freedom of speech in two ways: (1) it restricts their ability to define and express their gender identity; and (2) it compels them "to endorse the government's position as to their own gender," and "disclose their transgender status" when they show their birth certificates to third parties. (Doc. 41 at 32.)  Defendants move to dismiss, arguing that the contents of a birth certificate are government speech which does not implicate the First Amendment.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  The First Amendment protects against prohibitions of speech, and also against laws or regulations that compel speech.  "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say."  *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (citations and quotations omitted); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

1.      **Prohibition on Speech**

First, Plaintiffs contend that Defendants' Policy impermissibly "prohibits Plaintiffs from conveying their own constitutionally-protected message about their identity and gender."  (Doc. 33 at 32.)  But this "argument rests on a faulty conception of expressive conduct."  *Interest of C.G.*, 976 N.W.2d 318, 341 (Wis. 2022).  The Free Speech Clause's protection "extend[s] . . . only to conduct that is inherently expressive."  *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006); *see also Cressman v. Thompson*, 798 F.3d 938, 952-53 (10th Cir. 2015) (stating that the "animating principle" behind pure-speech protection is "safeguarding self-

expression").  For example, when Plaintiffs present themselves to society in conformance with

their gender identities, their conduct is expressive.  The expressive component of their transgender

identity is not created by the sex designation listed on their birth certificates, but by the various

actions they take to present themselves as a man or woman, e.g., dressing in gender-specific

clothing, or changing their legal name.  *See Interest of C.G.*, 976 N.W.2d at 341.  In no way does

Defendants' Policy restrict Plaintiffs' ability to express themselves in this manner or otherwise

prevent them from bringing their bodies and their gender expression into alignment with their

subjective gender identities.  (*See* Doc. 41 at 17.)

Defendants' Policy is only implicated when Plaintiffs present their birth certificates to a

third-party.  However, "[t]he act of presenting identification," or "handing government documents

. . .  to someone else, has never been considered a form of expressive conduct in either legal

precedent or in the historical record."  *Interest of C.G.*, 976 N.W.2d at 341, 345 ("[I]dentifying

one's self is an act, not a mode of expression."); *see also United States v. Cline*, 286 F. App'x 817,

820 (4th Cir. 2008) (holding that production of identification documents does not implicate any

right protected by the First Amendment); *United States v. Jaensch*, 678 F. Supp. 2d 421, 431 (E.D.

Va. 2010) (same); *Petition of Variable for Change of Name v. Nash*, 190 P.3d 354, 355 (N.M. Ct.

App. 2008).  A person observing a Plaintiff present himself in conformance with his gender

identity would not understand that Plaintiff to be expressing himself as a gender that he does not

identify with simply based on the sex designation on his birth certificate.  Perhaps the birth

certificate might cause a person to realize that a Plaintiff is transgender, but this insight does not

stop Plaintiffs from expressing themselves in whatever manner they choose.  And while this may

inhibit the success of their intended goal to be perceived as a man or woman, "[t]hat impediment

does not render the production of identification expressive conduct." *See Interest of C.G.*, 976 N.W.2d at 341.

Accordingly, the court finds that Oklahoma's prohibition on changing a person's sex designation on their birth certificate does not restrict Plaintiffs' rights to freedom of speech or expression.

### 2.   Compelled Speech

Next, Plaintiffs contend that Defendants' Policy compels transgender people to use birth certificates that convey Defendants' viewpoint about their gender.[6]   (Doc. 33 at 32.)   According to Plaintiffs, Defendants' Policy "represents a particular ideology: that a person's gender should be based exclusively on the sex associated with their external genitalia at birth." (*Id.*)   Plaintiffs contend that they "cannot be made to endorse the State's message by being forced to communicate it to others." (*Id.*)   But Defendants contend that the contents of a birth certificate are government speech which does not implicate the First Amendment.

Government-compelled speech is antithetical to the First Amendment.   Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable . . . 'invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.'" *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). For example, the government cannot coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation. *See Hurley*, 515 U.S. at 573; *Wooley*, 430 U.S. at 714; *Barnette*, 319 U.S. at 633-34.

---

[6] As noted, *supra*, the Oklahoma legislature has made it clear that the relevant information on the birth certificate is a biological sex designation.   Thus, as a factual matter, Plaintiffs are simply wrong: to the extent the birth certificate conveys the government's viewpoint on the subject at all, it only conveys a viewpoint on Plaintiffs' biological sex, not any gender with which they might identify.

However, the "First Amendment's Free Speech Clause does not prevent the government from declining to express a view." *Shurtleff v. City of Boston, Mass.*, 142 S. Ct. 1583, 1589 (2022). The government-speech doctrine provides that: "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). As explained by the Supreme Court:

> That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech. Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas. Instead, the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect its electoral mandate.

*Id*.

"The doctrine is usually invoked when the question is whether the control that the government exercises over a particular forum (in *Walker*, license plates) constitutes government regulation of private speech (which cannot discriminate on the basis of content) or is no more than the government determining what content it wishes to convey itself." *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1176 (10th Cir. 2021) (Hartz, J., dissenting) (citing *Walker*, 576 U.S. at 206-07). Thus, "[t]here is no violation of the First Amendment protections of free speech when the government favors particular content, or even a particular viewpoint, so long as it is the government that is speaking." *Id*.

In *Shurtleff*, the Supreme Court explained that the "boundary between government speech and private expression can blur when . . . a government invites the people to participate in a program." 142 S. Ct. at 1589 ("In those situations, when does government-public engagement transmit the government's own message? And when does it instead create a forum for the expression of private speakers' views?"). Thus, the court looks to several types of evidence to

12

guide the analysis, including: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id*. at 1589-90.

Here, the court finds that the content of a birth certificate constitutes government speech which does not implicate the First Amendment. Specifically, birth certificates constitute a purposeful communication of data chosen by the State of Oklahoma, on behalf of the government. The public would reasonably view a birth certificate as spoken by the government—who is certifying the information therein to be accurate—as opposed to the birth certificate holder.

Indeed, government bodies have long used vital records to speak to the public. *See, e.g.*, Am. Bar Ass'n, *Birth Certificates* (Nov. 20, 2018), *available at* https://www.americanbar.org/groups/public_education/publications/teaching-legal-docs/birth-certificates/ (noting that the United States began collecting birth data at the national level in 1902, via the U.S. Census, but certain individual states (which were actually colonies at the relevant time) had already been collecting birth data as far back as the 1630s). Because these are inherently government documents, the State of Oklahoma—not the birth certificate holder—controls every aspect of the issuance and appearance of a birth certificate. The State determines what information is required on a birth certificate, and what information can—and cannot—be subsequently amended. *See Walker*, 576 U.S. at 212 ("[L]icense plates are, essentially, government IDs. And issuers of ID typically do not permit the placement on their IDs of message[s] with which they do not wish to be associated.") (quotations omitted). If state law permitted individuals to communicate their own messages in birth certificates without restriction, birth certificates would cease to function as reliable government-issued identification. *See id.*; *Doe v. Kerry*, 2016 WL 5339804, at *18 (N.D. Cal. 2016). Accordingly, the reasonable interpretation would be that a birth

certificate is conveying a message on the government's behalf—not the birth certificate holder's. *See also Shurtleff*, 142 S. Ct. at 1595 (Alito, J., concurring) ("[The government-speech doctrine] presents no serious problems when the government speaks in its own voice—for example, when . . . a governmental body issues a report.").

And while the government may be communicating information that a birth certificate holder does not agree with, it is not impermissibly compelling unwanted expression.  The cases cited by Plaintiffs are not persuasive because they involved government speech containing an "ideological message" or a political position.   *See Janus v. Am. Fed'n of State, Cty., and Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018) (addressing Illinois law which forced employees to subsidize a union, even if they choose not to join and strongly object to the positions the union takes in collective bargaining and related activities); *NIFLA v. Beccera*, 138 S. Ct. 2361, 2375 (2018) (addressing California law which forced pro-life pregnancy centers to notify women that California provides free or low-cost services, including abortions, and give them a phone number to call).  These cases implicated the First Amendment because the government's ideological message would be attributed to—or deemed to be endorsed by—the private citizen.  But here, the sex designation on a birth certificate simply conveys one of "the facts of birth" that the legislature directed to be recorded at the time of birth.  *See* 63 O.S. § 1-311(B).  This does not communicate any ideological or political message and is thus distinguishable from the compelled, ideological speech at issue in *Janus* and *NIFLA*.

The court thus finds that Defendants' Policy does not violate the First Amendment's prohibition on government-compelled speech.  *See United States v. Arnold*, 740 F.3d 1032, 1034–35 (5th Cir. 2014) (explaining that "compelled disclosure of information on an IRS form" is not unlawful compelled speech"); *see Interest of C.G.*, 976 N.W.2d at 345 (rejecting compelled speech

challenge to statute that prohibits sex offenders from changing their legal name, noting that "[t]he State has not branded Ella with her legal name, and when Ella presents a government-issued identification card, she is free to say nothing at all or to say, 'I go by Ella'").  The Policy imposes no restraint on Plaintiffs' freedom to communicate any message to any audience; it does not compel Plaintiffs to engage in any actual or symbolic speech; and it does not compel Plaintiffs to endorse or communicate any political or ideological views.  Plaintiffs may not agree with the information contained in their birth certificates.  But for government to work, private parties cannot invoke the protections of the First Amendment to force their elected officials to espouse other views or, more particularly in this case, to collect and record the data Plaintiffs want rather than the data that the government wants to collect; instead, it is through the ballot box that such parties may provide a check on the government's own speech or otherwise compel the government to collect and record data more to their liking.  *See Shurtleff*, 142 S. Ct. at 1589; *see also Johnson v. Wis. Elections Comm'n*, 967 N.W.2d 469, 487 (Wis. 2021) (explaining that the freedoms protected by the First Amendment do not entitle the speaker to a favorable outcome in her endeavor).

Accordingly, the court finds Plaintiffs' have failed to state a claim under the First Amendment.

**B.    Defendants' Policy does not infringe upon a fundamental right protected by the Fourteenth Amendment's Due Process Clause.**

Next, Plaintiffs bring a Fourteenth Amendment substantive due process claim under two theories.  First, Plaintiffs allege that the fundamental right to privacy includes the freedom from involuntary disclosure of transgender status.  And second, Plaintiffs allege that Defendants' Policy "burdens transgender people's liberty interests, including the right to define and express a person's gender identity and the right not to be treated in a manner contrary to a person's gender by the government."  (Doc. 41 at 30-31.)  Defendants move to dismiss Plaintiffs' due process claims

15

because Plaintiffs have not identified a fundamental right that is protected by the Fourteenth Amendment.  (Doc. 24 at 24.)

"Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2244-45 (2022) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 186-189, 6 L. Ed. 23 (1824)).  The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Constitution makes no express reference to a right to privacy concerning one's gender, nor does it reference a right to be treated consistent with one's gender identity.  Thus, Plaintiffs must show that the right is somehow implicit in the constitutional text, i.e., that the Due Process Clause provides substantive protection for Plaintiffs' "liberty" interest.  *Dobbs*, 142 S. Ct. at 2245.

Under the Supreme Court's jurisprudence, the Due Process Clause protects two categories of substantive rights.  "The first consists of rights guaranteed by the first eight Amendments." *Id.*; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 763-67 (2010).  The second category, which Plaintiffs rely upon here, "comprises a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs*, 142 S. Ct. at 2246.

The latter category is one of the most controversial issues in constitutional law.  *See Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion) ("Substantive due process has at times been a treacherous field for this Court.").  In essence, substantive due process is a judicial doctrine that allows courts to conclude that the "liberties" specially protected by the Due Process Clause include additional rights beyond those specifically protected by the Bill of Rights.  The Supreme Court has used this doctrine to recognize the rights to marry, to have children, to direct

the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing cases).

The fundamental quandary with this doctrine, however, is that it lacks any well-defined limiting principle.[7] *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (cautioning that the "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended"). Indeed, the natural human tendency to confuse what the Fourteenth Amendment protects with a jurist's ardent views about the liberty that Americans should enjoy, "has sometimes led the Court to usurp authority that the Constitution entrusts to the people's elected representatives." *Dobbs*, 142 S. Ct. at 2447. Judicial caution is thus imperative and courts should "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences" of the judicial branch. *Glucksberg*, 521 U.S. at 720. And when determining whether this breaking of new ground amounts to recognizing rights long understood but not stated, or instead amounts to constitutionalizing the judge's own notions of right and wrong, courts should consider whether the relief sought amounts to a proper exercise of the judicial power, or whether it requires the exercise of powers reposed elsewhere under our constitutional system.

The Constitution divides the powers of the federal government into three distinct categories: the legislative power, the executive power, and the judicial power. Those powers spring from the "People of the United States." U.S. Const. preamble. Under Article II of the Constitution, the entirety of the executive power is vested in the President of the United States. *Id.* Art. II, § 1, cl. 1; *see also Seila Law LLC v. Consumer Fin. Prot. Bur.*, 140 S. Ct. 2183, 2197

---

[7] As President Lincoln once said: "We all declare for Liberty; but in using the same word we do not all mean the same thing." *Dobbs*, 142 S. Ct. at 2446 (quoting Address at Sanitary Fair at Baltimore, Md. (Apr. 18, 1864), reprinted in 7 The Collected Works of Abraham Lincoln 301 (R. Basler ed. 1953)).

(2020) (noting that the entire executive power is vested in the President and "belongs to the President alone").  Similarly, Article III vests the entirety of the judicial power in the Supreme Court "and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. Art. III; *see also Marbury v. Madison*, 5 U.S. 137, 173 (1803) ("The constitution vests the whole judicial power of the United States in one supreme court, and such inferior courts as congress shall, from time to time, ordain and establish. This power is expressly extended to all cases arising under the laws of the United States . . .").  By contrast, Article I vests Congress with only a portion of the legislative power.  *See* U.S. Const. Art I (limiting the scope of Congress's powers to those "legislative Powers herein granted").

Each of these distinct powers is fundamentally different in its nature than the other powers. *See, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) ("To the framers, each of these vested powers had a distinct content."); *see also Wayman v. Southard*, 23 U.S. 1, 46 (1825) ("The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law").  Reduced to its essence, the legislative power is the power to make law.  *See* The Federalist No. 78 (A. Hamilton) (defining legislative authority as the power to "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated").  It includes the ability to not only enact laws, but also to abolish laws and to change laws.  *See Az. State Leg. v. Az. Indep. Redistricting Comm'n*, 576 U.S. 787, 828 (2015) (Roberts, J., dissenting) (noting that the legislative power consists of the "power to make and repeal laws").  The executive power contemplates the authority to execute or carry out the laws, and to enforce them, but not to make laws in the first instance.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a

lawmaker."). And the judicial power is the power to construe and apply the law. *See Marbury*, 5 U.S. at 177 ("It is emphatically the province and duty of the judicial department to say what the law is."). Indeed, it is limited by the Constitution to be exercised in the context of cases and controversies, which has long been understood to prohibit federal courts from rendering advisory opinions regarding the interpretation or constitutionality of a law outside of a live case or controversy. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, (1936) ("The Court has frequently called attention to the 'great gravity and delicacy' of its function in passing upon the validity of an act of Congress; and has restricted exercise of this function by rigid insistence that the jurisdiction of federal courts is limited to actual cases and controversies; and that they have no power to give advisory opinions. And even within the context of an existing case, the judicial power comprehends only that a court should say what the law is, not what it ought to be.").

To alter or add to the Constitution requires an exercise of legislative power. This can be understood intuitively, or at least inductively, from the nature of the three powers of government. The act of establishing a constitution in the first instance is clearly an exercise of legislative power—the power to make law. No one could suggest that a president or a court could undertake to enact a new constitution through their respective executive or judicial powers. Similarly, it requires an exercise of legislative power to abolish a constitution, as was the case when the Articles of Confederation were abolished and replaced with the Constitution. Yet when it comes to altering the Constitution, such as by augmenting it with new rights not articulated therein or understood as being contemplated by the relevant constitutional provision at the time it was enacted, some view this as falling within the scope of the judicial power. *See, e.g.*, *Missouri v. Holland*, 252 U.S. 416, 433 (1920) (articulating the legal theory of a "living constitution," which suggests that the Constitution's meaning changes over time); ; *see also American Bush v. City of South Salt Lake*,

19

140 P.3d 1235, 1256 (Utah 2006) (Durrant, J., concurring) ("Adherents to this approach consider the constitution a living, evolving document that is malleable, sensitive to, and capable of reflecting changing social conditions, attitudes, perceptions, and trends."). However, if it requires legislative power to enact a constitution, and legislative power to abolish a constitution, then simple logic dictates that legislative power, not judicial power, is required to alter a constitution. Were it not for the need to avoid the obvious problem of triggering the process contemplated under Article V of the Constitution, we would likely refer to an alteration of the meaning of that instrument as an "amendment."

Just as intuition and consideration of the basic nature of the powers of government shows that legislative power is wielded when changing constitutional meaning, the same conclusion can be reached deductively by analyzing relevant provisions of the Constitution. Article V of the Constitution describes the amendment process. That provision authorizes Congress to propose amendments, but it does not empower Congress to approve them. Instead, ratification is left to the People, acting through their respective state legislatures, or through state conventions, depending on the mode of ratification proposed by Congress. In either case, the question arises as to what power the People exercise when they ratify changes to the Constitution. It cannot be the judicial power, because in Article III they gave the entirety of the judicial power to the courts. Likewise, it cannot be an exercise of the executive power, because the totality of that power was given to the president under Article II. The only remaining alternative is the legislative power because, as plainly stated in Article I, the People invested Congress with only a portion of that power. U.S. Const. Art. I ("All legislative Powers *herein granted* shall be vested in a Congress of the United States . . . ." (Emphasis added)). Thus, it is beyond cavil that in approving changes to the

Constitution under Article V, the People are exercising a portion of their retained legislative power because that is the only power they have left.

Based on the foregoing, one might wonder how a court, invested only with the judicial power, could undertake to engraft new rights onto the Constitution when that appears to be a prerogative that the People reserved to themselves. More specifically, when a court undertakes to alter the Constitution in that manner, from whom does it acquire the legislative power necessary to do so? Certainly not from Congress, for not even Congress is authorized to alter the Constitution, though the text of Article V makes clear that Congress has an indispensable role in that process. What becomes readily apparent from an analysis of the nature of each of the three powers of government, and the manner in which the People separated and granted those powers in Articles I, II, III, and V of the Constitution, is that the only way a court could undertake to alter the Constitution is to appropriate to itself the legislative power that the People reserved to themselves to perform that very task.

Some have suggested that the framers of the Constitution could never have intended the meaning of that document to remain static over the more than two centuries since it was originally ratified, and that the difficulties inherent in the amendment process envisioned in Article V necessitate a means for keeping it up to date with the needs of an ever-changing society. *See Holland*, 252 U.S. at 433 ("The case before us must be considered in the light of [our] whole experience and not merely in that of what was said a hundred years ago."); R. Randall Kelso, *Contra Scalia, Thomas, and Gorsuch: Originalists Should Adopt a Living Constitution*, 72 U. Miami L. Rev. 112, 117-18 (2017) (opining that when jurists adopt "a static or fixed approach to constitutional interpretation that seeks to determine how the framers and ratifiers would have decided the case in 1789 (or 1791 for the Bill of Rights, or 1868 for the Fourteenth Amendment's

Due Process or Equal Protection Clauses), they are not following either the historically valid original intent or original meaning of the Constitution"). Moreover, since the courts regard themselves as the final arbiters of the Constitution, many feel that the more or less incremental changes that flow from decisions of the Supreme Court provide a proper means to accomplish that important task. *See, e.g.*, Franita Tolson, *Benign Partisanship*, 88 Notre Dame L. Rev. 395, 429 (2012) (arguing that the Supreme Court "can resolve at least some of the [constitutional] issues created by gerrymandering by incrementally changing the norms that govern the process of redistricting"). But early authorities on the meaning of the Constitution did not see it that way.

During the debates on ratification of the Constitution in the winter of 1788, one of the leading Anti-Federalist voices opposing ratification of the proposed constitution was an author writing under the pseudonym "Brutus." In an essay published in the *New York Journal* in January of 1788, Brutus lamented that, under the proposed constitution, the federal courts would be empowered "to explain the constitution according to the reasoning spirit of it, without being confined to the words or letter." Brutus No. XI (Jan. 31, 1788), reprinted in *The Debate on the Constitution: Federalist and Anti-Federalist Speeches, Articles and Letters During the Struggle Over Ratification, Part Two: January to August 1788*, at 131 (Bernard Bailyn ed., 1993). Continuing, he noted that "in their decisions [the federal courts] will not confine themselves to any fixed or established rules, but will determine, according to what appears to them, the reason and spirit of the constitution." *Id.* at 132; *see also* Brutus No. XII (Feb. 7 & 14, 1788), *reprinted in* The Debate on the Constitution, *supra*, at 171 (explaining that the Supreme Court's ability to interpret the Constitution according to the spirit of the law will serve to expand federal power at the expense of the states).

Alexander Hamilton responded directly to Brutus' concerns on this point in Federalist 81.

Hamilton began by summarizing Brutus' contentions:

> The arguments or rather suggestions, upon which this charge is founded, are to this effect: "The authority of the proposed supreme court of the United States, which is to be a separate and independent body, will be superior to that of the legislature. The power of construing the laws, according to the *spirit* of the constitution, will enable that court to mould them into whatever shape it may think proper; especially as its decisions will not be in any manner subject to the revision or correction of the legislative body.  This is as unprecedented as it is dangerous.  In Britain, the judicial power in the last resort, resides in the house of lords, which is a branch of the legislature; and this part of the British government has been imitated in the state constitutions in general.  The parliament of Great-Britain, and the legislatures of the several states, can at any time rectify by law, the exceptionable decisions of their respective courts.  But the errors and usurpations of the supreme court of the United States will be uncontrollable and remediless." This, upon examination, will be found to be altogether made up of false reasoning upon misconceived fact.

The Federalist No. 81 (A. Hamilton).  Hamilton promptly countered Brutus' argument by observing "there is not a syllable in the plan under consideration, which *directly* empowers the national courts to construe the laws according to the spirit of the constitution . . . ." *Id.* (emphasis in original).  Moreover, to the extent that the courts might usurp legislative power in construing the constitution in this manner, Hamilton observes:

> Particular misconstructions and contraventions of the will of the legislature may now and then happen; but they can never be so extensive as to amount to an inconvenience, or in any sensible degree to affect the order of the political system. This may be inferred with certainty from the general nature of the judicial power; from the objects to which it relates; from the manner in which it is exercised; from its comparative weakness, and from its total incapacity to support its usurpations by force.  And the inference is greatly fortified by the consideration of the important constitutional check, which the power of instituting impeachments, in one part of the legislative body, and of determining upon them in the other, would give to that body upon the members of the judicial department.  This is alone a complete security.  There can never be a danger that the judges, by a series of deliberate usurpations on the authority of the legislature, would hazard the united resentment of the body entrusted with it, while this body was possessed of the means of punishing their presumption by degrading them from their stations.

*Id.*

23

Thus, prior to ratification, leading voices among both the Federalists and the Anti-Federalists decried the notion that the federal courts might depart from the text of the Constitution and interpret the laws according to the spirit of that document.  The Anti-Federalists regarded this as one of a number of risks so grave as to justify denying ratification altogether, while the Federalists viewed it as an approach not authorized by the Constitution and one, in any event, which would be curtailed by the threat of impeachment.

Nearly fifty years later, Supreme Court Justice Joseph Story addressed similar concerns in his oft-cited work from 1833, *Commentaries on the Constitution of the United States*.  In commenting on the propriety of judges altering established constitutional meaning in order to accommodate the changing views of public opinion or the perceived needs of a changing society, Story observed:

> Temporary delusions, prejudices, excitements, and objects have irresistible influence in mere questions of policy.  And the policy of one age may ill suit the wishes, or the policy of another.  The Constitution is not to be subject to such fluctuations.  It is to have a fixed, uniform, permanent construction.  It should be, so far at least as human infirmity will allow, not dependent upon the passions or parties of particular times, but the same yesterday, to-day, and for ever.

1 Joseph Story, *Commentaries on the Constitution of the United States*, at 410 (1833).  Repeatedly emphasizing the ills of an evolving constitution in the hands of the judges, Story noted that courts were bound by the established meaning of the Constitution until the people availed themselves of the right to alter it through the amendment process:

> No man in a republican government can doubt, that the will of the people is, and ought to be, supreme.  But it is the deliberate will of the people, evinced by their solemn acts, and not the momentary ebullitions of those, who act for the majority, for a day, or a month, or a year.  The constitution is the will, the deliberate will, of the people.  They have declared under what circumstances, and in what manner it shall be amended, and altered; and until a change is effected in the manner prescribed, it is declared, that it shall be the supreme law of the land, to which all persons, rulers, as well as citizens, must  bow  in  obedience.    When  it  is

constitutionally altered, then and not until then, are the judges at liberty to disregard its original injunctions . . . .

. . . .

The only means known to the constitution, by which to ascertain the will of the people upon a constitutional question, is in the shape of an affirmative or negative proposition by way of amendment, offered for their adoption in the mode prescribed by the constitution.

3 Joseph Story, *Commentaries on the Constitution of the United States*, at 473, 475 (1833).  And

in a sobering admonition, Story reminded judges of the difficulties attendant to fulfilling their

duties on this point:

> The truth is, that, even with the most secure tenure of office, during good behaviour, the danger is not, that the judges will be too firm in resisting public opinion, and in defence of private rights or public liberties; but, that they will be too ready to yield themselves to the passions, and politics, and prejudices of the day.  In a monarchy, the judges, in the performance of their duties with uprightness and impartiality, will always have the support of some of the departments of the government, or at least of the people.  In republics, they may sometimes find the other departments combined in hostility against the judiciary; and even the people, for a while, under the influence of party spirit and turbulent factions, ready to abandon them to their fate. Few men possess the firmness to resist the torrent of popular opinion. Still fewer are content to sacrifice present ease and public favour, in order to earn the slow rewards of a conscientious discharge of duty; the sure, but distant, gratitude of the people; and the severe, but enlightened, award of posterity.

*Id.* at 476-77.

In sum, the nature of, and differences between, the legislative and judicial powers makes

it abundantly clear that altering the Constitution requires an exercise of the legislative power, not

the judicial power.  Moreover, simple deductive reasoning demonstrates that when the People

exercise their authority to amend the Constitution under Article V, they are exercising the

legislative power because that is the only one of the three powers of government retained by the

People under Articles I, II, and III.  And finally, authoritative sources from the first fifty years of

our constitutional history roundly condemned the notion that judges could circumvent the amendment process by interposing their own views of what the Constitution should say and mean.

There can be no doubt that views on this topic have changed considerably since Justice Story penned his admonitions. With the passage of time it appears that the lawyers and the judges became discontented with the restraints placed on their power by the Constitution. Undoubtedly many were motivated with good intentions to deal with societal problems that were not being addressed by other departments of government, and which they thought could be solved with a few minor adjustments to the established meaning of certain constitutional provisions. The trajectory of that change, and the risks associated therewith were aptly summarized by Professor Paul L. Gregg in his article, *The Pragmatism of Mr. Justice Holmes*, published at the height of World War II:

> Many there are among the followers of Holmes' philosophy, who do not take the Constitution seriously. Let it stand, they say, but let it be a tool and not a testament; let it be an instrument for affecting social reforms that the people want. This is, in brief, the tenor of such recent books as Mr. Justice Jackson's *The Struggle for Judicial Supremacy*, and Levy's *Our Constitution – Tool or Testament*, as well as countless other books and law review articles too numerous to catalogue here. Of many quotations which might be cited to show the temper of the new pragmatism in Constitutional law, one will suffice for our present purpose. It was written by Mr. Justice Frankfurter sometime before his elevation to the Supreme Court. He says:
>
> > "Whether the Constitution is treated primarily as a text for interpretation or as an instrument of government may make all the difference in the world. The fate of cases, and thereby of legislation, will turn on whether the meaning of the document is derived from itself or from one's conception of the country, its development, its needs, its place in civilized society."
>
> Felix Frankfurter, *Mr. Justice Holmes* 58 (1931).
>
> Before the weaving of pragmatism into the fabric of American jurisprudence, chiefly by Holmes and Pound, men had always assumed that the Constitution, by its very nature, is a document to be interpreted by reference to itself; that it is the deposit of the fundamental principles – absolute at least within the frame of our

> Constitutional system – by which the fate of cases and legislation should be determined; that it is the guarantee of substantial individual rights against encroachment by dominant majorities or minorities.  In short, the Constitution has until recently been thought of as the ultimate safeguard against what has aptly been call "an unbridled juristic impressionism buffeted by gusts of popular frenzy."  But in the new juristic pragmatism there is no safeguard.  The Constitution is to be interpreted in terms of current public policy and popular will.

> History – recent history for that matter – shows that, in the absence of fixed principles of law and legal rights, the popular will soon dwindles into the will of the party in power, and the party will shrivels into the will of the party leader.  Where there are no absolute principles of individual rights, there will soon be no democracy.

Paul L. Gregg, *The Pragmatism of Mr. Justice Holmes*, 31 Geo. L.J. 292-93 (1943) (some internal citations omitted).

Perceptive of the past, perhaps prescient of the future, Professor Gregg seemed to accurately grasp what Justice Story warned of a century earlier – the consequences of a judicial philosophy, well-intentioned though it may be, that disregards the nature of the Constitution and the powers of government conveyed therein as it was understood when conceived, and instead appropriates to the judges powers that were reserved exclusively to the People.

With these and other concerns in mind, the Supreme Court has undertaken efforts to prevent substantive due process from turning into a freewheeling exercise of judicial subjectivity that effectively amends the Constitution.  First, when a court considers whether to recognize rights under substantive due process, such rights should be acknowledged only if there is an established history and tradition of protecting them, with the tradition stated at "the *most specific* level" of abstraction.  *Michael H. v. Gerald D*., 491 U.S. 110, 127 n.6 (1989) (Scalia, J., plurality opinion) (emphasis added); *see also Glucksberg*, 521 U.S. at 769-70 (Souter, J., concurring) ("When identifying and assessing the competing interests of liberty and authority, for example, the breadth of expression that a litigant or a judge selects in stating the competing principles will have much

27

to do with the outcome and may be dispositive . . . [j]ust as results in substantive due process cases are tied to the selections of statements of the competing interests.").  And second, the *Dobbs* Court recently emphasized that the asserted right must be "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."  *Dobbs*, 142 S. Ct. at 2246 (quoting *Timbs v. Indiana*, 139 S. Ct. 682, 686 (2019)).

### 1.     Framing the asserted right at the most specific level of abstraction

Plaintiffs contend that Defendants' Policy infringes upon transgender people's fundamental rights (1) to "informational privacy," and (2) to "liberty, autonomy, and dignity." (Doc. 33 at 23.)   Under the first theory, Plaintiffs contend that the constitutional right to informational privacy protects against involuntary disclosure of "information that is highly personal and intimate," such as a person's transgender status.  (Doc. 41 at 30.)  Plaintiffs allege that the "involuntary disclosure of a person's transgender status can . . . cause significant harm, including by placing a person's personal safety and bodily integrity at risk," and deprives Plaintiffs of control over the circumstances around such disclosure.  (*Id*. at 31.)  Under the second theory, Plaintiffs contend that the "constitutional protections that shelter a person's medical decisions, bodily autonomy, dignity, expression, and personhood prohibit the government from interfering with the right to live in accordance with a person's gender identity."  (*Id*.)

But these asserted rights are articulated in broad, general terms.  Instead, "substantive due process" analysis "must begin with a *careful description* of the asserted right, for the doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever we are asked to break new ground in this field."  *Reno v. Flores*, 507 U.S. 292, 302 (1993) (internal quotations and brackets omitted) (emphasis added).  A careful analysis reveals that any right against involuntary disclosure of highly-sensitive and confidential medical information is not at issue in this case.

Unlike in the cases Plaintiff relies upon, Plaintiffs are not alleging that Defendants involuntarily disclosed any information to anyone.[8]  *See A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994) (recognizing there is a constitutional right to privacy regarding disclosure by a police officer of the results of an arrestee's HIV test without the arrestee's knowledge or consent); *Herring v. Keenan*, 218 F.3d 1171, 1173 (10th Cir. 2000) (same); *Leiser v. Moore*, 903 F.3d 1137, 1141 (10th Cir. 2018) (discussing in dicta authority from the Second Circuit holding that there is a constitutional right to privacy regarding disclosure of an individual's transsexualism, but not expressly ruling on the issue because it was not relevant to the case).  These cases do not address what is distinctive about this lawsuit: Plaintiffs want to *compel* the government to amend its own records to reflect Plaintiffs' desired characteristics.  However, the substantive component of the Due Process clause protects "substantive liberties of the person," *Planned Parenthood of SE Pa. v. Casey*, 505 U.S. 833, 853 (1992), and acts to substantively restrain the state from the "affirmative abuse of power," *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 196 (1989) (quotation omitted).  "Substantive due process rights do not encompass a right to compel a state to do something *for* someone not under some form of custody or restraint."  *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1568 (10th Cir. 1993) (emphasis in original).  Thus, any fundamental right to informational privacy is not implicated in this case.  *Cf. NASA v. Nelson*, 562 U.S. 134, 155-57 (2011) (holding that the government's mere collection of information did not violate an assumed privacy interest when the information was sufficiently protected against public disclosure).

Nor is the broadly-defined right to "liberty, autonomy, and dignity" at issue in this case. At least not in the sense that Defendants are prohibiting Plaintiffs from bringing their bodies and

---

[8] Oklahoma law generally prohibits the government from providing a copy of a birth certificate to unauthorized individuals.  *See* 63 O.S. § 1-323(A) (stating that it is unlawful to issue a copy of a birth certificate except to certain authorized individuals, e.g., the person subject to the birth certificate, parents, legal representatives, etc.).

gender expression into alignment with their respective gender identities.  On the contrary, Plaintiffs are generally free to live, exist, and express themselves in conformance with their chosen gender identities.  Defendants' Policy has imposed no restrictions on how Plaintiffs present themselves to society and the State has even allowed Plaintiffs to legally change their names and the sex designation on their drivers' licenses.  As such, it is disingenuous to characterize Defendants' Policy as one broadly infringing upon Plaintiffs' medical decisions, bodily autonomy, dignity, expression, and personhood.  *Compare with Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (striking down a Texas statute criminalizing homosexual sodomy because the plaintiffs' "right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government").

The court thus rejects Plaintiffs' broad, general formulation of the rights at issue.  At the most specific level of abstraction, Plaintiffs are asserting the right to amend the sex designation on their birth certificate to be consistent with their gender identity.  *See Michael H.*, 491 U.S. at 127 n.6.  Although this right has been recognized by a handful of other federal courts, this right has never been recognized by the Supreme Court or the Tenth Circuit.

### 2.    Analyzing whether the right is anchored in history and tradition

Because the asserted right does not have a sound basis in precedent, the court must instead turn to the history and tradition that map the essential components of our Nation's concept of ordered liberty to determine what the Fourteenth Amendment means by the term "liberty."  This necessarily requires a "careful analysis" of the "historical support" of the right at issue.  *Dobbs*, 142 S. Ct. at 2246-47 ("*Timbs* and *McDonald* concerned the question whether the Fourteenth Amendment protects rights that are expressly set out in the Bill of Rights, and it would be anomalous if similar historical support were not required when a putative right is not mentioned

anywhere in the Constitution."). For example, the Supreme Court in *Glucksberg* analyzed more than 700 years of "Anglo-American common law tradition" to determine whether the Due Process Clause confers the right to assisted suicide, and in *Timbs* the Court "traced the [asserted] right back to Magna Carta, Blackstone's Commentaries, and 35 of the 37 state constitutions in effect at the ratification of the Fourteenth Amendment." *Dobbs*, 142 S. Ct. at 2246-47 (citing *Glucksberg*, 521 U.S., at 711; *Timbs*, 139 S. Ct. at 687-90). "Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the 'liberty' protected by the Due Process Clause because the term 'liberty' alone provides little guidance." *Dobbs*, 142 S. Ct. at 2247.

But here, Plaintiffs have failed to allege sufficient facts for the court to conclude that the right to amend the sex designation on their birth certificate has historically been protected. Plaintiffs allege that transgender people in Oklahoma had the right to amend their sex designation "from at least 2007 if not earlier, through most of 2021." (Doc. 41 at 12.) Even assuming this right existed somewhat prior to 2007, Plaintiffs point to no authority to suggest that it existed prior to 1908[9] when Oklahoma first began filing birth records. Thus, the right certainly did not exist on July 9, 1868, when the Fourteenth Amendment was adopted. *See Dobbs*, 142 S. Ct. at 2254 ("Not only are respondents and their *amici* unable to show that a constitutional right to abortion was established when the Fourteenth Amendment was adopted, but they have found no support for the existence of an abortion right that predates the latter part of the 20th century—no state constitutional provision, no statute, no judicial decision, no learned treatise.").

---

[9] *See* Okla. State Dep't of Health, *Birth Certificates* (2023), *available at* https://oklahoma.gov/health/services/birth-and-death-certificates/birth-certificates.html ("Oklahoma began filing birth records in October of 1908. It was not mandatory, however, that these records be filed until 1917. Because birth records were not required for identification as they are today, not all records prior to 1940 were placed on file consistently.").

In their brief, Plaintiffs offer little historical analysis concerning the law in other jurisdictions.  But it appears that until recently,[10] there was little-to-no support in any American jurisdiction for a constitutional right to change the sex designation on a person's birth certificate.  To the court's knowledge, no state constitutional provision presently recognizes such a right.  And while Plaintiff contends that "47 states [currently] permit transgender people to correct their birth certificates to match their gender identity," Plaintiff offers no historical context for when the statutory protections were granted.  (Doc. 33 at 21.)

Nor have Plaintiffs established that the asserted right is an essential component of ordered liberty.  Plaintiffs cite *Obergefell* for the proposition that "individual dignity and autonomy," including the right "to define and express their identity," is a fundamental liberty interest.  (Doc. 33 at 27.)  But the *Obergefell* Court did not claim that this broadly-framed right was absolute.  *See Obergefell v. Hodges*, 576 U.S. 644, 703 (2015) (Roberts, J., dissenting) (noting that "the majority does not suggest that its individual autonomy right is entirely unconstrained").  While individuals are certainly free to think and to say what they wish about their identity, they are not always free to act in accordance with those thoughts.  *See Dobbs*, 142 S. Ct. at 2257; *see also Pennekamp v. State of Fla.*, 328 U.S. 331, 351 (1946) (Frankfurter, J., concurring) ("[T]he Constitution [does] not allow absolute freedom of expression—a freedom unrestricted by the duty to respect other needs fulfillment of which make for the dignity and security of man.").

More importantly, an individual's freedom to act does not confer the right to *compel the government to act*.  *See, e.g.*, *Brown v. Cooke*, 362 F. App'x 897, 900 (10th Cir. 2010) ("[T]here is [no] fundamental right of citizens to compel the Government to accept a common-law name

---

[10] The first court case recognizing the right as being protected by the U.S. Constitution was not decided until 1975.  *See Darnell v. Lloyd*, 395 F. Supp. 1210 (D. Conn. 1975) (holding that the State Commissioner of Health's refusal to change the sex recorded on the applicant's birth certificate from male to female in order to reflect her sex reassignment surgery infringed on the applicant's equal protection rights).

change and reform its records accordingly."); *Doyle*, 998 F.2d at 1568 ("Substantive due process rights do not encompass a right to compel a state to do something for someone not under some form of custody or restraint . . . ."). Plaintiffs' freedom to define and express their identity may correspond to one of the many understandings of "liberty," but it is certainly not an integral component of "ordered liberty," as that term has been defined by the Supreme Court. *See Dobbs*, 142 S. Ct. at 2257 ("License to act on the basis of such beliefs may correspond to one of the many understandings of 'liberty,' but it is certainly not 'ordered liberty.'").

In sum, Plaintiffs fail to allege sufficient facts to conclude that there is a long history and tradition of protecting the right to amend the sex designation on a birth certificate, or that such right is fundamental to our scheme of ordered liberty. Because Plaintiffs are not asserting a fundamental right, Defendants' Policy will be upheld if it is rationally related to a legitimate government purpose. *See* Section III.D *infra*.

### C. Plaintiffs are not a suspect or quasi-suspect class under the Equal Protection Clause.

Next, Plaintiffs claim that Defendants' Policy violates the Fourteenth Amendment's Equal Protection Clause. Plaintiffs contend that Defendants' Policy engages in sex-based discrimination, which is subject to heightened scrutiny. (Doc. 33 at 12.) But Defendants argue that "transgender status is not, as a matter of law, a suspect classification under the Equal Protection Clause." (Doc. 24 at 17.) Defendants thus contend that Plaintiffs' claim should be analyzed under the rational basis framework.

The Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.A. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). But the guarantee of equal protection coexists, of course,

with the reality that most legislation must classify for some purpose or another.  *See Romer v. Evans*, 517 U.S. 620, 631 (1996).   Thus, the Equal Protection Clause "does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).   When considering an equal protection claim, the court must first determine what level of scrutiny applies; then, the court must determine whether the law or policy at issue survives such scrutiny.

In determining what level of scrutiny applies to an equal protection claim, the court looks to the basis of the distinction between the classes of persons.  *See generally United States v. Carolene Products Co*., 304 U.S. 144, 152 n.4 (1938).   "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying strict scrutiny."  *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008).   In such a case, "the government has the burden of proving that [its] classifications are narrowly tailored measures that further compelling governmental interests."  *Id*. (quoting *Johnson v. California,* 543 U.S. 499, 505 (2005)).

"If, instead, the challenged government action classifies people according to a quasi-suspect characteristic, such as gender or illegitimacy, then [the] court will apply intermediate [or heightened] scrutiny."  *Id*. at 1109-10.  In those cases, the test would be whether the government can demonstrate that its classification serves "important governmental objectives" and is "substantially related to achievement of those objectives."

But if the challenged government action does not implicate either a fundamental right or a protected class, the court will apply rational basis review.  *Carney v. Okla. Dep't of Public Safety*, 875 F.3d 1347, 1353 (10th Cir. 2017).  Under the rational basis standard, Plaintiffs' claim will fail

"if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id*. (citing *F.C.C. v. Beach Commc'ns, Inc*., 508 U.S. 307, 313 (1993)).

The court begins by noting that the Fourteenth Amendment contains no language concerning "inherently suspect classifications," or, for that matter, merely "suspect classifications." *See* U.S. Const. amend. XIV.  The familiar "tiers of scrutiny" is thus a judicially-created doctrine that can be traced back to the famous *Carolene Products* footnote.  *United States v. Carolene Products Co*., 304 U.S. 144, 152 n.4 (1938) (suggesting that "a more searching judicial inquiry" is warranted when prejudice against "discrete and insular minorities" undercuts the "operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry").  Over the years, the Court has developed a three-tiered system offering varying degrees of protection depending upon whether a group is designated as a suspect, quasi-suspect, or non-suspect class.

Because "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," the starting point for evaluating the constitutionality of a law under the Equal Protection Clause has long been the rational basis test.  *F.C.C. v. Beach Comm'c'ns, Inc.*, 508 U.S. 307, 313 (1993); *see also Metro. Cas. Ins. Co. v. Brownell*, 294 U.S. 580, 583 (1935).  Thus, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Comm'c'ns, Inc.*, 508 U.S. at 313.  "This standard of review is a paradigm of judicial restraint." *Id*.  "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic

process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley*, 440 U.S. 93, 97 (1979).

However, the Supreme Court has recognized that a more searching level of judicial inquiry is appropriate when a law discriminates based on "suspect" characteristics. Obviously, race is the paradigmatic suspect classification under the Fourteenth Amendment. *See Sugarman v. Dougall*, 413 U.S. 634, 649 (1973) (Rehnquist, J., dissenting) (citation omitted) ("The principal purpose of those who drafted and adopted the Amendment was to prohibit the States from invidiously discriminating by reason of race, and, because of this plainly manifested intent, classifications based on race have rightly been held 'suspect' under the Amendment."). The Supreme Court has expanded the list of suspect classes to also include national origin and alienage. *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971) (holding classification based on alienage is a suspect classification); *Oyama v. California*, 332 U.S. 633, 646-47 (1948) (holding classification based on national origin is a suspect classification). Laws that facially discriminate against a suspect class are subject to strict scrutiny and rarely survive judicial review. *See Cleburne*, 473 U.S. at 440 (explaining that the classifications of race, alienage, or national origin "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy . . . .").

Recognizing that not every classification was always inherently suspect, but that rational basis review was insufficient to protect against some types of invidious discrimination, the Supreme Court developed a third category, referred to as "quasi-suspect" classifications, which are subject to intermediate scrutiny. To date, the Supreme Court has only placed two classifications in this category: sex and illegitimacy. *See Reed v. Reed*, 404 U.S. 71 (1971) (holding classifications based on sex calls for heightened standard of review); *Trimble v. Gordon*,

36

430 U.S. 762, 767 (1977) (holding that classifications based on legitimacy were not inherently suspect but that "[i]n a case like this, the Equal Protection Clause requires more than the mere incantation of a proper state purpose").

Unfortunately, *Reed*, *Trimble*, and their progeny offer little guidance for determining whether intermediate scrutiny should apply to classifications based on characteristics beyond sex or illegitimacy.[11] There is at least superficial consensus that courts should be skeptical of—and should scrutinize more carefully—classifications involving politically powerless groups that have historically been discriminated against. But beyond this basic truism, much is unsettled. Indeed, the Supreme Court has not provided a carefully-crafted test or precisely-defined criteria for determining quasi-suspectness. *See* Marcy Strauss, *Reevaluating Suspect Classifications*, 35 Seattle U. L. Rev. 135, 138 (2011) ("Since the outcome of an equal protection case is largely determined by whether the group is designated as a suspect, quasi-suspect, or nonsuspect class, one may assume that the test for distinguishing between the three types of classes has been carefully crafted and precisely defined. But despite decades of case law on this specific issue, nothing could be further from the truth."). Instead, it has pointed to some vague and ill-defined considerations, including a history of discrimination, a circumstance of immutability, and political powerlessness.[12] *See generally Frontiero v. Richardson*, 411 U.S. 677 (1973) (Brennan, J.,

---

[11] In *Reed*, the Court did not perform any sort of suspect classification analysis, but simply determined that the sex classification lacked a rational relationship to the goal of the law. *See Reed*, 404 U.S. at 75-76 ("The Equal Protection Clause...den[ies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute."); *see also id.* at 76 ("A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'").

[12] In a plurality opinion, the Supreme Court first examined these factors and concluded that they justify applying strict scrutiny to state action that discriminates against women. *Frontiero v. Richardson*, 411 U.S. 677, 684-88 (1973) (Brennan, J., plurality opinion) (discussing reasons why women constitute a suspect class). Later, however, the Court settled upon intermediate scrutiny as the standard for analyzing claims of sex-based discrimination. *See Craig v. Boren*, 429 U.S. 190 (1976).

plurality opinion).  Even when a Supreme Court majority has agreed on the correct characteristics

of a suspect class, it has not settled on the required elements and the appropriate weight each

element should receive.[13]  *See* Susannah W. Pollvogt, *Beyond Suspect Classifications*, 16 U. Pa.

J. Const. L. 739, 777 (2014).

The Court's abstract quasi-suspect framework did not enjoy strong majority support and

was subject to sharp criticism at the time.  *See United States v. Virginia*, 518 U.S. 515, 567 (1996)

(Scalia, J., dissenting) ("We have no established criterion for 'intermediate scrutiny' either, but

essentially apply it when it seems like a good idea to load the dice."); *Craig v. Boren*, 429 U.S.

190, 221 (1976) (Rehnquist, J., dissenting) (criticizing the components of intermediate scrutiny as

"so diaphanous and elastic as to invite subjective judicial preferences or prejudices relating to

particular types of legislation"); *Sugarman v. Dougall*, 413 U.S. 634, 657 (1973) (Rehnquist, J.,

dissenting) ("[U]nless the Court can precisely define and constitutionally justify both the terms

and analysis it uses, these decisions today stand for the proposition that the Court can choose a

'minority' it 'feels' deserves 'solicitude' and thereafter prohibit the States from classifying that

'minority' different from the 'majority.' I cannot find, and the Court does not cite, any

constitutional authority for such a 'ward of the Court' approach to equal protection.").

Because of this sharp divide, the Supreme Court has been reluctant to expand the scope of

quasi-suspect classifications.  In fact, since adding illegitimacy in 1977, the Supreme Court has

declined every opportunity to recognize a new quasi-suspect class.  *See, e.g.*, *City of Cleburne*,

473 U.S. at 445-46 (refusing to recognize mental disabilities as a quasi-suspect classification, as

"it would be difficult to find a principled way to distinguish" that classification from "a variety of

---

[13] For example, in *Plyler v. Doe*, the Court conceded that the formula for determining suspect status suffers from lack of specificity.  457 U.S. 202, 216 n.14 (1982) (noting that "[s]everal formulations *might* explain our treatment of certain classifications as 'suspect,'" and then tentatively listing several factors (emphasis added)).

other groups"); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (holding that age classifications are subject to rational basis review); *see also id.* at 319-20 (Marshall, J., dissenting) (noting that the Supreme Court "has apparently lost interest in recognizing further 'fundamental' rights and 'suspect' classes"); *Romer v. Evans*, 517 U.S. 620, 633 (1996) (avoiding the question of whether a classification based on sexual orientation merits heightened scrutiny); *Obergefell*, 135 S. Ct. at 2597-2604 (same).

As it currently stands, there is no indication that the Supreme Court is willing to extend heightened scrutiny to any other classifications. *See* Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 757-58 (2011) (arguing that the Supreme Court has, in essence, closed the "heightened scrutiny canon," and thus no new groups will be added to the suspect or quasi-suspect categories). This includes, as is relevant here, classifications based on gender identity, either by recognizing transgender people as a distinct quasi-suspect class or by compressing transgender people into classifications based on sex.

Nor has the Tenth Circuit expressly indicated a willingness to extend heightened scrutiny to classifications based on transgender status either. The Tenth Circuit first addressed this issue in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995). In that case, the court rejected a transgender inmate's claim that by denying estrogen treatment, the defendants violated the plaintiff's equal protection rights. The court relied on a Ninth Circuit case which held "that transexuals are not a protected class . . . because transsexuals are not a discrete and insular minority, and because the plaintiff did not establish that 'transsexuality is an immutable characteristic determined solely by the accident of birth' like race, or national origin.'" *Brown*, 63 F.3d at 971 (quoting *Holloway v. Arthur Andersen & Co*., 566 F.2d 659, 663 (9th Cir. 1977)). The Tenth Circuit did discuss that "[r]ecent research may support reevaluating *Holloway*," but the court determined that the plaintiff's

39

"allegations are too conclusory to allow proper analysis of this legal question." *Id*. Thus, the court decided to "follow *Holloway* and hold that [the plaintiff] is not a member of a protected class in this case." *Id*.

The Tenth Circuit had the opportunity to revisit this issue in 2015. But the court did not engage in any meaningful analysis. The court simply confirmed that, "[t]o date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims," and analyzed the plaintiff's equal protection claim under rational basis. *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (citing *Brown*, 63 F.3d at 971).

The court notes that there have been calls for the Tenth Circuit to revisit its holding in *Brown*. *See, e.g.*, *Griffith v. El Paso Cnty., Colo.*, 2023 WL 2242503, at *9 (D. Colo. 2023) (stating that the court "has little trouble stating that the Tenth Circuit needs to revisit its holding in *Brown v. Zavaras*" because *Holloway* has since been overruled and the holding "is out-of-step with the 'many district courts' that 'have analyzed the relevant factors for determining suspect class status and held that transgender people are at least a quasi-suspect class'"). But until the Tenth Circuit does so, *Brown* remains good and binding law. For this reason, and because "courts have been very reluctant, as they should be in our federal system" to create new suspect classes, the court declines to expand the application of intermediate scrutiny to a new quasi-suspect class. *See Johnston v. Univ. of Pittsburgh of the Comm. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015) (declining to recognize transgender status as a class entitled to heightened scrutiny because neither the Supreme Court nor the Third Circuit have ruled otherwise); *see also Cleburne*, 473 U.S. at 441 ("[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of

powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued.").

Moreover, the premature designation of suspect classifications would disrupt the necessary balance between the judicial branch and the democratic process.[14] Finding that transgender people are a quasi-suspect class would have implications that reach beyond the limited issue presented in this case (i.e., Plaintiffs' right to amend their birth certificates), as it would subject *all* future legislation concerning transgender people to heightened scrutiny. The legislature must have a certain amount of flexibility and freedom from judicial oversight in shaping and limiting their policies. As Justice Powell noted in *Frontiero*:

> There are times when this Court, under our system, cannot avoid a constitutional decision on issues which normally should be resolved by the elected representatives of the people. But democratic institutions are weakened, and confidence in the restraint of the Court is impaired, when we appear unnecessarily to decide sensitive issues of broad social and political importance at the very time they are under consideration within the prescribed constitutional processes.

*Frontiero*, 411 U.S. at 692 (Powell, J., concurring). Justice Powell's admonition is particularly instructive now, when Congress and legislatures across the country are struggling with a broad array of legislation to address the multitude of concerns and conflicts arising around the subject of transgender rights. *See, e.g.*, H.R. Res. 269, 118th Cong. (2023) ("Recognizing that it is the duty of the Federal Government to develop and implement a Transgender Bill of Rights to protect and

---

[14] To the extent that Plaintiffs argue for application of the *Frontiero* factors, the court finds they do not support a finding that transgender people are part of a quasi-suspect class. Notably, the principal purpose underlying intermediate scrutiny into the realm of legislative judgment is directly related to the political power factor. Intermediate scrutiny is appropriate in those instances in which, because of the status of the group affected by the classification, the group has *no* effective means of redressing any discrimination through the normal political process. But here, the court is not convinced that transgender people are powerless to effectuate change through the normal democratic process. Indeed, as Plaintiffs point out, 47 states currently allow transgender people to amend their birth certificates. (Doc. 33 at 21.) It is unreasonable to assume that transgender people as a whole are simply incapable of effectuating change via the normal democratic process. *See Cleburne*, 473 U.S. at 440 ("[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic process.").

codify the rights of transgender and nonbinary people under the law and ensure their access to medical care, shelter, safety, and economic security."); S.B. 613, 2023 Reg. Sess. (Okla., enacted May 1, 2023) (banning gender-affirming care for minors); S.B.23-188, 74th G.A. (Colo., enacted Apr. 14, 2023) (establishing gender-affirming care as "legally protected"); S.B. 180, 2023-24 Leg. Sess. (Kan., eff. July 1, 2023) (defining male and female based on sex assigned at birth and declaring that "distinctions between the sexes" in bathrooms and other spaces serves "the important governmental objectives" of protecting "health, safety and privacy").

Accordingly, the court finds that Plaintiffs do not constitute a quasi-suspect class for equal protection purposes. *See Brown*, 63 F.3d at 971; *Griffith*, 2023 WL 2242503, at *9.

## D. Defendants' Policy is rationally related to its stated purpose.

Because Defendants' Policy does not infringe upon a fundamental liberty interest or implicate a suspect class, the challenged action is subject to rational basis review. *Carney*, 875 F.3d at 1353. Defendants argue that the Policy survives rational basis review, as it furthers at least two legitimate state interests: (1) protecting the integrity and accuracy of vital records, including documenting birth information and classifying individuals based on the two sexes; and (2) using those classifications to protect the interests of women. (Doc. 24 at 22-23.) While Plaintiffs primarily contend that Defendants' Policy is subject to heightened review, Plaintiffs contend that it fails even rational basis review. (Doc. 33 at 19.) According to Plaintiffs, Defendants' Policy "does not promote any interest in accuracy and, in fact, thwarts that interest." (*Id*. at 20.) Plaintiffs further contend that protecting women is not a legitimate interest, nor is Defendants' Policy rationally related to that interest. (*Id*. at 22.)

A law or policy complies with the Fourteenth Amendment's Due Process and Equal Protection Clauses under the rational basis test if there is a "rational relationship between the

[policy] and the government's stated purpose." *Bolden v. City of Topeka*, 327 F. App'x 58, 61 (10th Cir. 2009). State actions subject to rational-basis review are "presumed constitutional," and courts uphold the actions "if there is any reasonably conceivable state of facts that could provide a rational basis for" them. *Petrella v. Brownback*, 787 F.3d 1242, 1266 (10th Cir. 2015) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). The Supreme Court has often indicated that rational basis review should not inquire into the actual purpose of the challenged classification. Those attacking the rationality of the state action thus have the burden "to negative every conceivable basis which might support it." *Beach Comm'c'ns*, 508 U.S. at 315 (citing *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Here, there is a rational basis for a policy of categorically prohibiting the amendment of the sex designation on a birth certificate. Under Oklahoma law, the purpose of a birth certificate is to record "the facts of the birth." *See* 63 O.S. § 1-311(B). The legislature has delegated authority to the State Commissioner of Health "to protect the integrity and accuracy of vital statistics records." *Id.* § 1-321(A). Protecting the integrity and accuracy of vital records is obviously a legitimate state interest. *See, e.g.*, *Pavan v. Smith*, 137 S. Ct. 2075, 2079 (2017) (Gorsuch, J., dissenting) ("[R]ational reasons exist for a biology based birth registration regime, reasons that in no way offend *Obergefell*—like ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders."). And this interest is logically furthered by a law prohibiting subsequent alterations to the "facts of birth." *See MH v. First Judicial Dist. Ct. of Laramie Cnty.*, 465 P.3d 405, 412 (Wyo. 2020) (Kautz, J., concurring) ("[C]hanges to a birth certificate which seek to alter 'the facts of the birth' undermine the integrity and the accuracy of the birth certificate.").

Plaintiffs contend that Defendants' Policy actually thwarts the government's interest in promoting accuracy because it promotes inconsistency under the law.  (Doc. 33 at 20.)  Notably, Oklahoma previously allowed other transgender people to change the sex designation on their birth certificates, while denying Plaintiffs that same opportunity.  And Oklahoma currently still allows transgender people to change the sex designation on their driver's licenses, leading to transgender people having inconsistent identity documents.  *See, e.g.*, *K.L. v. State, Dep't of Admin.*, 2012 WL 2685183, at \*7 (Ak. Sup. Ct. 2012) (holding that the refusal to correct a transgender woman's driver's license failed to "further[] . . . the state's interest in accurate document[s] and identification" and created a risk of "inaccurate and inconsistent identification documents").

However, neither the Due Process Clause nor the Equal Protection Clause demand logical tidiness.  The fact that a law is imperfect does not make it irrational.  *See Vance v. Bradley*, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required."); *Murgia*, 427 U.S. at 314 (explaining that where rationality is the test, "perfection in making the necessary classifications is neither possible nor necessary").  Indeed, the government "must be allowed leeway to approach a perceived problem incrementally."  *Beach Comm'c'ns*, 508 U.S. at 316.  "'[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.'"  *Id*. (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)) (finding a rational basis where the state made geographic distinctions to determine tax rates for slot machines)).

Moreover, the court can readily conceive of reasons that a state might want to preserve the accuracy of the facts of a birth related to biological sex.  By way of example, there is currently a

44

debate raging across the country about the propriety of allowing biological men to participate in women's sports.  *Compare* 70 O.S. § 27-106(E)(1) (2022) (prohibiting "students of the male sex" from participating on athletic teams designated for "females," "women," or "girls"); *with* Cal. Educ. Code § 221.5(f) (2014) ("A pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records.").  Women fought for decades to achieve equality in sports, resulting in victories such as Title IX of the Education Amendments of 1972, which required equal opportunities for women to participate in athletics at federally-funded education institutions.  *See* 20 U.S.C. § 1681.  Now, all of a sudden, it appears that some of those hard-won victories may be slipping away as biological men, who may not be particularly competitive in male sports, compete as transgender women and begin to displace women from the podiums in women's sporting events.  As legislative bodies grapple with solutions to this problem and contemplate protections for women in women's sports, they might readily conclude that birth certificates provide a ready, reliable, non-invasive means of verifying the biological sex of participants in women's athletics should they choose to enact statutes that restrict participation by biological men.

It is not the role of the court to decide whether Defendants have chosen the best path, or the least restrictive means.  *See Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004) (stating that, under the rational basis standard, "[s]econd-guessing by a court is not allowed"); *Beach Comm'c'ns*, 508 U.S. at 313 ("[E]qual protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").  The court's role is limited to determining the constitutionality of Defendants' Policy.  Under the Fourteenth Amendment, the State of Oklahoma is not required to make special accommodations for transgender people, so long as their actions

45

toward such individuals are rational. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-68 (2001). The State "could quite hardheadedly—and perhaps hardheartedly"—hold to laws or policies "which do not make allowance" for persons whose gender identity conflicts with that recorded at the time of their birth. *Id*.; *see also New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines...."). "If special accommodations for [transgender people] are to be required, they have to come from positive law and not through the Equal Protection Clause." *Garrett*, 531 U.S. at 357.

Because there is a reasonably conceivable state of facts that provides a rational basis for Defendants' Policy, the court finds that the Policy does not violate the Fourteenth Amendment. Accordingly, Plaintiffs fail to state a cognizable claim under the Due Process or Equal Protection Clauses.

## IV.    CONCLUSION

IT IS THEREFORE ORDERED that Defendants' motion to dismiss (Doc. 24) is GRANTED.

IT IS SO ORDERED. Dated this 8th day of June, 2023.

_s/John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE