No. 23-5080

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ROWAN FOWLER, ET AL.,

*Plaintiff–Appellant*,

v.

KEVIN STITT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE
OF OKLAHOMA, ET AL.,

*Defendants–Appellees*,

On Appeal from the United States District Court
for the Northern District of Oklahoma
No. 22-CV-115-JWB-SH
Hon. John W. Broomes, District Judge

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION &
AMERICAN CIVIL LIBERTIES UNION OF OKLAHOMA IN SUPPORT
OF APPELLANT AND REVERSAL**

Harper S. Seldin (admitted only in
Pennsylvania)
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hseldin@aclu.org

Adam Hines (admitted only in
Oklahoma)
Megan Lambert
American Civil Liberties Union of
Oklahoma Foundation
PO Box 13327
Oklahoma City, OK 73113
(405) 525-3831
ahines@acluok.org
mlambert@acluok.org

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................. vi

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................................. vii

STATEMENT PURSUANT TO RULE 29(a)(4)(E) ............................. vii

STATEMENT PURSUANT TO RULE 29(a)(2) ...................................... vii

ARGUMENT ...................................................................................... 1

I.  Brown v. Zavaras does not foreclose applying heightened scrutiny to plaintiffs' equal protection claim. ............................................................ 3

    A. Brown neither considered a sex discrimination claim nor decided as a matter of law whether transgender individuals are a suspect class. .................................................................................. 3

    B. To the extent Brown's language could foreclose plaintiffs' sex discrimination claim, it is no longer good law. ......................... 5

II. Because classifications based on transgender status are sex-based, heightened scrutiny applies. .......................................................... 6

    A. Oklahoma's policy is sex-based because it requires referencing sex. ....................................................................................... 7

    B. Oklahoma's policies use impermissible sex stereotyping to discriminate against plaintiffs and other transgender individuals. .............. 9

III. Heightened scrutiny also applies to plaintiffs' claims because transgender persons constitute a quasi-suspect class. ......................................... 11

CONCLUSION .................................................................................. 15

RULE 32(g)(1) CERTIFICATE OF COMPLIANCE ............................. 17

CERTIFICATE OF SERVICE ............................................................ 18

i

# TABLE OF AUTHORITIES

## Cases

*Adams ex rel. Adams Kasper v. Sch. Bd. of St. Johns Cnty.*,
  3 F.4th 1299 (11th Cir. 2021), *vacated on other grounds by* 57 F.4th 791
  (11th Cir. 2022) (en banc)......................................................................................7

*Adkins v. City of New York*,
  143 F. Supp. 3d 134 (S.D.N.Y. 2015) ........................................................ 12, 15

*Barnes v. City of Cincinnati*,
  401 F.3d 729 (6th Cir. 2005) ..............................................................................10

*Baskin v. Bogan*,
  766 F.3d 648 (7th Cir. 2014) ..............................................................................14

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*,
  208 F. Supp. 3d 850 (S.D. Ohio 2016) ........................................................ 14, 15

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020)........................................................................ 1, 2, 5, 6, 8

*Bowen v. Gilliard*,
  483 U.S. 587 (1987)............................................................................................11

*Brandt ex rel. Brandt v. Rutledge*,
  47 F.4th 661 (8th Cir. 2022) ..............................................................................11

*Bridge v. Okla. State Dep't of Educ.*,
  No. CIV-22-00787-JD, 2022 WL 20689557 (W.D. Okla. Dec. 20, 2022).. vi, 12

*Brown v. Zavaras*,
  63 F.3d 967 (10th Cir. 1995) .................................................................... 2, 3, 4

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)............................................................................................11

*Corbitt v. Taylor*,
  513 F. Supp. 3d 1309 (M.D. Ala. 2021).............................................................7

*Eknes-Tucker v. Governor of Alabama*,
　No. 22-11707, 2023 WL 5344981 (11th Cir. Aug. 21, 2023) ...........................11

*Evancho v. Pine-Richland Sch. Dist.*,
　237 F. Supp. 3d 267 (W.D. Pa. 2017)..................................................................15

*F.V. v. Barron*,
　286 F. Supp. 3d 1131 (D. Idaho 2018) ............................................................7, 9

*F.V. v. Barron*,
　286 F. Supp. 3d 1131 (D. Idaho 2018), *decision clarified sub nom. F.V. v.*
　*Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020) .............................................15

*Flack v. Wis. Dep't of Health Servs.*,
　328 F. Supp. 3d 931 (W.D. Wisc. 2018) ............................................................15

*Free the Nipple-Fort Collins v. City of Fort Collins*,
　916 F.3d 792 (10th Cir. 2019) .................................................................. 6, 9, 10

*Frontiero v. Richardson*,
　411 U.S. 677 (1973)............................................................................................12

*Glenn v. Brumby*,
　663 F.3d 1312 (11th Cir. 2011) .........................................................................10

*Golinski v. U.S. Off. of Pers. Mgmt.*,
　824 F. Supp. 2d 968 (N.D. Cal. 2012)................................................................14

*Grimm v. Gloucester Cnty. Sch. Bd.*,
　972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,*
　2021 WL 2637992 (June 28, 2021) ............................ 7, 8, 10, 11, 12, 13, 14, 15

*Holloway v. Arthur Andersen & Co.*,
　566 F.2d 659 (9th Cir. 1977) ...............................................................................4

*J.E.B. v. Alabama*,
　511 U.S. 127 (1994)..............................................................................................8

*Karnoski v. Trump*,
　926 F.3d 1180 (9th Cir. 2019) ..............................................................................4

*L.W. ex rel. Williams v. Skrmetti*,
　No. 23-5600, 2023 WL 6321688 (6th Cir. Sept. 28, 2023).................................11

*Latta v. Otter*,
　771 F.3d 456 (9th Cir. 2014) ...........................................................................14

*Lyng v. Castillo*,
　477 U.S. 635 (1986)..........................................................................................14

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
　286 F. Supp. 3d 704 (D. Md. 2018)...................................................................15

*Norsworthy v. Beard*,
　87 F. Supp. 3d 1104 (N.D. Cal. 2015)...............................................................15

*Poe v. Drummond*,
　No. 23-CV-177-JFH-SH, 2023 WL 4560820 (N.D. Okla. July 17, 2023) .. vi, 12

*Price Waterhouse v. Hopkins*,
　490 U.S. 228 (1989).............................................................................................9

*Ray v. McCloud*,
　507 F. Supp. 3d 925 (S.D. Ohio 2020) .................................................. 13, 14, 15

*Schwenk v. Hartford*,
　204 F.3d 1187 (9th Cir. 2000) .............................................................................4

*Sessions v. Morales-Santana*,
　582 U.S. 47 (2017)...................................................................................... 2, 6, 9

*Tudor v. Se. Okla. State Univ.*,
　13 F.4th 1019 (10th Cir. 2021) ...........................................................................5

*United States v. Virginia*,
　518 U.S. 515 (1996)..................................................................... 1, 2, 5, 6, 9, 10

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
　858 F.3d 1034 (7th Cir. 2017) .......................................................... 6, 8, 10, 12

**Statutes**

Okla. Admin. Code § 1:2021-24 (2021) .....................................................................8

iv

Okla. Stat. Ann. 63, § 1-321 (West 2022) ................................................8

**Other Authorities**

Aruna Saraswat et al.,
   *Evidence Supporting the Biologic Nature of Gender Identity*, 21
   Endocrine Prac. 199 (2015) ...............................................13

Council on Minority Mental Health and Health Disparities,
   *Position Statement on Issues Related to Sexual Orientation and Gender
   Minority Status*, Am. Psychiatric Ass'n (2020).................................13

Jacqui Germain,
   *'I shouldn't have to justify how I exist': Democrat Mauree Turner on
   being boxed in by identity*, The Guardian (Feb. 1, 2021) ....................................14

Jody L. Herman et al.,
   *How Many Adults and Youth Identify as Transgender in the United
   States?*, Williams Inst. (June 2022) ..................................... vi

Randi Kaufman,
   *Introduction to Transgender Identity and Health*, *in* THE FENWAY GUIDE
   TO LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH 331 (Harvey J.
   Makadon et al. eds., 1st ed. 2008) .....................................13

S.E. James, et al.,
   *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for
   Transgender Equal. (2016) ..............................................12

Wylie C. Hembree et al.,
   *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent
   Persons: An Endocrine Society Clinical Practice Guideline*, 102 J.
   Clinical Endocrinology & Metabolism 3869 (2017)..........................................13

Yllza Xerxa, et al.,
   *Gender Diversity and Brain Morphology Among Adolescents*, JAMA
   Network Open (2023) ...........................................13

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution. The ACLU of Oklahoma, founded in 1964, is a state affiliate of the ACLU with 2,025 current members. Throughout their history, the ACLU and ACLU of Oklahoma have advocated in courts and legislatures against discrimination in all its forms, including on the basis of sex, sex stereotypes, and transgender status. It is estimated that at least 21,500 Oklahomans identify as transgender.[1] Because amici are dedicated to the constitutional rights and civil liberties of all Oklahomans, they have a unique interest in ensuring that Plaintiffs and other transgender Oklahomans are not denied the equal protection of the law. *See Poe v. Drummond*, No. 23-CV-177-JFH-SH, 2023 WL 4560820 (N.D. Okla. July 17, 2023) (challenging Oklahoma's ban on gender affirming care); *Bridge v. Okla. State Dep't of Educ.*, No. CIV-22-00787-JD, 2022 WL 20689557 (W.D. Okla. Dec. 20, 2022) (challenging Oklahoma's ban on transgender students using a bathroom of any sex other than that assigned at birth).

---

[1] *See* Jody L. Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Inst., 10 (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The ACLU and ACLU of Oklahoma are non-profit entities, not subsidiaries or affiliates of any publicly owned corporation, and do not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the ACLU or ACLU of Oklahoma.

## STATEMENT PURSUANT TO RULE 29(a)(4)(E)

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## STATEMENT PURSUANT TO RULE 29(a)(2)

Counsel for the parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2)

## ARGUMENT

"[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020). Plaintiffs have suffered discrimination on the basis of sex in this case, and, as in all cases when the government classifies on the basis of sex, heightened scrutiny applies. *United States v. Virginia*, 518 U.S. 515, 555 (1996) ("*VMI*").

Plaintiffs are transgender people born and living in Oklahoma. But Oklahoma law prohibits them from changing the sex marker on their birth certificates to match their gender identity, exposing them to harassment and discrimination. When faced with the inevitable need to prove their identity to participate in modern society, Plaintiffs cannot use a key form of government identification without outing themselves as transgender and exposing themselves to the persecution and violence transgender people often face. *See* Second Am. Compl. ¶¶ 81-88, 98-101, 112-120, ECF No. 41. On the other hand, people who are not transgender can readily provide official documents with sex markers that comport with their gender identity. Thus, the sex a person is assigned at birth "plays a necessary and undisguisable role" in how Oklahoma treats people under this law, making it sex-based discrimination that requires heightened scrutiny. *Bostock*, 140 S. Ct. at 1737; *see also VMI*, 518 U.S. at 555.

Yet the district court held that this Court's decision in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995) required it to apply rational basis review. The district court was mistaken for two reasons. First, *Brown* neither asked nor answered the key question for this case: whether discrimination on the basis of transgender status is sex-based discrimination requiring heightened scrutiny under the equal protection clause. Instead, the court briefly considered whether "transsexuality" was a suspect class and decided the complaint was "too conclusory" to properly address the question. *Brown*, 63 F.3d at 971. *Brown* merely acknowledged that for this Court to analyze transgender status under the equal protection clause, it required the benefit of full briefing, not just a pro se complaint. Second, even if *Brown* had addressed the issues in this case, it is no longer good law because it conflicts with more recent Supreme Court precedent that heightened scrutiny applies to all sex-based classifications, *VMI*, 518 U.S. at 555; *Sessions v. Morales-Santana*, 582 U.S. 47 (2017), and that discrimination based on transgender status is necessarily sex-based discrimination. *Bostock*, 140 S. Ct. at 1737, 1741.

Amici respectfully request that this Court: (1) hold, consistent with *VMI* and *Bostock*, that discrimination based on transgender status is inherently discrimination on the basis of sex, triggering heightened scrutiny; (2) hold that transgender status is a quasi-suspect classification, independently triggering heightened scrutiny; and (3) overrule *Brown* as necessary to reach that result.

2

I. **Brown v. Zavaras does not foreclose applying heightened scrutiny to plaintiffs' equal protection claim.**

Plaintiffs requested that the lower court apply heightened scrutiny for two reasons: (1) Oklahoma's policy is sex-based discrimination under *VMI* and its progeny; and (2) classifications based on transgender status trigger heightened scrutiny because transgender people are a quasi-suspect class. The lower court rejected both arguments by reasoning that *Brown v. Zavaras* dictated that Plaintiffs' claims be reviewed only under rational basis. *See* Order Granting Defs.' Mot. to Dismiss 39-40, ECF No. 52. Not so.

**A. Brown neither considered a sex discrimination claim nor decided as a matter of law whether transgender individuals are a suspect class.**

*Brown* concerned a pro se prisoner's claim against a prison for its refusal to provide estrogen treatment. 63 F.3d at 969-70. The court addressed the equal protection claim in a few paragraphs by relying on a now-overturned Ninth Circuit case because the plaintiff's "allegations are too conclusory to allow proper analysis of this legal question." *Id.* at 971.

The *Brown* court never addressed the alleged sex discrimination under the equal protection doctrine or analyzed how sex classifications relate to transgender status. Instead, it only considered whether transgender status (or rather, "transsexuality") constituted its own suspect class. *Id.* And when answering that question, it relied upon a now-overturned Ninth Circuit case. *Id.* (citing *Holloway v.*

3

*Arthur Andersen & Co.*, 566 F.2d 659, 663 (9th Cir. 1977)). *But see Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (holding that classification based on transgender status triggers heightened scrutiny); *Schwenk v. Hartford*, 204 F.3d 1187, 1202-03 (9th Cir. 2000) (animus against transgender individual was sex-based). In fact, when the *Brown* court cited *Holloway*, it expressed skepticism of that holding and pointed to lower court opinions investigating the immutability of gender identity. *Brown*, 63 F.3d at 971 ("Recent research concluding that sexual identity may be biological suggests reevaluating *Holloway*.").

Given the posture of the case and the particularities of the briefing, the *Brown* court proceeded with caution and deferred the decision for another day. *Id.* ("We decline to make such an evaluation *in this case* because [the plaintiff's] allegations are too conclusory to allow proper analysis.") (emphasis added). Without the necessary information to conduct its own examination, the *Brown* court followed *Holloway* and issued a narrow holding: "We . . . hold that [the plaintiff] is not a member of a protected class *in this case.*" *Id.* (emphasis added). That is not the language of a conclusive statement on an important issue of constitutional law; *Brown* was the result of a cautious court signaling the need for more information. Thankfully, nearly twenty years of jurisprudence and more recent Supreme Court precedent have clarified the issue: a classification based on transgender status is a sex-based classification, and transgender status is a quasi-suspect class.

**B. To the extent Brown's language could foreclose plaintiffs' sex discrimination claim, it is no longer good law.**

Even if *Brown* could foreclose the application of heightened scrutiny to the claims below, that holding no longer controls. *VMI* clarified that all discrimination based on sex triggers heightened scrutiny, 518 U.S. at 532-33, and all discrimination based on transgender status "necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock*, 140 S. Ct. at 1747. This Court has already recognized and adopted *Bostock*'s reasoning. *See Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) ("In the wake of *Bostock*, it is now clear that transgender discrimination . . . is discrimination 'because of sex.'").

It is true that *Bostock* and *Tudor* were Title VII cases, but *Bostock*'s reasoning derives from logical principles and textual definitions that apply with the same force to equal protection cases. *First*, discrimination means to treat someone differently. *See Bostock*, 140 S. Ct. at 1740. *Second*, transgender people are those whose gender expression or identity does not match their sex assigned at birth. *Id.* at 1741. Therefore, to treat someone differently because they are transgender is to treat them differently *because their gender expression does not match their sex assigned at birth*. *Id.* at 1740-41. This conclusion holds true regardless of whether the context is Title VII or the equal protection clause.

Take this case for example. Oklahoma refuses to allow transgender people designated male at birth—but who now identify as female—to have a birth

certificate that matches their gender identity. But the state permits those designated female at birth—and who continue to identify as female—to have a birth certificate that matches their gender identity. Put simply, the state treats transgender individuals differently than people who are not transgender *because their gender expression does not match their sex assigned at birth*. Thus, sex plays just as "necessary and undisguisable" a role in Oklahoma's discrimination as it did in the employer's discrimination in *Bostock*. *Id.* at 1737. *Bostock* removes any impediment from *Brown* that might prevent this Court from recognizing classifications based on transgender status as sex-based.

## II.    Because classifications based on transgender status are sex-based, heightened scrutiny applies.

Supreme Court and Tenth Circuit precedent dictate that all sex-based classifications warrant heightened scrutiny. *VMI*, 518 U.S. at 555; *accord Morales-Santana*, 582 U.S. at 58; *see also Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 799 (10th Cir. 2019). Even before the logical applications of *Bostock*, courts across the nation began recognizing that sex-based discrimination included discrimination against transgender individuals, and the trend has only continued since. *See, e.g.*, *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (school policy that "decide[d] which bathroom a student may use based upon the sex listed on the student's birth certificate" was "inherently based upon a sex-classification."); *Grimm v. Gloucester*

*Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,* 2021 WL 2637992 (June 28, 2021) (policy limiting access to male and female restrooms based on "biological" gender "necessarily rests on a sex classification"); *Adams ex rel. Adams Kasper v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1307 (11th Cir. 2021) (school bathroom policy subject to heightened scrutiny because it "categorize[d] on the basis of sex"), *vacated on other grounds by* 57 F.4th 791 (11th Cir. 2022) (en banc).[2] Courts have likewise applied heightened scrutiny when the state has denied transgender individuals the ability to update their sex-marker on government documents. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1144-45 (D. Idaho 2018) (finding that Idaho's birth certificate law was sex-based discrimination deserving heightened scrutiny); *Corbitt v. Taylor*, 513 F. Supp. 3d 1309, 1312 (M.D. Ala. 2021) (finding that Alabama's law requiring sex reassignment surgery before changing a driver's license sex-marker was sex-based discrimination deserving heightened scrutiny). The reasoning from these cases and *Bostock* apply directly to the Oklahoma policy at issue in this case.

### A. Oklahoma's policy is sex-based because it requires referencing sex.

Oklahoma's policies are subject to heightened scrutiny because they cannot be enforced, nor can they even be "stated[,] without referencing sex." *Whitaker*, 858

---

[2] In ultimately upholding a sex-separated restroom policy, the Eleventh Circuit still unequivocally recognized the policy as a sex-based classification and analyzed whether it satisfied heightened scrutiny. *See Adams*, 57 F.4th at 801.

F.3d at 1051; *see also Bostock*, 140 S. Ct. at 1746 (explaining that transgender discrimination is necessarily sex discrimination because the discrimination itself would be impossible to explain without understanding the words "man, woman, or sex"). References to sex are plain and inescapable in Oklahoma's policy, appearing even in the language of the policies themselves. *See* Exec. Order No. 2021-24 in Okla. Admin. Code § 1:2021-24 (2021) (the Oklahoma State Department of Health cannot "in any way alter" the "*sex or gender* on a birth certificate.") (emphasis added); *see also* Okla. Stat. Ann. 63, § 1-321 (West 2022) (The "*sex* designation on a certificate of birth amended under this section shall be either male or female and shall not be nonbinary.") (emphasis added).

Defendants cannot disclaim these references to sex and escape heightened scrutiny by arguing that the policy applies to everyone. The equal protection clause works to prevent discrimination against the individual. *See J.E.B. v. Alabama*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring) ("The neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups."). The fact that the state applies the same policy to transgender and cisgender people is irrelevant because cisgender people do not try to change their legal sex designations from those assigned at birth and therefore already have birth certificates containing sex designations congruent with their gender identities. *See Grimm*, 972 F.3d at 609 ("that is like saying that racially

8

segregated bathrooms treated everyone equally, because everyone was prohibited from using the bathroom of a different race.").

**B. Oklahoma's policies use impermissible sex stereotyping to discriminate against plaintiffs and other transgender individuals.**

As both this Court and the Supreme Court have recognized, heightened scrutiny exists to counter and protect against "archaic and overbroad generalizations about gender." *Free the Nipple*, 916 F.3d at 799-800; *see also Morales-Santana*, 582 U.S. at 62 (explaining that the Supreme Court has "[f]or close to a half century . . . viewed with suspicion laws that rely on 'overbroad generalizations'" about what it means to be a man or woman) (citing *VMI*, 518 U.S. at 533).

Oklahoma's classification hinges on exactly this type of impermissible sex stereotyping about how people should feel, act, and look based on sex or gender. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). Oklahoma's generalization is that all people have a gender identity that corresponds to the sex assigned at birth based on then-observed external characteristics. *See F.V. v. Barron*, 286 F. Supp. 3d at 1136 ("Sex determinations made at birth are most often based on the observation of external genitalia alone."). The Governor admitted as much in his statement preceding the policy changes. *See* Second Am. Compl. ¶ 53, ECF No. 41. ("[P]eople are created by God to be male or female. Period."). Courts have consistently recognized that this kind of generalization, i.e. requiring transgender individuals to conform to expectations around their sex assigned at birth, is

impermissible sex stereotyping. *See, e.g.*, *Whitaker*, 858 F.3d at 1048 (holding that discrimination against transgender individuals is impermissible sex-based stereotyping because "[b]y definition, a transgender individual does not conform to the sex-based stereotypes" of their sex assigned at birth); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (holding that demoting transgender police officer for not "conform[ing] to sex stereotypes concerning how a man should look and behave" violates Title VII); *Grimm*, 972 F.3d at 608 ("Grimm was subjected to sex discrimination because he was viewed as failing to conform to the sex stereotype propagated by the Policy."); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."). These sex and gender stereotypes play an unmistakable role in Oklahoma's policies, and those "stereotypes and their potential to perpetuate inequality" are precisely why they must face heightened scrutiny. *Free the Nipple*, 916 F.3d at 802.

Oklahoma cannot avoid heightened scrutiny by offering a justification for its sex stereotypes, i.e. insisting that its birth certificate policy only reflects the "natural distinction between men and women." Defs.' Mot. to Dismiss 13, ECF No. 24. The state's justification for its sex-based classification goes to whether heightened scrutiny is satisfied, not whether it applies in the first instance. *See VMI*, 518 U.S. at 532-33 (explaining the two-part analysis where first the court focuses "on the

10

differential treatment for denial of opportunity" to decide if heightened scrutiny applies and then, if it does, "the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.'"); *accord Grimm*, 972 F.3d at 607 ("When considering an equal protection claim, we first determine what level of scrutiny applies; then, we ask whether the law or policy at issue survives such scrutiny."). The reasoning behind *Bostock* and *Tudor* requires the application of heightened scrutiny to Oklahoma's policies, regardless of the state's justifications, which only go to the ultimate outcome of the analysis.[3]

### III. Heightened scrutiny also applies to plaintiffs' claims because transgender persons constitute a quasi-suspect class.

Heightened scrutiny applies not only because Oklahoma's classification is sex-based, but also because transgender individuals constitute their own quasi-suspect class. *See Grimm*, 972 F.3d at 611 (analyzing the four factors derived from *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) and *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985)).

---

[3] Recent decisions from the Sixth and Eleventh Circuits similarly confuse the issue of whether heightened scrutiny *applies* with whether heightened scrutiny is *satisfied*. *See L.W. ex rel. Williams v. Skrmetti*, No. 23-5600, 2023 WL 6321688, at *18 (6th Cir. Sept. 28, 2023) (applying rational basis review); *Eknes-Tucker v. Governor of Alabama*, No. 22-11707, 2023 WL 5344981, at *1 (11th Cir. Aug. 21, 2023) (same). The government's reason for creating any particular sex-based classification goes to whether the classification survives a more searching judicial review; the justification itself cannot be used to avoid intermediate scrutiny in its entirety. *See, e.g.*, *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022).

*First*, transgender individuals have faced historical discrimination. *See Whitaker*, 858 F.3d at 1051 ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."); *Grimm*, 972 F.3d at 611-12 (recounting both historical and current examples of discrimination against transgender people). Among transgender adults, 30% have suffered adverse employment outcomes because of their gender identity and 77% have taken steps to hide their identity to avoid discrimination.[4] Oklahoma's recent laws targeting transgender people highlight the persistence of this discrimination. *See, e.g.*, *Poe v. Drummond*, 2023 WL 4560820 (challenging Oklahoma's ban on gender affirming care); *Bridge*, 2022 WL 20689557 (challenging Oklahoma's ban on transgender students using a bathroom of any sex other than that assigned at birth).

*Second*, being transgender is a defining characteristic with no relation to the ability to "perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). Courts reject the claim that transgender status somehow impairs a person's abilities. *See Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) ("The Court is not aware of any data or argument suggesting that a

---

[4] *See* S.E. James, et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equal., 148 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf (largest survey of transgender individuals in the U.S. with 27,715 respondents).

transgender person . . . is any less productive than any other member of society.);
*see also Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *Grimm*, 972
F.3d at 612.[5]

*Third*, transgender individuals are a discrete group with immutable
characteristics. *See Grimm*, 972 F.3d at 612-13. The research suggesting that "sexual
identity may be biological," cited by this Court in *Brown,* has now crystallized into
a scientific understanding that gender identity is an innate, biological expression that
cannot be altered or changed.[6] Courts have taken note and found that "being

---

[5] *See further* Council on Minority Mental Health and Health Disparities, *Position Statement on Issues Related to Sexual Orientation and Gender Minority Status*, Am. Psychiatric Ass'n, 1 (2020), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-Sexual-Orientation-Gender-Minority-Status.pdf (explaining that transgender status "implies no impairment… in judgment, stability, reliability, or general social or vocational capabilities.").

[6] *See, e.g.*, Randi Kaufman, *Introduction to Transgender Identity and Health*, *in* THE FENWAY GUIDE TO LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH 331, 337-38 (Harvey J. Makadon et al. eds., 1st ed. 2008) (discussing the "predominating biological theory" of how embryonic development influences various sex-related characteristics); Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3874 (2017); ("Results of studies from a variety of biomedical disciplines—genetic, endocrine, and neuroanatomic—support the concept that gender identity and/or gender expression likely reflect a complex interplay of biological, environmental, and cultural factors."); Aruna Saraswat et al., *Evidence Supporting the Biologic Nature of Gender Identity*, 21 Endocrine Prac. 199 (2015) (reviewing data suggesting a biologic basis for gender identity); Yllza Xerxa, et al., *Gender Diversity and Brain Morphology Among Adolescents*, JAMA Network Open (2023) (finding distinct

transgender is not a choice. Rather, it is as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612-13; *see also Ray*, 507 F. Supp. 3d at 937; *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016) (citing *Lyng v. Castillo*, 477 U.S. 635, 638 (1986)). Even if transgender status was not immutable, it remains a trait "so fundamental to one's identity that a person should not be required to abandon [it]." *Latta v. Otter*, 771 F.3d 456, 464 n.4 (9th Cir. 2014); *accord Baskin v. Bogan*, 766 F.3d 648, 655 (7th Cir. 2014); *Golinski v. U.S. Off. of Pers. Mgmt.*, 824 F. Supp. 2d 968, 987 (N.D. Cal. 2012).

*Fourth*, transgender individuals are a minority group lacking political power. Even after accounting for their small percentage of the population, transgender individuals remain "underrepresented in every branch of government." *Grimm*, 972 F.3d at 613 (comparing data on transgender population in the United States and representation in judicial, executive, and legislative branches). In fact, Oklahoma's House of Representatives is home to one of the nation's few gender-nonconforming legislators.[7]

---

biological differences in the brains of youth assigned male at birth who later reported gender diversity).

[7] *See* Jacqui Germain, *'I shouldn't have to justify how I exist': Democrat Mauree Turner on being boxed in by identity*, The Guardian (Feb. 1, 2021), https://www.theguardian.com/us-news/2021/feb/01/democrat-mauree-turner-oklahoma-state-representative.

Accordingly, this Court should join the host of other courts that have already recognized transgender individuals as their own quasi-suspect class and apply heightened scrutiny. *See, e.g.*, *Grimm*, 972 F.3d at 611, 613; *Ray*, 507 F. Supp. 3d at 937; *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018), *decision clarified sub nom. F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wisc. 2018); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Highland*, 208 F. Supp. 3d at 873-74; *Adkins*, 143 F. Supp. 3d at 139-40; *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015).

## CONCLUSION

Amici respectfully urge this Court to hold, consistent with *Bostock* and *Tudor*, that Oklahoma's policies trigger heightened scrutiny because it is impossible to discriminate against transgender individuals without discriminating on the basis of sex, and because transgender status is its own quasi-suspect classification.

Date: October 5, 2023

*/s/ Megan Lambert*
Megan Lambert
Oklahoma Bar Number: 33216
Adam Hines (admitted only in Oklahoma)
Oklahoma Bar Number: 35640
American Civil Liberties Union of
Oklahoma Foundation
P.O. Box 13327

Oklahoma City, OK 73113
(405) 524-8511
mlambert@acluok.org
ahines@acluok.org

Harper S. Seldin (admitted only in
Pennsylvania)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hseldin@aclu.org

Counsel for *Amici Curiae*

## RULE 32(g)(1) CERTIFICATE OF COMPLIANCE

This brief complies with the length and type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 4,262 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2023, I electronically filed the foregoing

BRIEF AMICI CURIAE OF THE AMERICAN CIVIL LIBERTIES UNION AND

THE AMERICAN CIVIL LIBERTIES UNION OF OKLAHOMA IN SUPPORT

OF APPELLANTS AND REVERSAL with the Clerk of the Court for the United

States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.


Date: October 5, 2023                    */s/ Megan Lambert*
                                         Megan Lambert
                                         Oklahoma Bar Number: 33216
                                         American Civil Liberties Union of
                                         Oklahoma Foundation
                                         P.O. Box 13327
                                         Oklahoma City, OK 73113
                                         (405) 524-8511
                                         mlambert@acluok.org

                                         Counsel for *Amici Curiae*