No. 23-5080

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

ROWAN FOWLER, *et al.*,

*Plaintiffs-Appellants*,

v.

KEVIN STITT, in his official capacity as Governor of the State of Oklahoma, *et al.*,

*Defendants-Appellees*.

_____

On appeal from the United States District Court
for the Northern District of Oklahoma
The Hon. John W. Broomes
No. 4:22-cv-00115-JWB-MTS

Brief of Appellees

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
AUDREY A. WEAVER
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
*Counsel for Defendants-Appellees*

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................ 1

**STATEMENT OF THE ISSUES** ............................................................... 3

**STATEMENT OF THE CASE** .................................................................. 4

    **I.** Since Statehood, Oklahoma has prioritized recording and maintaining vital statistics, including a person's sex identified at the time of birth. ......................................................................................... 4

    **II.** In recent years, some individuals took advantage of non-adversarial state court proceedings to obtain changes to the sex on birth certificates. .............................................................................................. 7

    **III.** Plaintiffs sued, claiming the First and Fourteenth Amendments prohibit the State from permanently recording biological sex on birth certificates. ........................................................................................... 8

    **IV.** The district court correctly held that the Constitution does not include a right to alter biological sex on a birth certificate. ................... 9

**STANDARD OF REVIEW** ...................................................................... 11

**SUMMARY OF THE ARGUMENT** ....................................................... 12

**ARGUMENT** ............................................................................................ 14

    **I.** PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW. ....... 14

        **A.** *Classification is not discrimination.* ............................................... 14

        **B.** *Oklahoma law does not intentionally discriminate.* ................................ 18

            i. Oklahoma law is neutral on its face and in its effects. ................... 18

            ii. Oklahoma law does not discriminate on the basis of transgender status. ...................................................................................... 21

            iii. Oklahoma law does not discriminate on the basis of sex. ................. 23

        **C.** *Transgender status is not a quasi-suspect class.* ................................. 28

    **II.** PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIM FAILS AS A MATTER OF LAW. .................................................................................................. 32

**A.** ***Altering the sex marker on a birth certificate is not fundamental to ordered liberty nor deeply rooted in history and tradition.*** ...............33

**B.** ***Plaintiffs fail to allege any governmental intrusion or disclosure.*** ........39

**C.** ***Neither sex nor transgender status is the kind of highly personal and intimate information warranting due process protection.*** .............43

**III.** MAINTAINING BIOLOGICAL SEX ON BIRTH CERTIFICATES IS RATIONALLY RELATED TO LEGITIMATE GOVERNMENTAL OBJECTIVES. .............45

**CONCLUSION** ........................................................................................51

**STATEMENT REGARDING ORAL ARGUMENT**.............................................52

**CERTIFICATE OF COMPLIANCE** ...................................................................52

**CERTIFICATE OF DIGITAL SUBMISSION** ...........................................................52

**CERTIFICATE OF SERVICE**............................................................................53

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.L.A. v. W. Valley City*,
    26 F.3d 989 (10th Cir. 1994) .......................................................................40

*Acanfora v. Bd. of Ed. of Montgomery Cnty.*,
    359 F.Supp. 843 (D. Md. 1973) ...................................................................38

*Adams v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022)......................................................25, 26, 32

*Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) .....................................................................................18

*Anderson v. Blake*,
    469 F.3d 910 (10th Cir. 2006) ......................................................34, 40, 41

*Arroyo Gonzalez v. Rossello Nevares*,
    305 F.Supp.3d 327 (D.P.R. 2018) ...................................................... 41, 42

*Ashaheed v. Currington*,
    7 F.4th 1236 (10th Cir. 2021).............................................................. 18, 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .....................................................................................11

*Ballard v. United States*,
    329 U.S. 187 (1946) .....................................................................................25

*Bensing v. United States*,
    551 F.2d 262 (10th Cir. 1977) .....................................................................44

*Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020) ..................................................................25, 26, 29

*Buckley Constr.. v. Shawnee Civic & Cultural Develop. Auth.*,
    933 F.2d 853 (10th Cir. 1991) .....................................................................15

*Cape v. Tenn. Secondary Sch. Athletic Ass'n*,
    563 F.2d 793 (6th Cir. 1977) .......................................................................30

*Caskey Baking Co. v. Virginia*,
    313 U.S. 117 (1941) .............................................................................. 14, 15

*Chavez v. Martinez*,
    538 U.S. 760 (2003) .....................................................................................36

*Citizens for Const. Integrity v. United States*,
    57 F.4th 750 (10th Cir. 2023)......................................................................21

*City of Cleburne v. Cleburne Living Cntr.*,
    473 U.S. 432 (1985) ........................................................................ 18, 28

*Corbitt v. Taylor*,
    21-10486 (11th Cir. filed Feb. 12, 2021) ...................................... 27

*Corey Airport Servs. v. Clear Channel Outdoor*,
    682 F.3d 1293 (11th Cir. 2012) ...................................................... 22

*Cumbey v. Meachum*,
    684 F.2d 712 (10th Cir. 1982) ........................................................ 30

*Dalton v. Reynolds*,
    2 F.4th 1300 (10th Cir. 2021) ........................................................ 21

*Dandridge v. Williams*,
    397 U.S. 471 (1970) ........................................................................ 46

*Denver Policemen's Prot. Ass'n v. Lichtenstein*,
    660 F.2d 432 (10th Cir. 1981) ........................................................ 40

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) .............................................................*passim*

*Drake v. Werdegar*,
    907 F.2d 154 (9th Cir. 1990) .......................................................... 38

*Druley v. Patton*,
    601 F.App'x 632 (10th Cir. 2015) (unpublished) ........................... 28, 30

*Eastwood v. Dep't of Corr.*,
    846 F.2d 627 (10th Cir. 1988) ........................................................ 40

*Eknes-Tucker v. Governor of Alabama*,
    80 F.4th 1205 (11th Cir. 2023) ...................................................... 31, 32

*F.C.C. v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) .................................................................23, 45, 46

*F.S. Royster Guano Co. v. Virginia*,
    253 U.S. 412 (1920) ........................................................................ 14

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ...................................................*passim*

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ..................................................................... 25, 49

*Gore v. Lee*,
    23-5669 (6th Cir. filed July 26, 2023) ............................................ 27

*Gore v. Lee*,
    3:19-CV-0328, 2023 WL 4141665 (M.D. Tenn. June 22, 2023)...................19, 43

*Hartin v. Dir. of Bureau of Records & Statistics, Dep't of Health of City of N.Y.*,
    347 N.Y.S.2d 515 (N.Y. Sup. Ct. 1973).....................................................38

*Jana-Rock Constr. v. N.Y. Dep't of Econ. Dev.*,
    438 F.3d 195 (2d Cir. 2006) ....................................................................17

*K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*,
    3AN-11-05431-CI, 2012 WL 2685183 (2012)........................................41

*Kitchen v. Herbert*,
    755 F.3d 1193 (10th Cir. 2014)...............................................................46

*Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans*,
    330 U.S. 552 (1947) ...............................................................................18

*L.W. v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) .............................................................*passim*

*Lankford v. City of Hobart*,
    27 F.3d 477 (10th Cir. 1994) ..................................................................40

*Leiser v. Moore*,
    903 F.3d 1137 (10th Cir. 2018)........................................................35, 40

*Love v. Johnson*,
    146 F.Supp.3d 848 (E.D. Mich. 2015)...............................27, 41, 42, 43

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976) ...............................................................................28

*Michael M. v. Superior Ct. of Sonoma Cnty.*,
    450 U.S. 464 (1981) ...............................................................................25

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) ...............................................................................15

*NASA v. Nelson*,
    562 U.S. 134 (2011) ...............................................................................42

*Neitzke v. Williams*,
    490 U.S. 319 (1989) ...............................................................................11

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)....................................................................................14

*Powell v. Schriver*,
    175 F.3d 107 (2d Cir. 1999) .............................................................40, 41

*Powers v. Harris,*
379 F.3d 1208 (10th Cir. 2004) ............................................................ 12, 14, 46-47

*Ray v. Himes,*
2:18-CV-272, 2019 WL 11791719 (S.D. Ohio 2019) ...................................... 42, 43

*Ray v. McCloud,*
507 F.Supp.3d 925 (S.D. Ohio 2020) ..........................................................41, 42, 43

*Regents of Univ. of Cal. v. Bakke,*
438 U.S. 265 (1978) ...................................................................................................15

*Reno v. Flores,*
507 U.S. 292 (1993) ...................................................................................................33

*Richison v. Ernest Grp.,*
634 F.3d 1123 (10th Cir. 2011) ...............................................................................11

*Romer v. Evans,*
517 U.S. 620 (1996) ...................................................................................................28

*Ross v. Moffitt,*
417 U.S. 600 (1974) ...................................................................................................21

*Rostker v. Goldberg,*
453 U.S. 57 (1981) .....................................................................................................50

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
411 U.S. 1, 28 (1973) ........................................................................................ 28, 45

*SECSYS v. Vigil,*
666 F.3d 678 (10th Cir. 2012) ......................................................................... 18, 19

*Seegmiller v. LaVerkin City,*
528 F.3d 762 (10th Cir. 2008) .................................................................................36

*Shaw v. Patton,*
823 F.3d 556 (10th Cir. 2016) ...................................................................................4

*Sheets v. Salt Lake Cnty.,*
45 F.3d 1383 (10th Cir. 1995) .................................................................................40

*Smith v. Plati,*
258 F.3d 1167 (10th Cir. 2001) ...............................................................................11

*Stewart v. City of Okla. City,*
47 F.4th 1125 (10th Cir. 2022) ................................................................................40

*Stidham v. Peace Officer Standards & Training,*
265 F.3d 1144 (10th Cir. 2001) ...............................................................................43

*Taylor v. Roswell Indep. Sch. Dist.*,
  713 F.3d 25 (10th Cir. 2013) ...................................................................14

*Teigen v. Renfrow*,
  511 F.3d 1072 (10th Cir. 2007)..............................................................11

*Tuan Anh Nguyen v. INS*,
  533 U.S. 53 (2001) ...................................................................................31

*Tudor v. SE Okla. State Univ.*,
  13 F.4th 1019 (10th Cir. 2021)...............................................................26

*Ulane v. E. Airlines, Inc.*,
  742 F.2d 1081 (7th Cir. 1984) ................................................................44

*United States v. Guillen*,
  995 F.3d 1095 (10th Cir. 2021) ..............................................................34

*United States v. Hardman*,
  297 F.3d 1116 (10th Cir. 2002) ..............................................................10

*United States v. Virginia*,
  518 U.S. 515 (1996) ..........................................................................14, 25

*Washington v. Davis*,
  426 U.S. 229 (1976)..................................................................................18

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ..........................................................................*passim*

*Waters v. Merchs. Louisville Ins. Co.*,
  36 U.S. 213 (1837) ...................................................................................42

**Statutes**

12 O.S. § 1631 .................................................................................................8

63 O.S. § 1-310...............................................................................................19

63 O.S. § 1-311........................................................................................5, 19

63 O.S. § 1-321.......................................................................................*passim*

13 U.S.C. § 101(b) .........................................................................................16

42 U.S.C. § 300..............................................................................................16

**Regulations**

6 C.F.R. § 37.17(c) .......................................................................................16

8 C.F.R. § 274a.2(b)(v)(B)(1) ......................................................................16

23 C.F.R. § 200.9(b)(4).................................................................................16

24 R.C.N.Y. Health Code § 207.05(a) ...................................................................38

29 C.F.R. § 1614.601 ..........................................................................................16

**Session Laws**

S.B. 26, 1963 O.S.L. ch. 325, art. 3 § 321.............................................................6

S.B. 1100, 2022 O.S.L. 87....................................................................................8

**Constitutional Provisions**

U.S. Const. amend. XIV ........................................................................................32

**Other Authorities**

Alice M. Hetzel, U.S. Dep't of Health & Human Servs., Ctrs. for Disease
   Control & Prevention, Nat'l Ctr. for Health Stats., *U.S. Vital Statistics
   System - Major Activities and Developments, 1950-95* (1997) .........................6

Black's Law Dictionary (6th Ed. 1990) ................................................................16

Ctrs. for Disease Control & Prevention, Nat'l Ctr. For Health Stats., *Birth
   Edit Specifications for the 2003 Revision of the U.S. Standard Certificate of Birth*
   (June 2021Rev.) ...............................................................................................7

Dean Spade, *Follow-up Letter About Legal Issues (Birth Certificate Policy)*,
   Sylvia Rivera Law Project (Feb. 25, 2003) ............................................... 38, 39

Harry Benjamin, *Transvestism and Transsexualism in the Male and Female*,
   3 J. Sex Rsch. (May 1967) ..............................................................................38

Nat'l Cntr. For Transgender Equality, *Understanding Nonbinary People: How to be
   Respectful and Supportive* (Jan. 12, 2023) .....................................................22

Natalie Shainess, *The Formation of Gender Identity*,
   5 J. Sex Rsch. (May 1969) ..............................................................................38

Okla. State Bd. of Health, *Annual Report of the Okla. State Bd. of Health, 1917*
   (1917) ...............................................................................................................5

Okla. State Health Dep't, *The Biennial Report of the State Health Department of
   Oklahoma for 1930-32* (1932) .........................................................................4

Okla. State Pub. Health Dep't, *First Biennial Report of the Oklahoma State Public
   Health Department for the Years 1909 and 1910* (1910)...................................4

U.S. Dep't of Health & Human Servs., Nat'l Ctr. for Health Stats.,
   *Hospitals' and Physicians' Handbook on Birth Registration and Fetal Death
   Reporting* (Oct. 1987) .....................................................................................7

ix

Ventura SJ, *The U.S. National Vital Statistics System: Transitioning Into the 21st Century, 1990-2017*, NCHS, 1 Vital & Health Stats. 62 (March 2018) ...................5

*Webster's New Collegiate Dictionary* 775 (2d ed. 1956) ...........................................................44

## <u>STATEMENT OF RELATED CASES</u>

There are no prior or related appeals.

# INTRODUCTION

The State of Oklahoma records, permanently, the immutable sex of Oklahomans on state-issued birth certificates. Upon discovering the State Department of Health's ("OSDH") informal practice of amending sex designations on birth certificates pursuant to state court orders in recent years, the Legislature reiterated that an Oklahoma birth certificate documents objective, biological sex: male or female.

Plaintiffs challenge the constitutionality of a biological sex designation on birth certificates, and the State declining to alter that designation. Plaintiffs posit that Oklahoma law impermissibly discriminates under the Equal Protection Clause and violates an unenumerated substantive right to privacy under the Due Process Clause. Plaintiffs, in short, seek to compel the State to supplant its biological sex designation with a gender-identity designation. Because nothing in the Constitution prohibits States from permanently documenting biological sex on birth certificates, the district court correctly dismissed Plaintiffs' lawsuit for failure to state a claim.

Under Plaintiffs' equal protection theory, the question is not whether Oklahoma law "deprives [Plaintiffs] of access to birth certificates that match their gender identity, which others are afforded[,]" Appellants' Br. 2, as no one receives an Oklahoma birth certificate recording gender identity. Instead, the question is whether recording and declining to alter an individual's biological sex on a state certificate of birth impermissibly discriminates under the Fourteenth Amendment. It does not. Similarly, under Plaintiffs' substantive due process theory, the question is not whether

transgender status is the type of "highly personal and intimate information" that if disclosed would violate some unenumerated right to privacy, *id.*, as an Oklahoma birth certificate does not record or disclose gender identity or transgender status. Instead, the question is whether biological sex is the type of highly intimate information that when recorded on an individual's birth certificate violates due process. It is not. Nor can a substantive due process claim be analyzed outside the confines of the Supreme Court's most recent binding pronouncement on substantive due process, *Dobbs v. Jackson Women's Health Organization*, which held that any such "particular right" must be "'deeply rooted in this Nation's history and tradition.'" 142 S. Ct. 2228, 2244, 2260 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

Finally, the "central question" is not "what ... is the harm" of Plaintiffs' preference of recording gender identity on birth certificates, Appellants' Br. 2, but whether the Constitution requires States to adopt that policy. It does not. Plaintiffs' far-sweeping constitutional theories have no basis in law. Thus, dismissal was proper.

## <u>STATEMENT OF THE ISSUES</u>

1.  Whether the district court correctly held that the Equal Protection Clause does not prohibit recording, and declining to alter, biological sex on birth certificates.

2.  Whether the district court correctly held that the Due Process Clause does not prohibit recording, and declining to alter, biological sex on birth certificates.

## STATEMENT OF THE CASE

**I.     Since Statehood, Oklahoma has prioritized recording and maintaining vital statistics, including a person's sex identified at the time of birth.**

State and local governments have a long history of recording vital statistics, including an individual's sex identified at birth. P.A. 57; D.A. 19-20.[1]  In Oklahoma, the practice of recording facts about birth traces back to Statehood. P.A. 75 n.9. Indeed, the First Biennial Report of the Oklahoma State Public Health Department for the Years 1909 and 1910, at 89, https://tinyurl.com/bd6z4xpb ("First Report"), explained that "[t]here is no more important subject that can come before a State Legislature for its consideration than that of vital statistics" and added that a "complete and modern system for reporting and registering births and deaths is fundamental to any system of vital statistics."[2] "[R]egistering of birth is no less important" than registering deaths, as failing to "hav[e] a complete record of the birth, properly recorded," may deprive the child "of its most valuable rights and privileges." *Id.* at 91.

The Biennial Report of the State Health Department of Oklahoma for 1930-32, at 33, https://tinyurl.com/5csa2mp9 ("1930 Report"), similarly explained "[t]he importance of Vital Statistics to the State and Civilization as a whole …." Oklahoma needs such information "to keep, for ages to come a record of each of her children[,]"

---

[1] Citations to appendices will take this form: P.A. # (Plaintiffs'-Appellants' Appendix) or D.A. # (Defendants'-Appellees' Appendix).

[2] This Court can take judicial notice of these records. *See Shaw v. Patton*, 823 F.3d 556, 564 n.12 (10th Cir. 2016) ("Judicial notice is properly taken of publicly available historical articles." (citation omitted)).

and the federal government likewise needs "to complete his own records of population and public health." *Id.* Moreover, "the facts and figures recorded on these birth and death certificates" are "PERMANENT" and "form the VERY FOUNDATION of all intelligent public health work and research." *Id.*

As a result, Oklahoma has long imposed duties on itself, medical personnel, and parents to produce accurate birth records—the child's sex included. For example, in 1910 the Health Department required physicians to report "all births and deaths, and the disease with which said person died and his age and sex, which said report shall be verified by affidavit ...." First Report at 91. Likewise, "[p]arents owe a duty to the State as well as to their off-spring to see that the record of their birth is properly reported" so "that it may become a permanent record with the Bureau of Vital Statistics." *Id.* at 93; *see also id.* at 92 ("The record of a birth shall state the date and place of birth, name of child—if it has any—sex," etc.); Annual Rep. of the Okla. State Bd. of Health, 1917, at 132, https://tinyurl.com/32c9j8d4 ("1917 Report") (similar). Those duties continue to this day. *See* P.A. 46 (individual preparing certificate "shall certify to the facts of birth" and the parent "attest[s] to the accuracy" (quoting 63 O.S. § 1-311(B), (E)); *see also* D.A. 21.

Each detail reported on birth or death certificates, including sex, is important. *See* Ventura SJ, *The U.S. National Vital Statistics System: Transitioning Into the 21st Century, 1990-2017*, NCHS, 1 Vital & Health Stats. 62, p. v (March 2018), https://www.cdc.gov/nchs/data/series/sr_01/sr01_062.pdf. In 1917, the items

recorded on an Oklahoma birth certificate, including the "[s]ex of the child[,]" were well established and the State Health Board emphasized that "[e]very one of these items ... is essential to the keeping of proper records" and "necessary for the legal, social, and sanitary purposes subserved by registration records ...." 1917 Report at 116, 132-33. Not long after, the Health Department began regularly publishing compiled data about births, using sex—male and female—as a key heading in charts. *See* 1930 Report at 36.

By 1963, the Oklahoma Legislature codified existing practices relating to vital statistics and birth certificates. *See* S.B. 26, 1963 O.S.L. ch. 325, art. 3. Since then, Oklahoma law has consistently allowed amendments of birth certificates in only two circumstances: changes of name and changes related to paternity. *Compare id.* § 321, *with* 63 O.S. § 1-321.[3] Oklahoma law has also consistently recognized the importance of complying with amendment procedures "to protect the integrity and accuracy of vital statistics records." *Id.*

None of this is unique to Oklahoma. "[T]he vital records and statistics system developed originally not as a national undertaking, but first as a local, then as a State function." Alice M. Hetzel, HHS, CDC, & NCHS, *U.S. Vital Statistics System - Major Activities and Developments, 1950-95*, at 44 (1997),  https://www.cdc.gov/nchs/data

---

[3] Oklahoma law also allows "additions or minor corrections" within a year of birth "without the certificate being considered as amended." 1963 O.S.L. ch. 325, art. 3 § 321(b); 63 O.S. § 1-321(B).

/misc/usvss.pdf.[4] By 1841, Massachusetts had birth records on file for the entire state. *Id.* at 58. By 1910, 33 states, including Oklahoma, had birth records on file for the entire state. *Id.* And by 1933, all 48 States had been admitted to the national birth registration area. *Id.* Of note, every iteration of the U.S. Standard Certificate of Live Birth from 1900 to the present reported the sex of the child. *Id.* at 28; *see also* Ventura, *supra* at 52.

The national importance of accurate vital statistics about birth has been the subject of much literature. *See* D.A. 19-20; Hetzel, *supra* at 1-2, 44-47, 54-55. Because vital records, including certificates of birth, report objective information, constitute permanent legal records, and provide valuable health and research data, "it is essential that the certificates and reports be prepared accurately." HHS & NCHS, *Hospitals' and Physicians' Handbook on Birth Registration and Fetal Death Reporting*, at 1-2, 7 (Oct. 1987), https://www.cdc.gov/nchs/data/misc/hb_birth.pdf.[5]

## II.     In recent years, some individuals took advantage of non-adversarial state court proceedings to obtain changes to the sex on birth certificates.

Around 2007, some individuals began seeking to amend "the sex markers on their birth certificates to match their gender identity[,]" despite nothing in Oklahoma law authorizing this. P.A. 46-47. Through the non-adversarial procedure for name

---

[4] Because of the well-recognized national importance of vital statistics, however, the federal government has long supported the state and local function. *See id.* at 2-5.

[5] Oklahoma law is also consistent with federal recommendations to mark the "sex of the infant" on birth certificates. P.A. 46 n.2. Notably, the district court appears to have inadvertently cited the Model Vital Statistics Act instead of the CDC's *Birth Edit Specifications for the 2003 Revision of the U.S. Standard Certificate of Birth* (June 2021 Rev.), https://www.cdc.gov/nchs/data/dvs/birth-edit-specifications.pdf. *Id.*

changes, these individuals were able to obtain state court orders purporting to compel the OSDH to amend sex designations on official records, all without involvement of or prior notice to the OSDH. *See id.* 21, 47; *see also* 12 O.S. § 1631. The OSDH complied with the court orders. P.A. 47; D.A. 21.

Controversy surrounding this little-known practice exploded in 2021, after the OSDH entered a settlement allowing a plaintiff in a federal lawsuit to obtain an amended birth certificate with a "non-binary" designation. P.A. 48. In response, on November 8, 2021, the Governor issued Executive Order 2021-24, which required the OSDH to "[c]ease amending birth certificates … in any way inconsistent with 63 O.S. § 1-321." P.A. 48. The Legislature then enacted S.B. 1100. *See id.* 49 (citing S.B. 1100, 2022 O.S.L. 87). S.B. 1100 amended Section 1-321 to emphasize the sex designation on birth certificates is "the biological sex designation" and therefore "shall be either male or female and shall not be nonbinary …." *Id.* (quoting 63 O.S. § 1-321(H)). The OSDH has since denied requests to amend sex on birth certificates. *Id.* 49-50.

### III. Plaintiffs sued, claiming the First and Fourteenth Amendments prohibit the State from permanently recording biological sex on birth certificates.

On March 14, 2022, Plaintiffs sued the Governor, Commissioner of Health, and Registrar of Vital Records (the "State" or "Defendants"), alleging that the State declining to amend the biological sex designation on birth certificates to reflect gender identity violates the Free Speech Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth

Amendment. P.A. 51; *id.* 37-41. On July 29, 2022, Plaintiffs amended their complaint to include S.B. 1100. *Id.* 51.

On August 26, 2022, the State filed a Motion to Dismiss, arguing that "no set of facts could establish a plausible claim for relief" and that "Plaintiffs' far-sweeping constitutional theories have no basis in law." D.A. 19. The district court then denied Plaintiff Ray's Motion to Proceed Pseudonymously, leading Plaintiffs to file an amended pleading disclosing Ray's identity. P.A. 51-52. The parties and the court agreed to apply the Motion to Dismiss to the Second Amended Complaint. *Id.*

## IV. The district court correctly held that the Constitution does not include a right to alter biological sex on a birth certificate.

On June 8, 2023, the district court granted the State's Motion to Dismiss. P.A. 45. The court first concluded that Plaintiffs failed to state a First Amendment claim, in part because declining to amend the sex designation on birth certificates did not restrict Plaintiffs' speech or expression or compel them to speak. *Id.* 53-59.

After a review of the substantive due process doctrine, *id.* 60-72, the court dismissed the idea that Plaintiffs' "informational privacy" claim should subject Oklahoma's law to heightened scrutiny. *Id.* 74, 77. Declining to amend the sex designation on birth certificates does not involve "involuntary disclosure of highly-sensitive and confidential medical information[.]" *Id.* 72. Homing in on the specific right alleged—"the right to amend the sex designation on [a] birth certificate to be consistent

with ... gender identity"—the court found that such a right is not "fundamental to our scheme of ordered liberty[,]" as determined by history and tradition. *Id.* 74, 77.

Next, the court held that Oklahoma law does not discriminate against a suspect class for equal protection purposes. *Id.* 86. Neither the Supreme Court nor the Tenth Circuit have "indicated a willingness to extend heightened scrutiny to classifications based on transgender status[,]" whether "by recognizing transgender people as a distinct quasi-suspect class" or by turning all sex classifications into transgender discrimination. *Id.* 83. Moreover, "the premature designation of a suspect classification would disrupt the necessary balance between the judicial branch and the democratic process" and "have implications that reach beyond the limited issue presented in this case[.]" *Id.* 85.

To conclude, the court found Oklahoma law survived rational basis by furthering at least two legitimate state interests: protecting the integrity and accuracy of vital records and using those records to protect the interests of women. *See id.* 86-90.

On July 6, 2023, Plaintiffs initiated this appeal, abandoning their First Amendment claim. *See id.* 91; Appellants' Br. 11 n.5. Plaintiffs frame their challenge as against State policy, focusing on the Governor and executive actions. Meanwhile, they relegate the key statute to a footnote, neglecting to mention that it specifies "biological sex." *Compare* Appellants' Br. 9 n.2, *with* 63 O.S. § 1-321(H); *see also United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."). The district court correctly observed that "Defendants' enforcement of Oklahoma law would only be

unconstitutional if the underlying law is unconstitutional." P.A. 50-51 n.4. Thus, the State uses the phrase "Oklahoma law" here and focuses on the statute.

## STANDARD OF REVIEW

This Court reviews the granting of a motion to dismiss under Rule 12(b)(6) *de novo*, applying the same standards as the district court. *See Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). Pleading standards "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and "labels and conclusions ... will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A complaint does not survive unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citation omitted). Importantly, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

This Court has also recognized a "preference for affirmance" that flows "from the deference we owe to the district courts and the judgments they reach ...." *Richison v. Ernest Grp.*, 634 F.3d 1123, 1130 (10th Cir. 2011). As such, this Court is "free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001) (citation omitted). When analyzing a state law under rational basis review, for example, courts "are not bound by the parties' arguments as to what legitimate state interests the statute seeks to further[,]" but instead

they are "*obligated* to seek out other conceivable reasons for validating" state law. *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004) (citation omitted).

## SUMMARY OF THE ARGUMENT

The district court correctly dismissed the Complaint.

Plaintiffs cannot succeed under their equal protection theory. Oklahoma law concerning birth certificates does not intentionally discriminate against any individual or class. It is neutral on its face and in its application. It does not involve any adverse government action, does not take away, condition, or grant any benefit, does not compel any individual to act, and does not treat any individual or class differently. Oklahoma law treats all individuals the same, regardless of sex, gender identity, or incongruence between sex and gender identity. No matter the motivation or subjective identity of the applicant, no individual can compel the State to replace the biological sex maintained on a birth certificate with some other subjective component. Thus, no set of facts could establish Oklahoma law engages in differential treatment.

An Oklahoma birth certificate *records* sex to be sure—but the mere act of permanently recording sex on a government document does not treat men or women differently, and Plaintiffs concede Oklahoma law applies equally to men and women. Nor do Plaintiffs allege non-transgender individuals are allowed to alter their sex designations while transgender individuals are not. Plaintiffs' claim is a trojan horse that outwardly professes to protect transgender individuals from discrimination but inwardly ushers in the destruction of sex classifications altogether. It attempts to erase

objective biological sex and supplant it with subjective gender identity. For Plaintiffs to succeed, this Court would need to accept that the very recognition of biological sex is insidious or that transgender status is a distinct, quasi-suspect classification. Either conclusion is foreclosed by Supreme Court precedent.

Plaintiffs cannot succeed on their substantive due process claim, either. Plaintiffs invoke a broad right to informational privacy, but Supreme Court precedent requires a careful description of substantive due process rights. Plaintiffs ignore this precedent, but this Court cannot. Per *Dobbs*, this Court must conduct a careful historical inquiry to determine whether the asserted right, narrowly construed, is fundamental to ordered liberty or deeply rooted in our Nation's history and tradition. Plaintiffs provide no historical analysis to support such a conclusion here, and history points the other way.

Even ignoring *Dobbs*, Plaintiffs failed to allege any intrusion by the State, whether through disclosure of information to third parties or compelling Plaintiffs to provide information. This Court should reject Plaintiffs' sweeping theory that the State is responsible for voluntarily disclosures of a state-issued document, merely because the State decides what categories of information are recorded thereon. In any event, the information at issue is not transgender status, but *biological sex*. And Plaintiffs don't even attempt to argue biological sex is the type of highly personal and intimate information that would lead to a legitimate expectation of privacy.

For all these reasons and more, this Court should affirm.

# ARGUMENT

## I.     PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW.

This Court should affirm the district court because no set of facts can establish that Oklahoma's birth certificate law violates the Equal Protection Clause.

### A.     *Classification is not discrimination.*

Plaintiffs' equal protection argument relies on one central and dispositive flaw: it mistakes classification for discrimination. *See, e.g.,* Appellants' Br. 18-19. The Supreme Court long ago made clear: "[c]lassification is not discrimination." *Caskey Baking Co. v. Virginia*, 313 U.S. 117, 121 (1941); *see also F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920) ("[T]he 'equal protection of the laws' required by the Fourteenth Amendment does not prevent the states from resorting to classification for the purposes of legislation."). Thus, the district court was correct: "the Equal Protection Clause 'does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" P.A. 78 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 54 (10th Cir. 2013) (similar).

To trigger a plausible equal protection claim, a law must do more than merely record or classify. Instead, it must impose differential legal treatment. *See, e.g., United States v. Virginia*, 518 U.S. 515, 532-33 (1996). Indeed, differential treatment is the touchstone of equal protection. *See Powers*, 379 F.3d at 1215 ("[E]qual protection only

applies when the state treats two groups, or individuals, differently."); *Buckley Constr. v. Shawnee Civic & Cultural Develop. Auth.*, 933 F.2d 853, 859 (10th Cir. 1991) (similar).

Here, Plaintiffs declare that "[t]he Policy ... is literally a sex-based classification" and suggest the State's description of Oklahoma law as "classif[ying] individuals based on biological or birth sex" is dispositive. *See* Appellants' Br. 18-19. Plaintiffs made similar arguments below, proclaiming that any law merely "referencing sex" "plainly creates a sex-based classification[,]" and therefore "discriminates on that basis." D.A. 58-59. Plaintiffs never attempt to reconcile these statements with the precedents just cited, nor do they wrestle with the wild implications of such a position.

To be sure, some cases casually refer to the class-based application of legal prohibitions or entitlements as a "classification." *See, e.g., Virginia*, 518 U.S. at 546 (exclusion of women from military school is "gender-defined classification"); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 729-30 (1982) (exclusion of men from nursing school is "gender-based classification"); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289 (1978) (affirmative-action admissions are "classification based on race and ethnic background"); *Free the Nipple-Fort Collins v. City of Fort Collins,* 916 F.3d 792, 799 (10th Cir. 2019) (female-only topless ban is "gender-based classification"). In each case, however, the challenged policies did far more than recognize that individuals have a sex or race. Instead, they tied benefits or exclusions to those classifications. Thus, it was not the classification that deserved heightened scrutiny, it was the differential treatment.

There is nothing inherently discriminatory in the mere "[a]rrangement into groups or categories on the basis of established criteria." CLASSIFICATION, Black's Law Dictionary (6th Ed. 1990), https://tinyurl.com/ycxy5jnp; *compare* DISCRIMINATION, Black's Law Dictionary (6th Ed. 1990) ("[T]he effect of a statute or established practice which confers particular privileges on a class" or that imposes "[u]nfair treatment or denial of normal privileges to persons because of their race, age, sex, nationality or religion."). Indeed, governments *routinely* classify individuals by race, sex, and other categories in their own records. Federal law, for example, requires the Secretary of Public Health to collect and report "data on race, ethnicity, sex," and more "for applicants, recipients, or participants" of public health programs. 42 U.S.C. § 300kk(a)(1)(A). The EEOC requires agencies to "establish a system to collect and maintain accurate employment information on the race, national origin, sex and disability of its employees." 29 C.F.R. § 1614.601. The Federal Highway Administration requires states to "[d]evelop procedures for the collection of statistical data (race, color, religion, sex, and national origin) of participants in … State highway programs ...." 23 C.F.R. § 200.9(b)(4); *see also* 13 U.S.C. § 101(b). Additionally, the federal REAL ID Act of 2005 requires state driver's licenses to include a sex/gender marker, "as determined by the State." 6 C.F.R. § 37.17(c); *see also* 8 C.F.R. § 274a.2(b)(v)(B)(1). Does heightened scrutiny apply to these run-of-the-mill classifications? Of course not.

The very point of recording vital statistics is to classify individuals. As noted in the Second Biennial Report of the Oklahoma State Public Health Department in 1910-

1912, "STATISTICS is defined by Webster as '[t]he science which has to do with the **collection and classification** of certain facts respecting the condition of the people in a State.'" *Id.* 179 (emphasis added), https://tinyurl.com/4j22tpka. "Vital statistics is the most important of the statistical studies," and "[t]he foundation Vital Statistics lies in the registration of births and deaths ...." *Id.* Under Plaintiffs' theory of classification, then, the collection of vital statistics itself—including birth, death, and marriage certificates, censuses, and any collection of demographic data—would be subject to heightened scrutiny. This proves too much.

Moreover, States retain the discretion to determine which individuals fall within various categories, even when differential treatment based on those categories would be constitutionally suspect. For example, in *Jana-Rock Construction v. New York Department of Economic Development*, 438 F.3d 195, 200 (2d Cir. 2006), a plaintiff challenged the State's definition of "Hispanic" for its affirmative-action law. The law clearly involved a racial classification, but the Second Circuit concluded that "the contours of the specific racial classification that the government chooses" was subject to rational basis scrutiny. *Id.* 210-12. So too here: the State's decision to define sex in its own records the way sex has historically been understood is subject to rational basis review.

In sum, heightened scrutiny applies only when a State relies on suspect classifications for discriminatory treatment, not when that State uses a classification in its own records. Because Oklahoma does the latter, heightened scrutiny is not triggered.

B.    ***Oklahoma law does not intentionally discriminate.***

i.    <u>Oklahoma law is neutral on its face and in its effects.</u>

To survive dismissal, Plaintiffs must first establish that Oklahoma law "intentionally discriminates between groups of persons." *SECSYS v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012). Again, this requires differential treatment. *City of Cleburne v. Cleburne Living Cntr.*, 473 U.S. 432, 439 (1985); *Taylor*, 713 F.3d at 53-54. Intentional discrimination can be proven on the law's face or in its effects. *SECYS*, 666 F.3d at 685-86.

When different groups of persons are treated differently on the face of the law, "an intent to discriminate is presumed and no further examination of legislative purpose is required." *Id.* at 685. But "when the law under review is generally applicable to all persons, no presumption of intentional discrimination arises; proof is required." *Id.* Thus, when a law is facially neutral, the plaintiff bears the burden of establishing "'the existence of purposeful discrimination' causing an adverse effect." *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (citation omitted).

A disparate impact alone, however, does not show intentional discrimination. *See SECYS,* 666 F.3d at 686; *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979); *Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans*, 330 U.S. 552, 556 (1947). While "[d]isproportionate impact is not irrelevant," "it is not the sole touchstone of an invidious [] discrimination forbidden by the Constitution." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Thus, even disparate impact to a suspect class does not necessarily

trigger heightened scrutiny. *See id.* "Invidiousness still matters" in challenges to facially neutral laws that impact groups differently. *Fort Collins*, 916 F.3d at 800. Only *after* a plaintiff establishes intentional discrimination against a particular group does the Court "ask whether the state's intentional decision to discriminate can be justified by reference to some upright government purpose." *SECSYS*, 666 F.3d at 686; *see also Ashaheed*, 7 F.4th at 1250 ("Once a plaintiff shows discriminatory intent and an adverse effect, a court reviews the government action under the appropriate level of scrutiny.").

Here, Plaintiffs cannot establish that Oklahoma law intentionally discriminates as an initial matter. No set of facts could establish that Oklahoma law treats any similarly situated class of individuals differently from another. Regardless of "how Plaintiffs feel or think about the Birth Certificate Policy[,]" the Court "must start with what the Birth Certificate Policy, as described by Plaintiffs' own allegations and facts judicially noticeable, actually does." *Gore v. Lee*, 3:19-CV-0328, 2023 WL 4141665, at *18 (M.D. Tenn. June 22, 2023), *appeal docketed*, 23-5669 (6th Cir. July 26, 2023).

On its face, Oklahoma law is neutral and equally applies to all. An Oklahoma birth certificate, a form adopted by the State, is uniform and contains the same categories for each individual. *See, e.g.,* 63 O.S. §§ 1-310, 1-311; D.A. 46. Men are given the same form as women, and so on. The process for amending a birth certificate is also facially neutral. *See, e.g.,* 63 O.S. § 1-321. Regardless of the race, sex, or gender identity of the applicant, Oklahoma law only permits amendments for name changes or paternity. *See id.* § 1-321(C)-(E). Because Oklahoma certificates by law record biological

sex, not gender self-identity, **<u>no one</u>** in Oklahoma can amend a birth certificate to reflect their gender identity—regardless of what their sex is, which gender they identify with, or whether their gender identity aligns with their biological sex. *See id.* § 1-321(H). Including one objective category of information on a government record does not treat any group differently. Plaintiffs cannot possibly establish that Oklahoma law discriminates facially.

Nor can Plaintiffs allege any facts to establish that Oklahoma law discriminates in its effects. Plaintiffs do not allege, for example, that they are being denied amendments on their certificates while non-transgender persons are not. Again, Oklahoma law does not allow *any* individual, regardless of motivation or identity, to supplant the biological sex recorded on a birth certificate. And it never has. The fact that some individuals were able to circumvent the law for a short period of time in Oklahoma history does not change this, and to hold otherwise would undermine democracy by placing constitutionality squarely in the hands of unelected bureaucrats as opposed to the State officials Oklahomans have chosen to represent them. Oklahoma law is plainly neutral in its effects.

The fact that one individual's birth certificate will record facts that differ from another does not establish that anyone is being treated differently. *See* Appellants' Br. 20. Those factual differences reflect the uniqueness of the child, not a discriminatory policy. A male will receive a birth certificate with a different sex designation than a female, just as a "Bill" born in Tulsa will receive a certificate with a different name and

birth location than a "Shannon" born in Lawton. Yet, every Oklahoma birth certificate will document the same categories—biological sex, time of birth, etc. D.A. 46.

In sum, Oklahoma law treats everyone the same—on its face and in its effects— and no set of facts could establish intentional discrimination as a matter of law. Because Plaintiffs cannot establish an essential element of their equal protection claim, this Court should affirm.

ii.    Oklahoma law does not discriminate on the basis of transgender status.

Identifying a class of persons allegedly disadvantaged by a state law is "[a] fundamental tenet of equal-protection analysis ...." *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 765 (10th Cir. 2023); *see also Ross v. Moffitt*, 417 U.S. 600, 609 (1974); *Dalton v. Reynolds*, 2 F.4th 1300, 1310 (10th Cir. 2021). The class of persons supposedly disadvantaged by a state action "will necessarily have at least one common distinguishing characteristic among sub-class members—that is, the one that defines who is part of the sub-class." *Dalton*, 2 F.4th at 1310.

Plaintiffs try to make this case about transgender status, suggesting repeatedly that Oklahoma law "intentionally discriminates against transgender people ...." P.A. 37; *see also id.* 11, 37-38. But Plaintiffs cannot establish that transgender status is the defining characteristic of any class aggrieved by Oklahoma law. Each Plaintiff is transgender, but the identity of the litigants challenging a law does not alter how it functions or applies. And again, Oklahoma law does not take transgender status or gender identity into account for birth certificates. Thus, what really links Plaintiffs together is that they

disagree with the State's policy choice to record biological sex and desire to obtain a birth certificate that "reflect[s] their gender identity ...." *Id.* 38. That policy disagreement does not render them victims of differential treatment. *See Corey Airport Servs. v. Clear Channel Outdoor*, 682 F.3d 1293, 1298 (11th Cir. 2012).

Put differently, the alleged "class" aggrieved by Oklahoma law is much broader than those who identify as transgender. Everyone is affected by the State's decision since everyone has a biological sex. It is also broader in the sense that it encompasses everyone with some characteristic not recorded on birth certificates, whether it be physical deformity, medical condition, hair color, socioeconomic status, or anything else imaginable. It is also highly likely that non-transgender individuals share Plaintiffs' dislike of Oklahoma law *and believe they are disadvantaged by it*. Surely some non-transgender individuals—such as a person who identifies as "non-binary"[6]—would wish to erase or alter the biological sex designation as well. *Compare* P.A. 48 (referencing a lawsuit over non-binary sex designations on birth certificates), *with* 63 O.S. § 1-321(H) (biological sex designation on birth certificates "shall not be nonbinary").

Nor does Plaintiffs' half-hearted hint at an "animus" argument get them anywhere, something they nearly admit. *See* Appellants' Br. 26 n.8 ("Plaintiffs need not show animus ...."). Plaintiffs vilify the Governor's "personal views" regarding God and

---

[6] "Most transgender people are not nonbinary." NAT'L CNTR. FOR TRANSGENDER EQUALITY, *Understanding Nonbinary People: How to be Respectful and Supportive* (Jan. 12, 2023), https://transequality.org/issues/resources/understanding-nonbinary-people-how-to-be-respectful-and-supportive.

creation, *id.* 25-26, but expressing religious beliefs cannot possibly be considered invidious, given our country's rich tradition of religious freedom and expression. Moreover, the personal opinions of the Governor cannot be assigned to a law duly enacted by a separate branch of government, and Plaintiffs point to nothing in the legislative history of S.B. 1100 that could support some nefarious legislative motive. *See also Dobbs*, 142 S. Ct. at 2255 ("This Court has long disfavored arguments based on alleged legislative motives.").

In the end, Oklahoma law does not discriminate against transgender individuals, and the actual class at issue, people who disagree with the law, is not suspect. There will always be those who disagree with a state's policy choices, but that does not transform a neutral law into a discriminatory one. As the district court correctly emphasized: "[b]ecause 'equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices,' the starting point for evaluating the constitutionality of a law ... has long been the rational basis test." P.A. 79 (quoting *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 313 (1993)).

    iii.   <u>Oklahoma law does not discriminate on the basis of sex.</u>

Plaintiffs concede that "the Policy applies to both transgender men and women ...." Appellants' Br. 52; *see also* P.A. 25, 30, 33. And the Complaint alleges that Oklahoma law violates Equal Protection Clause because it "intentionally discriminates against transgender people ...." *Id.* 37; *see also id.* 38-39. It is rather obvious, in other words, that Plaintiffs allege transgender discrimination, not sex discrimination. Thus, Plaintiffs'

assertion that the district court "failed to seriously grapple with Plaintiffs' sex discrimination claim," Appellants' Br. 21, rings rather hollow.

Nevertheless, Plaintiffs' attempt to stretch for sex discrimination fails, as well. Although Plaintiffs invoke sex discrimination in their brief, they do not—and cannot—allege that permanently documenting biological sex on birth certificates treats men and women differently. Thus, as the Sixth Circuit just explained while upholding a law prohibiting sex-transition treatments on minors:

> Such an across-the-board regulation lacks any of the hallmarks of sex discrimination. It does not prefer one sex over the other.... It does not include one sex and exclude the other.... It does not bestow benefits or burdens based on sex.... And it does not apply one rule for males and another for females.

*L.W. v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023). The Sixth Circuit was also unpersuaded by the law's mere mention of "sex[,]" explaining that "[i]f any reference to sex in a statute dictated heightened review, virtually all abortion laws would require heightened review"—contra *Dobbs*—and "every medical condition, procedure, and drug having any relation to biological sex could not be regulated without running the gauntlet of skeptical judicial review." *Id.* at 482. So too, here. If a simple reference to sex dictates heightened review, virtually all government statistics or records would be constitutionally suspect.

The allegation that Oklahoma law traffics in sex stereotypes should also be rejected. Biological sex is not a stereotype. To find that the mere act of recording an

individual's biological sex reflects "archaic and overbroad generalizations about gender," Appellants' Br. 24 (citing *Fort Collins*, 916 F.3d at 801), would warp equal protection jurisprudence beyond recognition. It would contravene the Supreme Court's longstanding recognition that "sex, like race and national origin, is an immutable characteristic[,]" *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973), and its recognition that "[p]hysical differences between men and women ... are enduring" and "[t]he two sexes are not fungible." *Virginia*, 518 U.S. at 533 (citing *Ballard v. United States*, 329 U.S. 187, 193 (1946)); *see also Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981). Plaintiffs never reconcile their claim that the State's recognition of biological sex is unconstitutional stereotyping with these precedents.

Nor does the decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), support a sex discrimination theory here. Most importantly, *Bostock* expressly limited its holding to Title VII and employment discrimination and did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 1753. Rather than "provide[] the controlling precedent" for "Plaintiffs' sex discrimination claim," Appellants' Br. 29, *Bostock* itself confirms it does not control outside Title VII. *See also Skrmetti*, 83 F.4th at 484 (*Bostock*'s "reasoning applies only to Title VII, as *Bostock* itself and many subsequent cases make clear."); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (similar). Plaintiffs have no basis to criticize the district court for taking the Supreme Court at its word. *See* Appellants' Br. 21.

To the extent *Bostock* warrants further consideration, it supports the State. While *Bostock* may stand for the proposition that discrimination against transgender individuals in the Title VII context necessarily entails sex discrimination, it does not stand for the reverse proposition: that neutral sex classifications necessarily entail discrimination against transgender individuals. *See, e.g., Adams*, 57 F.4th at 808-09 ("*Bostock* does not resolve the issue before us" because "a policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status."). And *Bostock* certainly does not stand for the proposition that the unremarkable act of permanently recording biological sex discriminates against transgender individuals.[7] To conclude that a neutral sex classification necessarily discriminates based on transgender status would effectively ban Oklahoma from recognizing that sex exists as an objective, biological matter. Plaintiffs' theory would supplant objective sex with subjective gender identity for all government actions.

Such a ruling is foreclosed by the wealth of U.S. Supreme Court precedent already cited herein recognizing biological differences between men and women, as well as *Bostock* itself. After all, *Bostock* was built on the foundational assumption that "sex" refers "to biological distinctions between male and female." *Bostock*, 140 S. Ct. at 1739. Only by recognizing that "transgender status [is a] distinct concept[] from sex[,]" and

---

[7] This Court's recognition that *Bostock* is binding in the Title VII context likewise does not control this case. *See* Appellants' Br. 21 (relying on *Tudor v. SE Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021)).

yet "inextricably bound up with sex[,]" could the Court find that the adverse employment action was discrimination because of sex under Title VII. *Id.* at 1746-47, 1742 This conclusion would be logically impossible if gender identity *is* sex.[8]

Moreover, it is Plaintiffs' theory that improperly elevates sex stereotypes, not Oklahoma law. Only by relying on gender stereotypes about how a member of each sex talks, walks, dresses, or behaves could a court hold that knowledge of an individual's biological sex "caus[es] others to question whether [he or] she is the same person reflected on the birth certificate, and expos[es]" that individual to any supposed harms. P.A. 20. Plaintiffs' "causation" theory, in other words, is implicitly premised on stereotypes this Court has held are verboten. *Compare* Appellants' Br. 1 ("the presentation of their birth certificates involuntarily discloses their transgender status"); *with Fort Collins*, 916 F.3d at 801-02 ("Any law premised on generalizations about the way women are—or the way men are—will fail constitutional scrutiny … [W]e must beware of stereotypes …." (cleaned up)).

Because Plaintiffs failed to allege a sex discrimination claim, and because Oklahoma law does not discriminate based on sex as a matter of law, the district court correctly applied rational basis review.

---

[8] Non-binding district court cases should not persuade this Court otherwise. *See* Appellants' Br. 17 n.6. For one thing, pending appeals in two circuits could overturn half of the federal district court cases cited by Plaintiffs, including both *Ray* opinions, *Love*, and *Corbitt*. *See Gore v. Lee*, 23-5669 (6th Cir. filed July 26, 2023); *Corbitt v. Taylor*, 21-10486 (11th Cir. filed Feb. 12, 2021).

C.    ***Transgender status is not a quasi-suspect class.***

The district court was also correct to hold transgender individuals are not a quasi-suspect class meriting automatic heightened scrutiny, although such a ruling is not necessary here since Oklahoma law doesn't discriminate against transgender individuals.

To start, the Supreme Court has never recognized gender identity or transgender status as a quasi-suspect class. *Bostock* had the opportunity and declined. Neither has this Court made such a ruling. As recently as 2015, this Court confirmed it "has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims." *Druley v. Patton*, 601 F.App'x 632, 635 (10th Cir. 2015) (unpublished).

This is for good reason. First, "there is no indication that the Supreme Court is willing to extend heightened scrutiny to any other classifications." P.A. 83. As the district court explained, "the Supreme Court has been reluctant to expand the scope of quasi-suspect classifications[,]" "declin[ing] every opportunity to recognize a new quasi-suspect class" since recognizing illegitimacy in 1977—nearly 50 years ago. *Id.* 82. The Supreme Court has declined to recognize a quasi-suspect class for mental disabilities, *City of Cleburne*, 473 U.S. at 445-46, age, *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976), poverty, *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28–29 (1973), sexual orientation, *Romer v. Evans*, 517 U.S. 620, 633 (1996), and transgender status, *Bostock*, 140 S. Ct. at 1739, 1743. The bar to recognize a new suspect class is high, to say the least. *See Skrmetti*, 83 F.4th at 486.

Second, "the premature designation of suspect classifications would disrupt the necessary balance between the judicial branch and the democratic process" on a number of difficult issues. P.A. 85. Plaintiffs' retort that "[i]t is precisely when legislatures are actively curtailing the rights of a vulnerable minority that heightened scrutiny—and courts—are most needed[,]" Appellants' Br. 30, just assumes one side is correct in regard to what is actively being debated across the country. Are legislatures "actively curtailing the rights of a vulnerable minority" when it comes to sports teams or bathrooms, for example, or are they actively protecting the rights of women to privacy and fair competition? The Supreme Court's admonition in *Dobbs*, 142 S. Ct. at 2247, is sensibly applied here: "we must guard against the natural human tendency to confuse what that [Fourteenth] Amendment protects with our own ardent views about the liberty that Americans should enjoy. That is why the Court has long been 'reluctant' to recognize rights that are not mentioned in the Constitution." Courts, that is, should guard against "wielding nothing but 'raw judicial power,' ... [to] usurp[] the power to address a question of profound moral and social importance that the Constitution unequivocally leaves for the people ...." *Id.* at 2265.

Third, elevating transgender status to the same plane as sex or even higher, in terms of scrutiny, would wreak havoc on existing sex-based protections. If adopted, Plaintiffs' view would mean that any state action acknowledging real biological differences between men and women, even when treating all individuals evenhandedly, would constitute discrimination against transgender individuals. Plaintiffs fail to provide

any limiting or guiding principles for courts to resolve the inevitable, direct conflicts that will arise when laws rely on either biological sex or gender identity. As Plaintiffs' challenge to the benign birth certificate law illustrates, gender identity would simply prevail over biological sex every time.

Consequently, hard-won victories in women's equality would be eviscerated overnight. *See* P.A. 88-89; *see also Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated in part on different grounds in Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 190 F.3d 705, 706 (6th Cir. 1999) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement."). "[F]raught line-drawing dilemmas" would ensue in the "[r]egulation of treatments for gender dysphoria[,]" "[b]athrooms and locker rooms[,] [s]ports teams and sports competitions[,]" and others "sure to follow." *Skrmetti*, 83 F.4th at 486. Separating inmates in prisons based on biological sex, a practice plainly protecting inmates' privacy interests, *see Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982), would be constitutionally suspect. *Contra Druley*, 601 Fed. App'x at 633 (rejecting transgender inmate's claim that "housing her in an all-male facility" violates equal protection).

Plaintiffs' theory finds no support in equal protection jurisprudence. As the Supreme Court explained over twenty years ago, "[t]o fail to acknowledge even our

most basic biological differences ... risks making the guarantee of equal protection superficial, and so disserving it." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001).

Fourth, transgender status does not bear the normal indicia of a suspect classification. *See, e.g., Skrmetti*, 83 F.4th at 486-88; *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1230 (11th Cir. 2023). To start, gender identity is not immutable. Although Plaintiffs summarily allege that there is a medical consensus that gender identity is innate, P.A. 15, they cannot dispute that "[u]nlike existing suspect classes, transgender identity is not 'definitively ascertainable at the moment of birth.'" *Skrmetti*, 83 F.4th at 487 (citation omitted)). Indeed, Plaintiffs admit that gender identity is "a person's core internal sense of their own gender," P.A. 14, which places it firmly in a category of a subjective and potentially fluid classification rather than an objectively ascertainable fact. *See Adams*, 57 F.4th at 803 n.6.

Nor are transgender individuals a politically powerless group. As the district court emphasized, "[i]t is unreasonable to assume that transgender people as a whole are simply incapable of effectuating change via the normal democratic process." P.A. 85 n.14. Plaintiffs, after all, *repeatedly* note that "47 states currently allow transgender people to amend their birth certificates[,]" *id.*, and one of their own *amicus curiae* claims that "state and federal governmental policies across the United States" stand behind transgender individuals. Br. of GLBTQ Legal Advocates & Defenders 12. The fact that transgender individuals are supported by the President, federal executive agencies (including the DOJ), medical associations, the media and entertainment industries, and

major law firms should put an end to the notion that courts must permanently place a finger on the scrutiny scale because transgender individuals lack power. *See, e.g., Skrmetti*, 83 F.4th at 487.

Unsurprisingly, then, several appellate courts have recently declined to find transgender status is a suspect classification. *See, e.g., id.* at 486-87; *Eknes-Tucker*, 80 F.4th at 1230 ("'[W]e have grave 'doubt' that transgender persons constitute a quasi-suspect class,' distinct from sex, under the Equal Protection Clause." (quoting *Adams*, 57 F.4th at 803 n.5)). This Court should follow suit, if it touches the issue at all, and decline to recognize transgender status as a quasi-suspect classification.

## II. PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIM FAILS AS A MATTER OF LAW.

The Fourteenth Amendment holds that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. Plaintiffs allege that by permanently recording biological sex on a birth certificate, the State violates the "substantive protections" of this procedural clause, protections which "give rise to a right to privacy, protecting information that is highly personal and intimate." P.A. 39. This Court should affirm the district court's dismissal.

Plaintiffs do not dispute the district court's conclusion that "Plaintiffs are generally free to live, exist, and express themselves in conformance with their chosen gender identities" and that Oklahoma "has imposed no restrictions on how Plaintiffs present themselves to society." *Id.* 74; *compare* Appellants' Br. 32-42. Thus, Plaintiffs have abandoned any reliance on a broadly defined right to liberty, medical decisions,

bodily autonomy, dignity, expression, or personhood. *See* P.A. 40. Plaintiffs instead argue on appeal that Oklahoma's birth certificate law *indirectly* causes "the involuntary disclosure of their transgender status," which "is precisely the kind of highly personal and intimate information that warrants constitutional protection." Appellants' Br. 31; *see also* P.A. 39. This is incorrect. Such an alleged right is not fundamental to ordered liberty nor deeply rooted in the Nation's history and tradition, as substantive due process rights must be. Moreover, the objective information a birth certificate reveals— biological sex—is not the kind of highly personal and intimate information warranting constitutional protection.

A.    **Altering the sex marker on a birth certificate is not fundamental to ordered liberty nor deeply rooted in history and tradition.**

As the Supreme Court has emphasized, *every* substantive due process analysis "must begin with a *careful description* of the asserted right," and the asserted right must be "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." P.A. 72 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993), and *Dobbs*, 142 S. Ct. at 2246); *see also Glucksberg*, 521 U.S. at 721. Plaintiffs never grapple with history or "ordered liberty," declining to cite *Reno, Glucksberg,* or *Dobbs* a single time. Plaintiffs contend the district court's dismissal was "unmoored from" Tenth Circuit precedent, Appellants' Br. 36, but it is Plaintiffs' analysis that is unmoored from controlling Supreme Court precedent. Plaintiffs cannot evade binding case law entrenching the framework to analyze *all* substantive due process claims. *See, e.g., United*

*States v. Guillen*, 995 F.3d 1095, 1114 (10th Cir. 2021) ("Vertical stare decisis is absolute and requires us … to follow applicable Supreme Court precedent in every case.").

In any event, contrary to Plaintiffs' insinuation, the Tenth Circuit informational privacy cases cited by Plaintiffs don't reject the *"careful description"* requirement, at least not clearly. At most, these cases omit discussion of this requirement, likely because they involved as-applied challenges to a particular official's action within a qualified immunity framework, not a facial challenge to a neutral state law under substantive due process. *Compare Anderson v. Blake*, 469 F.3d 910, 918 (10th Cir. 2006) (exploring, under qualified immunity, whether a woman's "privacy interest in [a particular] video was clearly established at the time the officer disclosed it"), *with* P.A. 41-42 (demanding the court "[p]ermanently enjoin Defendants … from enforcing" the birth certificate law statewide).

Moreover, the fact this Court has previously endorsed a right to informational privacy does not extinguish its obligation to conduct a careful historical analysis of the specific asserted application of that right. If *Glucksberg* left any doubt as to this point, *Dobbs* erased it. In *Dobbs*, the Supreme Court emphasized that "[h]istorical inquiries … are essential" whenever the Court is asked to recognize substantive due process protections. 142 S. Ct. at 2247. In overturning *Roe v. Wade*'s holding that abortion was a fundamental privacy right,[9] it explained that "[s]ubstantive due process has at times

---

[9] *Dobbs*, of course, came after half a century of case law based on a right to privacy. Yet, the Supreme Court did not hesitate to remedy the absence of a careful historical analysis

34

been a treacherous field" and has led courts "to usurp authority that the Constitution entrusts to the people's elected representatives." *Id.* (citation and internal quotations omitted). This is especially so for a right to privacy, "which is … not mentioned" in the Constitution. *Id.* at 2245. *Dobbs* recognized that a "right to shield information from disclosure" is conceptually different from the claimed right to abortion, *id.* at 2267, but it gave no indication that an information-shielding claim could be analyzed under a different framework.[10] To the contrary, it called the rights "not mentioned anywhere in the Constitution" a "select list" that required the Court to "careful[ly]" analyze whether the right is "deeply rooted in [our] history and tradition" and "essential to our Nation's 'scheme of ordered liberty.'" *Id.* (citations omitted). Thus, any substantive due process claim—including those arising under the concept of informational privacy—must proceed with a careful historical analysis.

Plaintiffs' descriptions of the alleged right—*e.g.*, a "right to privacy" or "informational privacy" in their transgender status—are "vague generalities," *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003), that fail to comport with *Glucksberg* and *Dobbs*. Claiming a generalized right to privacy in transgender status or "highly personal"

---

in *Roe*. This Court should not hesitate either, even if (as Plaintiffs wrongly claim) "circuit precedent settled the issue [here] more than forty years ago[.]" Appellants' Br. 31.

[10] Even before *Dobbs*, this Court questioned whether a right to "informational" privacy existed at all, observing: "it can no longer be said in the context of government disclosure of information that '[t]here is *no dispute* that confidential medical information is entitled to constitutional privacy protection.'" *Leiser v. Moore*, 903 F.3d 1137, 1144 (10th Cir. 2018) (citations omitted).

information does not "narrowly and accurately reflect[] the right that [Plaintiffs] seek[] to vindicate." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008) (citation and internal quotations omitted).

The district court correctly described the right Plaintiffs assert here as a "right to amend the sex designation on [a] birth certificate[.]" P.A. 74. With the issue properly framed, the district court concluded there was no history or tradition supporting such a right under the historical inquiry required under *Dobbs*. *Id*. 74-77.[11] The court emphasized that Plaintiffs only alleged an informal state practice allowing amendments to the sex designation on birth certificates dating back to 2007, *id*. 75, and it observed that non-binding cases exploring this issue arose around 1975 at the earliest. *Id*. 76 n.10. "Even assuming this right existed somewhat prior to 2007," the court explained, "Plaintiffs point to no authority to suggest that it existed prior to 1908 when Oklahoma first began filing birth records. Thus, the right certainly did not exist on July 9, 1868, when the Fourteenth Amendment was adopted." *Id*. 75. Given these findings, there was no reason for the Court to engage in the three-part informational privacy test Plaintiffs claim is required. *See* Appellants' Br. 36.

In response, Plaintiffs complain that the court focused too much on the "the *manner* in which disclosure occurs [or] the *remedy* for such disclosure" instead of the underlying information at issue. *Id*. 37. Setting aside the fact there is no government

---

[11] The court also concluded that Plaintiffs failed to establish that an alleged right to amend sex designations in birth certificates is essential to ordered liberty. *Id*. 75-76.

disclosure here at all, the "manner" in which an alleged disclosure occurs is the central issue as to whether a constitutional right exists. This is a *birth certificate* case: Plaintiffs cannot deny that they are seeking to alter their birth certificates. This goes back to *Glucksberg*—there, the Supreme Court flatly rejected the Ninth Circuit's ambiguous characterization of the right at issue as a "liberty to shape death[.]" 521 U.S. at 722-23. The actual issue was the manner of death: Is there a "right to <u>commit suicide</u>"? *Id.* (emphasis added). Much like how a "liberty to shape death" does not accurately describe an asserted right to assisted suicide, a right to privacy in transgender status does not accurately describe an asserted right to alter the sex designation on a birth certificate.

Nevertheless, Plaintiffs analogize the district court's reasoning to rejecting "a right not to have a videotape of ... alleged rape disclosed by the government" because "videotapes did not exist in 1868[,]" rejecting a "privacy claim on the grounds that HIV did not exist when the Fourteenth Amendment was adopted[,]" or rejecting a right not to have HIV disclosed on a website because websites did not exist at the time the Fourteenth Amendment was adopted. Appellants' Br. 37-38. Plaintiffs' fixation on technological innovations ignores that birth records—unlike videotapes, modern diseases, and websites—*did* exist when the Fourteenth Amendment was adopted. *See supra* p. 4. In any event, this argument is an obvious caricature of the district court's analysis, and Plaintiffs cannot evade the mandatory, in-depth historical review required under *Dobbs* and *Glucksberg* just because they disagree with it.

Even if the Court could focus on a broadly asserted right to privacy in transgender status, regardless of "manner," such a right would *still* fail a careful historical analysis. The concept of "gender identity" did not even emerge until well into the Twentieth Century. *See, e.g.,* Natalie Shainess, *The Formation of Gender Identity*, 5 J. Sex Rsch. 75, 75 (May 1969), https://www.jstor.org/stable/3811598 ("The concept of 'gender identity' is a relatively new one."); Harry Benjamin, *Transvestism and Transsexualism in the Male and Female*, 3 J. Sex Rsch. 107, 107 (May 1967), https://www.jstor.org/stable/3811945 (similar). In federal case law, the first reference to "gender identity" did not appear until 1973, *see Acanfora v. Board of Education of Montgomery County*, 359 F.Supp. 843, 848 (D. Md. 1973), and the first reference to "transgender" until 1990. *See Drake v. Werdegar*, 907 F.2d 154, *1 (9th Cir. 1990). Plaintiffs never attempt to explain how a right relying on a concept that did not even exist until over 100 years after the Fourteenth Amendment was enacted could be fundamental to ordered liberty or deeply rooted in the Nation's history or tradition.

Moreover, it appears that the first state law allowing amendments to sex markers in birth certificates was not enacted until 1971. *See Hartin v. Dir. of Bureau of Records & Statistics, Dep't of Health of City of N.Y.*, 347 N.Y.S.2d 515 (N.Y. Sup. Ct. 1973) (citing 24 R.C.N.Y. Health Code § 207.05(a)). Similarly, the push to allow amendments to sex markers without proof of sex reassignment surgery did not begin until the early 2000's. *See* Dean Spade, *Follow-up Letter About Legal Issues (Birth Certificate Policy)*, Sylvia Rivera Law Project (Feb. 25, 2003), https://srlp.org/follow-up-letter-about-legal-issues-

birth-certificate-policy/. In other words, Plaintiffs' repeated reliance on a 47-state practice means nothing since that practice originated over a century after the Fourteenth Amendment was adopted. No matter how the asserted right is described, Plaintiffs have not and cannot establish a right protected under substantive due process here.

B.    ***Plaintiffs fail to allege any governmental intrusion or disclosure.***

Even focusing on this Court's informational privacy cases, Plaintiffs' claim fails as a matter of law. Plaintiffs do not allege, nor can they establish, the State "involuntarily disclosed any information to anyone." P.A. 73. The Complaint does not include a single allegation of any involuntarily disclosure *by the State* of a birth certificate to any third party. *Id.* 10-42. To the contrary, "Oklahoma law generally prohibits the government from providing a copy of a birth certificate to unauthorized individuals." *Id.* 73 n.8. Plaintiffs likewise concede that *they*—not the State—"present their birth certificates to others." Appellants' Br. 39-40. Thus, the only disclosure plausibly alleged is one by Plaintiffs, not the State.

Additionally, the Complaint does not contain a single allegation of the State compelling Plaintiffs to disclose transgender status *to the State*. To the contrary, nothing about the issuance or amendment of birth certificates requires disclosure of gender identity.[12] Thus, Plaintiffs cannot save their substantive due process claim by invoking cases involving the government compelling a plaintiff to disclose to the government

---

[12] On the other hand, forcing the State to supplant biological sex with gender identity, as Plaintiffs demand here, *would* involve such a disclosure to the State.

private information. *See, e.g., Eastwood v. Dep't of Corr.*, 846 F.2d 627, 631 (10th Cir. 1988) (qualified immunity did not apply when a DOC official forced plaintiff "to answer a number of irrelevant and embarrassing questions" about her sexual history).

The common thread between this Court's cases developing so-called "informational" privacy is the existence of some *governmental intrusion*: either "inquiring into or disclosing private information." Appellants' Br. 32 (quoting *Stewart v. City of Okla. City*, 47 F.4th 1125, 1137 (10th Cir. 2022)); *see also Eastwood*, 846 F.2d at 631. That is, the cases relied upon by Plaintiffs involved either directly disclosing personal information to a third party or compelling a party to provide personal information to the government. *See, e.g., Denver Policemen's Prot. Ass'n v. Lichtenstein*, 660 F.2d 432, 435-36 (10th Cir. 1981) (court order compelling production of investigative file did not violate right to privacy); *A.L.A. v. W. Valley City*, 26 F.3d 989, 990 (10th Cir. 1994) (officer disclosing individual's HIV status); *Lankford v. City of Hobart*, 27 F.3d 477, 479 (10th Cir. 1994) (government seizing "medical records from a local hospital without [plaintiff's] consent and without a warrant"); *Sheets v. Salt Lake Cnty.*, 45 F.3d 1383, 1386 (10th Cir. 1995) (investigator's disclosure of diary to the press); *Anderson*, 469 F.3d at 912 (officer's disclosure of a video of rape to TV reporter); *Stewart*, 47 F.4th at 1137 (disclosure of biographical information in disciplinary proceedings did not violate right to privacy); *Leiser v. Moore*, 903 F.3d 1137, 1141 (10th Cir. 2018) (government disclosure of cancer diagnoses to friends and family); *see also Powell v. Schriver*, 175 F.3d 107, 109 (2d Cir. 1999) (prison employee's disclosure of HIV and transsexualism to inmates and

staff). Because Plaintiffs failed to plead any governmental intrusion, their substantive

due process claim finds no comfort in this Court's informational privacy precedents.

Plaintiffs instead argue that "the government is responsible for the disclosures

that it causes—regardless of whether it engages in those disclosures itself or causes

disclosure by other means." Appellants' Br. 38. Under this theory, the government can

violate a right to informational privacy even when it does nothing at all. No case in this

circuit supports such a theory. *See, e.g.*, *Anderson*, 469 F.3d at 917 (alleging police and

reporter "acted jointly and in concert"). Plaintiffs rely on a few federal district court

cases from other circuits to make this point: *Ray v. McCloud*, 507 F.Supp.3d 925 (S.D.

Ohio 2020) (birth certificates), *Arroyo Gonzalez v. Rossello Nevares*, 305 F.Supp.3d 327

(D.P.R. 2018) (birth certificates), and *Love v. Johnson*, 146 F.Supp.3d 848 (E.D. Mich.

2015) (drivers' licenses).[13] These decisions are unpersuasive.

Among other deficiencies, these courts never truly grappled with the plaintiffs'

failure to show a governmental intrusion. In *Arroyo Gonzalez*, the court merely declared,

without analysis, that prohibiting a change of sex in birth certificates "force[d] them to

disclose their transgender status in violation of their constitutional right to

informational privacy." *Arroyo Gonzalez*, 305 F.Supp.3d at 333. In *Love*, the court

---

[13] Plaintiffs also cite an unreported case from Alaska: *K.L. v. State, Department of
Administration, Division of Motor Vehicle*s, 3AN-11-05431-CI, 2012 WL 2685183 (Alaska
2012), but that decision analyzed Alaska's constitution, which "[u]nlike the federal
Constitution ... provides an explicit right to privacy." *Id.* at *4. Moreover, that court was
"not now suggesting that K.L. has a fundamental right to have the gender designation
changed on her driver's license." *Id.* at *6.

summarily declared "that by requiring Plaintiffs to disclose their transgender status, the Policy directly implicates their fundamental right of privacy." 146 F.Supp.3d at 856. And while the *Ray* court briefly mentioned this issue in an unreported order at the dismissal stage, it did not revisit the intrusion question at summary judgment. *Compare Ray v. Himes*, 2:18-CV-272, 2019 WL 11791719, at *10 (S.D. Ohio 2019) (unpublished), *with Ray v. McCloud*, 507 F.Supp.3d 925 (S.D. Ohio 2020).

To the extent these or any other cases support a conclusion that a state "indirectly" violates a right to privacy by controlling the information on its own records, such a conclusion is untenable. For one thing, it puts constitutionality in the hands of the allegedly aggrieved individual, letting them decide if, when, and where to trigger the violation by disclosing their certificate. Moreover, if "the ministerial function ... of printing" government records about an individual *for* that individual was sufficient to establish a violation of privacy, the mere act of *maintaining* "highly personal" information in governmental records would violate informational privacy, as well. Appellants' Br. 40-41. How could it not? But the Supreme Court has rejected claims that the mere collection of information violates any assumed privacy interest when the government sufficiently protects against unwarranted public disclosures. *See NASA v. Nelson*, 562 U.S. 134, 155-57 (2011). And even the realm of torts demands a stronger causal tether than what Plaintiffs' theory suggests. *See Waters v. Merchs. Louisville Ins. Co.*, 36 U.S. 213, 223 (1837) (Story, J.) ("It is a well-established principle … that in all cases of loss we are to attribute it to the proximate cause, and not to any remote cause.").

Moreover, a third district court within the Sixth Circuit has recently disagreed with *Ray* and *Love*. *See Gore*, 2023 WL 4141665. There, the court dismissed the plaintiffs' substantive due process claim, finding "the notion that the Birth Certificate Policy forces transgender persons to disclose their transgender status" to be "entirely implausible." *Id.* at *28. The *Gore* court actually explored the details of the disclosure question, pointing out that "the fact that someone with a male sex designation looks or acts in a purportedly traditional 'feminine' manner" does not "mean that the person's gender identity is female." *Id.* at *29. Thus, it rejected "out of hand the notion that gender identity, defined by Plaintiffs as something internal, somehow is conveyed based on external appearance created by activities, dress, or physical features." *Id.* at *30.

C.     **Neither sex nor transgender status is the kind of highly personal and intimate information warranting due process protection.**

Plaintiffs claim that transgender status is highly personal or intimate information warranting constitutional scrutiny of the highest caliber. *See* Appellants' Br. 31. But, again, an Oklahoma birth certificate *does not disclose transgender status*. Instead, a birth certificate discloses only an individual's biological sex.

Biological sex is not the type of highly personal information in which Plaintiffs have "a legitimate expectation of privacy." *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1155 (10th Cir. 2001). Plaintiffs never make this argument, nor could they without directly challenging every government action related to sex, including medical treatments, sports, bathrooms, data collection, census-taking, and so on. The

State has been recording citizens' sex at birth for the entirety of statehood. *See supra* p. 4. Every State has a deeply rooted history of recording vital information on birth, including sex. *See supra* p. 7. And there can be no dispute that at the time this recording began and long after, the term "sex" carried the "narrow, traditional interpretation." *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085–86 (7th Cir. 1984); *see also, e.g., Webster's New Collegiate Dictionary* 775 (2d ed. 1956) (defining "sex" as "pertaining to the distinctive function of the male or female in reproduction.").

Women across the United States still face sex discrimination. Yet, that does not transform their sex into the kind of highly personal information subsumed under an alleged right to informational privacy. Similar things could be said for race, nationality, age, etc. While any exposure to discrimination is highly regrettable, it is not the role of the judiciary to create constitutional rights to address all of society's problems or potential problems. *See Bensing v. United States*, 551 F.2d 262, 265 (10th Cir. 1977).

Because biological sex is not highly personal or intimate, Plaintiffs likewise cannot plausibly argue that transgender status is so highly personal and intimate that it must be protected. Biological sex is, after all, one of two defining components of transgender identity. *See* P.A. 15. Nor do Plaintiffs cite any binding authority holding that transgender status is highly personal or intimate. And their argument is undermined by the fact that all three Plaintiffs appear here, as transgender individuals in a highly public lawsuit, under their names. Although one Plaintiff moved to appear pseudonymously, the district court found that the Complaint "include[d] enough

specific details" to "easily" identify this Plaintiff. ECF 37 at 3. In sum, no highly personal or intimate information is at issue here.

### III.  MAINTAINING BIOLOGICAL SEX ON BIRTH CERTIFICATES IS RATIONALLY RELATED TO LEGITIMATE GOVERNMENTAL OBJECTIVES.

Because Oklahoma law does not implicate a fundamental right, discriminate against a quasi-suspect class, or treat similarly situated people differently, the district court correctly applied rational basis review. *See* P.A. 78. Thus, "Plaintiffs' claim will fail 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* 78-79. (citation omitted). And "a strong presumption of validity" attaches to the Oklahoma law. *Beach Commc'ns,* 508 U.S. at 314.

Plaintiffs' suggestion that this Court could contrive a "more searching rational basis review where the government has discriminated against an unpopular group," Appellants' Br. 42, defies binding precedent. *See Beach Commc'ns*, 508 U.S. at 313 ("[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld … if there is any reasonably conceivable state of facts that could provide a rational basis …."). Rational basis review "is a paradigm of judicial restraint." *Id.* at 314. Plaintiffs "attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *Id.* at 315 (citation omitted). In applying the rational basis standard, it is not the province of the court to weigh the wisdom or social value of a law. *See Rodriguez,* 411 U.S. at 55. Nor is it the role of this Court to second-guess a classification

simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (citation omitted). And, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commnc'ns*, 508 U.S. at 315, (citation omitted); *see also Powers*, 379 F.3d at 1217.

Plaintiffs' contention that Oklahoma law "lacks any rational connection to a government interest," Appellants' Br. 43, repeatedly relies on arguments rooted in heightened scrutiny. For example, in arguing that the State's interest in accuracy "does not explain *why* the government has any concrete and articulable interest in refusing to correct their birth certificates to match their gender identity[,]" Plaintiffs cite to cases involving intermediate or strict scrutiny. *See id.* 44 (citing *Fort Collins*, 916 F.3d at 804-05 and *Kitchen v. Herbert*, 755 F.3d 1193, 1216 (10th Cir. 2014)). Same goes for Plaintiffs' argument that "Oklahoma law is already structured such that any conceivable government interest is fully achieved through the original certificate." *Id.* 45-46 (citing *Fort Collins*, 916 F.3d at 804-05)). Plaintiffs spill much ink claiming the State must somehow prove that "harm" resulted from the prior informal practice, but "harm" is not the rational basis standard. *See, e.g., id.* (State must "provide answers to basic questions: Who was harmed? How did that harm occur?"); *id.* 47 (criticizing the district court for failing to "take as true" the legal allegation that no harm resulted from the policy). None of these arguments are of real consequence under rational basis review.

While making argument rooted in heightened scrutiny, Plaintiffs neglect their heavy burden to negate every *conceivable* basis that may support Oklahoma law. Instead of contending with the legitimate interests identified by the district court and the State, Plaintiffs fight with strawmen and feign incredulity. For example, Plaintiffs characterize the district court's cogent observation that maintaining sex on birth certificates could "provide a ready, reliable, non-invasive means of verifying the biological sex of participants in women's athletics[,]" P.A. 89, as a "hypothetical scenario[]" this Court can disregard. Appellants' Br. 52. But under rational basis review, hypotheticals *are* enough. That is, while Plaintiffs dismiss the district court's rationale as an "attempt to backfill any concrete interest" or an "imagined *post hoc* justification[,]" Appellants' Br. 45, 51, this Court is "*obligated* to seek out other conceivable reasons for validating" Oklahoma law under rational basis review. *Powers*, 379 F.3d at 1217 (citation omitted).

Plaintiffs' arguments are also rather obtuse. For example, the self-explanatory fact that an Oklahoma birth certificate records biological sex, not gender identity, explains why recording gender identity as biological sex would be inaccurate. *See* Appellants' Br. 44, 48. Plaintiffs also misunderstand that one of the State's proffered interests is in the accuracy in its own vital statistics recording facts about birth, not in the accuracy of later third-party perceptions of gender identity. *See id.* 48. Moreover, many rational reasons explain a reversal of a prior unwritten policy or practice. *Contra* Appellants' Br. 46. Such a practice may go unnoticed for years, as here, prompting a change in law once discovered by higher ranking elected officials. *See* P.A. 47-48. A

rational desire to reduce actual *or apparent* ambiguity in the law may also prompt a change, for example when a select group attempts to change the meaning a term that has had one consistent meaning throughout the Nation's history.

Plaintiffs' contention that "Oklahoma has the ability to look to an original birth certificate when it wishes to do so for a particular purpose" is perhaps the most perplexing of the arguments offered. Appellants' Br. 53; *see also id.* 46 ("[T]he relief sought by Plaintiffs ... does not change *Defendants'* ability to retain and use the original"). According to Plaintiffs, "[i]f information regarding one's assigned sex at birth is supposedly needed for some reason, Defendants have access to it." *Id.* 46. Did Plaintiffs forget that the foundation of their constitutional claims is that a birth certificate "reflect[ing] a sex contrary to their gender identity ... causes harm[,]" and "discriminat[es] based on gender, gender identity, transgender status, gender transition, and nonconformity with sex stereotypes"? P.A. 37-38; *see also id.* 10, 20, 24. Did Plaintiffs forget that they allege "[t]he Birth Certificate Policy violates transgender people's right to privacy by causing disclosures of their transgender status and depriving them of significant control over the circumstances around such disclosure"? *Id.* 40; *see also id.* 19. Plaintiffs even go so far as to allege *any* "revision history that can disclose a person's transgender status" is constitutionally suspect. *See id.* 24; *see also id.* 20. Why would the State's own use of an original birth certificate reflecting biological sex— which invariably will involve disclosure to *someone*—not offend the Constitution for these same reasons? If Plaintiffs concede the State is free to access and disclose a

transgender individual's original birth certificate reflecting biological sex, why would the State's refusal to amend that original birth certificate violate the Constitution? Plaintiffs cannot easily reconcile these positions.

Plaintiffs also claim it is irrational to allow paternity, name, and other changes if birth certificates are truly permanent. Appellants' Br. 15, 43. Tellingly, however, Plaintiffs do *not* argue that persons seeking such changes are similarly situated to Plaintiffs. (They obviously aren't.) Moreover, several of Plaintiffs' examples, *e.g.*, "judicial determination of paternity," *id.* 43, are clearly tied to improving the certificate's accuracy *in relation to birth*. And Oklahoma's correcting "errors or misstatements," *id.* 43 (citation omitted), doesn't require the State to alter biological sex, which is not an error or a misstatement. Also, a person's name is subjective, unlike age or sex, which is an "immutable characteristic determined solely by the accident of birth …." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). By Plaintiffs' logic, that is, the State could not rationally decline to change the *birthdate* on a birth certificate. A plaintiff who has undergone plastic surgery, after all, could claim a certificate with their true birthdate "impedes the goal of verifying" identity, *id.* 48, exposes intimate information, *and* causes age discrimination. In any event, Plaintiffs surely would not be satisfied if Oklahoma simply started declining to change birth certificates to acknowledge paternity, adoptions, etc. This is a red herring.

Plaintiffs also suggest, sans authority, that protecting women cannot be a legitimate interest supporting a facially neutral law. *See id.* 51. This is wrong. In Plaintiffs'

view, Defendants apparently should have crafted a law that expressly applies to men but not women, which is absurd, in no small part because *that* law would arguably trigger heightened scrutiny. It also ignores that legitimate interests cannot be viewed in a vacuum; Oklahoma's interest in protecting women and ensuring accuracy work together, not apart from each other. Moreover, Plaintiffs' insinuation that protecting women cannot be a legitimate state interest here only exemplifies their radical belief that any recognition of biological sex by the State inherently discriminates against transgender people. Plaintiffs also try at one point to claim that this "is a case about birth certificates, not sports," Appellants' Br. 2, but Plaintiffs simultaneously cite case law about women's sports to support their position, *id.* 18, and they claim that "identity documents are merely one context of government action targeting transgender people … including … athletics," *id.* 28. Plaintiffs cannot keep their story straight.

Finally, even intermediate scrutiny does not require the least-restrictive means or a perfect fit between interest and action. Instead, a state law must substantially relate to an important governmental objective. *See Fort Collins*, 916 F.3d at 799. Oklahoma law does just that. The Supreme Court has long upheld laws favoring women when "'the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated ....'" *Rostker v. Goldberg*, 453 U.S. 57, 79 (1981) (citation omitted). If a law merely recording an individual's biological sex would not pass intermediate scrutiny, what would?

The district court correctly concluded that Oklahoma law is rationally related to accuracy and protecting women, so this Court should affirm the dismissal.

## **CONCLUSION**

Biological sex is not a meaningless label. Like age, race, and national origin, sex is a certifiable and immutable characteristic that is knowable at birth. Nothing within the Constitution prohibits the State of Oklahoma from recording this sex on birth certificates. And nothing in the Constitution prohibits the State from declining to supplant that sex designation with subjective gender identity. The district court correctly dismissed Plaintiffs' challenge to Oklahoma law. This Court should affirm.

*s/ Zach West*
GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
AUDREY A. WEAVER
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:   (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
*Counsel for Defendants-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellees request oral argument. Despite elsewhere arguing that this is just "a case about birth certificates," Appellants' Br. 2, Plaintiffs correctly concede in their Statement Regarding Oral Argument that the impact of this case on "larger issues" will likely be significant. Therefore, oral argument could assist the Court.

## CERTIFICATE OF COMPLIANCE

This response complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word. The document complies with the type-volume limitation of Fed. R. App. P. 32, because it contains 12,942 words, excluding the parts exempted.

s/ *Zach West*
ZACH WEST
*Director of Special Litigation*

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with Crowdstrike antivirus using the latest version updated on September 21, 2023.

s/ *Zach West*
ZACH WEST
*Director of Special Litigation*

## CERTIFICATE OF SERVICE

I certify that on November 13, 2023, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. The seven required paper copies, each of which is an exact replica in form and content, will be dispatched via commercial carrier for receipt within five business days after the court issues a notice that the electronic version is accepted for filing.

s/ *Zach West*

ZACH WEST
*Director of Special Litigation*
