No. 23-5080

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

ROWAN FOWLER; ALLISTER HALL; and CARTER RAY,

*Plaintiffs-Appellants*,

v.

KEVIN STITT, in his official capacity as Governor of the State of Oklahoma;
KEITH REED, in his official capacity as Commissioner of Health for the
Oklahoma State Department of Health; and KELLY BAKER, in her official
capacity as State Registrar of Vital Records,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of Oklahoma
No. 4:22-cv-00115-JWB-MTS (Judge John W. Broomes)

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

Peter C. Renn
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa St., Ste. 1260
Los Angeles, CA 90017
(213) 382-7600

Shelly L. Skeen
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, D.C. 20006
(202) 804-6245

Karen Keith Wilkins
1515 S. Denver Ave.
Tulsa, OK 74119
(918) 599-8118

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................1

I.   Plaintiffs' Factual Allegations Support an Equal Protection Violation. .........1

   A.   The Policy Does Not Merely Classify But Harms Transgender People by Denying Them Identity Documents They Can Use. ............1

   B.   Defendants' Policy Discriminates Against Transgender People Based on Sex ...................................................................................5

   C.   Defendants' Policy Discriminates Against Transgender People Based on Their Status...........................................................................11

   D.   Transgender People Constitute At Least a Quasi-Suspect Class. .......13

II.  Plaintiffs' Factual Allegations Support a Privacy Violation. .......................15

   A.   The Test for Analyzing an Informational Privacy Claim is Settled Under Binding Circuit Precedent. ........................................................15

   B.   Transgender Status is Private Information Entitled to Protection. .....19

   C.   The Complaint Plausibly Alleges that Defendants Are Responsible for the Privacy Infringement Caused by Defendants' Policy. ............20

III. Plaintiffs' Factual Allegations Plausibly Show that Defendants' Policy Lacks an Adequate Justification. ...................................................................22

   A.   The Policy Is Not Rationally Related to an Interest in the Accurate Identification of Transgender People..................................................23

   B.   The Policy Cannot Be Justified By Women's Athletics. ....................26

i

CONCLUSION ...........................................................................................27

CERTIFICATE OF COMPLIANCE.........................................................28

CERTIFICATE OF SERVICE ..................................................................29

CERTIFICATE OF DIGITAL SUBMISSION .........................................30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.C. v. Metropolitan Sch. Dist. of Martinsville*,
    75 F.4th 760 (7th Cir. 2023) ................................................................. 5, 9

*A.L.A. v. W. Valley City*,
    26 F.3d 989 (10th Cir. 1994) ................................................................. 16

*Adams v. School Board of St. Johns County*,
    57 F.4th 791 (11th Cir. 2022) ................................................................. 8

*Anderson v. Blake*,
    469 F.3d 910 (10th Cir. 2006) ................................................... 16, 19-20

*Bishop v. United States*,
    962 F. Supp. 2d 1252 (N.D. Okla. 2014) .................................. 15, 23-24

*Bostock v. Clayton Cnty., Ga.*,
    140 S. Ct. 1731 (2020) .......................................................... 2, 6-7, 9

*Caskey Baking Co. v. Virginia*,
    313 U.S. 117 (1941) ................................................................. 4

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) ................................................................. 11

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022) .......................................................... 17-18

*Doe v. City of Mansfield*,
    No. 22-3052, 2023 WL 1822208 (6th Cir. Feb. 8, 2023) .................... 18

*Eastwood v. Dep't of Corrs.*,
    846 F.2d 627 (10th Cir. 1988) ................................................................. 19

*Finstuen v. Crutcher*,
    496 F.3d 1139 (10th Cir. 2007) ................................................................. 3

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*,
916 F.3d 792 (10th Cir. 2019)................................................................15

*Gore v. Lee*,
No. 3:19-cv-0328, 2023 WL 4141665 (M.D. Tenn. Jun. 22, 2023), *appeal docketed*, No. 23-5669 (6th Cir. Jul. 26, 2023)....................................22

*Grabowski v. Arizona Board of Regents*,
69 F.4th 1110 (9th Cir. 2023)...................................................................9

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020)..............................................3-4, 6, 9, 14

*Hecox v. Little*,
79 F.4th 1009 (9th Cir. 2023)................................6, 12-13, 27

*Kitchen v. Herbert*,
755 F.3d 1193 (10th Cir. 2014) .......................................................17, 24

*Kleinsmith v. Shurtleff*,
571 F.3d 1033 (10th Cir. 2009)...............................................................23

*Lankford v. City of Hobart*,
27 F.3d 477 (10th Cir. 1994)...................................................................16

*Latta v. Otter*,
771 F.3d 456 (9th Cir. 2014)...................................................................11

*Leiser v. Moore*,
903 F.3d 1137 (10th Cir. 2018)...............................................................26

*Mojo Built, LLC v. City of Prairie Vill.*,
2022 WL 288139 (10th Cir. Feb. 1, 2022).............................................7

*NASA v. Nelson*,
562 U.S. 134 (2011) .........................................................................17, 25

*Pavan v. Smith*,
137 S. Ct. 2075 (2017) ............................................................................4

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ........................................................................5, 9

*Ray v. Himes*,
    No. 2:18-cv-272, 2019 WL 11791719 (S.D. Ohio Sept. 12, 2019) ....................25

*Ray v. McCloud*,
    507 F. Supp. 3d 925 (S.D. Ohio 2020) .................................................20

*Romer v. Evans*,
    517 U.S. 620 (1996) ..............................................................23-24, 26

*SECSYS v. Vigil,*
    666 F.3d 678 (10th Cir. 2012)......................................................... 12, 15

*Sheets v. Salt Lake Cnty.*,
    45 F.3d 1383 (10th Cir. 1995).............................................................20

*Speidell v. United States*,
    978 F.3d 731 (10th Cir. 2020).............................................................18

*Stewart v. City of Oklahoma City*,
    47 F.4th 1125 (10th Cir. 2022)...................................................... 16, 19

*United States v. Virginia*,
    518 U.S. 515 (1996) ...................................................................5

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..................................................................13

*Whalen v. Roe*
    429 U.S. 589 (1977) ..................................................................17

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012)............................................................14

*Zzyym v. Pompeo*,
    958 F.3d 1014 (10th Cir. 2020)........................................................3, 8

## Statutes

63 Okla. Stat. § 1-301 ...............................................................................26

63 Okla. Stat. § 1-321 ...............................................................................10

70 Okla. Stat. § 37-106 .............................................................................26

# INTRODUCTION

Defendants assert that allowing Plaintiff Rowan Fowler to amend her birth certificate portends "the destruction of sex classifications altogether"—if not ushering the end of "'[c]ivilization as a whole.'"  Defs.' Br. 4, 12.  Yet, according to Defendants, this civilization-threatening problem that Oklahoma sought to solve also apparently went *unnoticed* by its elected officials for at least 14 years.  And they then reversed Oklahoma policy not in response to any problem that had emerged in all of those years but, rather, because the Governor believed that transgender people were transgressing their God-given purpose.  Defendants flail to manufacture another basis for their Policy—from positing that it would be more accurate for transgender people to present birth certificates in conflict with their gender when trying to prove their identity to others, to imagining the outcomes of high school girls' track-and-field meets with no connection to birth certificates whatsoever—which exemplify irrationality even at face value.  Under any level of scrutiny, Plaintiffs' factual allegations support plausible claims for relief.

# ARGUMENT

## I.    Plaintiffs' Factual Allegations Support an Equal Protection Violation.

### A.    The Policy Does Not Merely Classify But Harms Transgender People by Denying Them Identity Documents They Can Use.

To avert any equal protection inquiry at all, Defendants attempt to recast their Policy as merely classifying transgender people, rather than treating them

differently in any way.  But Plaintiffs' challenge is not to mere classification; it is to a specific practice: Defendants' refusal to provide transgender people with tangible copies of birth certificates consistent with their gender identity that they can use to prove their identity to others.  The complaint does not, for example, challenge an internal government database that does nothing more than record individuals' assigned sex or, for that matter, the government's maintenance of files containing original birth certificates.  *Cf.* Defs.' Br. 16-17 (listing examples of the collection of statistical data).  Rather, the challenge here is with respect to public-facing versions of identity documents, and the entire point of providing individuals with copies of their own certificates is so that they can then *use them* to prove their identity to others.  A.18.[1]

Discrimination requires both differential treatment and harm, *see Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020), and the complaint here alleged facts establishing both.  A.17-20, 25-37.  To illustrate, Defendants are willing to provide a cisgender woman with a copy of a birth certificate indicating that she is female, which she can then use to prove her identity when applying for government

---

[1] Citations to A. refer to Plaintiffs' Appendix.  Citations to D.A. refer to Defendants' Appendix.  Plaintiffs object to Defendants' extensive reliance on materials outside the complaint, raised for the first time on appeal, which are largely irrelevant but far exceed any permissible purpose allowed through judicial notice.  *See, e.g.*, Defs.' Br. 5-6 (arguing the importance of sex designations).

programs, enrolling in school, and starting a new job.  But Defendants refuse to provide a transgender woman like Ms. Fowler with a copy of a birth certificate indicating that she is female, depriving her of the equal ability to prove her identity as well as violating her privacy.  Indeed, Defendants concede that birth certificates are "necessary" for both legal and social purposes.  Defs.' Br. 6.

The notion that Defendants' denial of an amended certificate is effectively immune from judicial review, on the asserted grounds that it does not involve any government "treatment" at all, cannot be reconciled with precedent.  In *Zzyym v. Pompeo*, 958 F.3d 1014 (10th Cir. 2020), for instance, the government's refusal to provide an intersex person with an identity document consistent with their gender was subject to legal challenge.  *Id.* at 1022-23 (analyzing whether agency decision was arbitrary and capricious).  Likewise, in *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 615 (4th Cir. 2020), the court held that a school's refusal to update a transgender student's school records to reflect his male gender violated equal protection because "[u]nlike students whose gender matches their sex-assigned-at-birth, [plaintiff] is unable to obtain a transcript indicating that he is male." Similarly, in *Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007), this Court held that Oklahoma's refusal to issue a birth certificate listing both members of a same-sex couple as parents was unconstitutional.  *Id.* at 1145 (holding that plaintiffs had suffered injury-in-fact because OSDH refused to revise birth certificate); *see also*

3

*Pavan v. Smith*, 137 S. Ct. 2075, 2079 (2017) (holding that Arkansas' refusal to list both members of a same-sex couple as parents on a child's birth certificate was unconstitutional).  In none of these cases did the courts find that the government was "merely classifying" the parties at issue, e.g., as male or female in the case of *Zzyym* and *Grimm*, or as non-parents in the case of *Finstuen* and *Pavan*.  Rather, the government had engaged in conduct giving rise to cognizable injury.

Defendants' cited authorities also do not support the proposition they claim. For example, Defendants rely on a quote—that "[c]lassification is not discrimination"—which, when read in context, stands for the unremarkable proposition that some forms of differential treatment, as in economic regulation, may not be *unlawful* discrimination.  *Caskey Baking Co. v. Virginia*, 313 U.S. 117, 121 (1941).  That case thus rejected a claim brought by business objecting that it was subject to taxation—when other businesses were not—because the Equal Protection Clause "does not prevent a state from classifying businesses for taxation."  *Id.*  Likewise, the observation that the Equal Protection Clause does not forbid classifications, Defs.' Br. 14, merely restates that some differential treatment may be found to be permissible—not that it evades the equal protection analysis required to make that determination.[2]

---

[2] Defendants also cannot evade equal protection by characterizing their differential

**B.     Defendants' Policy Discriminates Against Transgender People Based on Sex.**

Defendants' Policy is unavoidably based on sex, no matter how it is analyzed: it is an unabashed sex-based classification, which discriminates against transgender people based on their birth-assigned sex at a minimum, and the facts alleged also show that it was plausibly motivated by sex stereotypes, including the Governor's personal religious views regarding sex.

*First*, the Policy is a sex-based classification on its face: it literally classifies individuals based on their sex. Defendants' argument to the contrary is a logical contradiction in terms. They agree that their Policy—in their own words— "classif[ies] individuals based on biological or birth sex," D.A.30—but insist that it is simultaneously "neutral" with regard to sex. *See also* Defs.' Br. 26 (characterizing the Policy as a "neutral sex classification[]"). As the Supreme Court explained long ago, in unambiguous terms, "all gender-based classifications" are subject to heightened scrutiny where they cause harm. *United States v. Virginia*, 518 U.S. 515, 555 (1996). By definition, they are not neutral; they are

---

treatment as merely shaping the "contours" of a classification. Defs.' Br. 17. Insisting that a female employee conform to the "contours" of what an employer believes is appropriate for women, for instance, is a form of differential treatment based on sex. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Likewise, the question of "who counts as a 'boy'" and "who counts as a 'girl'" plainly implicates equal protection where transgender people are denied recognition of their gender and experience harm as a result. *A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023).

based on sex.  This principle is also not new—it has been settled authority for decades—and thus Defendants' assertion that this principle is somehow unworkable is disproven by experience.  Defs.' Br. 24 (arguing any law merely mentioning sex would be subject to heightened scrutiny).  Their assertion also ignores that, in order for a sex-based classification to be challenged, it must first cause injury.

Defendants cannot erase the sex-based nature of the Policy by resort to an "equal application" defense.  For example, they argue that "**no one** in Oklahoma can amend a birth certificate to reflect their gender identity."  Defs.' Br. 20 (ignoring that cisgender people already have access to birth certificates consistent with their gender identity).  By that faulty reasoning, laws barring same-sex couples from marriage also did not discriminate against them on any grounds, because **no one** could marry a person of the same sex.  *Cf. Hecox v. Little*, 79 F.4th 1009, 1024, 1029-30 (9th Cir. 2023) (rejecting similar fallacious logic in claim that state did not discriminate against transgender students).  Likewise, Defendants' reasoning would mean that "racially segregated bathrooms treated everyone equally," because **no one** could use a restroom for a different race.  *Grimm*, 972 F.3d at 609.  The Supreme Court similarly recognized that an employer discriminates against based on sex even if "it is equally happy to fire male *and* female employees who are homosexual or transgender."  *Bostock*, 140 S. Ct. at

1742.  Instead of avoiding discrimination, doing so "doubles it."  *Id.* at 1741.

Defendants' "equal application" defense also ignores that the proper focus of any discrimination inquiry is "on individuals rather than groups."  *Id.*  For instance, Defendants insist that their Policy "'does not prefer one sex over the other.'"  Defs.' Br. 24 (quoting *L.W.*).  But, as *Bostock* explained, the notion that "the law concerns itself simply with ensuring that employers don't treat women generally less favorably than they do men" is wrong.  140 S. Ct. at 1740.  That is why an employer who fires a woman because she is insufficiently feminine, and fires a man for being insufficiently masculine, "may treat men and women as groups more or less equally"—but it has nonetheless discriminated against those *individuals* because of sex.  *Id.* at 1741.  "[I]t is well-settled the Equal Protection Clause protects persons, not groups."  *Mojo Built, LLC v. City of Prairie Vill.*, 2022 WL 288139, at *2 (10th Cir. Feb. 1, 2022) (cleaned up).

*Second*, Defendants also cannot deny that their Policy denies transgender people birth certificates matching their gender identity because of their birth-assigned sex, at a minimum.  *Bostock* explained that if an employer has two employees "who identif[y] as a female," and retains the one who "was identified as female at birth" while firing the other because she "was identified as a male at birth," the employer discriminates based on sex.  140 S. Ct. at 1741.  Similarly, if a person who identifies as female can access a female-designated birth certificate if

she was identified as female at birth, but a transgender woman may not because she was identified as male at birth, that too is sex discrimination.

Expecting that all people must live in a manner consistent with their assigned sex necessarily discriminates against transgender people based on sex. Defendants resist this legal principle, Defs.' Br. 26, but even their cited authorities recognize that heightened scrutiny is required. *See, e.g.*, *Adams v. School Board of St. Johns County*, 57 F.4th 791, 803 (11th Cir. 2022). If Defendants were correct, then a requirement that all employees must present at work consistent with their assigned sex, or be fired, would also be a "neutral" rule that merely acknowledges that "sex exists as an objective biological matter." Defs.' Br. 26. Under that approach, *all* discrimination against transgender people could be recast and erased.

Defendants note that transgender status is a distinct concept from sex, but it does not follow that sex therefore *excludes* gender identity, as Defendants argue. As the complaint alleges, there are multiple sex-related characteristics, including chromosomes, hormones, and gender identity; and gender identity is the critical determinant of sex where these characteristics diverge. A.14-15. But, even if sex could be narrowly defined as one's assigned sex, contrary to scientific reality and precedent, *see, e.g.*, *Zzymm*, 958 F.3d at 1018, that does not change that the Policy discriminates against transgender people like Plaintiffs on that basis at a minimum. "Any way you slice it," an action taken because a person is transgender is "because

8

of the affected individuals' sex." *Bostock*, 140 S. Ct. at 1746.

Defendants' primary response to *Bostock* is to reject its application outside Title VII, but *Bostock*'s explanation of *why* discrimination against transgender people constitutes sex discrimination applies with equal force here. Defendants insist that sex reduces to nothing more than one's assigned sex; but *Bostock* explains why discrimination against a transgender person nonetheless discriminates on that basis. Other courts, including the Fourth, Seventh, and Ninth Circuits, have similarly recognized that *Bostock*'s sex discrimination analysis cannot be arbitrarily limited to Title VII. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d at 616; *Grabowski v. Arizona Board of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023); *A.C.*, 75 F.4th at 770. Even the *Bostock* dissent recognized that the logic of the decision "extend[s] well beyond" Title VII. 140 S. Ct. at 1783 (Alito, J.) (noting implications for constitutional claims including to change of gender on birth certificates).

*Third*, *Bostock* aside, it is well-established that sex stereotyping is a form of sex discrimination, *see Price Waterhouse*, 490 U.S. 228, and Governor Stitt was astoundingly candid that his Policy was motivated by his personal beliefs that "people are created by God to be male or female. Period." A.22. A supervisor who admitted in a deposition that he fired a transgender employee because "people are created by God to be male and female" would be well-advised to quickly settle.

9

Defendants cannot deflect from this smoking gun by pointing to a "rich tradition of religious freedom and expression."  Defs.' Br. 23.  The Governor is free to express his religious beliefs; but he is not free to impose those beliefs on individuals whose gender identity diverges from societal expectations.

Defendants also cannot deflect from this admission by pointing to legislation, also signed by the Governor, that bans *non-binary* designations on birth certificates—which is a distinct issue from the male and female-designated birth certificates sought by Plaintiffs here.  That relies on an untenable reading of the statute,[3] A.23, but it is also immaterial, because whether the Policy is required by only the Executive Order, or both the Executive Order and a statute, does not alter its constitutionality.

Defendants also cannot credibly argue that it is Plaintiffs who are somehow engaging in sex stereotyping.  Defs.' Br. 27.  The purpose of gender transition is to

---

[3] Defendants assert that the statute's use of the phrase "biological sex designation" bans OSDH from amending Plaintiffs' birth certificates; but that is not what the statute says.  As to what the statute actually requires or prohibits, it only states that the sex designated on birth certificates "shall be either male or female and shall not be nonbinary or any symbol representing a nonbinary designation including but not limited to the letter 'X.'"  63 Okla. Stat. § 1-321.  That is consistent with the fact that the legislation was enacted in response to litigation concerning an individual seeking a gender-neutral designation.  A.21-22.  If the legislature had intended to go further than banning gender-neutral designations, and also ban transgender men and women from amending their certificates to reflect their male and female gender, it would have needed to say so.

live in a manner consistent with one's gender identity, and doing so is an essential aspect of treatment for gender dysphoria.  A.16, 25-34.  That is not a stereotype.  Nor is it a stereotype that "outing" transgender people—by revealing that their sex assigned at birth is contrary to the steps they have taken to live in a manner consistent with their gender identity—endangers their well-being.  A.19-20.

### C.    Defendants' Policy Discriminates Against Transgender People Based on Their Status.

Defendants' Policy also discriminates against transgender people based on their status: the *only* group whose birth certificate amendments the Policy sought to stop is people whose gender identity does not match their assigned sex.  That is the relevant shared characteristic for equal protection purposes—not, as Defendants suggest, some abstract disagreement with state law.  Defendants argue that everyone is "affected" by Defendants' actions "since everyone has a biological sex," Defs.' Br. 22, but their Policy only sought to change the status quo for transgender people, and only transgender people are *harmed* by their Policy.  "The proper focus … is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (quotes omitted).  That is also why a law excluding same-sex couples from marriage discriminates based on sexual orientation, even though "everyone" is barred from marrying another person of the same sex.  *Supra* I.B; *Latta v. Otter*, 771 F.3d 456, 468 (9th Cir. 2014).  The Policy here facially discriminates against

11

transgender people for the same reason: by definition, only transgender people are harmed by the Policy's denial of birth certificates consistent with their gender identity. *See Hecox*, 79 F.4th at 1042 (explaining why a policy need not use the word "transgender" to discriminate against transgender people on its face).

Moreover, Defendants cannot ignore the complaint's factual allegation that the Governor's office *specifically instructed* OSDH officials not to amend the birth certificates of transgender people to match their male and female gender identity. A.23. On this basis alone, the Policy challenged here cannot be regarded as facially neutral.

But even if the Policy could somehow be viewed as facially neutral, the complaint's factual allegations also plausibly show, at a minimum, that it was adopted with the intent of targeting transgender people. *See SECSYS v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012) ("bitter experience teaches that even rules of general application *can* harbor [] discriminatory purposes" and courts "must draw inferences about a law's intent or purpose from circumstantial evidence"). This "intent" does not require an intent to harm the group at issue; it can even be motivated by supposedly benevolent purposes. *Id.* at 689 (noting that laws precluding women from certain jobs can be motivated by the notion that they are "too good" for such things); Pls.' Br. 26 n.8.

This intent is additionally supported by the factual allegation—which

Defendants admit—that the Policy was enacted "in response" to OSDH changing the sex designation on the birth certificate of an individual whose gender identity diverged from their assigned sex. Defs.' Br. 8; *accord* A.21-22. In other words, the purpose of the Policy was *not* to change anything for cisgender men and women. Rather, it was only to change the status quo for people whose gender identity did not match their assigned sex. And the unusual circumstances surrounding the Policy's adoption—including the unexpected "resignation" of the head of OSDH the day after the Governor announced his personal religious beliefs and "condemned" OSDH for its actions—further support the plausibility that Defendants' intent was to change the birth certificate amendments that transgender people were able to obtain. *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (noting that departures from normal procedures can constitute "evidence that improper purposes are playing a role").

Taken as a whole, the "text, structure, purpose, and effect" of the Policy all demonstrate that it was intended to change the status quo for transgender people in particular. *Hecox*, 79 F.4th at 1022.

## D. Transgender People Constitute At Least a Quasi-Suspect Class.

Defendants largely disregard the legal test that exists in order to determine if a class is quasi-suspect, instead urging a standard-free judicial "reluctance" to apply that test to transgender people—and thereby recreating the potential for the

13

very discrimination that heightened scrutiny exists to smoke out.

Transgender people exhibit all of the indicia of at least a quasi-suspect class, as the Fourth and Ninth Circuits have recognized. Defendants do not deny the history of deep-seated discrimination against transgender people. They also do not contend that transgender status bears on one's ability to contribute to society. Their assertion that gender identity can be voluntarily changed is pure fantasy negated by medical consensus and disproven by staggering suicide rates, A.15-16, and it also ignores that one's transgender status is a distinguishing characteristic that "calls down" discrimination when it is manifest, which alone is sufficient to satisfy this aspect of the legal test. *Windsor v. United States*, 699 F.3d 169, 183 & n.4 (2d Cir. 2012). Finally, the notion that transgender people have sufficient political power to protect themselves, including because they have found law firm representation and are portrayed in movies, Defs.' Br. 31-32, is laid to waste by any glance at the modern political landscape, which has churned out law after law disadvantaging transgender people and shows no sign of stopping. *See Grimm*, 972 F.3d at 612.

Defendants also misconstrue the import of heightened scrutiny, which does not decide which "side is correct" across all cases where it applies, Defs.' Br. 29, but simply calibrates the scrutiny that is appropriate where discrimination against the group is "rarely" lawful. *SECSYS*, 666 F.3d at 687. After all, heightened

14

scrutiny tests whether the government's justification may, in fact, withstand scrutiny.

Defendants' related assertion that women's equality would be eviscerated by recognizing that transgender people are entitled to heightened scrutiny, as other circuits have held, wrongly presumes that equal protection is a zero-sum game. But equal protection "is not a scarce commodity to be meted out begrudgingly or in short portions." *Bishop v. United States*, 962 F. Supp. 2d 1252, 1296 (N.D. Okla. 2014). As the relief sought here illustrates, the state has options at its disposal that can accomplish any conceivable government interest without harming any group. And any contention that discrimination is justified by "physical differences" "requires more—not less—judicial scrutiny." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 805 (10th Cir. 2019).

## II.   Plaintiffs' Factual Allegations Support a Privacy Violation.

### A.   The Test for Analyzing an Informational Privacy Claim is Settled Under Binding Circuit Precedent.

This Court has *already held* that the Constitution protects a right to informational privacy, and it has *already decided* how to analyze if that right has been violated using a three-part test. Pls.' Br. 31-32 (collecting cases). Defendants misunderstand the assignment: their arguments about history and ordered liberty go, at best, to the question of whether the Constitution protects any right to informational privacy *at all*. But circuit precedent has already repeatedly answered

that question in the affirmative. And it has also answered the related question of how to determine if that right is violated in any given case using a three-part test, which does not involve conducting, for instance, a separate historical analysis afresh in every case. *See, e.g.*, *Stewart v. City of Oklahoma City*, 47 F.4th 1125, 1137 (10th Cir. 2022). Notably, this test has co-existed for decades alongside the due process authority that Defendants cite. Defs.' Br. 33 (*Reno*, *Glucksberg*).

Defendants fail to point to a single informational privacy case—from this circuit or anywhere else—employing the approach they urge, and doing so would lead to baffling results irreconcilable with circuit precedent. To illustrate, this Court did not conduct a separate historical inquiry into whether, when the Fourteenth Amendment was adopted in 1868, one had a right against disclosure of a videotape of one's sexual assault, *Anderson v. Blake*, 469 F.3d 910, 915 (10th Cir. 2006), a right against an examination of medical records to determine if one was a lesbian, *Lankford v. City of Hobart*, 27 F.3d 477, 479 (10th Cir. 1994), or a right against disclosure of HIV test results while in custody, *A.L.A. v. W. Valley City*, 26 F.3d 989, 990 (10th Cir. 1994). The list goes on. *See* Pls.' Br. 31-32. The underlying principle vindicated by the constitutional right to informational privacy remains steadfast; but the precise information at issue and the medium through which it may be disclosed can change over time. Defendants all but concede that their approach would permit disclosures, such as the ones at issue in *Anderson* and

16

*A.L.A.* among others, that this Court has already held violate the right to privacy. Their approach is at war with circuit precedent.[4]

Likewise, this Court has already recognized that transgender status is information entitled to constitutional privacy protection, *infra* II.B; and yet Defendants maintain that this should be foreclosed by the societal understanding of transgender people in 1868. That argument additionally contravenes this Court's recognition that the scope of liberty cannot be defined to carve out groups who were historically denied the exercise of a right. *Kitchen v. Herbert*, 755 F.3d 1193, 1209, 1215 (10th Cir. 2014) (rejecting the notion that a "careful description" of the right to marry based on history and tradition can be limited to marrying a person of a different sex). "The drafters of the Fifth and Fourteenth Amendments 'knew times can blind us to certain truths,'" and 'it is not the Constitution that has changed, but the knowledge of what it means to be gay or lesbian'" or, here, transgender. *Id.* at 1218.

*Dobbs* does not alter Plaintiffs' *informational* privacy claim here, which is fundamentally different from a *decisional* privacy claim. *Dobbs v. Jackson*

---

[4] It is also at odds with Supreme Court authority. It would be inexplicable for the Supreme Court to even *assume* that there was a privacy right in *NASA v. Nelson*, 562 U.S. 134, 147 (2011), and *Whalen v. Roe*, 429 U.S. 589, 599 (1977), if it could be summarily defeated by the absence of any right, in 1868, for government contractors not to answer questions about illegal drug use (*NASA*), or not to be included in a centralized computer file about prescription drug use (*Whalen*).

*Women's Health Org.*, 597 U.S. 215 (2022). *Dobbs* specifically distinguished between those rights: it held that "*Roe* conflated the right to shield information from disclosure and the right to make and implement important personal decisions." *Id.* at 219. It emphasized that those were "two very different meanings of the term" privacy. *Id.* at 273. And *Dobbs* made clear that its decision did not undermine other substantive due process decisions "in any way." *Id.* at 257.

Accordingly, there has been no intervening Supreme Court ruling that invalidates or is contrary to this Court's informational privacy precedent, which would be required to adopt Defendants' precedent-defying arguments. *See Speidell v. United States*, 978 F.3d 731, 739 (10th Cir. 2020) (holding that panel was bound by circuit precedent where any "tension" between prior circuit precedent and subsequent Supreme Court authority was "indirect" at best). The Sixth Circuit, for instance, has recognized that informational privacy was "untouched by *Dobbs*" and it thus "continue[s] to recognize the right" because no intervening Supreme Court authority had overruled its prior circuit precedent, which remained binding on the panel. *Doe v. City of Mansfield*, No. 22-3052, 2023 WL 1822208, at *3 (6th Cir. Feb. 8, 2023). So too here.

This Court's existing privacy precedent is also anchored in due process principles. As to the value that privacy holds in any scheme of ordered liberty, for instance, this Court has recognized that "[t]he right to be left alone … is the right

most valued by civilized men." *Eastwood v. Dep't of Corrs.*, 846 F.2d 627, 631

(10th Cir. 1988) (quotes omitted).  As Plaintiffs' experiences illustrate, privacy

invasions can threaten one's basic sense of safety and stop a person from

participating in public life altogether.  A.25-37.  This Court has also recognized the

long history of protection afforded to privacy.  *Stewart*, 47 F.4th at 1137 (rejecting

the contention, which Defendants urge, that *Leiser* overruled prior precedent).

There is no basis for upending this Court's well-established privacy precedent.

### B.   Transgender Status is Private Information Entitled to Protection.

Defendants do not disagree that this Court has already recognized that one's

transgender status is "'excruciatingly private and intimate'" information.

*Anderson*, 469 F.3d at 915; *see also* Pls.' Br. 32-35 (detailing the highly personal

nature of transgender status and interrelated considerations of medical

confidentiality, bodily privacy, and safety).  But Defendants deny that their Policy

causes any disclosure of that information and instead merely discloses Plaintiffs'

sex assigned at birth.

This perspective leaves commonsense at the door.  Defendants ignore that

the Policy challenged here targets a specific document: the copies of birth

certificates that Defendants provide to individuals so that they can prove their

identity to others.  That factual context is critical, because it means that the

certificate holder is present, for instance, when sliding that document across a

19

counter for a third party to scrutinize for the purpose of verifying their identity.[5]

The district court recognized that the Policy therefore causes the disclosure of

one's transgender status, A.54, as have many other courts, Pls.' Br. 34. *See also*

A.24. Acceptance of Defendants' argument would require willful ignorance of that

reality and the fact that transgender people live in a manner consistent with their

gender identity rather than their sex assigned at birth. A.16.

### C. The Complaint Plausibly Alleges that Defendants Are Responsible for the Privacy Infringement Caused by Defendants' Policy.

Defendants cannot absolve themselves of responsibility for the privacy

infringement caused by their own actions in enforcing their Policy—much less by

blaming transgender people for somehow bringing these harms on themselves—

and particularly not as a matter of law at the pleading stage.

"A defendant is the proximate cause of a plaintiff's injury if the injury [is] a

natural consequence of defendant's actions." *Sheets v. Salt Lake Cnty.*, 45 F.3d

1383, 1389 (10th Cir. 1995). Thus, for instance, a plaintiff was able to obtain

damages stemming from a book that disclosed excerpts of his murdered wife's

---

[5] Furthermore, contrary to Defendants' argument, the fact that transgender people may be "out" about their status in other aspects of life "in no way negates their right to not be forced to disclose such private and personal information except on their own terms and in environments they chose"—which is also crucial to personal safety. *Ray v. McCloud*, 507 F. Supp. 3d 925, 934 (S.D. Ohio 2020); *see also Anderson*, 469 F.3d at 916 (focusing on "time and … manner" of dislcosure).

diary, which a county investigator had made available to the book's author.  This Court held that it was irrelevant that the investigator did not "intentionally cause [the author] to use diary excerpts in the book" because the jury could reasonably conclude that that was the "natural consequence" of his actions.  *Id.* (further noting that the defendant need not have specific intent to deprive the plaintiff of a constitutional right; rather, it is sufficient if the defendant intentionally committed the acts resulting in the violation of a right).  It was immaterial that the government official had not directly made the actual disclosure causing harm, that is, the publication of the excerpts in a book.

In taking away the ability of transgender people to amend their birth certificates to match their gender identity, and consigning them to present their original birth certificates to others, it is more than plausible that the "natural consequence" of Defendants' actions is to cause the disclosure of one's transgender status.  The district court recognized as much.  A.54.  And the same is true for other courts addressing privacy infringements caused by similar birth certificate policies.  Pls.' Br. 38-39.  Defendants argue that all of these cases were wrongly decided because the aggrieved individuals cause their own violation by deciding to disclose their certificate to others.[6]  That is a non-starter here because

---

[6] Defendants' reliance on *Gore* is unavailing.  First, that court dismissed the

Defendants admit birth certificates are "'required for identification.'"  A.75;

*accord* A.18.  The very purpose of providing people with copies of their own birth

certificates is so that they can present them to others to prove their identity.  A.18.

### III.  Plaintiffs' Factual Allegations Plausibly Show that Defendants' Policy Lacks an Adequate Justification.

Defendants devote the least attention to the central issue in this appeal

regardless of what level of scrutiny is employed: the justification for the Policy.

They also virtually admit that there *were* no problems caused by the prior policy,

under which transgender people could amend their birth certificates to match their

gender identity, because it went "unnoticed" for a decade and a half.  Defs.' Br. 47.

The Policy must survive heightened scrutiny, which Defendants cannot

possibly satisfy at the pleading stage in light of Plaintiffs' factual allegations

(much less with impermissible *post hoc* justifications), but those allegations also

plausibly show that it fails even rational basis review.  Rational basis review is not

a meaningless exercise of rubberstamp approval, particularly where the

government has disadvantaged a vulnerable minority, in contrast, for instance, to

---

privacy claim on circuit-specific grounds with no relevance here.  *Gore v. Lee*, No.
3:19-cv-0328, 2023 WL 4141665, at *25 (M.D. Tenn. Jun. 22, 2023).  Second, to
the extent *Gore* went further in dicta to suggest that the presentation of a
transgender person's birth certificate would not out them as transgender, the
district court here expressly found the opposite, recognizing that the Policy causes
others "to realize that a Plaintiff is transgender."  A.54.  Similar flaws in reasoning
pervade *Gore*.  2023 WL 4141665, at *15 ("Persons certainly can have sex-change
surgeries for reasons unrelated to being transgender").

run-of-the-mill economic regulation. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) (invalidating state law disadvantaging lesbian, gay, and bisexual people under rational basis review); *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1048 (10th Cir. 2009) (holding that *Romer* applied "heightened rational-basis review"); *Bishop*, 962 F. Supp. 2d at 1287-96 (holding that the exclusion of same-sex couples from marriage failed rational basis review because it was too attenuated from asserted interests).  Defendants wholly ignore that other courts have held that similar birth certificate policies ultimately failed rational basis review, which underscores that Plaintiffs' claims are far more than merely plausible.  Pls.' Br. 42-43 (collecting cases).

### A. The Policy Is Not Rationally Related to an Interest in the Accurate Identification of Transgender People.

As recognized by the majority of federal and state courts to consider the issue, including the Supreme Courts of Utah and Wyoming, depriving transgender people of public-facing identity documents consistent with their gender identity cannot be justified by any interest in accuracy.  Pls.' Br. 48-49.  A critical purpose of providing people with copies of their own birth certificates is contemporaneous identity verification, connecting a given individual to a given birth certificate. That is why, for example, Defendants permit changes to reflect a person's name following a name change, even though that was not the name assigned at birth. But Defendants do not deny that their Policy both undermines the ability of

transgender people to prove that they are the same individuals reflected on their birth certificates and also causes mismatches with their other identity documents.

Defendants fail to conjure even a logically coherent hypothetical scenario to explain how permitting Ms. Fowler, for instance, to amend her birth certificate to match her gender identity would cause any problem.  Instead, Defendants seemingly believe that they can take away that ability, *even if it causes no harm whatsoever*.  Defs.' Br. 46.  That would make a nullity out of rational basis review, let alone the heightened scrutiny that properly applies here.  Defendants' *ipse dixit* that their accuracy justification is "self-explanatory" only proves the point, Defs.' Br. 47, and constitutes precisely the type of circular justification this Court has rejected.  *Kitchen*, 755 F.3d at 1216.  "[A] classification of persons undertaken for its own sake[] [is] something the Equal Protection Clause does not permit." *Romer*, 517 U.S. at 635.  Defendants fail to explain *why* Oklahoma has an interest in forcing transgender people to use birth certificates "accurately" displaying their assigned sex.  If the purpose of listing "sex" on birth certificates at all is to facilitate identity verification, the Policy actively "hinders rather than promotes that goal" for transgender people.  *Bishop*, 962 F. Supp. 2d at 1292; Pls.' Br. 48-49.

To the extent Defendants have an interest in maintaining a record of Plaintiffs' sex assigned at birth, Defendants have no persuasive response to the

indisputable fact that nothing precludes them from *both* (a) retaining original birth certificates, *and* (b) providing transgender people like Plaintiffs with copies of corrected birth certificates consistent with their gender identity.  That simple fact alone is sufficient to resolve this appeal, without more.  Indeed, Defendants cannot deny that they employ this exact same practice for other birth certificate changes, both retaining original versions and providing corrected copies to the individuals at issue.  Pls.' Br. 45-46.  Nor can they explain how 47 other states, some of which have joined an amicus brief supporting Defendants, "have figured it out."  *Ray v. Himes*, No. 2:18-cv-272, 2019 WL 11791719, at *12 (S.D. Ohio Sept. 12, 2019).

Defendants insist that OSDH's retention of these original birth certificates would itself violate equal protection and informational privacy under Plaintiffs' claims.  Not true.  As noted above, an equal protection claim requires *harm*, and Plaintiffs have never argued that OSDH's retention of the original version of their birth certificates have caused them harm.  They have only argued that OSDH's refusal to provide them with copies of corrected birth certificates does so, because *that* is what Plaintiffs must present to others—not the original version that exists in OSDH's file cabinets.  Likewise, both sides agree that an informational privacy claim requires an *infringement* on privacy.  But, plainly, nothing about OSDH retaining original certificates constitutes an infringement on privacy.  *See* Pls.' Br. 45-46; *cf. NASA*, 562 U.S. at 156 (distinguishing between the government's mere

collection of information with the unwarranted disclosure of information). The same is true, for instance, for any analysis of "statistical data derived from such records," 63 Okla. Stat. § 1-301, which does not "bring about public opprobrium" or "expose a person to discrimination and intolerance." *Leiser v. Moore*, 903 F.3d 1137, 1145 (10th Cir. 2018) (quotes omitted). Defendants cannot rewrite Plaintiffs' claims to suit Defendants' arguments.

### B. The Policy Cannot Be Justified By Women's Athletics.

Defendants cannot justify the Policy by asserting that it "protects" women's athletics. First, the Policy does not rationally further any such interest for the simple reason that Oklahoma *does not even rely on birth certificates* to determine eligibility for sex-designated athletics. *See* 70 Okla. Stat. § 27-106 (relying instead on an affidavit). The Policy does not ban any athletics participation that was not already banned. Defendants have no response to this glaring irrationality in their justification.

Second, even if Defendants could overcome that insurmountable barrier, the Policy is a grossly overbroad measure—applying to all transgender people born in Oklahoma—for targeting a subset of a subset of a subset of that population: transgender females, who attend public schools, who wish to participate in women's athletics. *Cf. Romer*, 517 U.S. at 632. Defendants argue that they need not tailor their Policy to this purported goal (which the Governor never actually

invoked) because admitting that they wished to exclude transgender females from women's athletics would make the Policy more difficult to defend.  Defs.' Br. 50. To state the argument is to defeat it.

Third, and finally, Defendants do not even attempt to justify the constitutionality of categorically banning transgender females from athletics, which other federal courts have invalidated, *Hecox*, 79 F.4th at 1033 n.16, nor does this case present an appropriate vehicle for deciding that fact-bound issue.  In sum, there is no rational basis that can be credited at this stage of the proceedings.

## CONCLUSION

The district court's dismissal should be reversed.

Dated: December 20, 2023                    Respectfully submitted,

                                            /s/ Peter C. Renn
Sasha Buchert                               Peter C. Renn
LAMBDA LEGAL DEFENSE AND                    LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.                        EDUCATION FUND, INC.
1776 K Street NW, Suite 722                 800 S. Figueroa St., Ste. 1260
Washington, D.C. 20006                      Los Angeles, CA 90017
(202) 804-6245                              (213) 382-7600

Shelly L. Skeen                             Karen Keith Wilkins
LAMBDA LEGAL DEFENSE AND                    1515 S. Denver Ave.
EDUCATION FUND, INC.                        Tulsa, OK 74119
3500 Oak Lawn Avenue, Suite 500             (918) 599-8118
Dallas, TX 75219
(214) 219-8585

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,497 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and 10th Cir. R. 32 because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on December 20, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that (1) all required privacy redactions have been made;

(2) any paper copies of this document submitted to the Court are exact copies of

the version filed electronically; and (3) the electronic submission was scanned this

document for viruses using Microsoft Defender and, according to that program,

this document is virus free.

/s/ Peter C. Renn
Counsel for Plaintiffs-Appellants