**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 18, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ROWAN FOWLER; ALLISTER HALL;
CARTER RAY,

     Plaintiffs - Appellants,

v.

KEVIN STITT, in his official capacity as
Governor of the State of Oklahoma;
KEITH REED, in his official capacity as
Commissioner of Health for the Oklahoma
State Department of Health; and KELLY
BAKER, in her official capacity as State
Registrar of Vital Records,

     Defendants - Appellees.

------------------------------

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION
OF OKLAHOMA; GLBTQ LEGAL
ADVOCATES & DEFENDERS; STATE
OF KANSAS; STATE OF ARKANSAS;
STATE OF IOWA; STATE OF
INDIANA; STATE OF GEORGIA;
STATE OF LOUISIANA; STATE OF
MISSISSIPPI; STATE OF MISSOURI;
STATE OF MONTANA; STATE OF
NEBRASKA; STATE OF NORTH
DAKOTA; STATE OF SOUTH
CAROLINA; STATE OF TENNESSEE;
STATE OF TEXAS; STATE OF UTAH;
STATE OF WEST VIRGINIA,

     Amici Curiae.

No. 23-5080

————————————————————

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:22-CV-00115-JWB-MTS)**

————————————————————

Peter C. Renn, Lambda Legal Defense and Education Fund, Inc., Los Angeles, California
(Sasha Buchert, Lambda Legal Defense and Education Fund, Inc., Washington, D.C.;
Shelly L. Skeen, Lambda Legal Defense and Education Fund, Inc., Dallas, Texas; and
Karen Keith Wilkins, Tulsa, Oklahoma, with him on the briefs), for Plaintiffs –
Appellants.

Audrey A. Weaver, Assistant Solicitor General, Office of the Attorney General for the
State of Oklahoma (Garry M. Gaskins, II, Solicitor General, and Zach West, Director of
Special Litigation, with her on the brief), Oklahoma City, Oklahoma, for Defendants –
Appellees.

Harper S. Seldin, American Civil Liberties Union Foundation, New York, New York;
and Adam Hines and Megan Lambert, American Civil Liberties Union of Oklahoma
Foundation, Oklahoma City, Oklahoma, filed an amicus curiae brief for American Civil
Liberties Union and American Civil Liberties Union of Oklahoma.

Kimberly A. Havlin and Ariell D. Branson, White & Case LLP, New York, New York;
and Patience Crozier, GLBTQ Legal Advocates & Defenders, Boston, Massachusetts,
filed an amicus curiae brief for GLBTQ Legal Advocates & Defenders.

Kris Kobach, Attorney General, Anthony Powell, Solicitor General, and Erin B. Gaide,
Assistant Attorney General, Office of the Attorney General for the State of Kansas,
Topeka, Kansas, filed an amicus curiae brief for State of Kansas, State of Arkansas, State
of Iowa, State of Indiana, State of Georgia, State of Louisiana, State of Mississippi, State
of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of South
Carolina, State of Tennessee, State of Texas, State of Utah, and State of West Virginia.

————————————————————

Before **HARTZ**, **McHUGH**, and **FEDERICO**, Circuit Judges.

————————————————————

**McHUGH**, Circuit Judge.

————————————————————

Starting in at least 2007, the Oklahoma State Department of Health ("OSDH") permitted transgender people to obtain Oklahoma birth certificates with amended sex designations.[1] So, for example, a transgender woman assigned male at birth could obtain an amended Oklahoma birth certificate indicating she is female. This practice ended in 2021 after an individual obtained an amended Oklahoma birth certificate with a gender-neutral sex designation. Oklahoma Governor Kevin Stitt learned about this amended birth certificate and publicly stated, "I believe that people are created by God to be male or female. Period." App. at 22. Shortly thereafter, Governor Stitt issued an Executive Order directing OSDH to stop amending sex designations on birth certificates.

Plaintiffs Rowan Fowler, Allister Hall, and Carter Ray are transgender people without amended Oklahoma birth certificates. This means the sex listed on their birth certificates does not reflect their gender identities. Plaintiffs all obtained court orders directing that their sex designations on official documents be amended. They then applied for amended birth certificates. OSDH denied all three applications, citing the Governor's Executive Order.

Plaintiffs sued Governor Stitt; OSDH's Commissioner of Health, Keith Reed; and the State Registrar of Vital Records, Kelly Baker (collectively, "Defendants"), in

---

[1] Plaintiffs refer to the male/female designation on identity documents as both a "sex designation" and a "gender marker." For consistency, we use "sex designation" when referring to male/female designations. But we do not alter quotes using other terms.

their official capacities. Plaintiffs' suit centers on Defendants' practice of denying sex-designation amendments ("the Birth Certificate Policy" or "the Policy"). Pursuant to 42 U.S.C. § 1983, Plaintiffs asserted claims under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Specifically, Plaintiffs allege the Policy violates equal protection because it unlawfully discriminates based on transgender status and sex. Additionally, Plaintiffs allege that without amended birth certificates, they must involuntarily disclose their transgender status when providing their birth certificates to others. They contend these involuntary disclosures violate their substantive due process right to privacy.

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing Plaintiffs failed to state a claim. The district court granted the Motion, and Plaintiffs appealed. For the reasons set forth below, we reverse the district court's dismissal of the equal protection claim. But we affirm the district court's dismissal of Plaintiffs' substantive due process claim.

## I.    BACKGROUND

### A.    *Factual History*

Because we are reviewing the dismissal of a complaint for failure to state a claim, we draw the facts from Plaintiffs' well pleaded factual allegations and construe them in the light most favorable to Plaintiffs. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002). We begin with a general discussion of sex, gender identity, and gender dysphoria drawn from Plaintiffs' allegations. We then outline the allegations concerning the Policy and Plaintiffs' relevant experiences.

4

1.    **Sex, Gender Identity, and Gender Dysphoria**[2]

According to the Complaint, individuals are typically assigned a sex at birth based solely on the appearance of their external genitalia. Yet, all individuals have "multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity." App. at 14. Gender identity is "a person's core internal sense of their own gender." *Id.* Each person has a gender identity, "and that gender identity is *the* critical determinant of a person's sex." *Id.* Furthermore, "[t]here is a medical consensus that gender identity is innate, has biological underpinnings (including sexual differentiation in the brain), and is fixed at an early age." *Id.* at 15.

Most people are cisgender, meaning their sex assigned at birth aligns with their gender identity. But some people are transgender, meaning their sex assigned at birth conflicts with their gender identity. An incongruence between sex assigned at birth and gender identity is associated with gender dysphoria. "Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth." *Id.* "If left untreated, gender dysphoria may result in serious consequences including depression, self-harm, and even suicide." *Id.* at 16. Moreover, attempts to alter gender identity "are not only unsuccessful but also dangerous, risking psychological and physical harm, including suicide." *Id.* at 15.

---

[2] We take no position on the correct way to define sex or treat gender dysphoria. But at this stage in the litigation, we must accept Plaintiffs' well pleaded facts as true and view those facts in the light most favorable to Plaintiffs. *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007).

Internationally recognized standards of care govern the treatment of gender dysphoria. Treatment generally involves transgender people living in a manner consistent with their gender identity—a process called transition. Each person's transition varies but may include social and medical transition. "Social transition entails a transgender person living in a manner consistent with the person's gender identity." *Id.* at 16. For a transgender man, this may mean wearing traditionally male clothing, using male pronouns, and adopting grooming habits associated with men. Medical transition "includes treatments that bring the sex-specific characteristics of a transgender person's body into alignment with their gender identity, such as hormone replacement therapy or surgical care." *Id.*

Plaintiffs allege that an essential part of transitioning is amending the name and sex designation on identity documents. Relevant here, transgender people will often request an amended birth certificate because birth certificates are "critical and ubiquitous identity document[s] used in many settings to verify a person's identity." *Id.* at 11. Birth certificates are also often used to obtain other identity documents, like driver's licenses and passports. Without amended birth certificates, transgender people may have difficulty proving their identity because of a visible discord between their gender identity and their sex designation. Additionally, transgender people without amended birth certificates have less control over when they reveal their transgender status. This is because they may need to show their birth certificates to others who may perceive a difference between their gender identity and sex designation.

2.    **The Birth Certificate Policy**[3]

OSDH is responsible for Oklahoma's vital records, including issuing and amending Oklahoma birth certificates. Starting in at least 2007, OSDH allowed transgender people to amend the sex designations on their birth certificates. From 2018 to late 2021, at least one hundred transgender individuals received Oklahoma birth certificates with amended sex designations.

OSDH stopped amending sex designations when it began implementing the Birth Certificate Policy. Plaintiffs define the Birth Certificate Policy as the policy "of refusing to provide transgender people with birth certificates that match their gender identity."[4] *Id.* at 20.

---

[3] Defendants refer to the challenged state action as "Oklahoma law." Appellees' Br. at 10–11. We use "the Birth Certificate Policy" or "the Policy" because Plaintiffs allege it is the Policy, not Oklahoma law, that prevents them from obtaining amended birth certificates. Specifically, they allege that OSDH provided sex-designation amendments under Okla. Stat. tit. 63, § 1-321 for over ten years before Governor Stitt's Executive Order, that transgender people may still acquire court orders directing that their sex designations be amended, that OSDH officials cite the Executive Order when denying sex-designation amendments, and that Governor Stitt and his office have specifically instructed OSDH officials not to provide sex-designation amendments. At this stage, we must accept these allegations as true and view them in the light most favorable to Plaintiffs. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002). Accordingly, we accept as true that the Policy, not Oklahoma law, prevents Plaintiffs from obtaining amended birth certificates.

[4] Plaintiffs also claim the Policy includes the refusal to provide an amended birth certificate "without the mandatory inclusion of revision history that discloses a person's transgender status." App. at 20. Before the Policy, OSDH included revision history when amending a transgender person's birth certificate. The parties did not present arguments concerning revision history on appeal, so we do not consider this aspect of Plaintiffs' Complaint.

Plaintiffs allege that the Birth Certificate Policy originates in part from a 2021 settlement between OSDH and an individual whose gender identity and assigned sex conflicted. Per the settlement, the individual received "an amended Oklahoma birth certificate with a gender-neutral designation, consistent with their gender identity." *Id.* at 21–22. Governor Stitt responded to the settlement by issuing a statement, declaring, "I believe that people are created by God to be male or female. Period." *Id.* at 22. He further stated, "There is no such thing as non-binary sex, and I wholeheartedly condemn the OSDH court settlement that was entered into by rogue activists who acted without receiving proper approval or oversight." *Id.* He promised to "tak[e] whatever action necessary to protect Oklahoma values." *Id.*

The following month, Governor Stitt issued Executive Order 2021-24 ("Executive Order"). The Executive Order states that Oklahoma law does not "provide OSDH or others any legal ability to in any way alter a person's sex or gender on a birth certificate." *Id.* The Executive Order also directs OSDH to immediately "[c]ease amended birth certificates [sic] that is in any way inconsistent with" Okla. Stat. tit. 63, § 1-321. *Id.* (first alteration in original). The Executive Order further specified that the Commissioner of Health, among others, "shall cause the provisions of this Order to be implemented." *Id.* The Executive Order requires "OSDH to inform Governor Stitt's office of any pending litigation related to amending birth certificates." *Id.*

In April 2022, Governor Stitt signed Senate Bill 1100 into law. Accordingly, § 1-321 now states, "Beginning on the effective date of this act, the biological sex

designation on a certificate of birth amended under this section shall be either male or female and shall not be nonbinary or any symbol representing a nonbinary designation including but not limited to the letter 'X.'"[5] Okla. Stat. tit. 63, § 1-321(H). Plaintiffs allege § 1-321(H) "does not prohibit transgender men and women from correcting their birth certificates to match their male or female gender identity," but merely limits the sex designation choices to male or female. App. at 23. But they allege § 1-321(H) as informed by the Policy is regarded by Defendants as prohibiting amendments to sex designations.

Plaintiffs further allege that Oklahoma permits individuals to amend the sex designation on a driver's license without an amended birth certificate. Furthermore, forty-seven states, the District of Columbia, and Puerto Rico all permit transgender people to amend the sex designation on their birth certificates. And the United States Department of State "permits changes to the gender marker on a citizen's passport through self-certification." *Id.* at 24.

### 3.    The Plaintiffs

After Governor Stitt issued the Executive Order, OSDH began denying requests to amend sex designations on birth certificates. Ms. Fowler, Mr. Hall, and Mr. Ray were among the transgender people denied amended birth certificates. We briefly outline each person's relevant experiences as alleged in the Complaint.

---

[5] Prior to this amendment, § 1-321 listed specific information that could be amended on a birth certificate but did not discuss sex designations. *See* Okla. Stat. tit. 63, § 1-321 (2021).

Ms. Fowler is a transgender woman who began living openly as female in 2021, when she was forty-six years old. As part of her transition, Ms. Fowler "has taken steps to bring her body and her gender expression into alignment with her female gender identity, including through clinically appropriate treatment undertaken in consultation with health care professionals." *Id.* at 26. She has also been diagnosed with gender dysphoria, and her treatment includes "hormone therapy and social transition to living openly as female." *Id.*

As part of her transition, Ms. Fowler petitioned to change her conventionally male first and middle names to be more consistent with her female gender identity. An Oklahoma district court granted her petition and ordered, among other things, that Ms. Fowler "shall be designated as female on official documents generated, issued, or maintained in the State of Oklahoma." *Id.*

Ms. Fowler has taken steps to change her sex designation on official records. For example, Ms. Fowler has updated her sex designation in her records with the Social Security Administration, the Transportation Security Administration, and the federal health insurance marketplace. She also updated her Oklahoma driver's license to indicate she is female, although there was some difficulty because she was initially told she needed to present an amended birth certificate.

Ms. Fowler also tried to amend the sex designation on her birth certificate. She provided OSDH with the court order directing that she "shall be designated as female on official documents" and paid the requisite fee. *Id.* OSDH cashed Ms. Fowler's

check but later denied her request in an email from Ms. Baker. In the email, Ms. Baker invoked Governor Stitt's Executive Order.

According to the Complaint, not having an amended birth certificate has negatively impacted Ms. Fowler. For instance, the discrepancy between Ms. Fowler's driver's license and birth certificate resulted in uncomfortable questions when she applied for the TSA PreCheck program. Ms. Fowler has also been unable "to update her gender-related information with credit-related entities, which have insisted that they need a corrected birth certificate." *Id.* at 30. Finally, Ms. Fowler alleges she will need to provide her birth certificate to others in the future, including employers.

Mr. Hall is a transgender man who "has taken steps to bring his body and his gender expression into alignment with his male gender identity." *Id.* at 31. He has been diagnosed with gender dysphoria, and his treatment includes "hormone therapy and social transition to living openly as male." *Id.* Because of the hormone therapy, Mr. Hall has facial hair and "a more typically masculine appearance." *Id.*

To aid his transition, Mr. Hall petitioned to change the sex designation on his official Oklahoma documents, as well as his first and middle names. An Oklahoma district court granted his petition, ordering that Mr. Hall "shall be designated as male on official documents generated, issued, or maintained in the State of Oklahoma." *Id.* Mr. Hall updated his name and sex designation in his records with the Social Security Administration. He also updated his name and sex designation on his Oklahoma driver's license. But like Ms. Fowler, he was denied an amended birth certificate, despite providing OSDH with the court order, filing an application, and paying the

11

fee. Ms. Baker invoked Governor Stitt's Executive Order in an email denying Mr. Hall's request.

Without an amended birth certificate, Mr. Hall has been unable to amend other identity documents. For example, Mr. Hall alleges he is a member of the Choctaw Nation of Oklahoma, and he has a tribal membership card that identifies him by name and sex. He tried to update the membership card to reflect his gender identity but was told any change required an amended birth certificate. This harms Mr. Hall because he needs his tribal membership card to access tribal services, including health services. Moreover, he will continue to need his birth certificate in the future to prove his identity and to update other identity documents.

Mr. Ray is a transgender man who "has taken steps to bring his body and his gender expression into alignment with his male gender identity." *Id.* at 34. He has also been diagnosed with gender dysphoria and, as a result, has begun hormone therapy and transitioning to living openly as male. Because of the hormone therapy, Mr. Ray "has a more typically masculine expression, including a typically male voice." *Id.*

Mr. Ray petitioned to change his name and sex designation, and an Oklahoma district court granted his petition. Mr. Ray alleges the court ordered "that the gender marker on Mr. Ray's birth certificate be changed to male and that OSDH issue a new birth certificate consistent with the changes ordered." *Id.* Mr. Ray requested an amended birth certificate, attaching the court's order and paying the necessary fee,

but OSDH denied his request. Mr. Ray received an email from Ms. Baker denying his request and invoking Governor Stitt's Executive Order.

Mr. Ray has been able to change his sex designation on other documents. His Oklahoma driver's license is updated, although like Ms. Fowler, he was initially told an amended birth certificate would be required. Mr. Ray has also updated the sex designation in his Social Security Administration and school records. Further, he is an Emergency Medical Technician (EMT), so he has updated his information with "the bodies that license and maintain a registry of EMTs." *Id.*

According to the Complaint, not having an amended birth certificate is an obstacle in Mr. Ray's life. After purchasing a home, for example, he sought to obtain services under his name and was told he needed two forms of identification, one of which could be a birth certificate. He had similar issues when attempting to update his information with a credit card company. And when he tried to update his information with the body handling EMT licensing, he was initially asked to provide his birth certificate and then required "to determine if there were alternate ways of proving his identity." *Id.* at 37. Mr. Ray alleges he will need to provide his birth certificate to others in the future.

Ms. Fowler, Mr. Hall, and Mr. Ray have all experienced discrimination and hostility when others have learned they are transgender. Additionally, they have all experienced hostility when presenting identity documents that conflict with their gender identity.

### B.    Procedural History

Plaintiffs initiated this action against Defendants in March 2022. They brought their claims under 42 U.S.C. § 1983. They allege the Birth Certificate Policy violates the United States Constitution, specifically the First Amendment and the Fourteenth Amendment's Equal Protection and Due Process Clauses. Plaintiffs seek declaratory relief, injunctive relief, and fees and costs under 42 U.S.C. § 1988. They do not seek money damages. The district court dismissed Plaintiffs' First Amendment claim for failure to state a claim. Plaintiffs have not appealed that dismissal, so we focus our discussion on the equal protection and substantive due process claims.

In their equal protection claim, Plaintiffs contend that "[o]thers born in Oklahoma, who are not transgender, are not deprived of birth certificates that accurately reflect their gender identity." *Id.* at 38. They thus allege the Policy unlawfully discriminates against transgender people on the basis of transgender status and sex. Plaintiffs also argue transgender people are a quasi-suspect class, so the Policy must pass intermediate scrutiny.

In their substantive due process claim, Plaintiffs allege the Policy results in involuntary disclosure of transgender status when a transgender person must disclose a birth certificate. Plaintiffs assert these involuntary disclosures violate their

fundamental right to privacy because their transgender status is highly sensitive personal information.[6]

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing Plaintiffs failed to state a claim upon which relief can be granted. Defendants argued that the Policy does not discriminate between groups, that transgender status is not a suspect class, and that the Policy survives rational basis review. Defendants further argued Plaintiffs had not identified a fundamental right and had failed to allege that Defendants disclosed Plaintiffs' transgender status.

The district court granted Defendants' Motion to Dismiss. Concerning equal protection, the district court concluded that binding Tenth Circuit precedent holds transgender status is not a quasi-suspect class. And regardless, the district court determined that transgender status is not a quasi-suspect class because transgender people have political power. The district court stated it was unwilling to "compress[] transgender people into classifications based on sex" but did not further consider whether the Policy unlawfully discriminates on the basis of sex. *Id.* at 83.

Because the court concluded the Policy "does not infringe upon a fundamental liberty interest or implicate a suspect class," it evaluated the Policy under rational basis review. *Id.* at 86. Defendants raised two state interests, and the court considered

---

[6] Plaintiffs also alleged the Policy burdens "the right to define and express a person's gender identity and the right not to be treated in a manner contrary to a person's gender by the government." App. at 40. Plaintiffs have not pursued this theory on appeal, and we do not address it.

both. First, Defendants argued the Policy protects "the integrity and accuracy of vital records, including documenting birth information and classifying individuals based on the two sexes." *Id.* The court concluded this was a legitimate state interest rationally related to the Policy because "[u]nder Oklahoma law, the purpose of a birth certificate is to record 'the facts of the birth.'" *Id.* at 87 (quoting Okla. Stat. tit. 63, § 1-311(B)). Second, Defendants argued the Policy "protect[s] the interests of women." *Id.* at 86. When considering this rationale, the court discussed the "debate raging across the country about the propriety of allowing biological men to participate in women's sports." *Id.* at 89. The court then concluded that the Policy could protect women by providing a way to identify "biological men" and exclude them from women's sports. *Id.* Having determined the Policy satisfied rational basis review, the court concluded the Policy did not infringe on Plaintiffs' rights under the Equal Protection Clause.

The district court next considered the substantive due process claim. The court concluded that Plaintiffs had not adequately alleged a fundamental constitutional right because their asserted right—the right to privacy—was defined too generally. The court determined the asserted right is really "the right to amend the sex designation on [Plaintiffs'] birth certificate[s] to be consistent with their gender identity." *Id.* at 74. This is not a fundamental right, the court concluded, because it is not "anchored in history and tradition" and not "fundamental to our scheme of ordered liberty." *Id.* at 74, 77. Additionally, the court explained that any fundamental

right to privacy is not implicated because Plaintiffs, not Defendants, disclose Plaintiffs' birth certificates.

The district court thus concluded Plaintiffs failed to state a plausible equal protection or substantive due process claim and dismissed Plaintiffs' Fourteenth Amendment claim. Plaintiffs timely appealed.

## II.    DISCUSSION

We review "*de novo* the district court's grant of a motion to dismiss pursuant to Rule 12(b)(6)." *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). We thus accept all well pleaded facts as true and view them in the light most favorable to Plaintiffs. *Id.* If the complaint includes "enough facts to state a claim to relief that is plausible on its face," then dismissal is not warranted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

We begin by considering whether Defendants are entitled to Eleventh Amendment immunity. We conclude they are not. Next, we address Plaintiffs' equal protection and due process claims. We conclude that Plaintiffs plausibly stated a claim under the Equal Protection Clause but not the Due Process Clause.

17

### A.     Eleventh Amendment Immunity

Plaintiffs are suing state officials, so the immunity granted to the states by the Eleventh Amendment is implicated. But under *Ex parte Young*, 209 U.S. 123 (1908), Defendants are not entitled to Eleventh Amendment immunity.[7]

The Eleventh Amendment grants states sovereign immunity from suit. *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021). "This immunity extends to suits brought by citizens against their own state." *Id.* The Eleventh Amendment also "bars suits for damages and other forms of relief against state defendants acting in their official capacities." *Buchheit v. Green*, 705 F.3d 1157, 1159 (10th Cir. 2012). This bar exists because suits against state officials in their official capacities are "no different from" suits "against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

If Eleventh Amendment immunity applies, the federal courts do not have jurisdiction because "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000); *see also Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013). However, the Eleventh Amendment does not always bar suits against nonconsenting

---

[7] Although neither party raised Eleventh Amendment immunity, we may address it sua sponte. *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019). We elect to address it sua sponte because "Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Id.* (brackets and quotation marks omitted).

states.[8] Relevant here, *Ex parte Young* creates an exception "for suits seeking prospective injunctive relief." *Buchheit*, 705 F.3d at 1159. To determine whether *Ex parte Young* applies, courts "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)). A court conducting this analysis should not analyze "the merits of the claim." *Id.* at 646.

Additionally, *Ex parte Young* allows suit only if the named state official has "'some connection with the enforcement' of the challenged" action. *Hendrickson*, 992 F.3d at 965 (quoting *Ex parte Young*, 209 U.S. at 157). "Otherwise, the suit is 'merely making [the official] a party as a representative of the state' and therefore impermissibly 'attempting to make the state a party.'" *Id.* (alteration in original) (quoting *Ex parte Young*, 209 U.S. at 157). Thus, *Ex parte Young* "require[s] that the state official have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Id.* (internal quotation marks omitted).

---

[8] Congress may abrogate the States' Eleventh Amendment immunity "pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). But Congress did not abrogate immunity in 42 U.S.C. § 1983, the statute under which Plaintiffs brought their claims. *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010).

Turning to the instant case, Plaintiffs allege an ongoing violation of federal law, and their requested relief is prospective. *See Verizon*, 535 U.S. at 645. Plaintiffs seek the following relief:

- A declaration that enforcement of the Birth Certificate Policy violates the United States Constitution,

- An order permanently enjoining Defendants and their agents from enforcing the Policy,

- An order directing Defendants to immediately provide Plaintiffs their amended birth certificates as requested,

- An order directing Defendants "to take any necessary and appropriate action to ensure that transgender people" can obtain amended Oklahoma birth certificates that match their gender identity and do not include information that would disclose their transgender status,

- An order directing "Defendants to maintain the confidentiality of information disclosing a person's transgender status," and

- Fees and costs under 42 U.S.C. § 1988.

App. at 41–42.

Viewing all facts in Plaintiffs' favor, they are seeking prospective relief because they are attempting to stop alleged ongoing violations of federal law and are not seeking monetary compensation for past legal wrongs. *See Verizon*, 535 U.S. at 646. And to the extent Plaintiffs seek a declaration that Defendants violated federal law in the past, that does not bar application of *Ex parte Young*. This is because, as far as Oklahoma is concerned, "the prayer for declaratory relief adds nothing to the prayer for injunction." *Id.*

Furthermore, Plaintiffs sufficiently allege Defendants "have some connection with the enforcement" of the Policy. *Ex parte Young*, 209 U.S. at 157. Plaintiffs

allege Mr. Reed is OSDH's Commissioner of Health and "supervises the activities of

OSDH, enforces Oklahoma's vital statistics laws, and maintains and operates

Oklahoma's system of vital statistics." App. at 13–14. Plaintiffs further allege

Ms. Baker "is the official custodian of the vital records of the state, and she also

enforces Oklahoma's vital statistics laws." *Id.* at 14. Ms. Baker also sent the emails

denying Plaintiffs' applications for amended birth certificates. Accordingly, Plaintiffs

have alleged Mr. Reed and Ms. Baker are sufficiently connected to the Policy's

enforcement for *Ex parte Young* to apply.

Concerning Governor Stitt, Plaintiffs have alleged more than a general duty to

enforce the law. *See* 13 Charles Alan Wright & Arthur R. Miller, *Federal Practice &

Procedure* § 3524.3 (3d ed. 1998) ("[T]he duty must be more than a mere general

duty to enforce the law."); *see also Hendrickson*, 992 F.3d at 967 (holding a governor

was entitled to sovereign immunity because she did not have "a particular duty to

enforce the challenged statute," and her connection to the statute "stem[med] from

[her] general enforcement power"). Specifically, Plaintiffs allege Governor Stitt

oversees OSDH and "has taken actions under color of state law to prevent

transgender people from accessing Oklahoma birth certificates matching their gender

identity." App. at 13. They further allege that Governor Stitt's Executive Order set

the Policy in motion and that OSDH invoked the Executive Order when denying

Plaintiffs' applications for amended birth certificates. Consequently, Plaintiffs have

alleged an adequate connection between Governor Stitt and the Policy, thus

demonstrating they did not sue Governor Stitt in an attempt to make Oklahoma a

21

party. *See Ex parte Young*, 209 U.S. at 157; *see also* Wright & Miller, *Federal Practice & Procedure* § 3524.3 ("When there is some chance that the governor may act to enforce a statute, however, some courts have been willing to retain the governor as a named defendant.").

In short, Defendants are proper parties under *Ex parte Young* and do not have Eleventh Amendment immunity. We thus turn to the merits of Plaintiffs' claims.

### B.    Equal Protection

The Equal Protection Clause provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a viable equal protection claim, Plaintiffs must allege that the Policy purposefully discriminates against them because of their membership in a particular class. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594 (2008); *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021). Plaintiffs must also allege that the Policy fails under the appropriate level of scrutiny. *Ashaheed*, 7 F.4th at 1250.

We first assess whether the Birth Certificate Policy purposefully discriminates on the basis of transgender status and sex. We conclude that it does. Accordingly, we next consider whether the Policy satisfies rational basis review and intermediate scrutiny. Because the Policy cannot withstand even rational basis review, Plaintiffs have stated a viable equal protection claim.

22

### 1.     Purposeful Discrimination

An equal protection claim must allege that the challenged state action purposefully discriminates based on class membership. *Id.* Purposeful discrimination may be shown "directly or circumstantially." *Id.* "Direct proof is showing that a distinction between groups of persons appears on the face of a state law or action." *Id.* (internal quotation marks omitted). When a distinction is facially apparent, purposeful discrimination is presumed and no further examination of intent is required. *Dalton v. Reynolds*, 2 F.4th 1300, 1308 (10th Cir. 2021).

If the state action is facially neutral, however, a court may infer purposeful discrimination from the "totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). For example, a court may consider whether the state action disparately impacts one group. *Id.* But disparate impact "is not the sole touchstone" of purposeful discrimination. *Id.* Other touchstones include the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and "[d]epartures from the normal procedural sequence." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). Importantly, a plaintiff need not allege that discrimination "was the sole, or even the primary, motivation." *Navajo Nation v. New Mexico*, 975 F.2d 741, 743 (10th Cir. 1992). The plaintiff need allege only that the state actor chose "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Similarly, the plaintiff is not required to show "discriminatory animus, hatred, or

bigotry." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).
"The 'intent to discriminate' forbidden under the Equal Protection Clause is merely
the intent to treat differently." *Id.*

Plaintiffs argue the Policy purposefully discriminates on the basis of
transgender status and sex. We first address transgender status, concluding that the
Policy does discriminate on that basis. Rather than proceed directly to applying
judicial scrutiny to the Policy on that basis, we next address whether the Policy also
discriminates on the basis of sex. We do so despite our holding that the Policy
discriminates on the basis of transgender status because the level of scrutiny to be
applied may vary depending on the class subject to discrimination.

    a.   *Transgender status*

Plaintiffs contend the Policy facially discriminates on the basis of transgender
status. They also contend they allege facts from which the court could infer
purposeful discrimination. We address each argument in turn. We conclude that at
minimum, Plaintiffs have alleged facts from which we may reasonably infer
purposeful discrimination on the basis of transgender status.

    i.   <u>Facial discrimination</u>

To show a facial classification, Plaintiffs must identify "a distinction" that
appears on the Policy's face. *See Ashaheed*, 7 F.4th at 1250 (quotation marks
omitted). At first glance, the Policy appears facially neutral because it prevents all
Oklahomans—regardless of their sex or gender identity—from amending the sex
designation on their birth certificates. But Plaintiffs argue the Policy is facially

24

discriminatory because "by definition, only transgender people are harmed by the" Policy.[9] Reply at 12. At oral argument, Plaintiffs cited for the first time *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), for the proposition that a law may be facially discriminatory even if it theoretically applies to everyone.

In *Bray*, the Supreme Court held that opposition to abortion did not necessarily demonstrate sex-based discrimination.[10] 506 U.S. at 270. This is because "there are common and respectable reasons for opposing [abortion], other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class." *Id.* Yet the Court acknowledged that "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Id.* For example, a "tax on wearing yarmulkes is a tax

---

[9] Plaintiffs also contend the Policy is facially discriminatory because "the Governor's office *specifically instructed* OSDH officials not to amend the birth certificates of transgender people to match their male and female gender identity." Reply at 12. In their Complaint, Plaintiffs allege, "Upon information and belief, Governor Stitt and his office have enforced the Executive Order by specifically instructing OSDH officials that they cannot correct the birth certificates of transgender people to reflect their male or female gender identity." App. at 23. It is not clear that this specific instruction was a facial aspect of the Policy, especially because as alleged, the Policy prevents all Oklahomans from amending their sex designations.

[10] *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), did not involve a claim brought under the Equal Protection Clause. Rather, it involved a claim brought under 42 U.S.C. § 1985(3), which required the plaintiff to show that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the [defendants'] action." *Bray*, 506 U.S. at 268 (first alteration in original) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

on Jews." *Id.* But the Court did not specify that a tax on wearing yarmulkes *facially* discriminates against Jews. *See id.*

Furthermore, the Court has stated that disparate impact alone does not show purposeful discrimination. *See, e.g.*, *Davis*, 426 U.S. at 242 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."); *Vill. of Arlington Heights*, 429 U.S. at 264–65 (stating that *Washington v. Davis*, 426 U.S. 229 (1976), "made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact"); *but see id.* at 266 (acknowledging that in "rare" cases like *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), or *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face").

There is thus some tension in the caselaw concerning whether disparate impact alone is sufficient to show facial discrimination. We need not address this tension, however, because Plaintiffs have alleged facts from which we can reasonably infer discriminatory purpose. *See Navajo Nation*, 975 F.2d at 743 (declining to decide whether state action was facially discriminatory when the "disparate impact analysis" revealed discriminatory intent).

### ii.   Totality of relevant facts

A court may infer purposeful discrimination from the "totality of the relevant facts." *Davis*, 426 U.S. at 242. Relevant facts may include disparate impact, the

"historical background" of the challenged action, the "sequence of events leading up to the challenged" action, and "[d]epartures from the normal procedural sequence." *Vill. of Arlington Heights*, 429 U.S. at 267. Below, we evaluate Plaintiffs' allegations concerning disparate impact and the Policy's history. These allegations—combined with Defendants' inability to justify the Policy—support a reasonable inference of purposeful discrimination.

First, the Policy's disparate impact on transgender people indicates discriminatory intent. Before the Policy, cisgender and transgender people could obtain Oklahoma birth certificates that accurately reflected their gender identity. After the Policy, cisgender people still have access to Oklahoma birth certificates reflecting their gender identity. Transgender people, however, may no longer obtain a birth certificate reflecting their gender identity. Consequently, the Policy affects transgender people but not cisgender people.

Defendants, however, contend there is no disparate impact because Plaintiffs have not alleged "they are being denied amendments on their certificates while non-transgender persons are not." Appellees' Br. at 20. This argument fails to recognize that cisgender people do not need sex-designation amendments because they already have birth certificates accurately reflecting their gender identity. And because cisgender people do not need amendments, the Policy has no effect on them. After all, state action may apply to everyone equally but not affect everyone equally—"[a] tax on wearing yarmulkes is a tax on Jews." *See Bray*, 506 U.S. at 270.

Other courts have held that similar laws or policies disparately impact transgender people by denying only them birth certificates that accurately reflect their gender identity. *See D.T. v. Christ*, 552 F. Supp. 3d 888, 895–96 (D. Ariz. 2021) (reasoning that requiring individuals to get a "sex change operation" before obtaining an amended birth certificate necessarily targeted transgender people); *Ray v. McCloud*, 507 F. Supp. 3d 925, 935–36 (S.D. Ohio 2020) (holding that prohibiting changes to sex listed on birth certificates "treats transgendered people differently than similarly situated Ohioans" who can amend their birth certificates to accurately reflect their identity); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1141 (D. Idaho 2018) (holding that prohibiting changes to sex listed on birth certificates denied "transgender people, as a class, access to birth certificates that accurately reflect their gender identity").

At least one district court has held that a policy prohibiting sex-designation amendments does not disparately impact transgender people. *Gore v. Lee*, No. 3:19-cv-0328, 2023 WL 4141665, at *23 (M.D. Tenn. June 22, 2023), *appeal filed*, Case No. 23-5669 (6th Cir. 2023). The district court in *Gore* concluded there was no disparate impact because the transgender plaintiffs had not shown "that the sex designation on a transgender person's birth certificate is *incorrect*." *Id.* at *11; *see also id.* at *23. But here, Plaintiffs have plausibly alleged that because of the Policy, their birth certificates do not accurately reflect their gender identities. And while they acknowledge Oklahoma's right to maintain the original birth certificate accurately recording the sex designation made at birth, they contend that designation is no

28

longer accurate. Thus, taking the Complaint's allegations as true, *Gore*'s reasoning is not persuasive.

Next, the events leading up to the Policy's adoption are sufficient to support a finding of discriminatory intent. Plaintiffs allege that starting in at least 2007, transgender people could amend the sex designation on their birth certificates. But after Governor Stitt learned about a settlement permitting a nonbinary person to have a gender-neutral designation, he stated, "I believe that people are created by God to be male or female. Period."[11] App. at 22. He also promised to protect "Oklahoma values" and shortly thereafter issued an Executive Order stating that Oklahoma law does not "provide OSDH or others any legal ability to in any way alter a person's sex or gender on a birth certificate." *Id.* Plaintiffs also allege that Governor Stitt and his office "specifically instruct[ed] OSDH officials that they cannot correct the birth certificates of transgender people to reflect their male or female gender identity." *Id.* at 23. OSDH officials cited the Executive Order when denying Plaintiffs' applications for amended birth certificates.

This sequence of events demonstrates that the Policy was implemented "at least in part 'because of'" the effect it would have on transgender people. *See Feeney*,

---

[11] These events may also show purposeful discrimination against nonbinary people. But that does not negate Plaintiffs' equal protection claim because they need not allege the Policy was motivated solely by an intent to discriminate against transgender people. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (stating discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group").

442 U.S. at 279. When read in context, Governor Stitt's statement about God creating people to be male or female demonstrates disfavor with people amending their birth certificates to change the sex designation. And Governor Stitt made this statement shortly before directing OSDH to stop amending the sex listed on transgender individuals' birth certificates.

In response, Defendants contend that "expressing religious beliefs cannot possibly be considered invidious, given our country's rich tradition of religious freedom and expression." Appellees' Br. at 23. But Plaintiffs are not challenging the Governor's right to express his beliefs. They are merely highlighting his statements to show the intent of the Policy is to target transgender people. *See Vill. of Arlington Heights*, 429 U.S. at 268 (stating that "legislative or administrative history may be highly relevant" to discriminatory intent, "especially where there are contemporary statements by members of the decisionmaking body").

Defendants also argue Governor Stitt's statements are irrelevant because they "cannot be assigned to a law duly enacted by a separate branch of government." Appellees' Br. at 23. This argument builds on Defendants' contention that Plaintiffs are really challenging Okla. Stat. tit. 63, § 1-321(H), which was enacted after Governor Stitt's Executive Order. But Plaintiffs allege that the Policy, not § 1-321(H), prevents them from obtaining amended birth certificates. Recall that § 1-321(H) simply limits sex designations on birth certificates to male or female, without speaking to requests to change from one approved sex designation to the other in an amended birth certificate. Okla. Stat. tit. 63, § 1-321(H). Accordingly,

Governor Stitt's statements are germane because Plaintiffs are challenging a policy he set in motion that precludes OSDH from issuing birth certificates with amended sex designations.

We are not persuaded, however, of the relevance of one allegation Plaintiffs rely on in support of their claim of purposeful discrimination. Plaintiffs allege that the day after Governor Stitt's public statements, the OSDH Commissioner "announced his unexpected 'resignation.'" App. at 22. Plaintiffs argue this was a departure from normal procedures evincing the Policy's discriminatory intent. But Plaintiffs have not alleged enough facts for us to reasonably infer the resignation was related to the Policy, let alone that it demonstrates a discriminatory intent. We thus do not consider the Commissioner's resignation as part of our equal protection analysis.

Lastly, Defendants' inability to proffer a legitimate justification for the Policy suggests it was motivated by animus towards transgender people. As we explain later, the Policy is not rationally related to a legitimate state interest. *See infra* Section II.B.2. Indeed, the Policy is wholly disconnected from Defendants' proffered justifications. *See id.* When state action cannot be explained by a legitimate state interest, it "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer v. Evans*, 517 U.S. 620, 634 (1996).

Given the Policy's disparate impact on transgender people, the events leading to the Policy's adoption, and Defendants' inability to justify the Policy as advancing

a legitimate state interest, we could conclude that the Policy "seems inexplicable by anything but animus toward" transgender people. *Id.* at 632. But even without this conclusion, Plaintiffs have sufficiently alleged the Policy was motivated by an intent to treat transgender people differently. No more is required. *See Colo. Christian Univ.*, 534 F.3d at 1260. Plaintiffs have thus adequately alleged the Policy purposefully discriminates against transgender people.

  b.  *Sex*

  Plaintiffs contend that because the Policy discriminates based on transgender status, it necessarily discriminates on the basis of sex as well. This argument relies on the Supreme Court's reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020). Defendants respond that because *Bostock* is a Title VII case, it does not apply to equal protection claims. As set forth below, we agree with Plaintiffs that *Bostock*'s reasoning applies here.[12]

  In *Bostock*, the Supreme Court considered whether it is possible to fire an employee for being transgender or homosexual without discriminating against that employee based on sex. 590 U.S. at 650–52. The case arose under Title VII, which prohibits discrimination "because of . . . sex." *Id.* at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)).

---

[12] Plaintiffs argue the Policy facially discriminates based on sex because it "cannot be stated, much less understood, without referencing sex." Appellants' Br. at 18–19. Although we agree with Plaintiffs' application of *Bostock v. Clayton County*, 590 U.S. 644 (2020), we need not decide whether the Policy is sex-based discrimination on its face.

The Court first stated it would assume that "sex" means "biological distinctions between male and female." *Id.* The Court then explained that Title VII focuses "on individuals, not groups," because it proscribes discrimination "against any *individual*" because of the "*individual's*" sex. *Id.* at 658 (quoting 42 U.S.C. § 2000e-2(a)(1)). Title VII's focus on the individual means an employer can violate Title VII even if it treats men and women equally. *Id.* at 659 ("Nor is it a defense for an employer to say it discriminates against both men and women because of sex.").

Turning to the merits, the Court held, "[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. To illustrate, the Court considered two hypothetical employees who are alike in all respects, except one is a transgender woman and the other is a cisgender woman. *See id.* If the employer fires only the transgender woman, the employer has "intentionally penalize[d]" her "for traits or actions that it tolerates in an employee identified as female at birth." *Id.* As the Court explained, "if changing the employee's sex would have yielded a different choice by the employer," then sex-based discrimination has occurred. *Id.* at 659–60.

The Court further held that even if the employer's "ultimate goal" is to discriminate against transgender employees, the employer still intentionally discriminates based on sex. *Id.* at 661–62. This is because transgender status is "inextricably bound up with sex." *Id.* at 660–61. So even if the employer's goal is to discriminate based on transgender status, "the employer must, along the way, intentionally treat an employee worse based in part on that individual's sex." *Id.* at

662. In other words, an employer who intends to discriminate based on transgender status necessarily intends to discriminate based in part on sex. *Id.* at 665 ("When an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex.").

Applied here, *Bostock*'s reasoning leads to the conclusion that the Policy intentionally discriminates against Plaintiffs based in part on sex.[13] Take Ms. Fowler, for example. If her sex were different (i.e., if she had been assigned female at birth), then the Policy would not deny her a birth certificate that accurately reflects her identity. So too for Mr. Hall and Mr. Ray—had they been assigned male at birth, the Policy would not impact them. Thus, the Policy intentionally treats Plaintiffs differently because of their sex assigned at birth. *See id.* at 660–62.

Nevertheless, Defendants and the dissent suggest several reasons for why *Bostock*'s reasoning should not apply here. For the reasons we now explain, we find none persuasive. Defendants and the dissent first suggest that *Bostock* limited its own reasoning to the Title VII context. The dissent, for example, notes that the Supreme Court stated, "The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.* at 681. Although that was the only question the Supreme Court decided, the Court did not indicate that its logic concerning the intertwined nature of transgender status and sex

---

[13] In our analysis, we use "sex" to mean sex assigned at birth. Plaintiffs allege "sex" has other definitions, but those definitions are not necessary to our conclusion.

was confined to Title VII. *See id.* at 660–61 (stating that "homosexuality and transgender status are inextricably bound up with sex").

However, the dissent contends it would have been tedious for the Supreme Court to qualify every sentence with a reminder that the analysis was limited to the context of employment discrimination. True. But the Supreme Court did not once state that its analysis concerning the relationship between transgender status and sex was specific to Title VII cases—and it could have done so without unduly encumbering the opinion. Indeed, although the employers in *Bostock* warned that the reasoning adopted by the Court would "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination," *id.* at 681, the Court did not expressly limit its analysis to Title VII. Rather, the Court stated that other laws were not before it, so it would not "prejudge." *Id.* And the Court stated it was not "purport[ing] to address bathrooms, locker rooms, or anything else of the kind." *Id.* But the Court's focus on Title VII and the issue before it suggests a proper exercise of judicial restraint, not a silent directive that its reasoning about the link between homosexual or transgender status and sex was restricted to Title VII.

Defendants also dispute the applicability of *Bostock*, calling our attention to a Sixth Circuit case declining to adopt *Bostock*'s reasoning for equal protection claims. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484–85 (6th Cir. 2023), *petition for cert. filed* (U.S. Nov. 6, 2023) (No. 23-477), *cert. dismissed in part sub nom. Doe v. Kentucky*, 144 S. Ct. 389 (2023). There, the Sixth Circuit presented two reasons for not applying *Bostock*. The court first declined to apply *Bostock* because of

"[d]ifferences between the language of the statute and the Constitution." *Id.* at 484; *see also Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228–29 (11th Cir. 2023) (declining to apply *Bostock* to equal protection claims because of linguistic differences between Title VII and the Equal Protection Clause). Our sister circuits are correct that Title VII and the Equal Protection Clause are not interchangeable. The Equal Protection Clause "addresses all manner of distinctions between persons" and "implies different degrees of judicial scrutiny." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring). In contrast, Title VII is limited to certain classifications, and it does not incorporate tiers of scrutiny. *Bostock*, 590 U.S. at 655. But we see nothing about these differences that would prevent *Bostock*'s commonsense reasoning—based on the inextricable relationship between transgender status and sex—from applying to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context. *See id.* at 660. While further analysis may preclude recovery under the appropriate level of scrutiny, the corollary between sex and transgender status remains the same.

The Sixth Circuit next concluded that "[i]mporting the Title VII test for liability into the Fourteenth Amendment also would require adding Title VII's many defenses to the Constitution: bona fide occupational qualifications and bona fide seniority and merit systems, to name a few." *L.W.*, 83 F.4th at 485. But adopting *Bostock*'s commonsense explanation for how to detect a sex-based classification does not require us to import Title VII's "test for liability." *See id.* Moreover, as Judge

White pointed out in dissent, the defenses identified by the majority are codified in separate provisions of Title VII, "thus belying any notion that those defenses must apply in equal-protection cases." *Id.* at 503 n.7 (White, J., dissenting).

Nonetheless, Defendants and the dissent argue the Policy cannot be sex-based discrimination because it applies equally to all, regardless of sex. But in *Bostock*, the Supreme Court explained that an employer discriminates based on sex even if it is "equally happy to fire male *and* female employees who are homosexual and transgender." 590 U.S. at 662.

Granted, the Supreme Court reached this conclusion after emphasizing that Title VII's use of "individual" makes it clear that the "focus should be on individuals, not groups." *Id.* at 658. At first blush, this focus on individuals may seem unsuitable to equal protection claims, which often concern group treatment. *See Engquist*, 553 U.S. at 601 ("Our equal protection jurisprudence has typically been concerned with governmental classifications that 'affect some groups of citizens differently than others.'" (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961))). But the Supreme Court has consistently held that the Fourteenth Amendment "protect[s] *persons*, not *groups*."[14] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227

---

[14] The dissent correctly notes that the Supreme Court stated the Fourteenth Amendment "protect[s] *persons*, not *groups*" to explain why even benign racial classifications are subject to strict scrutiny. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Our reasoning does not apply the Supreme Court's ultimate holding—that even members of a privileged group may assert an equal protection claim—but rather its underlying conclusion that the Constitution guarantees "the *personal* right to equal protection of the laws." *Id.* at 232 (emphasis

(1995); *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 743 (2007) (stating that Supreme Court precedent "makes clear that the Equal Protection Clause 'protect[s] *persons*, not *groups*'" (alteration in original) (quoting *Adarand*, 515 U.S. at 227)). And the Equal Protection Clause uses "person," much like Title VII uses "individual." U.S. Const. amend. XIV, § 1.

Of course, group classifications are not irrelevant to equal protection claims. An equal protection plaintiff must plausibly allege that she was treated differently and that "the different treatment was based on [her] membership in [a] particular class." *Engquist*, 553 U.S. at 594. A plaintiff may meet this burden by alleging she belongs to a group that was treated differently than another group. *See Schuette v. Coal. to Def. Affirmative Action*, 572 U.S. 291, 324 n.7 (2014) (Scalia, J., concurring) ("Of course discrimination against a group constitutes discrimination against each member of that group."). But a plaintiff may just as well allege that she, an individual, was treated differently because of her membership in a group. *See Engquist*, 553 U.S. at 594; *see also Adarand*, 515 U.S. at 229–30 ("[W]henever the government treats any *person* unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." (emphasis added)); *id.* at 227 (stating

---

added); *see also id.* at 230 (stating there is a "long line of cases understanding equal protection as a personal right"). Put differently, we are quoting the Supreme Court to explain why each Plaintiff has a personal right to equal protection and "suffers an injury when he or she is disadvantaged by the government because of his or her [sex], whatever that [sex] may be." *Id.* at 230.

38

"that all governmental action based on race—a *group* classification . . .—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed"). In other words, she need not allege that one group was treated worse than another.

Consider jury selection, for example. The Equal Protection Clause prohibits litigants from striking "potential jurors solely on the basis of gender." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994). Accordingly, "individual jurors themselves have a right to nondiscriminatory jury selection procedures." *Id.* at 140–41. This "right extends to both men and women." *Id.* at 141. It thus violates the equal protection clause to strike individual jurors because of their sex, even if one sex collectively is not treated worse than another. *See id.* at 140–42; *see also L.W.*, 83 F.4th at 482–83 (acknowledging that "sex-based peremptory challenges violate[] equal protection even though the jury system ultimately may not favor one sex over the other").

In other contexts, the Supreme Court has likewise held that equal application does not guarantee constitutionality under the Fourteenth Amendment. In *Loving v. Virginia*, for example, Virginia argued that its antimiscegenation laws did not discriminate based on race because they punished Black and White citizens equally.[15]

---

[15] Virginia's antimiscegenation laws did not criminalize the same conduct for Black and White people. *Loving v. Virginia*, 388 U.S. 1, 4 (1967). White people were prohibited from marrying all non-White people, while Black people were prohibited only from marrying White people. *Id.*; *see also id.* at 5 n.4. Nevertheless, a Black person and a White person who married each other were punished equally. *Id.* at 4.

388 U.S. 1, 8 (1967). The Court disagreed, "reject[ing] the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations." *Id.* Since *Loving*, the Court has continued to reject "equal application" arguments. *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree.").[16] For this reason, we are unpersuaded by the argument that the Policy is not sex-based discrimination if it applies equally to all sexes.[17]

   Still, the dissent maintains that Plaintiffs have sufficiently alleged only that the purpose of the Policy was to disadvantage transgender people. Thus, the dissent

---

Virginia unsuccessfully argued that this "equal application" meant there was no racial discrimination. *Id.* at 7–9.

   [16] Under the Equal Protection Clause, race-based claims are subject to a higher level of scrutiny than sex-based claims. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985). But we have no reason to believe the initial question—whether there is a classification—differs depending on the classification at issue.

   [17] The dissent relies on then-Judge Gorsuch's opinion in *SECSYS, LLC v. Vigil* to support its contention that Plaintiffs have not sufficiently alleged intentional sex-based discrimination. 666 F.3d 678 (10th Cir. 2012) (opinion of Gorsuch, J., with Murphy, J., and Brorby, J., concurring in the result). In his opinion, then-Judge Gorsuch outlined how "'traditional' class-based equal protection jurisprudence generally proceeds." *Id.* at 685. However, that case is not precedential because the other panelists concurred only in the result. *Id.* at 690. And regardless, *SECSYS* considered a claim that the plaintiff was unlawfully discriminated against because "it was willing to pay only some of an allegedly extortionate demand." *Id.* at 683 (emphasis omitted). Accordingly, the context of *SECSYS* is distinct from this case, where Plaintiffs allege the Policy discriminates against transgender people on the basis of sex. For these reasons, we do not rely on *SECSYS*.

concludes, the element of intent is unproved. The Supreme Court could have reached this same conclusion in *Bostock* and held that the employers intended to discriminate only based on transgender status, not sex. But that is not what the Court held. Rather, the Court explained that to discriminate on the basis of transgender status, "the employer must, along the way, intentionally treat an employee worse based in part on that individual's sex." *Bostock*, 590 U.S. at 662. Similarly, the Policy here cannot discriminate against transgender people without, "along the way," intentionally treating them "worse based in part on" sex. *See id.*

Moreover, we are unpersuaded that the dissent's yarmulke example demonstrates a lack of intent here. The dissent posits that if a law prohibited wearing yarmulkes, a sex discrimination claim would likely fail, even though the law has a disparate impact on male Jews. The sex discrimination claim will likely fail, the dissent explains, because male Jews cannot show the law intends to treat men differently. Even if this were true, our conclusion here regarding intent does not rest on a determination that the Policy disparately impacts men or women. Rather, applying *Bostock*'s reasoning, we conclude that because the Policy intends to discriminate based on transgender status, it necessarily intends to discriminate based in part on sex. *Id.* at 661–62. As *Bostock* explains, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. And that discrimination on the basis of sex is present irrespective of whether the targeted individual is a transgender male or transgender female.

The final argument against concluding the Policy is sex-based discrimination comes from Defendants. They remind us that binding Supreme Court precedent recognizes "biological differences between men and women." Appellees' Br. at 26. In *United States v. Virginia*, for example, the Court stated that "[p]hysical differences between men and women" are "enduring." 518 U.S. 515, 533 (1996). We agree such differences exist and that they may be relevant to whether state action passes judicial scrutiny. But those differences "cannot render" a classification "sex- or gender-neutral." *L.W.*, 83 F.4th at 505 (White, J., dissenting); *see also Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 60, 64 (2001) (applying intermediate scrutiny to a "gender-based classification" that "takes into account a biological difference between" women and men).

We thus join the courts that have applied *Bostock*'s reasoning to equal protection claims. *See, e.g.*, *Kadel v. Folwell*, 100 F.4th 122, 153–54 (4th Cir. 2024) (en banc); *id.* at 177–81 (Richardson, J., dissenting); *Hecox v. Little*, Nos. 20-35813, 20-35815, 2023 WL 11804896, at *11 (9th Cir. June 7, 2024); *LeTray v. City of Watertown*, No. 5:20-cv-1194 (FJS/TWD), 2024 WL 1107903, at *7 (N.D.N.Y. Feb. 22, 2024); *D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Ariz. 2021); *but see L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484–85 (6th Cir. 2023), *petition for cert. filed* (U.S. Nov. 6, 2023) (No. 23-477), *cert. dismissed in part sub nom. Doe v. Kentucky*, 144 S. Ct. 389 (2023); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228–29 (11th Cir. 2023); *Poe v. Drummond*, No. 23-cv-177-JFH-SH, 2023 WL 6516449, at *6 (N.D. Okla. Oct. 5, 2023), *appeal filed*, Case No. 23-5110 (10th Cir. Oct. 10,

42

2023). Accordingly, Plaintiffs have plausibly alleged the Policy purposefully discriminates on the basis of sex.[18]

## 2. Levels of Scrutiny

Although Plaintiffs have sufficiently alleged purposeful discrimination on the basis of transgender status and sex, that does not necessarily mean their claim is viable. Instead, Plaintiffs' claims must be tested under the applicable level of judicial scrutiny. *Ashaheed*, 7 F.4th at 1250.

The appropriate level of scrutiny varies depending on the classification at issue. *City of Cleburne*, 473 U.S. at 440–42. Suspect and quasi-suspect classifications receive heightened review. *Id.* at 440. Suspect classifications—race, alienage, and national origin—must pass strict scrutiny.[19] *Id.* Strict scrutiny requires that the challenged action be "suitably tailored to serve a compelling state interest." *Id.* Quasi-suspect classifications, like sex, must satisfy intermediate scrutiny, meaning the challenged action must be "substantially related to a sufficiently important governmental interest." *Id.* at 441. All other classifications must pass rational basis review, a lesser scrutiny. *Id.* at 440. Rational basis requires that the challenged action be "rationally related to a legitimate state interest." *Id.*

---

[18] Plaintiffs also argue the Policy is sex-based discrimination because it relies on sex stereotypes. We need not consider this argument because we conclude the Policy, as alleged, is sex-based discrimination under *Bostock*'s reasoning.

[19] State action that burdens a fundamental right must also pass strict scrutiny. *City of Cleburne*, 473 U.S. at 440.

Here, Plaintiffs argue intermediate scrutiny should apply because the Policy discriminates based on sex and because transgender status is a quasi-suspect class. Defendants respond that under our precedent, transgender status is not a quasi-suspect class. *See Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (unpublished); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227–28 (10th Cir. 2007), *overruled on other grounds by Bostock*, 590 U.S. at 651–52; *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995). We decline to decide whether transgender status is a quasi-suspect class because the Policy discriminates based on sex, so intermediate scrutiny applies regardless.

As we now explain, the Policy cannot pass rational basis review. It follows then that it cannot pass the more exacting intermediate scrutiny either.

a.    *Rational basis*

Under rational basis review, we evaluate whether the state action is "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. Because Plaintiffs are challenging the Policy, they "have the burden 'to negative every conceivable basis which might support it.'" *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). But "it is entirely irrelevant for constitutional purposes whether the conceived reason" was the actual motivation. *Id.* Furthermore, the proposed justification "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* Problems may also be addressed "incrementally," meaning there may be rational solutions that are

nevertheless under- or overinclusive. *Id.* at 316; *see also Vance v. Bradley*, 440 U.S. 93, 108 (1979) (explaining that a classification may be "to some extent both underinclusive and overinclusive").[20]

The district court concluded the Policy was rationally related to two legitimate state interests: "protecting the integrity and accuracy of vital records" and protecting "the interests of women." App. at 86. Defendants assert these same interests on appeal. The State Amici assert two additional interests that merit consideration. We address each asserted interest below, concluding none are rationally related to the Policy.

      i.    <u>Accuracy of vital records</u>

Defendants assert Oklahoma has a valid interest "in the accuracy [of] its own vital statistics recording facts about birth." Appellees' Br. at 47. We assume this is a legitimate state interest. Nonetheless, it is not rationally related to the Policy because even if transgender people amend the sex listed on their birth certificates, Oklahoma retains and has access to original birth certificates.

---

[20] Plaintiffs argue we should apply a "more searching" version of rational basis because transgender people are an "unpopular group." Appellants' Br. at 42; *see also Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) ("On the other hand, several courts have read the Supreme Court's recent cases in this area to suggest that rational basis review should be more demanding when there are 'historic patterns of disadvantage suffered by the group adversely affected by the statute.'" (quoting *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 11 (1st Cir. 2012))). Because the Policy fails under the ordinary rational basis standard, we need not consider whether to apply a "more searching" version.

Plaintiffs want amended birth certificates for their own use—they are not trying to prevent Oklahoma from keeping and then later accessing original birth certificates. *See* Okla. Stat. tit. 63, § 1-316(B)(2) (indicating original birth certificate is retained after adoption); Okla. Admin. Code 310:105-3-5 (indicating original birth certificate for child "born out of wedlock" is retained after a child "has been legitimated"). Indeed, Defendants do not dispute that after a birth certificate is amended, they retain access to the original. Rather, they emphasize that there are good reasons to record a person's sex assigned at birth. This is a non sequitur. Plaintiffs are not challenging Oklahoma's practice of recording sex assigned at birth or of retaining such records. Plaintiffs merely want amended birth certificates for their own use that do not require any changes to the original records kept by the state. Thus, the Policy does not ensure accuracy of "vital statistics recording facts about birth" because the same statistics are available, regardless of whether the Policy exists. *See* Appellees' Br. at 47.

Nevertheless, Defendants argue Oklahoma has an interest in ensuring that all Oklahoma birth certificates uniformly reflect sex assigned at birth. But this asserted interest is at odds with the fact that Oklahoma allows amendments to the sex designation on driver's licenses. With the Policy in place, uniformity among official state documents is lacking because Oklahomans like Plaintiffs have a birth certificate that indicates one sex and a driver's license that indicates another.

Defendants also contend sex-designation amendments are different from other permitted amendments because sex is immutable. But Oklahoma allows amendments

46

to other seemingly immutable facts—like birth parents. *See* Okla. Stat. tit. 63, § 1-316(A)(1); *see also Ray v. McCloud*, 507 F. Supp. 3d 925, 938 (S.D. Ohio 2020) (concluding an accuracy argument was unpersuasive because people are allowed to change the parents listed on their birth certificates); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1142 (D. Idaho 2018) (same).

For these reasons, the Policy is not rationally related to Defendants' asserted interest in the accuracy of vital statistics.

ii.    <u>Protecting women's interests</u>

Defendants next argue the Policy furthers Oklahoma's interest in ensuring that individuals assigned male at birth do not compete in women's athletic events. We assume this is a legitimate interest, but we nonetheless conclude it is not rationally related to the Policy.

Oklahoma bans students assigned male at birth from competing on teams designated for women or girls. Okla. Stat. tit. 70, § 27-106(E). Oklahoma enforces this ban using affidavits, not birth certificates. *Id.* § 27-106(D) ("Prior to the beginning of each school year, the parent or legal guardian of a student who competes on a school athletic team shall sign an affidavit acknowledging the biological sex of the student at birth."). Birth certificates (and thus the Policy) are irrelevant to ensuring only students assigned female at birth compete on athletic teams designated for women or girls. And again, Oklahoma keeps and has access to original birth certificates. So, even if Oklahoma required birth certificates for athletic

purposes, it could require review of the original birth certificates. Accordingly, the Policy is not rationally related to advancing this asserted interest.

###### iii.    State Amici's interests

The State Amici raise two additional interests that merit consideration: preventing fraud and conserving resources.

The State Amici first argue that the Policy helps prevent fraud: "[S]tates rely on vital records, including birth certificates, to determine a person's eligibility for benefits. States have an interest in maintaining a complete, accurate, and uniform system to make those determinations and avoid fraud." State Amici Br. at 13. The State Amici do not offer more information, so it is unclear what type of fraud the Policy supposedly prevents. It is also unclear how the amendments Plaintiffs seek create opportunities for fraud where the state keeps the original birth certificate. Further, the Policy results in transgender people, like Plaintiffs, having inconsistent identity documents, which may facilitate, rather than prevent, fraud. *See Ray v. Himes*, No. 2:18-cv-272, 2019 WL 11791719, at *11 (S.D. Ohio Sept. 12, 2019) (applying strict scrutiny and stating the court "cannot conceive" how preventing sex-designation amendments "helps prevent fraud rather than perpetuate it").

The State Amici also argue that amendments plainly "require some expenditure of state resources," and "it is up to the state to determine whether such expenditures are worth it." State Amici Br. at 13. Yet, the State Amici offer no discussion of what resources sex-designation amendments require. Nor do they explain how the Policy would rationally conserve those resources. While we do not

require "evidence or empirical data," there must be some "rational speculation." *Beach Commc'ns*, 508 U.S. at 315. Here, there is not enough information or legal argument for us to rationally speculate.

For these reasons, the Policy is not rationally related to Oklahoma's interests in preventing fraud and conserving resources.

* * *

Plaintiffs have met their burden of negating every conceivable basis that might support the Policy. To be sure, rational basis is a low bar, and the challenged state action need not be perfect. But there must be *some* rational connection between the Policy and a legitimate state interest. There is no rational connection here—the Policy is in search of a purpose.

Because the Policy does not survive rational basis review, it cannot survive intermediate scrutiny. In fact, the disconnect is even more apparent under intermediate scrutiny, which requires a substantial relationship between the Policy and the asserted interests. *City of Cleburne*, 473 U.S. at 441. For example, consider the asserted interest of conserving resources. The Policy allows other amendments to birth certificates that presumably consume state resources, yet there is no indication that the cost of processing amended birth certificates for transgender persons is meaningfully burdensome. *See Craig v. Boren*, 429 U.S. 190, 198 (1976) (citing Supreme Court cases that have "rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications").

Under the facts alleged, the Policy does not withstand scrutiny. Plaintiffs sufficiently allege a constitutional violation, and we reverse the dismissal of their equal protection claim.

### C.     Substantive Due Process

Plaintiffs allege that without amended birth certificates, they are forced to involuntarily disclose their transgender status when showing their original birth certificates to third parties. Plaintiffs contend these involuntary disclosures violate their right to privacy guaranteed by the Fourteenth Amendment's Due Process Clause. The district court correctly dismissed this claim because Plaintiffs have not plausibly alleged state action.

The Due Process Clause prohibits "any *State*" from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1 (emphasis added). Thus, the Due Process Clause "erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948).

Additionally, Plaintiffs bring their claim under 42 U.S.C. § 1983, which requires "(1) deprivation of a federally protected right by (2) an actor acting under color of state law." *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1160 (10th Cir. 2021) (quotation marks omitted). Like the Fourteenth Amendment, § 1983 requires Plaintiffs to allege the challenged action is "fairly attributable" to state action. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Gallagher v. Neil*

*Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (quoting *Lugar*, 457 U.S. at 937).

The state action requirement is implicated when a plaintiff alleges that a state actor is liable for the actions of a private party. *See, e.g.*, *VDARE*, 11 F.4th at 1156. Here, Plaintiffs allege Defendants are liable for Plaintiffs' disclosures. But it is not enough that Plaintiffs challenge the Policy, which is state action. This is because Plaintiffs allege their privacy rights are violated when disclosures occur; they do not allege the violation occurred when their requests to amend were denied. *See Lugar*, 457 U.S. at 937 (stating that "the conduct allegedly causing the deprivation of a federal right" must "be fairly attributable to the State"); *see also Citizens for Health v. Leavitt*, 428 F.3d 167, 178 (3d Cir. 2005) (considering whether there was state action because although the plaintiffs challenged a rule promulgated by the Secretary of Health, the alleged injury was disclosure of medical information "by third parties"). To adequately plead Defendants are liable for Plaintiffs' involuntary disclosures, Plaintiffs must plausibly allege that those disclosures amount to state action. *See VDARE*, 11 F.4th at 1160.

We have articulated several tests for evaluating when action by a third party constitutes state action, including the "nexus test." *Gallagher*, 49 F.3d at 1448. We

evaluate Plaintiffs' claim under the nexus test because it is most appropriate for the facts of this case.[21]

"Under the nexus test, a plaintiff must demonstrate that 'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.'" *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). This requirement ensures "that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). A state "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.*

*VDARE Foundation v. City of Colorado Springs* is a useful demonstration of the nexus test. 11 F.4th at 1160–68. The plaintiff in *VDARE* was a nonprofit foundation that educated people about "the unsustainability of current U.S. immigration policy." *Id.* at 1156. The nonprofit reserved a private resort in Colorado Springs, Colorado, for a conference. *Id.* Over four months after the reservation, there were violent protests in Charlottesville, Virginia, following a political rally. *Id.* at 1157. Days after those protests, the Colorado Springs Mayor issued a public

---

[21] The other tests are the "public function test," the "joint action test," and the "symbiotic relationship test." *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013). None of these tests are relevant to the facts of this case.

statement on the city's behalf that the city did not have the authority to "direct private businesses" like the resort "as to which events they may host." *Id.* It then "encourage[d] local businesses to be attentive to the types of events they accept and the groups that they invite." *Id.* The statement further explained that the city would "not provide any support or resources" to the nonprofit's event. *Id.* The day after this statement, the resort canceled the nonprofit's reservation, even though it had been actively coordinating with the nonprofit up to that point. *Id.*

The nonprofit sued the city, alleging the city's statement coerced the resort into canceling the reservation. *Id.* at 1157–58. The district court dismissed the complaint, and we affirmed on appeal, concluding the resort's decision to cancel the reservation was not state action. *Id.* at 1158, 1160. We concluded there was not a sufficient nexus because the mayor's statement did not threaten, order, or intimidate the resort into canceling the reservation. *Id.* at 1164–68. Thus, the resort's decision was its own, and the nonprofit had not plausibly alleged state action. *Id.* at 1168.

Like the resort in *VDARE*, Plaintiffs have not alleged Defendants threatened, ordered, or intimidated them into disclosing their birth certificates. They do allege third parties require birth certificates, but they do not allege those third-party requirements amount to state action. And although Defendants are likely aware third parties will require birth certificates, that is not enough under the nexus test—"Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum*, 457 U.S. at 1004–05. Consequently, Plaintiffs have

not alleged that Defendants "exercised coercive power" or "provided such significant encouragement, either overt or covert," that Plaintiffs' disclosures "must in law be deemed" state action. *See id.* at 1004.

Nevertheless, Plaintiffs cite other cases where courts held a transgender plaintiff's right to privacy was violated because the state would not issue amended identity documents. But none of those cases considered the state action requirement. *See Ray*, 2019 WL 11791719, at *10 ("While ODH is not the entity requiring disclosure or the entity actually disclosing the information, the threat of disclosure is imposed indirectly by the government through its birth certificates."); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) ("By permitting plaintiffs to change the name on their birth certificate, while prohibiting the change to their gender markers, the Commonwealth forces them to disclose their transgender status in violation of their constitutional right to informational privacy."); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (concluding plaintiffs sufficiently pled the state violated their right to privacy by making it unduly burdensome to change the sex listed on state-issued IDs); *K.L. v. Alaska*, No. 3AN-11-05431 Cl., 2012 WL 2685183, at *6 (Alaska Sup. Ct. Mar. 12, 2012) ("Here, however, the fact that the DMV currently has no procedure allowing licensees to change the sex designation does not *directly* threaten the disclosure of this personal information. Nevertheless, the Court finds that such a threat is imposed *indirectly*."). As a result, they are not persuasive.

Additionally, Plaintiffs argue that "the government cannot force people to choose between a valuable benefit and a constitutionally protected right." Appellants' Br. at 40. But the cases they cite rely on the unconstitutional conditions doctrine, which states that the government cannot withhold benefits—such as tenure or a land-use permit—as a punishment for exercising constitutional rights. *See Perry v. Sinderman*, 408 U.S. 593, 598 (1972) (holding "that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights"); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599, 606 (2013) (holding that it was unconstitutional to deny a land-use permit to an applicant who would not yield his land). Plaintiffs have not alleged that a benefit was withheld because they exercised a constitutional right. Thus, the unconstitutional conditions doctrine is inapplicable.

Plaintiffs also contend that privacy violations may "occur even where no third-party disclosure occurs at all." Appellants' Br. at 40. In support, they cite *Lankford v. City of Hobart*, 27 F.3d 477, 479–80 (10th Cir. 1994). In *Lankford*, the plaintiff alleged that a police chief unlawfully seized her medical records from a hospital without a warrant and without her consent. *Id.* at 479. Plaintiffs here have not alleged that Defendants unlawfully accessed their private information, so *Lankford* is inapplicable. Similarly, Plaintiffs cite a case where teachers violated a student's right to privacy by requiring her to answer questions about her "sexual orientation, virginity, and sexual practices." *Botello v. Morgan Hill Unified Sch. Dist.*, No. C09-02121 HRL, 2009 WL 3918930, at *4–5 (N.D. Cal. Nov. 18, 2009). Plaintiffs here

have not alleged Defendants directly required them to disclose private information, so *Botello* is inapposite.

Finally, Plaintiffs argue that Defendants are liable under a proximate cause theory. Plaintiffs do not explain why a proximate cause analysis should supplant our nexus test. But more importantly, they raised this argument for the first time in their Reply Brief, affording Defendants no opportunity to respond. Plaintiffs have waived any argument based on proximate cause. *Anderson v. U.S. Dep't of Lab.*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue.").

Plaintiffs have adequately alleged that transgender people without amended birth certificates face difficult choices. But to assert a substantive due process claim, Plaintiffs needed to allege that their involuntary disclosures amount to state action. They failed to do so. We therefore affirm the district court's dismissal of Plaintiffs' substantive due process claim.

### III.     CONCLUSION

Plaintiffs stated a plausible equal protection claim. We thus REVERSE the district court's dismissal of Plaintiffs' equal protection claim and REMAND for proceedings consistent with this decision. But we AFFIRM the dismissal of Plaintiffs' substantive due process claim because Plaintiffs have failed to allege state action.

23-5080, *Fowler v. Stitt*
**HARTZ**, J., dissenting in part.

I join all but § II.B.1.b of the majority opinion. In particular, I agree that the Policy unconstitutionally discriminates against transgender persons because (1) the denial of a right to obtain an amended birth certificate with a revised gender identity disadvantages and was intended to disadvantage transgender persons and (2) there is no reasonable justification for the discrimination.

I part company with the majority, however, when it declares that it would apply intermediate scrutiny to the Policy on the ground that it comes within the doctrine that requires such scrutiny under the Equal Protection Clause because it discriminates on the basis of sex. The seminal Supreme Court decision on sex discrimination held that "a mandatory preference to members of either sex over members of the other" violates the Clause. *Reed v. Reed*, 404 U.S. 71, 76 (1971). That doctrine has been invoked to invalidate a generally applicable law only when the law has intentionally treated males and females differently, to the detriment of one of the sexes. *See, e.g.*, *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) ("Prescribing one rule for mothers, another for fathers, . . . is of the same genre as the classifications we declared unconstitutional in [*Reed* and four other cases].") Yet no one could say that the Policy intentionally discriminates against males, or that it intentionally discriminates against females. The Policy treats males and females (whether determined at birth or at present) identically. Which sex was intentionally discriminated against?

The majority relies on the Supreme Court opinion in *Bostock v. Clayton County*, 590 U.S. 644 (2020), as establishing that any discrimination on the basis of transgender status is *ipso facto* discrimination on the basis of sex. But that opinion addressed an employment claim under Title VII, not a challenge to a generally applicable law under the Equal Protection Clause. As will be apparent from the following discussion, the analysis employed in *Bostock* is different in essential respects from the type of analysis required for the present challenge under the Equal Protection Clause.

The *Bostock* analysis showed that an employer's adverse employment action against a transgender person necessarily discriminated against the employee on the basis of gender at birth, which it deemed discrimination on the basis of sex. The Court emphasized that its focus should be on the individual employee, not the group (the class) to which the employee belonged. That is, the question was whether the individual employee would have been treated differently if the employee was of a different sex, not whether the employer in general treated one sex better than the other. *See id.* at 658–59. It then explained as follows why an employee discriminated against for being transgender was *ipso facto* also being discriminated against because of the employee's birth gender.

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Id.* at 660. In short, the employer discriminates based on sex when it decides whether to fire an employee for particular behavior depending on whether the employee was born

male or female. The employee is allowed to do something if he was born a male but not if he was born a female. This establishes that two otherwise identical employees are treated differently depending on birth sex.

I recognize that there is language in *Bostock* that, out of context, could be read to say that any transgender discrimination is always prohibited discrimination on the basis of sex. But who wants to read an opinion in which every sentence is qualified by the language "in the context of employment discrimination under Title VII"? The language in the above-quoted paragraph of *Bostock* translates well to all examples of Title VII employment discrimination against transgender persons. In all such employment-discrimination cases one could show that but for the injured employee's gender at birth, the injury would not have occurred. The approach taken by the Court in *Bostock*, however, does not translate to the circumstance we confront in this case. As a lower court, we should be most reluctant to reject the reasoning of a Supreme Court opinion even when used in a different context. But when that reasoning is not a good fit in the context before us, we need not blindly apply the Court's conclusions to that different context. As the *Bostock* opinion states in response to a parade of horribles that allegedly would follow from the ruling in that case, "The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.* at 681. To be sure, the opinion does not list contexts in which its analysis would not apply. And there are some contexts—such as an equal-protection claim by someone fired by a government employer—in which the *Bostock* analysis is likely applicable. But

resolving the game-changing issue in *Bostock* was surely enough work for the day. The Court could not possibly envision all the contexts in which its language might be invoked; and even if some other contexts could be anticipated, there was no need for the Court to think through and resolve other issues. Hence, the cautionary "The only question before us" language. We ignore that language at our peril.

The essential difference between *Bostock* and the circumstances presented here concerns proof of intent. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). In *Bostock* an inference of the requisite intent is compelling. The employer must be thinking, "I am firing this woman for misconduct (or appearance) only because of her biological (birth) gender, since I would not be firing her if her birth gender had been female." For this reason, *Bostock* could say, "[A]n employer who discriminates on these grounds inescapably *intends* to rely on sex in its decisionmaking." 590 U.S. at 661. The requisite intent may also be obvious with respect to a generally applicable law, as when the law on its face treats members of a class differently from others. But when, as with the Policy, the generally applicable law does not on its face distinguish between classes of people, proof of intent is more complicated. After all, there may be many unintended consequences of a generally applicable law, and the law may have a disparate impact on a class that was not the purpose of the law.

Relying on Supreme Court decisions such as *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), the author of *Bostock* summarized the

4

proper analysis to establish the intent of a generally applicable law in an opinion while on this court. It describes the first step courts take in conducting equal-protection analysis of such a law (the second step is whether the alleged discrimination is justified, which is not relevant to this partial dissent): "First, we ask whether the challenged state action intentionally discriminates between groups of persons. Discriminatory intent, however, implies more than intent as volition or intent as awareness of consequences. It requires that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' the law's differential treatment of a particular class of persons." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012) (Gorsuch, J.) (citations, ellipsis, and internal quotation marks omitted). In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action." *Id.*

The opinion then describes how one may prove the intent necessary for this type of equal-protection violation: "Intentional discrimination can take several forms. When a distinction between groups of persons appears on the face of a state law or action, an intent to discriminate is presumed and no further examination of legislative purpose is required." *Id.* But "when the law under review is generally applicable to all persons, no presumption of intentional discrimination arises; proof is required. This is so because many laws, perhaps most and often unavoidably, affect some groups of persons differently than others even though they involve no *intentional* discrimination." *Id.* "Disparate impact, then, is not necessarily the same thing as discriminatory intent." *Id.* at

686. On the other hand, "while laws of general applicability may not be subject to a presumption of intentional discrimination, neither are they shielded from scrutiny. If the evidence shows that a generally applicable law was adopted at least in part because of, and not merely in spite of, its discriminatory effect on a particular class of persons, the first essential step of an equal protection challenge is satisfied." *Id.*

Turning to the case before us, the Policy is facially neutral. It applies generally to all persons. *No one* can obtain an amended birth certificate that changes gender. This does not, however, immunize the policy from an equal-protection attack. The majority opinion establishes that the Policy violates the Equal Protection Clause because it *intentionally* harms transgender persons. Where I disagree with the majority is in their conclusion that the Plaintiffs have also established a sex-discrimination equal-protection claim. The element of intent to disadvantage a class (male or female) is unproved.

The yarmulke example in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), can illustrate the shortcomings of the sex-discrimination analysis in the majority opinion. I will assume, contrary to some current practice, that only *male* Jews wear yarmulkes. Say, a statute prohibits the wearing of yarmulkes. Although the statute is facially neutral with respect to religion, I agree with the suggestion in *Bray* that an examination of the surrounding circumstances of enactment of the statute would almost certainly demonstrate the requisite intent to disfavor Jews. But what about discrimination on the basis of sex? Could a Jewish male succeed in a claim of sex discrimination, arguing that he is not able to fully practice his faith, whereas if just his sex were changed, leaving every other relevant attribute the same (in other words, if he were a female Jew),

6

the law would have no effect on the practice of his faith? This argument mirrors the analytic approach of *Bostock*, which focuses on the circumstances of the individual employee (rather than on the class to which the employee belongs)—he would be disadvantaged in comparison to someone identical to him in every way except sex. But that is not enough to establish an equal-protection challenge to a generally applicable law. In this context the court looks to see whether males as a class are the object of an intent to discriminate. In the words of then-Judge Gorsuch, the term *intent* when used in assessing this kind of an equal-protection violation "implies more than intent as volition or intent as awareness of consequences. It requires that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of the law's differential treatment of a particular class of persons." *SECSYS*, 666 F.3d at 685 (citation, ellipsis, and internal quotation marks omitted). Establishing a sex-discrimination equal-protection claim against the yarmulke law would require a showing that the discriminatory impact on males was the consequence of an *intent* to disadvantage males. That would be hard to demonstrate, given that Jewish males are a very small fraction of the total population of males. *See, e.g.*, *Feeney*, 442 U.S. at 276–81 (rejecting claim that statute providing veterans' preference for state civil-service jobs reflects a gender-based discriminatory purpose depriving women of equal protection); *id.* at 281 (Stevens, J., concurring) (noting that that there were many disadvantaged females (2,954,000) but there were also many disadvantaged males (1,867,000)).[1]

---

[1] Rather than applying the Supreme Court's approach, summarized by then-Judge Gorsuch in *SECSYS* (quoted at length above), to determining intent in an equal-protection

Here, Ms. Fowler (just as the other two Plaintiffs) brings both a transgender-discrimination claim and a sex-discrimination claim against the Policy. Her theory behind the first claim is that as a transgender woman she is being discriminated against because she cannot obtain a birth certificate that reflects her present gender. In support of her sex-discrimination claim, she states that she is treated differently than a comparator with a present identity as a female whose birth identity was also female because the comparator already has a birth certificate reflecting her present gender identity. The record supports Ms. Fowler's transgender-discrimination claim because the intended effect of the Policy was to disadvantage transgender persons in obtaining birth certificates reflecting their present identity. As the panel opinion establishes, the requisite intent was present in

---

challenge to a generally applicable statute, the majority apparently believes that the approach need not be applied because the Equal Protection Clause "protects persons, not groups," so it can simply adopt the reasoning of *Bostock* that resolved a claim of discrimination by an individual employer. Maj. Op. at 38 (cleaned up). But I know of no authority for that approach in resolving equal-protection challenges to generally applicable laws. To be sure, that quoted language appears in two Supreme Court opinions addressing equal-protection challenges to generally applicable laws. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 743 (2007). But intent was not at issue in either case, since the generally applicable laws at issue discriminated on their face on the basis of race. Rather, the quoted language was part of the Supreme Court's explanation why strict scrutiny should apply to any race discrimination, even discrimination purportedly justified by beneficent reasons. The point being made, as I understand it, was that an individual can invoke the protections of the Equal Protection Clause under the same standards as anyone else, even if the individual might be considered a member of a privileged group. *See Schuette v. Coal. to Def. Affirmative Action*, 572 U.S. 291, 324–25 (2014) (Scalia, J., concurring) (invoking proposition that Fourteenth Amendment "protects persons, not groups" in rejecting the proposition that the Equal Protection Clause protects only "particular groups" and that only laws "burdening racial minorities" deny equal protection (cleaned up)).

promulgating the Policy. But I see no evidence of the requisite intent in promulgating the Policy to disadvantage either males or females. No person, either male (at birth or at present) or female (at birth or at present) can obtain an amended birth certificate changing gender. As I asked at the outset of this partial dissent, which sex is discriminated against? *Bostock* cannot help Plaintiffs here, because it did not address a generally applicable law and resolving the Title VII claim in that case did not call for an answer to that question.

The sex-discrimination issue in this case is a difficult one. But I must respectfully dissent. Perhaps one day we will get clarification from the Supreme Court.